**RYAN W. STITT**
California State Bar No. 273651
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Ryan_Stitt@fd.org

Attorneys for Defendant
FERNANDO GIRARTE-ALCALA

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.:  20MJ20121-KSC |
| Plaintiff, | Hon. Karen S. Crawford |
| | Date: TBD |
| v. | Time: TBD |
| FERNANDO GIRARTE-ALCALA, | MR. GIRARTE'S MOTION TO |
| Defendant. | PREVENT UNLAWFUL CIVIL ARREST AND TO DISMISS THE COMPLAINT BECAUSE § 1325 VIOLATES EQUAL PROTECTION UNDER *ARLINGTON HEIGHTS* |

## I.    Statement of facts

Mr. Girarte is charged with illegal entry, has posted bond, and has remained on bond without an issue since January 28, 2020. Now, Mr. Girarte is ordered to appear in court for trial on November 6, 2020. It is highly likely that immigration officials plan to effectuate a warrantless removal arrest in this courthouse on the date of Mr. Girarte's trial. It is routine in the Southern District of California for immigration officers to be present at court hearings and to arrest defendants in the courtroom or courthouse in order to place the defendant in civil removal proceedings.[1] As explained below, civil deportation arrests at a courthouse, or

---

[1] In response to a similar motion, the government represented to Judge Schopler that the threat of immigration arrest at the courthouse following trial in a

against a party headed to or departing from a courthouse for official business, are prohibited and violate Mr. Girarte's constitutional rights and legal privileges. Mr. Girarte requests that the Court resolve this motion sufficiently in advance of trial so that he can seek interlocutory review if the motion is denied. He files a motion for a stay with this filing should the Court deny the motion to preclude unlawful civil arrest at trial.

In addition, Mr. Girarte moves to dismiss the charges because § 1325 was passed with a discriminatory purpose. Attached are extensive exhibits, which are explained in detail below. The exhibits are largely historical material that was part of the congressional record when the statute was enacted. The exhibits are included for the Court's convenience because they are not easily available on traditional search engines like Westlaw due to their age.

## II. The Court should exercise its supervisory authority to prevent Mr. Girarte's unlawful and unconstitutional civil arrest at court

The Court has broad supervisory powers that it should exercise to ensure that Mr. Girarte is not irreparably injured by civil deportation arrest at the courthouse. As argued below, civil deportation arrest while a defendant or witnesses is coming to, present at, or leaving from court on official court businesses violates long-standing common law principles as well as Mr. Girarte's Sixth Amendment and Due Process rights.

"It is within a judge's power— indeed, it is his obligation— to 'protect the sanctity and dignity of . . . courtroom proceedings.' '" *Gregory v. Thompson*, 500 F.2d 59, 64 (9th Cir. 1974) (quoting *Mullins v. Oakley*, 437 F.2d 1217, 1218 (4th

---

misdemeanor illegal entry case is "speculative." *See United States v. Oregal-Orozco*, 19-mj-24594-AGS, Dkt. No. 39. In response, Mr. Oregal submitted signed declarations from numerous defense counsel documenting the long history of immigration arrests in the courthouse. *See id.*, Dkt. No. 43, Exhibits A-E. Mr. Girarte will make a similar showing in this case if the government persists in arguing that civil deportation arrests following trial for misdemeanor illegal entry are speculative.

Cir. 1971)).   Accordingly, "judges exercise substantial discretion over what happens *inside* the courtroom."  *United States v. W.R. Grace*, 526 F.3d 499, 509 (9th Cir. 2008) (emphasis in original) (quoting *United States v. Simpson,* 927 F.2d 1088, 1091 (9th Cir.1991)).   The certainty of an unlawful civil arrest at the conclusion of Mr. Girarte's case causes present and continuing harm to Mr. Girarte's rights and this Court's interest in fair proceedings.  This Court can and must act now to prevent that ongoing harm.

### A. Civil deportation arrests at courthouses violate a longstanding common law privilege protecting people from civil process coming to, attending, and departing from court for official court business.

There is a long-standing common law prohibition on the civil arrest of people going to, present at, or departing from court.  *See Stewart v. Ramsay*, 242 U.S. 128, 129 (1916). The Supreme Court in *Stewart* addressed whether a witness and plaintiff may be served with civil process while attending court for official business. "The true rule, well founded in reason and sustained by the greater weight of authority, is, that suitors, as well as witnesses, coming from another State or jurisdiction, are exempt from the service of civil process while in attendance upon court, and during a reasonable time in coming and going." *Id*. at 129. Four recent decisions from district courts have applied *Stewart* and the common law privilege against civil courthouse arrest to prohibit immigration officials from engaging in exactly the type of arrest Mr. Girarte seeks to prevent in this motion. *See infra* Section II.A.3 (discussing cases).

### 1. Deportation arrests are civil arrests – they are not criminal.

Immigration arrests can be civil or criminal, and the distinction is important to keep straight. Mr. Girarte was criminally arrested and charged with an immigration violation at the start of this case. By contrast, the arrest by immigration authorities at issue in this motion is an arrest to place Mr. Girarte in deportation proceedings, which is a civil, not criminal, proceeding. *I.N.S. v. Lopez-Mendoza*,

468 U.S. 1032, 1039 (1974) (holding that deportation proceedings are "purely" civil); *Arizona v. United States*, 567 U.S. 387, 407 (2012) (holding that "it is not a crime for a removable alien to remain present" in the United States and that deportation proceedings are civil even if criminal conduct is the reason for the deportation).

The case law is clear that deportation proceedings are "purely" civil proceedings, and immigration authorities must adhere to the rules attendant to civil process when enforcing a civil deportation order.

> 2.  There is a common law privilege that bars civil arrests at courthouses.

A deportation arrest of Mr. Girarte or a witness on their way to court, while at court, or for a reasonable time in departing from court on official business would violate the common law privilege that bars the civil arrest at the courthouse. This privilege is centuries old and is based on the simple premise that the justice system operates best when parties to a case show up for proceedings, and that parties won't go to court if they could be arrested once there. *See Stewart v. Ramsay*, 242 U.S. 128, 129-30 (1916); Nathan Levy., Jr., Mesne Process in Personal Actions at Common Law and the Power Doctrine, 78 Yale L.L. 52, 61-70 (1968) (summarizing the history of civil arrests).[2]

The right to be free from civil process at court was clearly recognized by the Supreme Court over one hundred years ago in *Stewart* and reaffirmed several years later in *Page Co. v. MacDonald*, 261 U.S. 446, 448 (1923). This long-standing privilege remains in effect to this day.

---

[2] This law review article is not available on Westlaw, but an open source version can be found at
https://digitalcommons.law.yale.edu/cgi/viewcontent.cgi?article=5938&context=ylj

3.   Because deportation arrests are civil procedures, the common law doctrine barring civil arrests at courthouses necessarily bars deportation arrests at courthouses.

The common law rule prohibiting civil arrests does not include an exception for civil deportation arrests. When the Immigration and Naturalization Act ("INA") was enacted in 1952, the common law privilege against courthouse arrests was squarely in place as recognized by the Supreme Court in *Stewart* in 1916. Statutes that "invade" the common law must be read as to keep the common law intact unless the statute has a contrary purpose that is evident. *United States v. Texas*, 507 U.S. 529, 535 (1993). The INA does not address courthouse arrests and it cannot be said that Congress clearly intended to overturn the longstanding common law privilege against courthouse arrest when it passed the INA.

The INA must be constrained by the longstanding rule against civil courthouse arrests because the common law privilege against civil courthouse arrests was clearly established long before the INA was passed and the INA did not contain a clear directive from Congress supplanting the common law privilege against civil arrest in court. Because this common law privilege is contained, rather than supplanted by the INA, civil deportation arrests that occur when a person is on their way to, at, or departing from official court business are impermissible because they run afoul of the long-standing common law privilege against civil arrest while attending, present at, or departing from official court business.

Four recent decisions from three district courts have all unwaveringly ruled that there is a federal and state common law privilege that bars civil deportation arrests in courthouses and also prohibits authorities from arresting participants in a case as they head to or depart from a courthouse on official business. *See Ryan v. U.S. Immigration & Customs Enf't*, 382 F.Supp. 3d 142, 146, 160 (D. Mass. 2019) (ruling that plaintiffs were likely to succeed on the merits of a claim that civil

20MJ20121-KSC
MR. GIRARTE'S MOTION TO PROHIBIT UNLAWFUL CIVIL ARREST AND TO DISMISS BECAUSE §
1325 VIOLATES EQUAL PROTECTION UNDER *ARLINGTON HEIGHTS*

immigration arrests are illegal and granting an injunction on such arrest, and holding that "[c]riminal defendants will be unable to vindicate their rights if they are taken into ICE custody prior to appearing in court or if witnesses in their defense are too fearful to visit a courthouse."); *New York v. U.S. Immigration & Customs Enf't*, 431 F. Supp.3d 377, 391 (S.D.N.Y 2019) (ruling that the common law privilege barring courthouse arrests is intact, prohibits deportation arrests and that ICE's courthouse arrest policy "deter[s] immigrants from appearing in court, thus denying them an opportunity to seek justice in their own cases and impeding civil suits and criminal prosecutions by dissuading them from serving as witnesses."); *Washington v. U.S. Dep't of Homeland Sec.*, No. C19-2043 TSZ, 2020 WL 1819837, at *26-27 (W.D. Wash. Apr. 10, 2020) (ruling that plaintiffs proved that the common law privilege barring civil arrests, including deportation arrests, at courthouses "existed at the time the INA was enacted, that Congress did not abrogate the privilege or privileges when it passed the INA, and that, in issuing their 'courthouse arrest' policy, [DHS, ICE and CBP] exceeded the authority delegated to them in the INA."); and *New York v. U.S. Immigration & Customs Enf't*, No. 19-cv-8876(JSR), 2020 WL 3067715, at *7 (S.D.N.Y. June 10, 2020) (ruling that "courthouse civil arrests are not lawful, because they contravene the common-law privilege, which the INA is best read to incorporate, that protects courts and litigants against these intimidating and disruptive intrusions."). No courts have made rulings on this issue contrary to these four decisions.

This Court should grant this motion and rule consistent with the District of Massachusetts, the Western District of Washington, and the Southern District of New York to declare that a civil deportation arrest of Mr. Girarte while Mr. Girarte is en route to, at, or departing from the courthouse for official business would violate Mr. Girarte's common law privilege against civil arrest.

**B.    The specter and likelihood of Mr. Girarte being subject to a civil deportation arrest while attending court for his criminal matter infringes on his Sixth Amendment and Due Process rights to present a defense.**

The Sixth Amendment is the bedrock of the criminal justice system and guarantees a defendant the right to a speedy and public trial. The threat of civil immigration arrest while Mr. Girarte is on his way to, present at, or departing from court on official court business chills the exercise of his right to present a defense and to call witnesses in his defense.

1.    <u>ICE's courthouse arrest directive creates a chilling effect that harms a defendant's ability to receive due process.</u>

ICE's practice of arresting defendants at courthouses in order to begin civil deportation proceedings deters Mr. Girarte from exercising his Sixth Amendment right to access the court to adjudicate his case.

Defendants have a Sixth Amendment fundamental right to access the court. Government policies, rules, and directives that deter defendants from attending court to adjudicate their case, and to defend their liberty interests interfere with this right and are illegal. *Bounds v. Smith*, 97 S. Ct. 1491, 1494 (1977); *United States v. Jackson*, 390 U.S. 570, 583 (1968); *Casey v. Lewis*, 43 F.3d 1261, 1266 (9th Cir. 1994); and *Natale v. United States*, 424 F.2d 725, 728 (9th Cir. 1970). *See also Nordstrom v. Ryan,* 762 F.3d 903, 906 (9th Cir. 2014) (holding that a jailhouse policy that deterred a defendant form communicating candidly with his attorney violated Sixth Amendment rights). ICE's civil courthouse arrests have such a chilling effect. *New York v. U.S. Immigration & Customs Enf't*, 431 F. Supp. 3d 377, 382 (S.D.N.Y. 2019).

Each time Mr. Girarte appears at court for a preliminary hearings, conference, trial, or other proceeding, an ICE officer may stalk him down corridors, watch him from the back of the courtroom, and arrest him for a civil deportation proceeding at their whimsy. The omnipresent risk of civil arrest entering, being

1  present at, and leaving court infringes on Mr. Girarte's right to be present at court

2  to vindicate his right to present a defense. It forces him to exercise his right to

3  present a defense by forfeiting his right to be free from civil arrest at court.

4          2.      Civil deportation arrests interfere with a defendant's ability to
                   present evidence from defense witnesses.

5       ICE's standing courthouse arrest directive independently intimidates defense

6  witnesses by telling them that if they show up to court to testify in favor of the

7  defendant, they may leave in handcuffs and in a fight to remain in the United States

8  as a result. The directive and the civil deportation arrests at courthouses spawned

9  by it amount to an intimidation tactics that dissuades defense witnesses from

10 appearing at court to testify and deprives Mr. Girarte of the Sixth Amendment

11 Compulsory Process Clause right to call witnesses in his defense. *Washington v.*

12 *Texas*, 388 U.S. 14, 23 (1967). The case law is clear: the defendant is deprived of

13 due process under the Sixth Amendment's Compulsory Process Clause when the

14 state interferes with a defense witness's ability to testify. *Washington*, 388 U.S. at

15 23. "The Framers of the Constitution did not intend to commit the futile act of

16 giving to a defendant the right to secure the attendance of a witness whose

17 testimony he had no right to use." *Id*. Mr. Girarte's ability to present a vigorous

18 defense, complete with testimony from exculpatory witnesses, is in jeopardy

19 because the risk of being arrested at a courthouse for deportation deters defendant-

20 friendly witnesses from appearing at court to testify.

21      The Ninth Circuit has interpreted *Washington* broadly, holding that the

22 government cannot interfere with the defense witness's "free and unhampered

23 choice to testify." *Park v. Thompson*, 851 F.3d 910, 919 (9th Cir. 2017). *See also*

24 *Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005). In order for defendants to

25 fully realize their Sixth Amendment and Due Process rights to present a defense,

26 the Court must ensure that the defendant and potential defense witnesses are not

27 deterred from attending court. Confrontation rights are irreparably harmed if a

28

defense witness is deterred from being present in court due to the threat of civil removal arrest. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). The defendant is prejudiced when the government causes a loss of material and favorable evidence. *Id.* at 868. The defendant's rights are similarly harmed when the government transfers a witness who can provide testimony favorable to the defendant beyond the realm of service of the court, which would occur if a witness was deported. *United States v. Martinez-Morales*, 632 F.2d 112, 115 (9th Cir. 1980).

In sum, civil removal arrests in the courthouse infringe on the Mr. Girarte's Sixth Amendment and Due Process rights to present a defense and call witnesses in his defense, because the threat of civil courthouse arrest chills witness participation and forces defendants to choose between exercising their right to present a defense and exercising their right to be free from civil courthouse arrest.

**III.  The Court should dismiss the complaint because the illegal entry statute was enacted with a discriminatory, continues to have a disparate impact, and is unconstitutional under *Village of Arlington Heights***

Because the facts and historical evidence presented here show that the original illegal entry law was enacted with a discriminatory purpose and still has a disparate impact, § 1325 is presumptively unconstitutional under *Village ofArlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). The burden thus shifts to the government to show that Congress would have passed the 1929 law in the absence of any discriminatory purpose. If the government cannot make this showing, the law is invalid, and the Court must dismiss Mr. Girarte's criminal charge. At a minimum, if the Court believes Mr. Girarte has not shown a discriminatory purpose and a disparate impact, it should schedule an evidentiary hearing. At this hearing, Mr. Girarte will present expert testimony as further evidence of the law's discriminatory origins. The Court should also schedule an evidentiary hearing if the government submits evidence the Court believes may be sufficient to rebut Mr. Girarte's evidence. But if the

government does not attempt to rebut his evidence, or cannot do so, the law is unconstitutional, and the Court must dismiss the complaint.

### A.     Legal framework

The Fifth Amendment of the Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. This clause contains an implicit guarantee of equal protection in federal laws identical to what the Fourteenth Amendment guarantees in state laws. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017).

A law may violate equal protection in three ways. First, a law may discriminate on its face. *See*, *e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967). Second, authorities may apply a facially neutral law in a discriminatory way. *See*, *e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Third, a legislature may enact a facially neutral law with a discriminatory purpose, which disparately impacts a disfavored group. *See*, *e.g.*, *Arlington Heights*, 429 U.S. at 265–68.

Here, Mr. Girarte challenges § 1325 only under the third rationale, so the legal framework of *Arlington Heights* applies. *Arlington Heights* clarified that the *effect* of a racially discriminatory law does not alone make it unconstitutional— challengers must also show "[p]roof of racially discriminatory *intent* or *purpose*" at the time of the law's passage. *Id.* at 265 (emphasis added). *Arlington Heights* gave a non-exhaustive list of relevant factors to consider in this determination, including:

1)     the impact of the official action and whether it bears more heavily on one race than another;

2)     the historical background of the decision;

3)     the specific sequence of events leading to the challenged action;

4)     the [legislature's] departures from normal procedures or substantive conclusions; and

5)     the relevant legislative or administrative history.

*Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (citing *Arlington Heights*, 429 U.S. at 266–68).

The threshold for satisfying these factors is low. Since legislatures are rarely "motivated solely by a single concern," a challenger need not show that the legislature's actions "rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265–66. Instead, the challenger need only show "proof that a discriminatory purpose has been a *motivating factor* in the decision." *Id.* at 265–66 (emphasis added).

Once the challenger shows that discriminatory purpose was a "motivating factor," the burden shifts to the law's defender to show that "the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21. If the government cannot show that the legislature would have enacted the offending law in the "absence of the racially discriminatory motivation," the law violates the Fifth Amendment and must be invalidated. *Id*. at 225.[3]

## B.     Congress enacted the illegal entry law with a discriminatory purpose.

A close examination of the political context underlying the criminalization of illegal entry in 1929 reveals a disturbing truth: that racism and eugenics were not only a "motivating factor" in the legislature's passage of this law. *Arlington Heights*, 429 U.S. at 265. They were the *primary* factor. And as recent Supreme Court precedent confirms, courts must consider this historical evidence in determining the statute's constitutionality.

---

[3] Courts apply strict scrutiny to laws that are "motivated by a racial purpose or object" under *Arlington Heights. Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (quotations omitted).

**C.    Under the *Arlington Heights* factors, racism and eugenics were a "motivating factor" in the passage of illegal entry laws.**

While not "purporting to be exhaustive," the five *Arlington Heights* factors constitute the "proper inquiry in determining whether racially discriminatory intent existed." *Arlington Heights*, 429 U.S. at 268. Applying these factors shows that discrimination was unquestionably a "motivating factor" in the passage of the Undesirable Aliens Act of 1929.

1.    "The historical background of the decision."

The 1920s brought a decade of immigration legislation fueled by the eugenics movement and fears of "non-white" immigration.[4] Prominent restrictionists "spoke increasingly of 'racial indigestion,'"[5] and "the 'contamination' of Anglo-American society."[6] Although the arrival of southern and eastern Europeans in the early 1900s "fueled the rise of American manufacturing," nativists saw these groups as "'undesirable immigrants'" who were "socially inferior, culturally alien, and politically suspect."[7]

These fears of non-white immigration were bolstered by the growing acceptance of eugenics—a theory that "captured the imagination of many of America's leading intellectuals."[8] At the center of the eugenics movement was Dr. Harry H. Laughlin, the director of the Eugenics Record Office.[9] Dr. Laughlin was well known for his model sterilization law that many states and countries, including the Third Reich of Nazi Germany, used as a template.[10] During the 1920s,

---

[4] *See generally* Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out of America*, 2019.

[5] Ngai, at 23.

[6] Kelly Lytle Hernández, *Migra!: A History of the U.S. Border Patrol*, 2010, at 28.

[7] Hernández, at 28.

[8] Yang, at 35.

[9] Ngai, at 24.

[10] *Harry Laughlin and Eugenics*, Truman State University. Accessible at

MR. GIRARTE'S MOTION TO PROHIBIT UNLAWFUL CIVIL ARREST AND TO DISMISS BECAUSE § 1325 VIOLATES EQUAL PROTECTION UNDER *ARLINGTON HEIGHTS*

Dr. Laughlin testified before Congress multiple times and produced four reports that discussed topics such as "race crossing," "mate selection," "fecundity," "racial composition," and the "individual quality of future population." Exhibit A, *The Eugenical Aspects of Deportation: Hearings before the Committee on Immigration and Naturalization House of Representative*, 70th Congress, Feb. 21, 1928, 2–3.

2. <u>"The specific sequence of events leading to the challenged action."</u>

In the early 1920s, Congress began to focus its legislation around the exclusion of "undesirable" immigrants—which was often code for non-white. *See Ave. 6E Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 505–06 (9th Cir. 2016) (holding that "the use of 'code words' may demonstrate discriminatory intent"). The first such law was the National Origins Act of 1924, which established quotas based on the national origins of U.S. citizens as reflected in the 1920 census. The quotas created by the National Origins Act were skewed to keep the nation's "racial strains" predominantly Anglo-Saxon, as the law on its face did not count "nonwhite people residing in the United States" toward the quotas it established.[11]

Yet there was a wrinkle in the National Origins Act—it did not set quotas on countries in the Western Hemisphere. This was due to the influence of large agricultural businesses that "relied heavily on labor from just over the border."[12] As one representative complained, too many growers were "interested in the importation of these poor peons." Exhibit B, Cong. Rec. House 3619, Feb. 16, 1929. So less than two years after passing the bill, four men began to press a new type of law that would approach immigration from a criminal—rather than a civil—angle.

---

https://historyofeugenics.truman.edu/altering-lives/sterilization/model-law/.

[11] Ngai, at 24.

[12] Hutchinson, *Legislative History of American Immigration Law, 1798-1965* (Philadelphia: University of Pennsylvania Press, 1981) 212.

3.   "The relevant legislative or administrative history."

After passage of the National Origins Act of 1924, the Department of Labor (which at that time governed the Bureau of Immigration) began implementing Congress's new quota system.[13] Then-Secretary of Labor James Davis was a strong advocate of Dr. Laughlin and his eugenics theories—even using them as the basis for policies he had developed and published.[14]

Secretary Davis was nevertheless torn between his belief in eugenics and his responsibility to maintain a large labor supply for the railroad and agriculture industries.[15] So with help from devout racist (and suspected Ku Klux Klan member) Senator Coleman Blease,[16] Davis developed a compromise—Congress would criminalize border crossing *after the fact*, rather than *prevent* it in the first place.[17] That way, they reasoned, authorities could expel Mexicans through a criminal prosecution after the growing season was over, thereby avoiding resistance from businesses that depended on Mexican labor.[18]

Secretary Davis and Senator Blease found two eager collaborators in the House of Representatives, both of whom were on the powerful Immigration and Naturalization Committee. Representative John C. Box from Texas had long characterized the goal of immigration law as "the protection of American racial stock from further degradation or change through mongrelization." Exhibit D, Cong. Rec. 2817, Feb. 9, 1928. Box was joined by the influential Chairman of the

---

[13] Hans P. Vought, *The Bully Pulpit* (Macon: Mercer University Press, 2004) 174.

[14] Vought at 174.

[15] Vought at 216.

[16] For biographical and historical context about Senator Blease, s*ee* Simon, B. "The appeal of Cole Blease of South Carolina: Race, Class, and Sex in the New South," The Journal of Southern History, Feb., 1996, Vol. 62, No. 1 (Feb., 1996), pp. 57-86. Accessible at: http://www.jstor.org/stable/2211206.

[17] MacDougall, Ian, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*, ProPublica, June 19, 2020.

[18] *Id.*

House Immigration and Naturalization Committee, Representative Albert Johnson of Washington, for whom the 1924 "Johnson-Reed" National Origins Act was named. Chairman Johnson headed the Eugenics Research Association, a group that opposed interracial marriage and supported forced sterilizations.[19] He also proudly described his 1924 law as a "bulwark against a stream of alien blood."[20]

Within two years of the 1924 Act, Chairman Johnson convened hearings on new immigration legislation. *See* Exhibit F, Hearings Before the Committee on Immigration and Naturalization, 69th Congress, Hearing 69.1.3., Jan. 12, 1926. The following month, the same House committee held a hearing on "The Eugenical Aspects of Deportation," where the principle witness was the well-known eugenicist Dr. Laughlin. Exh. A, at 1. Early in the hearing, Chairman Johnson praised Dr. Laughlin's prior reports to Congress on race crossing, mate selection, and fecundity, describing one as a "priceless" resource that would "bear intimately on immigration policy." Exh. A at 3.

Dr. Laughlin testified about his latest eugenics report, the goal of which was to "protect American blood from alien contamination." Exh. A at 3. When Dr. Laughlin encouraged the committee to conduct future research on the effect of "race crossing within the United States," Chairman Johnson replied that such a study would "be of great use to the committee in its deliberations." Exh. A at 11.

Dr. Laughlin even compared the drafters of deportation laws to "successful breeders of thoroughbred horses," who would never consider "acquiring a mare or a stallion not of the top level" for their "stud farm." Exh. A at 44. One such successful breeder he knew "weeds out from the lower levels and recruits by purchase"—a process that is "analogous to immigration in man." Exh. A at 44–45.

---

[19] Dennis Wepman, *Immigration: From the Founding of Virginia to the Closing of Ellis Island* (New York City, Facts on File, 2002), p. 242–43.

[20] Roger Daniels, *Guarding the Golden Door* (NY: Hill and Wang, 2004), p. 55.

1   "Man is an animal," Dr. Laughlin explained, "and so far as heredity and future
2   generations are concerned, there is considerable real basis for [this] comparison."
3   Exh. A at 45.

4          When such racial engineering is not possible, Dr. Laughlin warned,
5   deportation of the "undesirable individual" becomes even more critical; otherwise,
6   "we cannot get rid of his blood no matter how inferior it may be, because we cannot
7   deport his offspring born here." Exh. A at 45. Dr. Laughlin predicted that so long
8   as the nation's borders remained open to immigrants, "there will always be need
9   for deportation, or the 'final selection.'" Exh. A at 44. In response to this testimony,
10  Chairman Johnson agreed that "[i]mmigration looks more and more like a
11  biological problem, and if the work of this committee results in establishing this
12  principle in our immigration policy we will be well repaid for our efforts." Exh. A
13  at 46.

14          Though Chairman Johnson's initial legislation stalled, the compromise with
15  the agricultural industry brokered by Secretary Davis and Senator Blease soon
16  made a breakthrough. On January 18, 1929, Senator Blease, on behalf of the Senate
17  Committee on Immigration, submitted a report to the full Senate recommending
18  passage of a law "making it a felony with penalty for certain aliens to enter the
19  United States under certain conditions in violation of law." Exhibit G, Report from
20  the Committee on Immigration, 70th Congress, Report No. 1456, at 1. This report
21  was accompanied by a letter from Secretary Davis on behalf of the Department of
22  Labor advocating for passage of the law. Exh. G at 2.

23          The following week, Senator Blease presented this bill on the Senate floor,
24  where he reported that Chairman Johnson had "asked me to get the measures over
25  to the House [within two days] if I possibly could." Exhibit H, Cong. Rec. 2092,
26  Jan. 23, 1929. The full Senate passed the bill with almost no discussion or debate.
27  Exh. H, Cong. Rec. 2092.

28          Two weeks later, Chairman Johnson submitted a report from the Committee

16                                           20MJ20121-KSC

of Immigration and Naturalization to the full House recommending passage of the illegal entry law. Exhibit I, Deportation of Aliens, 70th Congress, Report. No. 2397, Feb. 6, 1929. The language of the illegal entry law was virtually identical to the current version of § 1325. *See* Exh. I at 3. The bill passed, and the president signed it into law days later. Exh. B, Cong. Rec. 3621.

4.    "The legislature's departures from normal procedures or substantive conclusions."

Examining this *Arlington Heights* factor—whether a decisionmaker departs from "normal procedures or substantive conclusions"—requires courts to consider any illogical conclusions leading up to the enactment of a law that could signal a discriminatory intent. *See, e.g.*, *Ave. 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 507 (9th Cir. 2016) (citing the city's decision to "disregard the zoning advice of its own experts"). Here, Congress openly relied on the now-discredited theory of eugenics to enact immigration legislation. Both the 1924 and 1929 immigration laws drew heavily on Dr. Laughlin's belief that immigration control was a matter of racial engineering, akin to horse breeding. And while Congress ultimately repealed the eugenics-based National Origins Act of 1924," illegal entry remains one of the only laws still in effect from that era. *See* Immigration and Nationality Act of 1965, Pub. L. 89–236 (abolishing the National Origins Formula).

5.    "The impact of the official action and whether it bears more heavily on one race than another."

Within a year of the 1929 criminalization of illegal entry, the government had prosecuted 7,001 cases; by 1939, that number rose to over 44,000.[21] In each of these years, individuals from Mexico comprised no fewer than 84% of those

---

[21] *Annual Report of the Attorney General of the United States for the Fiscal Year 1939*, 37; Kelly Lytle Hernández, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771-1965*, n.6 at 138–39 (UNC Press, 2017).

convicted, and often made up as many as 99% of defendants.[22] So almost immediately, the passage of the illegal entry law bore more heavily on members of the "Mexican race" than any other nationality.

In sum, applying the five *Arlington Heights* factors shows that racism and eugenics were a "motivating factor" in the passage of the Undesirable Aliens Act. And as new Supreme Court precedent confirms, courts must consider this historical evidence in determining whether a statute is constitutional.

### D.   New Supreme Court precedent confirms that discriminatory purpose is relevant to a law's constitutionality.

Two recent Supreme Court cases confirm that a discriminatory purpose that fueled a law's original enactment remains relevant in determining its constitutionality. In *Ramos v. Louisiana*, the Court struck down a state law permitting convictions by non-unanimous juries, citing the "racially discriminatory *reasons* that Louisiana and Oregon adopted their peculiar rules in the first place." 140 S. Ct. at 1401 (emphasis in *Ramos*). Although Justice Alito argued in his dissent that both states later recodified their non-unanimity rules with no mention of race, the majority rejected the notion that this cured the laws' original animus, holding that if courts must "assess the functional benefits" of a law, they cannot "ignore the very functions those rules were adopted to serve." *Id.* at 1401 n.44. Nor could the justices' "shared respect for rational and civil discourse . . . supply an excuse for leaving an uncomfortable past unexamined." *Id.* (citation and quotations omitted).

Two months later, the Supreme Court struck down a Montana law prohibiting families from using state-sponsored scholarships at religious schools. *See Espinoza v. Montana Dep't of Revenue,* __ S. Ct. __, 2020 WL 3518364 (June 30, 2020). The majority relied on the law's "checkered tradition" of underlying religious discrimination, even though it was reenacted in the 1970s "for reasons

---

[22] Hernández, *supra* n. 6, at 138-39 (citing U.S. Bureau of Prisons, *Federal Offenders*, Fiscal Years, 1931-36.

1   unrelated to anti-Catholic bigotry." *Id.* at *9.

2          Concurring, Justice Alito invoked his *Ramos* dissent, noting its argument that

3   courts cannot examine impermissible motives underlying the original version of a

4   law where states have "readopted their rules under different circumstances in later

5   years." *Id.* at *16 (quotations omitted). Justice Alito then stated, "But I lost, and

6   *Ramos* is now precedent." *Id.* Justice Alito then provided an extensive history of

7   the anti-Catholic and anti-immigrant motives underlying Montana's law,

8   concluding that "[u]nder *Ramos*, it emphatically does not matter whether Montana

9   readopted the no-aid provision for benign reasons. The provision's 'uncomfortable

10  past' must still be 'examined.'" *Id.* at *19 (quoting *Ramos*, 140 S. Ct., at 1396,

11  n.44).

12         Here, the original illegal entry law codified in the Undesirable Aliens Act of

13  1929 has been reenacted several times, most notably in the Immigration and

14  Nationality Act of 1952.[23] But *Ramos* and *Espinoza* both confirm that not only do

15  courts examine the racial motivations of a law at the time of its passage, later

16  reenactments do not cleanse the law of its original taint.

17         The government may also argue that even if racism and eugenics were a

18  "motivating factor" in § 1325's original passage, the law currently serves other

19  legitimate purposes. But laws enacted with a discriminatory purpose cannot be

20  "cured" merely because they later satisfy a non-discriminatory purpose. *See Hunter*

21  *v. Underwood*, 471 U.S. 222, 233 (1985) (rejecting Alabama's argument that

22  "events occurring in the succeeding 80 years had legitimated" a racially motivated

23  disenfranchisement provision). Rather, when a court determines that a law's

24  "original enactment was motivated by a desire to discriminate . . . on account of

25

26  _____
    [23] *See* June 27, 1952, c. 477, Title II, ch. 8, § 275, 66 Stat. 229; Pub.L. 99-639,
    § 2(d), Nov. 10, 1986, 100 Stat. 3542; Pub.L. 101-649, Title I, § 121(b)(3),
27  Title V, § 543(b)(2), Nov. 29, 1990, 104 Stat. 4994, 5059; Pub.L. 102-232,
    Title III, § 306(c)(3), Dec. 12, 1991, 105 Stat. 1752; Pub.L. 104-208, Div. C,
28  Title I, § 105(a), Sept. 30, 1996, 110 Stat. 3009-556.

race and the section continues to this day to have that effect," the court must conclude that the law "violates equal protection under *Arlington Heights.*" *Id.*

### E. Section 1325 continues to disparately impact Mexican and other Latinx defendants.

*Arlington Heights* requires challengers to show that a law was enacted with a discriminatory purpose and disparately impacts a particular group. *See* 429 U.S. at 265. Here, not only were racism and eugenics a discriminatory purpose motivating the enactment of the first border crossing laws, such laws continue to disparately impact Mexican and other Latinx defendants.

Though no publicly available statistics exist concerning the national origin of persons prosecuted for § 1325 today, the overwhelming number of Border Patrol arrests along the southern border are of Mexicans or people of Latinx origin. In 2000, over 97% of persons apprehended at the border were Mexican. In 2005, Mexicans made up 86% of apprehensions, and in 2010, 87%.[24] In the last decade, Mexicans have made up a smaller percentage of arrestees due to increased migration from Central America, but combined, the two groups easily constitute the overwhelming majority of border crossers.[25]

Overall, these disparities are comparable to disparities that have supported other successful *Arlington Heights* challenges. *See, e.g.*, *Ave. 6E Investments*, 818 F.3d at 497 (concentrating most low-income housing in neighborhoods that are 75% Hispanic); *Arce*, 793 F.3d at 978 (targeting a program, 90% of whose enrollees

---

[24] *Border Patrol Total Apprehensions by Mexico and Other Than Mexico, 2000–2019*, https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Total%20Monthly%20Family%20Unit%20Apprehensions%20by%20Sector%20%28FY%202013%20-%20FY%202019%29_0.pdf.

[25] *U.S. Border Patrol Nationwide Apprehensions by Citizenship and Sector, 2007–2019*, https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Nationwide%20Apprehensions%20by%20Citizenship%20and%20Sector%20%28FY2007%20-%20FY%202019%29_1.pdf.

were of Mexican or other Hispanic origin). Combined with the historical evidence of the 1929 law's discriminatory purpose, this disparate impact on Mexican and Latinx immigrants satisfies the first step of *Arlington Heights*.

### F.     The burden of proof shifts to the government.

Because Mr. Girarte has shown both a discriminatory purpose and a disparate impact underlying § 1325, the burden shifts to the government to show that the Undesirable Aliens Act of 1929 would have passed "even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 266–68, 270 n.21. The Court should thus provide the government an opportunity to make this showing; if it declines to do so, the Court should dismiss the charge.

If, however, the government submits evidence showing that the 1929 law would have been enacted without a discriminatory purpose (or if the Court believes that Mr. Girarte has not shown a disparate impact and discriminatory purpose), the Court should schedule an evidentiary hearing. Courts frequently hold evidentiary hearings and trials to hear evidence on the *Arlington Heights* factors. *See, e.g., City of Memphis v. Greene,* 451 U.S. 100, 107 (1981) (noting the circuit court's remand for a trial on the issue of discriminatory purpose); *Arce,* 793 F.3d at 991.

At this evidentiary hearing, Mr. Girarte will present testimony from expert witnesses, including Dr. Kelly Lytle Hernández, Professor of History at the University of California, Los Angeles, and Dr. Benjamin Gonzalez O'Brien, Associate Professor of Political Science at San Diego State University. *See* Exhibit K, Curriculum Vitae of Prof. Lytle Hernández; Exhibit L, Curriculum Vitae of Prof. Gonzalez O'Brien. Both experts have written extensively on the Undesirable Aliens Act of 1929 and can testify about the historical events surrounding its passage. At the end of this hearing, if the government has not carried its burden to show that the crime of illegal entry would have been enacted without a racially discriminatory motive, § 1325 is unconstitutional, and the Court must dismiss the charge.

**IV.    If the Court denies Mr. Girarte's motions to prevent his civil removal arrest in court, the Court should stay Mr. Girarte's trial pending an interlocutory appeal and/or writ of mandamus to the district court**

Mr. Girarte intends to seek review before the district court if this Court denies his motion to prohibit civil deportation arrest in the courthouse and this Court should stay the criminal proceedings for resolution of this issue if it does not grant the motion to prohibit the civil arrest.

The issuance of a stay pending appeal is appropriate when the party requesting the stay demonstrates: (1) "serious questions going to the merits were raised," (2) "the balance of hardships tips sharply [in favor of the party seeking the stay]," (3) "there is a likelihood of irreparable injury" in the absence of a stay, and, (4) the stay is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011); *see also Leiva-Perez v. Holder*, 640 F.3d 962, 964 (9th Cir. 2011) (applying the *Wild Rockies* "serious questions" test to the petitioner's request for a stay pending appeal). All of these factors weigh in favor of a stay because the Mr. Girarte will suffer irreparable injury if forced to be present in court and subject to civil immigration arrest.

### A.    There are serious questions going to the merits of Mr. Girarte's case.

To receive a stay, Mr. Girarte is *not* required to show "that it is more likely than not that [he] will win on the merits." *Leiva-Perez*, 640 F.3d at 967. Instead, Mr. Girarte need only show that there are "serious questions going to the merits." *Id.* (quoting *Wild Rockies*, 632 F.3d at 1135). The Ninth Circuit has explained that this minimal standard makes sense in the context of a request for a stay because"[a] more stringent requirement would either . . . put every case in which a stay is requested on an expedited schedule, with the parties required to brief the merits of the case in depth for stay purposes, or would have the court attempting to predict with accuracy the resolution of often-thorny legal issues without adequate briefing

and argument." *Leiva-Perez*, 640 F.3d at 967. "Such pre-adjudication adjudication would defeat the purpose of a stay, which is to give the reviewing court the time to 'act responsibly,' rather than doling out 'justice on the fly.'" *Id*. (quoting *Nken v. Holder*, 556 U.S. 418, 427 (2009)).

Here, Mr. Girarte has demonstrated that there are serious questions going to whether he can lawfully be ordered to come to court while being subjected to civil immigration arrest on his way to court, while at court, or leaving from court. Moreover, the four recent district court decisions addressing this issue all agree with Mr. Girarte's position.

**B.    The balance of hardships tips sharply in favor of Mr. Girarte.**

The balance of hardships tips sharply in Mr. Girarte's favor. Issuing a stay will not result in any hardship to the government. By contrast, Mr. Girarte is currently out of custody on bond and in compliance with his bond conditions. Forcing the Mr. Girarte to move forward with trial would likely subject him to unlawful civil immigration arrest at court regardless of the result of trial.

**C.    There is a likelihood of irreparable injury in the absence of a stay.**

If the proceedings in magistrate court continue while the legality of civil courthouse arrest remains in dispute, then Mr. Girarte will be irreparably harmed in that he will forced to prepare with trial believing that his civil immigration arrest is likely to take place at the courthouse. As argued at length above, civil immigration arrests at the courthouse infringe on Mr. Girarte's Sixth Amendment and Due Process rights. Generally, the violation of a constitutional right suffices to demonstrate "irreparable harm." *See Brown v. Cal. Dep't of Transp.*, 321 F.3d 1217, 1225 (9th Cir. 2003).

**D.    The stay is in the public interest.**

There is a compelling and valid public interest that civil immigration arrests be thoroughly reviewed by the courts before Mr. Girarte's case proceeds to trial because it may impact which members of the public wish to be present for court.

1  Stripping the proceedings of the threat of civil arrest will encourage public access

2  to the courts and it is therefore in the public's best interest for the legality of civil

3  deportation arrests at the courthouse to be resolved before trial in this case.

4  **V.      Conclusion**

5          The Court should grant Mr. Girarte's motions. The Court should further

6  resolve his motion to prevent unlawful civil arrest sufficiently in advance of trial so

7  that he knows what to expect at trial. Mr. Girarte further requests that the Court stay

8  his case pending resolution of the unlawful civil arrest issue if the Court denies his

9  motion.

                          Respectfully submitted,

10

11

12  Dated:  August 7, 2020            *s/ Ryan W. Stitt*
                                      Federal Defenders of San Diego, Inc.
13                                    Attorneys for Defendant
                                      FERNANDO GIRARTE-ALCALA
14                                    Email:  Ryan_Stitt@fd.org

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MR. GIRARTE'S MOTION TO PROHIBIT UNLAWFUL CIVIL ARREST AND TO DISMISS BECAUSE §
1325 VIOLATES EQUAL PROTECTION UNDER *ARLINGTON HEIGHTS*