# Index of Exhibits

*USA v. FERNANDO GIRARTE-ALCALA*

*20MJ20121-KSC*

Page

Ex A: Immigration Committee report The Eugenical Aspects of Deportation February 21, 1926 ................................................................................. 1

Ex B: CR House 3614 February 16, 1929 .................................................. 91

Ex C: CR House 5887 April 8, 1924 ....................................................... 100

Ex D: CR House 2818 February 9, 1928 ................................................. 116

Ex E: CR House 2462 February 3, 1928 ................................................. 119

Ex F: Immigration Committee Report January 12, 1926 .......................... 122

Ex G: Senate Report No. 1456 Making it a Felony with Penalty for Certain Aliens to Enter the United States under Certain Condition in Violation of Law Jan. 17, 1929.158

Ex H: SR 5094 January 23, 1929 ........................................................... 161

Ex I:  House Report no. 2397 Deportation of Aliens February 6, 1929 .................... 163

Ex J:  CR House 3525 February 15, 1929 ................................................ 178

Ex K: Hernandez CV Current ................................................................ 191

Ex L: Gonzalez O' Brien CV .................................................................. 207

# EXHIBIT A

# THE EUGENICAL ASPECTS OF DEPORTATION

## HEARINGS

BEFORE

## THE COMMITTEE ON IMMIGRATION AND NATURALIZATION HOUSE OF REPRESENTATIVES

### SEVENTIETH CONGRESS

FIRST SESSION

FEBRUARY 21, 1928

(INCLUDING TESTIMONY TAKEN APRIL 28, 1926, WITH EIGHT APPENDICES)

STATEMENT OF
DR. HARRY H. LAUGHLIN

HEARING NO. 70.1.4



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON
89604                    1928

002

## COMMITTEE ON IMMIGRATION AND NATURALIZATION

### HOUSE OF REPRESENTATIVES

#### SEVENTIETH CONGRESS

**ALBERT JOHNSON, Washington, *Chairman***

J. WILL TAYLOR, Tennessee.
HAYS B. WHITE, Kansas.
ARTHUR M. FREE, California.
BIRD J. VINCENT, Michigan.
THOMAS A. JENKINS, Ohio.
BENJAMIN M. GOLDER, Pennsylvania.
CLARENCE MacGREGOR, New York.
GEORGE J. SCHNEIDER, Wisconsin.
ELBERT S. BRIGHAM, Vermont.
CARL G. BACHMANN, West Virginia.
KATHERINE LANGLEY, Kentucky.
J. MITCHELL CHASE, Pennsylvania.

ADOLPH J. SABATH, Illinois.
JOHN C. BOX, Texas.
SAMUEL DICKSTEIN, New York.
SAMUEL RUTHERFORD, Georgia.
JOHN W. MOORE, Kentucky.
LINDSAY WARREN, North Carolina.
JOHN M. EVANS, Montana.
R. A. GREEN, Florida.

**P. F. SNYDER, *Clerk***

II

**003**

# THE EUGENICAL ASPECTS OF DEPORTATION

————

House of Representatives,
Committee on Immigration and Naturalization,
*Tuesday, February 21, 1928.*

The committee this day met at 10.30 o'clock a. m., Hon. Albert Johnson, chairman, presiding.

The Chairman. The committee will be in order. Members of the committee will remember that on April 28, 1926, the committee authorized Dr. Harry H. Laughlin, who has been conducting some of the statistical and biological researches for the committee, to make further investigations for the committee. Up to that date three reports had been printed. On that date Doctor Laughlin made a preliminary report on the subject "The Eugenical Aspects of Deportation," and he was authorized by the committee to prepare tables and analyses concerning biological and other matters derived from studies of the deportations from the United States.

That matter is now before the committee and ready for the printer. It has occurred to the chairman that it would be well to authorize these researches to go to the printer as of this date and thereby bring them into the activities of this Congress. If there is no objection, it will be so ordered.

I think this will be found a very interesting hearing.

————

House of Representatives,
Committee on Immigration,
*Wednesday, April 28, 1926.*

The Chairman. The committee will be in order. In accordance with previous arrangement, this meeting was called in order to hear Dr. Harry H. Laughlin, of the eugenics record office of the Carnegie Institution of Washington, in a series of statements on the biological aspects of immigration. At the last meeting, if you will remember, when the doctor was present, it was agreed to set aside from that hearing his observations with regard to deportation under present laws and to make them the subject of a special hearing. If there is no objection he will proceed along that line to-day.

### PREVIOUS INVESTIGATIONS

The committee will remember also that on two or three previous occasions we authorized Doctor Laughlin to make investigations and studies for our use; Doctor Laughlin has been the expert eugenics agent for our committee since 1920, and his valuable investigations on different phases of immigration from time to time have been printed. These studies previously reported to this committee by Doctor Laughlin are as follows:

1. April 17, 1920, "Biological aspects of immigration."
2. November 21, 1922, "Analysis of America's modern melting pot."

**004**[1]

2                    EUGENICAL ASPECTS OF DEPORTATION

3. March 8, 1924, "Europe as an emigrant exporting continent and the United States as an immigrant receiving Nation."

Those are all printed in the records of the committee. Doctor Laughlin is now ready to report, as the result of his researches, on "The eugenical aspects of deportation."

The committee understands that these investigations were made at first hand under our authority, and because they have required so much study in the collection of data, in the preparation of tables and in their analysis, it is desirable that permission be granted to add tables and explanatory appendixes, and to revise the statements.

Mr. HOLADAY. Mr. Chairman, I would like to make a motion. These tables are very interesting and useful, and we shall need them in future reference.

I move that the matter that Doctor Laughlin gives us this morning, together with such tables and other data as he may prepare, be incorporated in the committee report of the hearing.

I understand that there are some matters on which he is not yet ready to report; and I include in my motion that we request him to continue his study of this matter and to include all of his data and analysis in the printed reports.

The CHAIRMAN. Gentlemen, you have heard the motion. Is there any discussion? Without objection, it will be considered ordered.

I understand that the motion which has just been made and carried provides that Doctor Laughlin, expert eugenics agent of this committee, shall go ahead with the several studies which he has on hand.

### FUTURE INVESTIGATIONS FOR THIS COMMITTEE

And just for your information, the subjects on which he is now working, in order to make future reports, are as follows (I quote from a memorandum of Doctor Laughlin's):

1. *The European sources of American immigration.*—The first material for this particular research was gathered in Europe under the joint auspices of the Committee on Immigration and Naturalization and the Department of Labor. Satisfactory data were secured from 67 of the 123 consular districts in Europe and the Near East. The completion of this investigation and the analysis of its findings for the use of the committee will depend upon a common agreement among this committee, the president of the Carnegie Institution, of Washington, and the Department of State of the United States. The facts covered by the particular survey relate to the population density, the standards of living, differential economic stress, and the racial composition of the population of each of the 123 American consular districts in Europe and the Near East, together with a record of the emigration history from each district and an examination of the current forces in the particular district which bear upon the quantity and quality of both actual and potential emigration.

Mr. HOLADAY. Mr. Chairman, I intend my motion to provide also that as to those future investigations, because the work on deportation is not yet completed, he be authorized to continue them.

The CHAIRMAN. Without objection, that authority is given.

The second study Doctor Laughlin is to make is as follows:

2. *Further study of crime among aliens.*—An extension of the researches of this subject already made in the "Analysis of America's modern melting pot." In the new study it is proposed to survey not only the State institutions for the criminalistic classes, but also to survey the field represented by the courts, the jails, and the public and private welfare organizations, and to classify foreign-born criminals by race, type, and history of crime, circumstances of immigration and naturalization, and to investigate alien crime in relation to soundness of social instincts and stress of adjustment to new environment.

**005**

EUGENICAL ASPECTS OF DEPORTATION

3. *Population increase and economic stress in relation to human migration.*—An analysis of population growth in connection with economic stress in the different countries of the world.

4. *Mate selection and race crossing in the United States.*—An investigation of the history and present trend of mate selection and an analysis of their underlying causes. This should include not only a study of wide race crossing, but also of mate selection between the more closely related racial strains and family stocks.

5. *Differential fecundity within the present American population, with particular reference to the racial composition and individual quality of future population.*—An analysis of reproduction rates of different groups of the American population.

We hope ultimately to hear and have printed reports on all these subjects, which bear intimately upon immigration policy.

Mr. JENKINS. Mr. Chairman, does Doctor Laughlin do this work for the Government?

The CHAIRMAN. He does it for us.

Mr. JENKINS. For this committee?

The CHAIRMAN. Yes. I will say that his report on "Analysis of America's modern melting pot," as printed for these hearings, was priceless and the demand for it was so great that copies of it can hardly be found now. That was printed in 1922.

Now, in giving your present report on deportation, will you please proceed in your own way, Doctor Laughlin?

## STATEMENT OF DR. HARRY H. LAUGHLIN, OF THE EUGENICS RECORD OFFICE OF THE CARNEGIE INSTITUTION OF WASHINGTON, COLD SPRING HARBOR, LONG ISLAND, N. Y.

Doctor LAUGHLIN. Mr. Chairman and gentlemen of the committee, in answer to the question asked a few minutes ago, I will state that I am not a Government official, but a member of the eugenics record office of the Carnegie Institution of Washington, which is devoted to scientific research. The chairman of this committee indicated that these researches on immigration in relation to population would be of value, and so I have made this particular study on deportation in order that I might lay the facts before this committee.

The CHAIRMAN. I suggest that you open your statement by outlining your present researches.

Doctor LAUGHLIN. In the investigation which I am reporting to-day, we made a survey of the several State and Federal custodial institutions for all types of the socially inadequate, including the feeble-minded, the insane, the criminalistic, and other classes. We studied the relation between the total number of foreign-born inmates in State custodial institutions and the number of such inmates who are deportable, by specific types and classes. We followed this with a study of the nondeportable foreign-born inmates in State institutions, by types and classes and causes of nondeportability. Then followed a comparison between the numbers of foreign-born inmates deportable and the numbers actually deported, by specific types and classes. The work included also an examination of the deportation practices of the several States, particularly in their relation to Federal procedure. Finally we made some studies on the economic and eugenic aspects of deportation.

In our immigration law and practice, deportation is the last line of defense against contamination of American family stocks by alien hereditary degeneracy. The first line of defense is the attempt to exclude certain types and classes of antisocial, and otherwise undesirable persons, from admission into the United States. Under

**006**

the perfect operation of the law, there would be no one to deport, but the fact is that many inadequates and potential inadequates have broken through our first lines, so that our last resort is to deport them, if we wish to protect American blood from alien contamination. It is not a matter of race—that is determined by the quota—but of later discovered degeneracy among the particular immigrants, regardless of race.

### SCOPE OF INVESTIGATION

The present investigation has been a first-hand study made under the direct auspices of this committee, into the several aspects of deportation.  In this study, out of 688 State and Federal institutions for the several types of the socially inadequate institutions, we received returns from 684, so that any statistical summaries which we may make from this investigation may be considered as practically complete and as fairly representative of the actual situation.  Only four—three for the delinquent classed and one for the deaf—institutions in the group did not finally make returns to these studies. These are: Rosewood State Training School, Owings Mills, Md.; House of Correction and State Prison for Women, Rutland, Vt.; Louisiana State School for the Deaf, Baton Rouge, La.; Mother Berkerdyke Home, Ellsworth, Kans.

Of the total 688 institutions, 53 are for the feeble-minded; 173 for the insane, 203 for the criminalistic and delinquent classes; 12 for epileptics; 82 for tuberculosis cases; 1 for leprosy; 42 for the blind; 30 for the deaf; 5 for the deformed or crippled; and 87 for the dependents.  These are major institutions maintained by the States and Federal Government, and do not include private institutions nor municipal institutions, such as jails and local almshouses, or county institutions for the tubercular.

The CHAIRMAN. It does not include county almshouses?

Doctor LAUGHLIN. No, sir.  It includes only State and Federal institutions, maintained directly by State and Federal Governments.

Of course the total number of institutions varies from time to time; new ones open and occasionally an old institution is closed. Most of the returns for the present survey were made during the calendar year 1925; many of them were not made until 1926.  They do not represent the exact situation at any one date, but they show the conditions severally at the time of their respective reports.

In these returns, for the 684 institutions, the authorities reported 74,170 foreign-born inmates.

In a preliminary survey which terminated January 1, 1923, we found, in 667 State and Federal institutions, where there were all classes of the socially inadequate in the United States, a total of 451,046 inmates.  Of these the institutional authorities reported knowledge of the nativity of 386,713, or 85.74 per cent; they confessed ignorance about the nativity of 64,333 inmates, or 14.26 per cent of the whole.  Of the total number of inmates of known nativity in 1922, 71,271, or 15.80 per cent, were reported as of foreign birth. It is not this figure, 71,271 for 1922, but the corresponding figure, 74,184 for 1925 and 1926, that we herewith analyze and present to the committee.

The CHAIRMAN. It is interesting to compare the 15.80 per cent of all inmates being of foreign birth with the 12.97 per cent of all our population in 1920 being of foreign birth.  It is significant that

**007**

## EUGENICAL ASPECTS OF DEPORTATION 5

while these defective aliens, whom the several States now support, were assigned a quota of zero, they have even overstepped the average run of defectiveness in the whole population by about one-fourth.

### FOREIGN-BORN INMATES OF CUSTODIAL INSTITUTIONS

Doctor LAUGHLIN. The present investigation concerns primarily the deportability of these 74,184 foreign-born inmates. (See Table I, p. 6.) If our immigration laws had worked as was intended, none of the present 74,184 inmates would have been admitted. But our first lines of defense were so broken by the alien attack that over 70,000 inadequates were found in 684 out of 688 State and Federal institutions. This disregards the additional numbers which are always found in municipal and private custodial institutions; it disregards also the number of aliens now at large in this country who are destined, shortly, to become institutional inmates.

It is apparent that, from the practical point of view, the deportation service must be greatly reinforced, both by statute defining its duties and by adequate appropriations making it physically possible to carry on the duties which are imposed upon it by law.

The CHAIRMAN. Do they differentiate in these reports as to the foreign born who are naturalized and those who are not naturalized?

### CAUSES OF NONDEPORTABILITY

Doctor LAUGHLIN. Yes, sir. This brings us to the analysis of the causes of nondeportability. In order to answer this and other questions in a definite manner, I have prepared a summary table, called Table No. 1. It shows, in condensed form, the statistical summary and analysis of this problem which deserves particular attention.

(Doctor Laughlin here displayed and explained Table No. I, p. 6.)

A very interesting feature shown by the examination of the chart consists in the fact that out of the 74,170 inmates of foreign birth, only 3,798, or 5.12 per cent, were reported as deportable; this means that 70,372, or 94.88 per cent, are not deportable. There are three reasons for the nondeportability of inadequates of foreign birth. First, the foreign-born person may be a naturalized citizen; second, he may have been in the United States more than five years; and third, he may have become inadequate from causes arising since his admission into the United States. Of these 70,372 foreign-born inmates who are reported as not deportable, the institution authorities gave the following reasons: For 15,363, or 20.71 per cent, the foreign-born inmates were naturalized. For 33,447, or 45.10 per cent, the particular aliens had been residents of the United States for more than five years. With 3,526, or 4.75 per cent, the reason assigned for nondeportability was that these persons had become inadequates from causes arising since their arrival in the United States; and for 18,036, or 24.32 per cent of the total foreign-born inmates, the institutional authorities claim nondeportability, but could give no reason why. Of course this means that for about one-fourth of the aliens, the institutional authorities of the States, which States were maintaining these alien inmates at their own expense, possessed very little information concerning the histories of their custodial charges. If a more vigorous deportation policy were in operation, doubtless much of this particular missing information would be found.

TABLE I.—*Institutional inmates, native born and foreign born, 1925–26*

| | Number of institutions | Native born | | Foreign born | | Nativity not known | | Total |
|---|---|---|---|---|---|---|---|---|
| | | Number | Per cent | Number | Per cent | Number | Per cent | |
| Feeble-minded | 53 | 36,347 | 84.2 | 1,602 | 3.71 | 5,218 | 12.09 | 43,16? |
| Insane | 173 | 148,484 | 60.43 | 53,686 | 21.97 | 43,254 | 17.60 | 245,72? |
| Criminalistic | 200 | 85,051 | 78.76 | 11,224 | 10.39 | 11,715 | 10.85 | 107,99? |
| Epileptic | 12 | 7,391 | 72.52 | 749 | 7.39 | 2,052 | 20.13 | 10,19? |
| Tuberculous | 82 | 13,478 | 74.85 | 2,608 | 14.48 | 1,920 | 10.66 | 18,00? |
| Leprous | 1 | 143 | 73.33 | 52 | 26.67 | ........ | ........ | 19? |
| Blind | 42 | 5,684 | 93.06 | 130 | 2.13 | 294 | 4.81 | 6,10? |
| Deaf | 29 | 6,382 | 91.84 | 57 | .82 | 510 | 7.34 | 6,94? |
| Deformed and crippled | 5 | 662 | 75.48 | 16 | 1.82 | 199 | 22.69 | 87? |
| Dependent | 87 | 21,254 | 54.28 | 3,746 | 9.57 | 14,155 | 36.15 | 39,15? |
| Total | ¹ 684 | 324,882 | 67.91 | 74,170 | 15.50 | 79,317 | 16.58 | 478,36? |

¹ 684 out of a total of 688 institutions supplied returns for this investigation.   (See p. 4.)

If only about 1 in 20 of the public charges of the Federal Government and of the several State governments is reported as deportable it means that 19 out of every 20 of the foreign-born inadequates in State and Federal institutions, by some way or another, not only go through our immigration sieve at our shore and border, but also have managed to circumvent deportation.   The principal remedy would seem to provide for more thorough examination into the individual and family histories of the would-be immigrant.   A great advance in this direction has been made by beginning the examination of immigrants in their home towns.   The feasibility of such examinations was first demonstrated by my studies made as a representative of the United States Department of Labor and of this committee. We made successfully such actual experimental examinations in Europe in 1923 and 1924, in perfect consonance with international law.   This procedure seems to point the way for achieving a more thorough sorting of immigrants before they take the ship for the United States.   The would-be immigrant must present his foreign passport to the American consul.   The American consul, before granting his visa, can, as we have demonstrated, require a great deal of information concerning the individual's present condition, his past history, and, if need be, the history of his family, all of which would throw a great deal of light upon the possibilities of the particular immigrant and his offspring developing into valuable citizens of the United States.   But one of the principal direct results of such requirement for more thorough overseas examination would consist in the more certain sorting out of individuals who are "likely to become public charges."

### IMMIGRANTS DEBARRED AND ALIENS DEPORTED

The CHAIRMAN. Let us have your memorandum on the relation between would-be immigrants debarred and aliens deported.

Doctor LAUGHLIN. For the fiscal year ending June 30, 1925, 294,314 aliens were admitted into the United States, according to the report of the Commissioner General of Immigration.   .

During the same year, 25,390 would-be immigrants were rejected at the ports and border.   The following table gives the classification of this latter number by causes:

### *Would-be immigrants debarred*

[From the report of the Commissioner-General of Immigration]

Without proper immigration visas (under act of 1924):

| | |
|---|---:|
| Land | 15, 989 |
| Seaport | 2, 618 |
| Likely to become public charges | 3, 029 |
| Loathsome or dangerous contagious diseases | 562 |
| Per centum limit law, extended (excess quota) | 561 |
| Unable to read | 523 |
| Contract laborers | 452 |
| Mental or physical defectives | 505 |
| Stowaways | 308 |
| Criminals | 251 |
| Under Chinese exclusion act | 188 |
| Immoral classes | 98 |
| All other classes | 306 |
| Total | 25, 390 |

Only 3,029 were rejected as likely to become public charges, only 251 as criminals, and only 505 as mental or physical defectives. Compare these figures with the actual findings in institutions in the United States. With the growth of inspection overseas, this class of would-be immigrants debarred at our gates should be greatly reduced. The removal of the necessity for such debarring is one of the greatest humanitarian advances which we could make in our immigration policy. The would-be immigrant who is ultimately to be debarred or deported should, very early in his contact with the United States consular and immigration officials, find out the truth concerning his prospect for admission. Of course, one of the greatest practical advances in this direction would consist in making it cost the transportation companies money to bring to our gates a debarable candidate for admission. If the transportation companies made money, both by bringing them to our gates and then by carrying them back again, doubtless many debarables would go through this procedure. But if it cost the companies money to bring debarables to us, they would collaborate with the United States in assorting immigrants as early as possible in the migration process.

During the same fiscal year—that is, the one which ended June 30, 1925—there were deported 9,495 persons. By causes these are listed as follows:

### *Aliens deported*

[From the report of the Commissioner-General of Immigration]

| | |
|---|---:|
| Entered without inspection | 1, 169 |
| Likely to become public charges and vagrants | 1, 759 |
| Mental diseases or defects | 608 |
| Without proper visa (under immigration act of 1924) | 2, 723 |
| Criminals | 637 |
| Unable to read | 474 |
| Under per cent limit (act of 1921) | 394 |
| Immoral classes | 327 |
| Physically defective | 174 |
| Loathsome or dangerous contagious diseases | 104 |
| Under Chinese exclusion laws | 93 |
| Entered within one year of deportation | 164 |
| All other causes | 869 |
| Total | 9, 495 |

**010**

TABLE II.—*Causes of nondeportability of foreign-born institutional inmates for all types of social inadequacy*

[From the present institutional investigation, 1925-26]

| Type of institution | Number of institutions reporting | Number of foreign-born inmates | | | | Foreign-born inmates, deportable | | | | Causes of nondeportability of foreign-born inmates | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Naturalized citizens | | | | Resident of United States more than 5 years | | | | Causes arising since admission | | | | Causes not given | |
| | | Male | Female | Total | Per cent | Male | Female | Total | Per cent | Male | Female | Total | Per cent | Male | Female | Total | Per cent | Male | Female | Total | Per cent | Total | Per cent |
| Feeble-minded | 53 | 744 | 858 | 1,602 | 100 | 12 | 9 | 21 | 1.31 | 9 | 6 | 15 | 0.94 | 343 | 583 | 926 | 57.80 | 3 | 6 | 9 | 0.56 | 631 | 39.38 |
| Insane | 173 | 29,942 | 24,044 | 53,986 | 100 | 812 | 411 | 1,223 | 2.27 | 6,383 | 5,056 | 11,439 | 21.19 | 14,276 | 11,454 | 25,730 | 47.66 | 1,223 | 392 | 1,615 | 2.99 | 13,979 | 25.89 |
| Criminalistic | 200 | 10,731 | 493 | 11,224 | 100 | 2,366 | 43 | 2,409 | 21.46 | 1,932 | 98 | 2,030 | 18.09 | 2,930 | 342 | 3,272 | 29.15 | 239 | 9 | 248 | 2.21 | 3,265 | 29.09 |
| Epileptic | 12 | 392 | 357 | 749 | 100 | 8 | 2 | 10 | 1.34 | 41 | 30 | 71 | 9.48 | 343 | 325 | 668 | 89.19 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tuberculous | 82 | 2,066 | 542 | 2,608 | 100 | 85 | 33 | 118 | 4.52 | 654 | 204 | 858 | 32.90 | 759 | 252 | 1,011 | 38.77 | 517 | 24 | 541 | 20.74 | 80 | 3.07 |
| Leprous | 1 | 45 | 7 | 52 | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 45 | 7 | 52 | 100.00 | 0 | 0 | 0 | 0 | 0 | 0 |
| Blind | 42 | 92 | 38 | 130 | 100 | 0 | 0 | 0 | 0 | 32 | 12 | 44 | 33.85 | 32 | 13 | 45 | 34.62 | 9 | 6 | 15 | 11.54 | 26 | 20.00 |
| Deaf | 29 | 30 | 27 | 57 | 100 | 2 | 1 | 3 | 5.26 | 3 | 8 | 11 | 19.30 | 18 | 15 | 33 | 57.89 | 0 | 0 | 0 | 0 | 10 | 17.54 |
| Deformed and crippled | 5 | 8 | 8 | 16 | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 6 | 12 | 75.00 | 2 | 2 | 4 | 25.00 | 0 | 0 |
| Dependent | 87 | 3,226 | 520 | 3,746 | 100 | 10 | 4 | 14 | 37 | 776 | 119 | 895 | 23.89 | 1,386 | 312 | 1,698 | 45.33 | 1,040 | 54 | 1,094 | 29.20 | 45 | 1.20 |
| Total | 684 | 47,276 | 26,894 | 74,170 | 100 | 3,295 | 503 | 3,798 | 5.12 | 9,830 | 5,533 | 15,363 | 20.71 | 20,138 | 13,309 | 33,447 | 45.10 | 3,033 | 493 | 3,526 | 4.75 | 18,036 | 24.32 |

*Aliens deported from United States for the fiscal year ending June 30, 1925*

[From the report of the Commissioner General of Immigration, 1925]

| Causes of deportability: | Number deported |
|---|---|
| Feeble-minded | 4 |
| Insane | 527 |
| Criminals | 637 |
| Epileptics | 6 |
| Under Chinese exclusion act | 93 |
| Contract laborers | 66 |

| Causes of deportability—continued. | Number deported |
|---|---|
| Unable to read (over 16 years) | 474 |
| Likely to become a public charge | 1,758 |
| All others (including persons deported for legal reasons not necessarily coupled with social inadequacy) | 5,930 |
| Total | 9,495 |

EUGENICAL ASPECTS OF DEPORTATION

Deportables fall principally into four classes in relation to the statute of limitations, mode of entry and kind of person. These classes are, first, members of excluded classes at time of entry, whose deportation is compulsory within five years after entry; second, public charges from causes existing prior to entry; and whose deportation is compulsory within five years after entry; third, entered without the consent of, or at time or place not designated by immigration officials, and whose deportation is required within three years after entry; fourth, certain classes of prostitutes, persons engaged in the white slave trade, and anarchists, whose deportation is compulsory within five years after entry.

In this study we are interested only in deportation of the socially inadequate individuals, particularly those who have become the charges of the several States on account of inadequacy of one or more of the several types shown in the tables which accompany this report. During the year 1925 the Immigration Service deported 4 persons because of their feeble-mindedness. In the 53 institutions for the feeble-minded, the present survey found 1,612 foreign-born inmates; thus we find that the relation between the number actually deported and the foreign born of this particular class is very remote. In reference to the insane, we learn that the immigration service deported, on account of insanity and all other mental conditions, except feeble-mindedness, in this year, 527 persons. Our survey found 53,986 insane persons of foreign birth in our State and Federal institutions. In 1925 the immigration service deported 637 criminals. We found in the State and Federal prisons (thus excluding jails and workhouses) 11,444 persons of foreign birth. To catch up with the intent of the law to maintain its standard of desirability for immigrants, the country will have to deport defective aliens in greatly increased numbers.

At this point it is proper to compare the findings of the present field survey with the official records of deportation made by the Secretary of Labor and the Commissioner General of Immigration.

### LIMITATIONS OF PRESENT DEPORTATION FACILITIES

The CHAIRMAN. Let us add these to our record.

In the Ninth Annual Report of the Secretary of Labor, for the fiscal year ending June 30, 1921, the Secretary says (p. 28):

The lack of a sufficient appropriation has prevented systematic overhauling of the various State and Federal charitable institutions with a view to returning deportable alien inmates to their respective countries, although this work will be prosecuted as vigorously as possible with the limited funds at hand.

In the Annual Report of the Commissioner General of Immigration for the fiscal year ending June 30, 1922, the Commissioner General says (p. 17):

Lack of funds has prevented the bureau from conducting an active campaign against aliens unlawfully resident here, and many such who were proper subjects for deportation under our laws have been permitted to remain for this reason. In fact, it may be stated that the bureau has been careful to see that the activities in this direction of its field officers have been confined to the more extreme cases where, for peculiarly good cause, deportation should be accomplished.

In the Annual Report of the Commissioner General of Immigration for the fiscal year ending June 30, 1925, this officer says (p. 9):

Of the total number of deportations effected during the year, 958 aliens were permitted to reship one way foreign as seamen in lieu of deportation, and in

fulfillment of the terms of the warrants of deportation in their respective cases. This procedure resulted in a saving to the Government of approximately $148,281.56.

In addition to the foregong, many thousands of dollars have been saved the appropriation by judiciously controlling the transportation of deportees from point to point in this country for ultimate deportation, with a view to the maximum economy.  *  *  *  Approximately $20,868 was saved in transportation costs alone in effecting, through the port of Galveston, Tex., instead of conveying them to Ellis Island  *  *  *.

Doctor LAUGHLIN. It is important to consider that while we may expect a great reduction in the number of persons rejected at the ports and border, the number of deportations has, in recent years, risen rapidly.  Both of these trends point toward greater efficiency in policy and administration.  Thus in 1921 the total number of persons deported was 4,517; in 1922, 4,345; in 1923, 3,661; and in 1924, 6,433.  This speaks well for the executive department intrusted with this work.  The advance is small, but it is in the right direction.  The deportation of all deportable persons in the United States would constitute a tremendous task and would cost much more than the funds made available by Congress for such a purpose. As a matter of fact, most deportables are permitted to remain in the country until the statute of limitations automatically transforms them into the class of nondeportables.  In the present study we are concerned primarily with institutional inmates.  The individuals who get in the institutions constitute only a minor portion of the undesirable elements.  It is known that only those inadequates who fall way below the line of efficiency into the class of helplessness or desperation are institutionalized.  These are the extreme inadequates and are always much fewer than the great border-line class, lying between competency and efficiency on the one hand and helplessness and menace on the other.  But of the 74,170 foreign-born inmates, 33,447 were given as nondeportables because of more than five years' residence within the United States.  This, as I previously stated, is 45.10 per cent of our whole number of foreign-born inadequates in the State and Federal custodial institutions.  Of these, only 3,526, or 4.75 per cent, were nondeportable because they were certified as having become inadequate from causes arising since their arrival in the United States.  Except for the statute of limitations, practically all of these inadequates would be deportable except the 3,526, for whom we take the responsibility, because we assume that their misfortunes are due to causes which arose in this country; it is assumed that they did not bring the basic causes of inadequacy with them.  It might be well to extend the statute of limitations to 10 years, making exceptions for certain classes of criminalistic persons who should never be given the advantage of this limitation.

RELATION BETWEEN NUMBER OF DEPORTABLES AND ACTUAL DEPORTATIONS

(See Table II, p. 8)

This investigation shows that not nearly all of the aliens who were found in the United States, and who are inadequate below the level set by our immigration standards, are legally deportable, and of those who are legally deportable only a small fraction are actually returned to the countries which produce them.  The situation calls for not only raising our admission standards on the basis of total numbers,

race, family stock, and individual quality, but also of keeping track of the aliens within our borders, and upon the first discovery of an alien, especially if such person is likely to become the parent of future Americans, who does not conform to our admission standards and to the standard we have set for our own citizenry, of securing his prompt return to his home country. It seems like a simple statement, but it is elementary. Our present research has covered a portion of this field in a careful manner. It is hoped that future researches will investigate other phases, particularly the trend of our national racial characteristics as the result of race crossing within the United States, and also the trend in hereditary endowment of our people in reference to those inborn capacities which we prize, regardless of race.

The CHAIRMAN. We hope that such a study will be made. It would be of great use to the committee in its deliberations.

ADMINISTRATION DISTRICTS OF THE BUREAU OF IMMIGRATION OF THE UNITED STATES DEPARTMENT OF LABOR

The CHAIRMAN. Let me suggest that you show the map of the United States which you have prepared showing the boundaries of the several immigration districts. The desire to diffuse information concerning procedure in deportation prompts me to suggest that the map which is before us (see p. 52), showing the districts and the headquarters of the immigration officers, be published in these hearings.

Doctor LAUGHLIN. We have a copy of the general order No. 2 which, on December 6, 1922, established these districts. For our own use we prepared a map showing them, but so far as I know no map has yet been published showing their boundaries, convenient for ready reference. The only map of this sort which I have seen is the one in the office of the Bureau of Immigration in Washington.

The CHAIRMAN. Without objection, this map will be printed in the record, and other plats as needed.

Doctor LAUGHLIN. This [indicating] is a map (see p. 52) of the United States which shows the administrative immigration districts of the United States; and every one of these districts has a capital, you might say, which is the headquarters of the immigration business in that district.

The CHAIRMAN. Let me interrupt you a moment to explain this map [indicating]. (See p. 52.) Of course, each person would be interested in his own district. You notice right away that the State of Washington is split in the middle and that one corner of it, apparently about the size of two or three New England States, is the western district of Washington. Now, in the institutions there, there are over 1,300 deportable people, including some, however, who have been in the institutions more than the five-year limit.

Now, that is not only highly informative, but these tables are carried out so as to show why these people are not deported, what the cost of deporting them would be, and so on. And that is shown on those tables for the whole United States. The publication of this map ought to be of use as an aid in making the necessary contacts between persons in charge of or who know of deportable aliens and the deportation officers of the United States.

**12**                    EUGENICAL ASPECTS OF DEPORTATION

### THE INTERSTATE RETURN OF SOCIAL INADEQUATES

Doctor LAUGHLIN. Closely connected with the matter of the international return or deportation of inadequates is the interstate and intercommunity return of similar classes.   We often find in the custodial institutions of one State a large number of inmates who spent most of their effective lives, if they possessed such a period at all, in some other State, but who are now being maintained, many with no hope of social or economic rehabilitation, in custodial institutions of or at the cost of some host State.   In social management and in governmental policy and in the interests of eugenical conservation there is a very important general principle of responsibility and deportation which is being developed and which has made great headway in recent years.

The CHAIRMAN. How would this principle be stated?

Doctor LAUGHLIN. It might well read this way: "Each community which produces a socially inadequate individual should be required to care for such person during the period of inadequacy."   This would prevent "dumping," if such practice exists.   It would prevent the official or unofficial encouragement of emigration of the less effective members of a community, and it would place the responsibility where it belongs socially, economically, and eugenically.   Socially, the care of a defective is certainly the duty of the family, the community, the State, and the nation which produces him.   Economically the cost should be assessed on the group responsible for him, and eugenically, it is clear that a person with defective hereditary endowment should not be permitted to leave his offspring as seed stock in other territories than his own.   Nor, for that matter, should he be permitted to reproduce at home.   But that is a domestic matter. The home territory should solve its own eugenical problems at home. While considering the United States as a whole, the matter of international deportation is a Federal matter.

The several States have it as a function of theirs to maintain social inadequates, although the Federal Government decides who may come in.   The latter Government ought, therefore, in common justice, to deport all foreign-born inadequates to the countries whence they came, when such inadequates are found being maintained at the expense of the several States.   Indeed, there is a growing tendency on the part of the several States to request permission of the Federal Government to sue the United States in equity to recover the cost of maintaining foreign-born inadequates, whom the United States has permitted to come into its Territories and whom only the United States can deport.   Doubtless, greater activity of this sort on the part of the several States would exert pressure which would animate the Federal Government to develop its deportation policy to a point of greater efficiency.

In reference to interstate deportation, our particular investigation asked four principal questions of each of the 688 custodial institutions.   We received returns from 590 of these, jointly with similar returns in reference to international deportation.   The questions and answers, tabulated by substance of answer and type of institution, are as follows.

The CHAIRMAN. We can examine the tables and print them in the hearing.

**015**

## EUGENICAL ASPECTS OF DEPORTATION   13

### A. RETURN OF CITIZENS OF OTHER STATES

**1.** When a citizen of another State is returned from your institution, to what officer in his home State is he delivered?

*Type of institution*

[NOTE.—Types of institutions: F=for the feeble-minded; I=for the insane; C=for the criminalistic and delinquent; E=for the epileptic; T=for the tuberculous; B=for the blind; D=for the deaf; Dep.=for the dependent]

| Answer | F. | I. | C. | E. | T. | B. | D. | Dep. | All others | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Sheriff | 5 | 20 | 8 | 1 | | 1 | | | | 35 |
| Institution | 4 | 39 | 7 | | 3 | 1 | 1 | 2 | | 57 |
| Relatives or friends | 5 | 5 | 17 | | | 1 | 5 | 4 | | 37 |
| No returns made | 14 | 17 | 43 | 3 | 25 | 7 | 4 | 22 | 2 | 142 |
| No answer | 8 | 11 | 38 | 1 | 14 | 13 | 9 | 17 | 1 | 112 |
| No nonresidents admitted | 5 | 1 | 11 | 1 | 15 | 9 | 4 | 21 | 5 | 72 |
| Refer us to some State department or official | 3 | 17 | 4 | 2 | 5 | | | | 1 | 32 |
| Probate judge | | 1 | | | | | | | | 1 |
| U. S. Veterans' Bureau or hospital | | 3 | | | 2 | | | | | 5 |
| No fixed rule—home, institution, or county official | | 15 | 2 | 1 | | | | | | 18 |
| Designated by authorities of receiving State | 3 | 12 | 18 | | | 1 | | | | 34 |
| Designated by authorities of returning State | 1 | 8 | 1 | | 1 | | | | | 11 |
| Probation officer | | | 8 | | | | | | | 8 |
| Police official | | | 2 | | | | | | | 2 |
| County attorney | | | 1 | | | | | | | 1 |
| No State laws on subject | 1 | | 4 | | 1 | | | | | 6 |
| Returned only when discharged or paroled | | 1 | 7 | | | | | | | 8 |
| Commissioner of charities | | | 1 | | | | | | | 1 |
| Court | | 3 | | | | | | | | 3 |
| None | | | | | 5 | | | | | 5 |
| Total | 49 | 153 | 177 | 9 | 71 | 33 | 23 | 67 | | 590 |

**2.** In such cases, what is the nature of the cooperation given by the receiving State?

*Type of institution*

| Answer | F. | I. | C. | E. | T. | B. | D. | Dep. | All others | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| None given | 3 | 7 | 14 | 1 | 7 | 1 | 3 | 2 | | 38 |
| Good cooperation | 4 | 19 | 14 | 2 | 1 | | 2 | | | 42 |
| No inmates returned | 17 | 17 | 43 | 3 | 23 | 7 | 4 | 22 | 2 | 138 |
| No nonresidents admitted | 5 | 1 | 9 | 1 | 17 | 9 | 5 | 21 | 5 | 73 |
| Acceptance of legal residents | 1 | 31 | 2 | | 2 | | | 1 | | 37 |
| Good cooperation with some States but not with others | 1 | 12 | | | | | | | | 13 |
| No answer | 12 | 23 | 47 | | 16 | 15 | 9 | 19 | 1 | 142 |
| Refer us to some State department or official | 3 | 19 | 5 | 2 | 5 | | | 1 | | 35 |
| Reciprocal agreements | 2 | 8 | 2 | | | | | | | 12 |
| Extradition | 1 | | 13 | | | | | | | 14 |
| No fixed rules or laws | | 5 | 5 | | | | | 1 | | 11 |
| Arrangements made by State department or official | | 10 | | | | 1 | | | | 11 |
| Pays expenses of return | | 1 | 5 | | | | | | | 6 |
| Call for prisoner | | | 14 | | | | | | | 14 |
| Returned only when discharged or paroled | | | 4 | | | | | | | 4 |
| Total | 49 | 153 | 177 | 9 | 71 | 33 | 23 | 67 | | 590 |

**016**

**3.** In case of such returns, who pays the transportation and other return charges?

*Type of institution*

| Answer | F. | I. | C. | E. | T. | B. | D. | Dep. | All others | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Returning State or institution | 8 | 75 | 19 | 3 | 2 | 1 | 1 | 2 | ...... | 111 |
| Receiving State | 1 | 4 | 39 | ...... | ...... | 1 | ...... | ...... | ...... | 45 |
| Patient, relatives, or friends | 4 | 8 | 21 | ...... | 2 | 1 | 4 | 3 | ...... | 43 |
| County | 1 | 2 | ...... | ...... | ...... | ...... | ...... | ...... | ...... | 3 |
| No returns made | 15 | 15 | 47 | 3 | 24 | 7 | 4 | 23 | 3 | 141 |
| No nonresidents admitted | 5 | ...... | 9 | 1 | 17 | 8 | 5 | 20 | 3 | 68 |
| Refer us to some State department or official | 2 | 19 | 5 | 2 | 5 | ...... | ...... | 1 | ...... | 34 |
| No answer | 12 | 11 | 29 | ...... | 14 | 15 | 9 | 17 | 2 | 109 |
| Each case determined on its own merits | 1 | 7 | ...... | ...... | ...... | ...... | ...... | 1 | ...... | 9 |
| U. S. Veterans' Bureau or Federal Government | ...... | 9 | 3 | ...... | 6 | ...... | ...... | ...... | ...... | 18 |
| Decided by some State department | ...... | 2 | ...... | ...... | ...... | ...... | ...... | ...... | ...... | 2 |
| No laws on subject | ...... | 1 | 5 | ...... | 1 | ...... | ...... | ...... | ...... | 7 |
| Total | 49 | 153 | 177 | 9 | 71 | 33 | 23 | 67 | 8 | 590 |

**4.** What practical rule determines whether an inmate shall be returned to his home State?

*Type of institution*

| Answer | F. | I. | C. | E. | T. | B. | D. | Dep. | All others | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Legal residence | 11 | 75 | 8 | 4 | 4 | 1 | 1 | 1 | ...... | 105 |
| Residence of family | 5 | ...... | 6 | ...... | ...... | ...... | 4 | 1 | ...... | 16 |
| No returns made | 10 | 14 | 43 | 1 | 23 | 7 | 4 | 22 | 3 | 127 |
| No nonresidents admitted | 7 | 1 | 9 | 1 | 15 | 9 | 5 | 20 | 3 | 70 |
| No answer | 9 | 15 | 31 | ...... | 14 | 15 | 9 | 18 | 2 | 113 |
| Refer us to some State department or official | 3 | 19 | 5 | 1 | 5 | ...... | ...... | 1 | ...... | 34 |
| Arrangements made by county returning patient | 1 | ...... | ...... | ...... | ...... | ...... | ...... | ...... | ...... | 1 |
| If relatives will pay transportation | 1 | 1 | 1 | ...... | ...... | ...... | ...... | ...... | ...... | 3 |
| Determined by State department | 2 | 5 | 3 | ...... | ...... | ...... | ...... | ...... | ...... | 10 |
| If permanently dependent | ...... | 3 | ...... | ...... | 1 | ...... | ...... | 1 | ...... | 5 |
| Rules of U. S. Veterans' Bureau | ...... | 5 | ...... | ...... | ...... | ...... | ...... | ...... | ...... | 5 |
| If home State will accept patient | ...... | 4 | 1 | ...... | ...... | ...... | ...... | ...... | ...... | 5 |
| State laws | ...... | 1 | ...... | ...... | 1 | ...... | ...... | ...... | ...... | 2 |
| If wanted for crime in home State | ...... | ...... | 6 | ...... | ...... | ...... | ...... | ...... | ...... | 6 |
| No uniform rules | ...... | 6 | 6 | ...... | 1 | ...... | ...... | 1 | ...... | 14 |
| Agreement between States | ...... | 1 | 3 | ...... | ...... | ...... | ...... | ...... | ...... | 4 |
| If friends will accept patient | ...... | 1 | ...... | 1 | 1 | ...... | ...... | ...... | ...... | 3 |
| No law allowing such returns | ...... | 2 | 9 | ...... | 1 | ...... | ...... | ...... | ...... | 12 |
| Returned home if environment is suitable | ...... | ...... | 9 | ...... | ...... | ...... | ...... | 1 | ...... | 10 |
| Returned only when paroled or discharged | ...... | ...... | 8 | ...... | ...... | ...... | ...... | ...... | ...... | 8 |
| Warrant of arrest | ...... | ...... | 24 | ...... | ...... | ...... | ...... | ...... | ...... | 24 |
| Welfare and condition of inmate | ...... | ...... | 5 | ...... | 6 | 1 | ...... | 1 | ...... | 13 |
| Total | 49 | 153 | 177 | 9 | 71 | 33 | 23 | 67 | 8 | 590 |

Doctor LAUGHLIN. While there is yet no highly developed system for returning inadequates to their respective sources in the United States, we can see a definite groping toward such an end and can observe considerable progress being made toward its achievement within the last few years.

One of the most interesting studies made in the field of national and interstate deportation has been carried on by the New York State bureau of special examination, by Dr. Spencer L. Dawes, medical examiner.

The CHAIRMAN. It is important that we have this report on file. If we can secure it, I suggest that we print it as an appendix to this hearing. Without objection this will be ordered.

(See Appendix 5, p. 67.)

Doctor LAUGHLIN. I have here also the returns from our own inquiry on international deportation practices, received from the same 590 institutions.

The CHAIRMAN. These also should be included in the record. The States, as well as the Federal Government, have a responsibility and a duty in deportation.

### THE ADMINISTRATIVE INITIATIVE IN DEPORTATION OF ALIEN PUBLIC CHARGES

Doctor LAUGHLIN. We made inquiry of each State and Federal custodial institution in the United States to find out how many foreigners each had in its custody, and of those how many were deportable, and of those who were not deportable, why each was not deportable, as I have already explained. And then we went further and made inquiry into the procedure of deportation. Of each institution we asked the following three questions:

1. With what Federal deportation office, if any, has your institution made immediate contacts?

2. In the case of deportation of aliens from your institution, who has taken the initiative—your institution or the Federal authority?

3. In the case of deportation of aliens from your institution, who pays the cost of transportation and other deportation expenses to the border or port of departure, your institution (that is, your State) or the Federal Government?

The returns of this study are shown in the accompanying tables (pp. 12, 13, and 15). When it came to asking the institutions, who had custody of more than 70,000 aliens, with what Federal deportation office, if any, the particular institution had made immediate contact, only 196 could answer the question; 288 claim to have made no contacts; 77 gave no answer; the other institutions referred us to some other official for our answer. It is interesting that from 590 institutional returns, in reference to initiative in deportation, 202 have stated that they had never made any deportation, and consequently could not answer the question; 40 had no alien inmates; 94 did not answer. Only three confessed not to know. One claimed that "the patient or relatives" took the initiative; 18 that "some State department or official took it," while one referred it to the "court of commitment." Fifteen said that "either the State or Federal Government" took the initiative. Thirty-one answered "some official of the State." Eighty-five said that the Federal Government took the initiative, and 100 said that the particular institution took the initiative.

89604—28——2

## B. DEPORTATION OF ALIENS

**1. With what Federal deportation office, if any, has your institution made immediate contacts?**

*Type of institution*

| Answer | F. | I. | C. | E. | T. | B. | D. | Dep. | All others[1] | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Office named | 15 | 85 | 77 | 2 | 12 | | | 4 | 1 | 196 |
| No contacts made | 26 | 46 | 72 | 6 | 44 | 27 | 14 | 48 | 5 | 288 |
| No answer | 5 | 9 | 25 | | 9 | 5 | 8 | 14 | 2 | 77 |
| No foreign-born | 1 | | | | | 1 | 1 | 1 | | 4 |
| Refer us to some State department or official | 2 | 13 | 3 | 1 | 6 | | | | | 25 |
| Total | 49 | 153 | 177 | 9 | 71 | 33 | 23 | 67 | 8 | 590 |

[1] Includes, for all questions under "B," 5 institutions for the deformed, 1 for inebriates, 1 for lepers, and 1 for diseases (venereal).

**2. In the case of deportation of aliens from your institution, who has taken the initiative, your institution or the Federal authority?**

*Type of institution*

| Answer | F | I | C | E | T | B | D | Dep. | All others | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Institution (or State) | 8 | 61 | 24 | 2 | 4 | | | 1 | | 100 |
| Federal Government | 4 | 17 | 50 | 1 | 11 | | | 1 | 1 | 85 |
| Some State department or official | 3 | 13 | 7 | 1 | 4 | | | 3 | | 31 |
| Either State or Federal Government | | 9 | 5 | 1 | | | | | | 15 |
| Court of commitment | 1 | | | | | | | | | 1 |
| No deportations made | 18 | 29 | 55 | | 31 | 18 | 10 | 39 | 2 | 202 |
| No alien inmates | 2 | | 10 | | 8 | 8 | 4 | 7 | 1 | 40 |
| No answer | 10 | 9 | 25 | 3 | 11 | 7 | 9 | 16 | 4 | 94 |
| Do not know | 1 | 2 | | | | | | | | 3 |
| Patient or relatives | | 1 | | | | | | | | 1 |
| Refer us to some State department or official | 2 | 12 | 1 | 1 | 2 | | | | | 18 |
| Total | 49 | 153 | 177 | 9 | 71 | 33 | 23 | 67 | | 590 |

**3. In the case of deportation of aliens from your institution, who pays the cost of transportation, your institution (or State) or the Federal Government?**

*Type of institution*

| Answer | F | I | C | E | T | B | D | Dep. | All others | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Federal Government | 7 | 77 | 76 | 3 | 10 | | | 5 | | 178 |
| State institution or State department | 4 | 8 | 3 | 1 | 3 | 2 | | | | 21 |
| No deportations made | 20 | 30 | 46 | | 34 | 14 | 10 | 42 | 3 | 199 |
| No alien inmates | 2 | | 8 | | 8 | 11 | 4 | 10 | 1 | 44 |
| Relatives or friends | 1 | 2 | 1 | 1 | | | | 1 | 1 | 7 |
| County | 2 | | | | | | | | | 2 |
| Sometimes Federal, sometimes State Government | | 5 | | | | | | | | 5 |
| No answer | 9 | 12 | 38 | 2 | 9 | 6 | 9 | 8 | 3 | 106 |
| Refer us to some State department or official | 4 | 19 | 5 | 2 | 7 | | | 1 | | 38 |
| Total | 49 | 153 | 177 | 9 | 71 | 33 | 23 | 67 | | 590 |

## FEDERAL AND STATE COLLABORATION IN DEPORTATION

Doctor LAUGHLIN. In this study one thing came out very prominently, and that is the peculiar relation between the Federal and the State Governments in the business of deportation. Now it is clear that many States have no laws at all to coordinate or cooperate with the Federal Government in deporting defectives. They leave the initiative to the Federal Government to find those individuals that need deportation or are deportable under the law; other States, such as New York, which has the greatest deportation problem of any State, recognizing the gravity of the situation, has a Bureau of Deportation well organized.

Rather than take the time of the committee to describe that process further, I will merely say that we secured from each State data as follows:

Whether the State has any central officer concerned with or delegated to the task of controlling deportation; whether the State has any law of any sort to take the initiative in deportation or to coordinate with the Federal Government, and also whether the State has any law or administrative system enabling the State officers to deport or return, not to foreign countries, but to other States in the United States, their socially inadequate individuals. This idea of deportation to the home of the dependent was treated as an international matter, as an interstate matter, and even as an intercounty matter, and beyond that as an interfamily matter.

We find that the Federal Government is much further advanced than the several State governments in trying to locate the responsibility for the production of degenerates. We have laws in the United States calling for the deportation of certain classes. Not all of the States have laws calling for the return to their home States of the citizens of other States, who are dependent and defective, and who are maintained by the host State. It is clear that when once the biological principle of human migration is firmly established in our policy of government, the following rule will be put into effect: "Any county, State, or nation which is responsible for the production of a degenerate or defective must be made to take care of that individual and not impose his custody, expense, and care upon another community."

In summary of another phase of the study, let me say that we find 28 States, (see appendix 4, p. 54) each with the department or officer for the general control of its custodial institutions and with more or less authority over State deportation activities. There are 29 States which claim to have machinery and procedure for taking the initiative for deportation. Thirteen States report having no provision for deportation. Twenty-two States report having laws for the return to the home States of nonresident inmates of their institutions. But generally, so far as State initiative in deportation of aliens is concerned, there is but little activity. Only a small portion of the administrative officers of State custodial institutions with alien inmates are acquainted with deportation laws and procedure or take active interest in deportation of aliens. When such business is handled at all by the State, it is generally handled by a central State agent, but for the most part, initiative and execution of deportation processes is still largely a Federal matter. Many institutions do not even keep permanent records of deportations; thus they are unable to give a

020

18                    EUGENICAL ASPECTS OF DEPORTATION

statistical history of aliens deported from their respective institutions. Homes for orphans and dependent children, whose inmates are largely native born, naturally show little interest in deportation. Schools and institutions for the blind and the deaf very reluctantly furnish information pertaining to their pupils. They seem to resent having their charges classified among the socially handicapped. As this group of handicapped persons, consists largely of native-born persons, there is hardly any deportation practiced by institutions for their care.

Two States are of particular interest. In California deportations are handled by the department of institutions. This bureau has initiated deportations from 13 institutions—6 for the insane, 4 for the criminalistic, 2 for the feeble-minded, and 1 for the blind. But New York is perhaps the best example in which the State is exceptionally active in such matters. Here the problem of alien inadequates is so pressing that a Bureau of Deportation is maintained by the State hospital commission, which works in close harmony with the Federal Government. It is clear that in each of the several States there should be an active State deportation bureau or officer in one of its departments concerned with handling social inadequates. This bureau or officer should be charged with taking the initiative in locating deportable aliens and citizens returnable to other countries, and in consummating such deportation and return.

### TYPICAL DUTIES OF THE STATE DEPORTATION OFFICERS

A paragraph like the following might well define the duties of the State deportation officer:

It shall be the duty of the State deportation officer to survey the institutions and population of the State in order to locate individual aliens and nonresident social inadequates, and when such inadequates are found, it shall be the duty of the said officer to institute and to consummate legal proceedings, in collaboration with the Federal immigration service, for the deportation of such aliens to the countries of their origin or citizenship, and to institute and to consummate legal proceedings for the return, to their respective home States, of such inadequates who are citizens of other States.

The CHAIRMAN. Will you describe again the second study which we have in mind?

Doctor LAUGHLIN. There is another important study which, if made, would constitute a logical step in this series of researches. I refer to the matter of mate selection. This has to do with family stock crossing and with the questions of race mixtures. Suppose we have 10,000 persons of known race and family stock quality in our midst; how will they mate? How many children will each mating produce? The answer to such questions is important. These are some of the things we want to find out, because of their bearing upon the inborn character of future Americans. Mate selection, *together* with differential fecundity, should constitute early studies. Immigration policy has and will continue to constitute a major element in this problem.

The CHAIRMAN. More than in any other field, the Federal Government controls the character of future Americans through immigration. These biological studies are of fundamental importance.

Mr. Box. We shall have to give heed to them or go out of business.

**021**

## RACE MIXTURE AND DIFFERENTIAL FECUNDITY

Doctor LAUGHLIN. Wherever two races come in contact there is always race mixture in the long run, and the upper levels tend to maintain themselves because of the purity of the women of the upper classes. The women of the upper classes marry only into their own racial and social levels. The women of the lower classes and the so-called inferior races tend to take mates, whether legitimately or illegitimately, from the dominant or upper races. The consequence is that the perpetuity of a race depends upon the virtue of its women, and among the lower races, wherever two races come in contact, there is a tendency towards "breeding up" by the "pure sire method." But that, of course, can not supply the whole nation with its upper levels; the upper levels are always recruited by the mothers of the better class. The "pure sire" principle in race mixture has had the biological effect of breeding up the lower races, and the only thing that has prevented the complete mixture of races where the two come in contact is the high virtue and the high mate selection standard of the women of the dominant classes.

Mr. Box. May I ask right there, is it not true that the upper classes are subjected constantly to the tendency to have very small families?

Doctor LAUGHLIN. Yes, sir; and that is a matter of differential fecundity that calls for still another study. The time will come when the several States, rather than the Federal Government, in making marriage laws, and the people in building up their customs, will have to demand fit mating and high fertility from the classes who are better endowed physically, mentally, and morally by heredity, and to prevent, either by segregation or sterilization or otherwise, the reproduction by the more degenerate classes. That is the job of the biological control of population, and immigration, of course, is one of the three great factors and the only one the Federal Government can now use effectively. Immigration control is the greatest instrument which the Federal Government can use in promoting race conservation of the Nation.

### THE FAMILY OR PEDIGREE STANDARD FOR ADMITTING IMMIGRANTS

There is one other feature which might well be brought to the attention of the committee, and that is the family basis for admitting persons into the United States. The law should define a family standard for admission, because equally or even more important than the individual is the family stock from which he springs. The immigrant is, above all, a progenitor of future Americans. The family or hereditary standard should be high enough to insure that future Americans sired by present-day immigrants be well endowed physically, mentally, and normally. It might be well to define a family and the standard for family connections something like this:

For the purposes of this act, and for administering the immigration law, the family is hereby defined as a small group of persons closely related by blood.

Socially, the family is a small group of persons closely related by blood, marriage, or adoption, and which constitutes a single household or a single economic unit. But these latter considerations are

apart from the present problem. We are now interested in good blood—that is, in the standard of hereditary family excellence. For the latter, the law might state:

A sound family is one which, except for the normal exigencies of childhood and old age, has not more than 1 inadequate out of 10 total members; provided that such inadequates shall not be so on account of highly hereditary and highly degenerative constitutional traits; provided that a sound family shall, in its own community, bear a favorable reputation for physical stamina, intelligence, obedience to sobriety, and initiative.

Then if a person, besides being required to be not feeble-minded, not insane, not criminalistic, not possessed of loathsome disease, and not apt to become a public charge, could be required positively to be derived from a sound family, we would expect from the persons who are admitted to the United States that fewer persons ultimately would get into the socially inadequate classes, and there would be much less need for deportation, and, above all, we should logically expect that the children of immigrants would tend to raise the level of our future racial soundness, intelligence, and inborn social instincts.

The family unit standard would also be an advantage from the humanitarian point of view, because in this country the immigrant's family would not have to be broken up on account of one or more members being deported. No member of the family would have been admitted in the first place, so its members could maintain their family unity in their own homes. If family quality were made a provision and requirement for immigration, the country would profit greatly.

Mr. WHITE. This question might not be pertinent; but have you taken into consideration the great difficulties there would be in arriving at this definition, in the way of parentage, progenitors?

Doctor LAUGHLIN. There is no doubt about the difficulty of the job, but if we ever have a process of registering aliens on this side of the water, and of examining aliens abroad, and have an immigration passport system with immigration passports carefully visaced by our consuls on the other side, it ought to be a possible task. It would not be a small task by any means, but it would be a possible task.

### BASIC PRINCIPLES OF THE UNITED STATES IMMIGRATION POLICY

The immigration laws or the United States and our immigration policy formerly were based upon the asylum idea; let every one come to the United States who cares to come. The next step in advance was to base the immigration policy on economic grounds. Then the third basis is the one we are just entering on now, the biological. The first step in that direction was taken when certain undesirable classes were excluded, but as we showed in the last hearing, excluding the individual without reference to the stock or the family he comes from is not very effective, because in the next generation, instead of the alien feeble-minded, for instance, supplying only 30 per cent of their quota, the children of immigrants supplied 190 per cent which showed the letting in of bad blood.

The time will come when this country will have to face, more courageously than it has at the present time, the matter not only of race and of individual quality, but also of pedigree or family stock, and

**023**

we will also have to face boldly and courageously the matter of race. It is a matter of conservation of nationality. After the Chinese exclusion act, the greatest step that the American people took in relation to the nationality or race was, of course, the quota laws of 1921 and 1924. It is now clear that the country has in its recent legislation entered definitely upon the biological basis, a farsighted policy, of immigration control.

The CHAIRMAN. The mere fact that we have a 2 per cent quota law is a long step in the right direction.

Doctor LAUGHLIN. Yes, sir.

The CHAIRMAN. And you think it led us to the conclusion that we ought to weed out within the 2 per cent, or any other per cent we have?

Doctor LAUGHLIN. Yes, sir.

The CHAIRMAN. Of course, as a matter of fact, the quota act is really the first restrictive step we ever had in the law. The others were more or less selective attempts, slight attempts to selection by certain elimination, with the exception of the Chinese exclusion act.

Mr. Box. In your opinion, what would be the ultimate result upon the people of America and upon the country if we should continue indefinitely the policy that had controlled us prior to the enactment of the 2 per cent law?

Doctor LAUGHLIN. The racial constitution of the ultimate American would, before many generations, be very different from the American of to-day. It would be certain in time to upset our ideals of law and government, and it would cause also a severe social upset. Our social ideals would be changed because the fundamental instincts of the people would be different. They might be better, but they would be different, most probably inferior.

Mr. Box. I want to have the opinion stay in the record.

The CHAIRMAN. I will be very glad to have it stay.

## THE SOVEREIGN RIGHT TO DEPORT ALIENS, AND THE OBLIGATION OF THE HOME COUNTRY TO RECEIVE ITS RETURNING NATIONALS

The CHAIRMAN. Suppose the home country should refuse to receive its nationals whom we attempt to deport to it?

Doctor LAUGHLIN. While international law is not written in black and white, by a superior legal authority capable physically of enforcing its statutes, nevertheless it is clearly established in practice that no country or State or community for that matter, may refuse to receive into its territory its own nationals, regardless of whether such nationals return voluntarily from or are deported by a host country. A second section of the same unwritten law states in substance that every sovereign nation has the right to deport aliens from its territories, which right can be limited only by specific treaties. In Italy I have had an Italian immigration official tap me on the chest and inform me that Italy has the right to deport any alien within her borders without giving any reason for such action. I had to agree to that proposition, and at the same time to claim the same right for the United States and for every other sovereign nation. As a matter of fact, in practice, if we can prove that any given alien came to the United States from a certain country or city in that country, the home country or community does not refuse to receive him.

It therefore behooves us, in our immigration business, to keep a careful record of origins of immigrants. This is only one more argument in favor of registration.

Deportation of aliens who become public charges is common international practice, and it is suggested also for increased use in interstate practice. Under the international practice, the country that produces the defective must be responsible for him, if no other country can be prevailed upon to naturalize or to care for him. Looking at the question from the practical standpoint of New York State, aliens who become public charges are costing this State a great many millions of dollars every year for their maintenance in its custodial institutions. It is especially costly to the great cities, and the States that have great cities in them. Millions of dollars for institutional maintenance are spent on inadequate aliens, which expenditure should be borne by the State or community which produces the particular defectives. In actual practice we do not pay much attention to the matter of original responsibility. A man may be born in some Eastern State; he may go to some Western State and reside there for a short time, perhaps for less than a year, and get committed to a public institution. The burden of his maintenance will thus be put upon State which did not produce him, to which he, in his prime, rendered no services, and in which he has lived but a short time.

### RESPONSIBILITY FOR THE PRODUCTION OF INADEQUATES

If any outstanding principle of practical eugenics has been developed within the last few years it is that of placing all responsibility for the production of hereditary degenerates or defectives. This principle is worth restating: So far as a family, a community, a state, or a nation is able to maintain its own defectives, it should be compelled by municipal and international law to do so. The policy of a family throwing its defectives on the community for maintenance is not looked upon with so much favor as formerly. In other words, the idea of public charity, while not less kind than formerly, is certainly becoming more effective. A State like New York, which, for the period 1894-1920, sent from its hospitals for the insane to the States of their residence 5,317 insane persons, shows that one State does not intend, if it can help it, to maintain in its public institutions individuals produced by another. Similarly, the United States does not purpose to maintain in its institutions persons who are produced in alien countries.

Mr. WHITE. Thousands of people from all sections come to Colorado, for instance, to be cured of tuberculosis.

Doctor LAUGHLIN. That principle of responsibility for the maintenance of dependent, defective, and delinquent classes should hold true not only as between States but, as I have said, between nations.

Mr. DICKSTEIN. They go out there in order to save their lives. Of course, that is an unfortunate situation. If New York were a place where tuberculosis could be cured, they would come to New York, of course.

Mr. WHITE. There are a lot of New York people who have gone to Colorado and settled there.

**025**

Mr. DICKSTEIN. And we have sent millions of dollars to Colorado to support those poor unfortunates.

Mr. WHITE. Yes; they have sent large sums of money there for the support of one of the most splendid institutions in the State, the National Jewish Home for Consumptives.   That condition is not confined to any particular State.   That is true also of Kansas, and of every other State to which my attention has been called.

Doctor LAUGHLIN. The general acceptance of the basic principle which would place responsibility for the maintenance of inadequates on the community which produces them would serve not only a valuable international purpose, but also would constitute a valuable rule for interstate and intercommunity adjustment, and, what is most important, it would work an advance in the practical application of national eugenics or race conservation.

With the United States deportation is not a matter of caprice. It is regulated by most liberal law which is administered with great charity and considerable laxity.   The standards for deportation call for returning to their home countries only aliens who have demonstrated, beyond doubt, degeneracy far below the level which we wish to maintain for ourselves.   As the matter now stands, no nation, State, or lesser community which produces a defective or degenerate person can refuse to receive such person into its territories when such person turns voluntarily from or is deported by a host community, State, or nation.   It is a good principle as well as an actual one, and one which, in the interests of justice, peace, and eugenical soundness, should be strengthened.   One of the most liberal features is the law that prevents the deportation of aliens who become public charges "from causes arising since arriving in the United States." This provision is a liberal and a just one, and is a keystone against injustice in deportation.

### EXILING AND "DUMPING" OF INADEQUATES

At present, practically all of the territory of the world is claimed and fully occupied, so that no nation has a right to exile or to "dump" its undesirable human stock into the territories of another.   Each nation (and indeed each lesser civil and social organization from the province and village to the family itself) must, in accordance with the principle of "live and let live," be responsible for the protection and care of its own undesirable and inadequate human stock. Institutionalization is the immediate palliative, but national eugenics is the long-time cure for human degeneracy.   A general acknowledgment of the international evil of exiling or "dumping," a harsh word not used in the careful parlance of international law, would greatly strengthen the principle of responsibility for defectives. The receiving nation should acknowledge with gratitude the origin of immigrants who become desirable citizens and who leave superior offsprings.   Such acknowledgments would constitute a considerable factor in making international amity.

### DESIRABLE AND UNDESIRABLE EXILES

Of course, we have received many splendid persons who have made most desirable immigrants from the seed-stock viewpoint, who have been practically exiled or driven out of their home coun-

tries because they disagreed with the ruling authorities in religious faith or in political adherence. But at the present time, with tolerance quite a general thing, we can expect little or no further superior human seed stock through exiling or "dumping" by foreign countries. Countries are continually increasing their appreciation of good human stock. "Dumping," exiling, and assisting emigration have, for the most part, in recent generations, resulted and will doubtless continue for many generations, to result in exporting from their home countries relatively little splendid human breeding stock, compared with the number of biological and social misfits. As a rule, the emigrant who was not welcome in his home country is derived from the genetically less effective stocks. We shall have to guard our own interests in selecting desirable immigrants. This calls for supporting our rules for debarring undesirables, for vigorous deportation laws, and for their active enforcement.

## THE LEGAL AND THE EUGENICAL ASPECTS OF CHINESE IMMIGRATION

Doctor LAUGHLIN. Chinese immigration and its control constitute a very important and instructive chapter in national eugenics. The Chinese are subject to deportation not because of social inadequacy—many Chinese are of splendid physique and healthy in both mind and body, have splendid minds, fine temperamental balance, and altruistic instincts—but simply because they are not racially assimilable.

The sex ratio of an immigrant stock is always important. Of the 61,639 Chinese found in the United States in 1920, there were practically 7 males to 1 female. The fecundity of the Chinese in America is limited primarily by the number of Chinese women in the country. If the Chinese men reproduce in this country, they will have to find wives among other nonwhite races, because there is very little mating of white women and Chinese men. Unless the number of Chinese women increase, the number of Chinese will never grow to comprise a considerable percentage of our whole population. The number of Chinese in the country under the present policy need not exceed the number which we need in order to maintain desirable commercial and cultural contacts with the Chinese people. There must always be a certain interchange of visitors, and even permanent residents and possibly immigrants, among peoples who are in commercial and cultural contact. But this number can always be kept low and need, in no manner, constitute an immigration of human seed-stock which would contribute a considerable proportion of the population of future generations of the host country. It need not lay the foundation for extensive race mixture, nor bend the trend in the development of national racial traits toward the immigrant stocks.

While the Chinese are recognized to be one of the oldest and most superior of the world's races, still, because of a great difference between their racial characteristics and those of the foundation stocks of the American people, it was not considered desirable to permit them to migrate in great numbers to the United States—not great enough to constitute an important element in producing offspring for future generations. During the year ending June 30, 1925, there were a total of 6,804 Chinese admitted, while 6,639 departed, leaving a net gain of only 165. During this year only 93 Chinese were deported

under the Chinese exclusion laws, and 54 by United States marshals
—147 in all.   Only 188 Chinese were debarred at our ports during
the year ending June 30, 1925.   The Federal census of 1920 found
61,639 Chinese in the United States.   It is important to consider
that in 1900 there were 89,863 Chinese here, and in 1910 there were
71,513.   If, without the Chinese exclusion law of 1882, economic
forces had been permitted to operate in the absence of statute law,
there would have been hundreds of thousands and probably millions
of Chinese in the United States at the present time.   It is a splendid
demonstration of how, in the case of modern immigration in times of
peace, statute law can control immigration into sovereign states.   Of
the several factors which govern changes in poulaption, immigration
is the easiest to govern by statute law.   The Chinese exclusion act
was no reflection on the splendid racial qualities of the Chinese people.
It was simply a statement that the Chinese were so different from the
foundation stocks of the United States that race mixture, which, in
the long run, always follows immigration, was not desirable on a
large scale for either the Chinese or the American foundation races.
The same eugenic principle applies to subraces within the white race,
to family stocks within each subrace, and to individuals within the
family stocks.   These are the principal foundations for immigrant
selection: first, race; second, family stocks; third, individual quality.
Regardless of race, immigration should be made to recruit to our
high standard of family stock and individual excellence, and it should
not be permitted to become a factor for deterioration, nor for break-
ing down our law and order.   The immigrant should be looked upon
primarily as seed stock for reproducing future Americans.

### SOVEREIGN RIGHTS IN HUMAN MIGRATION

The CHAIRMAN. It is a sound principle of international law that
every nation has the right to determine who may enter its borders
and how long each entrant may stay.   There is also growing into an
established rule the principle of applied eugenics that every com-
munity, whether a state or a sovereign nation, which produces an
antisocial person, whether defective or criminal, should be required
to care for such a person.   We should do everything possible, both in
legislation and administration, to reduce to the lowest possible level,
principally by debarring and deporting, crime among aliens in the
United States.

Mr. Box. Mr. Chairman, the trouble with the whole subject is
that it is too big for most of us.   But it looks as though we will have
to control immigration to suit our own needs or we will lose our
national character.   A thing like that would spell destruction for the
future of America.

The CHAIRMAN. It certainly would. .

Mr. WHITE. Along that very line then, I want to ask, should we not
now begin seriously to consider if we may, consistently with inter-
national relations, shut off entirely immigration from those countries
which we think are less desirable, that would degrade our own racial
and institutional standards?   Of course that would be a hard thing
to do, but we find by an examination of the report of the Commissioner
of Immigration that in some years the quota has been filled from many
certain countries and that it is short from many other countries,

but to our surprise, countries that we believed generally—that I believe generally would be better if we could have immigration from, notably England, France, Holland, and the northern countries of Europe—these have not nearly approached their quota, to the surprise of myself and many others.   Why not go the limit with them?

Mr. VINCENT. Then we will get just what you are after, Mr. White.   We can do it and do it legitimately and regularly.

Doctor LAUGHLIN. In California in 1918 there were admitted to all the hospitals for the insane 2,151 persons, of whom 1,959, or 91 per cent were natives of other States or countries.

The CHAIRMAN. I should like to have you present to the committee the especial data which you have on the three classes of inadequates—that is, the feeble-minded, the insane, and the criminal classes—which we discussed earlier.

### DEPORTATION OF THE FEEBLE-MINDED

Doctor LAUGHLIN. The feeble-minded present an interesting group when studied in relation to deportation.   Unlike any other group except the congenitally crippled, the alien feeble-minded in the United States are a group of persons who entered the country while suffering from their particular defects.   Persons do not become feeble-minded. If they suffer from this ailment, they have always had it.   Consequently, the feeble-minded aliens, both those in our institutions and the many more of them who are not in custodial care, have, by some means or another, managed to get past our immigration bars which would exclude them.   With almost any other class it is possible that at the time of entry the potentiality for later defect or inadequacy may be so thoroughly hidden that it can not be determined, even by the best inspection, although the individual may have a constitutional make-up which is the principal cause for the particular breakdown and a social conduct known as crime or some type of insanity, or a breakdown of physical and moral energy necessary to effective work. There is one reason for nondeportability of alien dependents which does not apply to the feeble-minded—that is the class which acquired the particular ailment "from causes arising since admission into the United States."   Another interesting phase in reference to feeble-mindedness is that our standards of admission in reference to intelligence require only that the individual be talented enough to learn to read and to keep out of custodial institutions for the feeble-minded. This means that he may be a very inferior individual so far as his intellectual, his spiritual, and his moral constitution is concerned.

The CHAIRMAN. Can you show us the table that has something to do with the birth rate of different intelligence classes in the United States?

Doctor LAUGHLIN. Yes; we have some data on this subject.

The CHAIRMAN. You can proceed with that subject then.

### DISTRIBUTION OF INTELLIGENCE AMONG THE FOREIGN BORN

Doctor LAUGHLIN. The best measure of intelligence in nativity groups in the United States has been based upon the Army intelligence tests.   These tests measured 12,407 foreign-born recruits in

our Army, which were fairly representative not only of all foreign-born recruits but also of the whole foreign-born population. This test found intelligence distribution as follows: Among the foreign born, (1) very superior (Army grade A), 1.1 per cent; (2) superior (Army grade B), 2.9 per cent; (3) high average (Army grade C+), 7.3 per cent; (4) average (Army grade C), 26.6 per cent; (5) low average (Army grade C−), 16.5 per cent; (6) inferior (Army grade D), 30.8 per cent; (7) very inferior (Army grade D−, E), 14.8 per cent.  Now, if we project these per cents to the whole 13,920,692 foreign-born persons in the United States in 1920, we find that 62.1 per cent, or 8,644,749, are below the average of American intelligence.

Mr. Box (interposing).  Does that mean that eight-thirteenths of them are below the average?

Doctor LAUGHLIN.  That is exactly what it means.  Now, for the population of the native stock———

Mr. Box (interposing).  What is the average?

Doctor LAUGHLIN.  The average intelligence do you mean?

Mr. Box.  Yes.  Is it the average of the people throughout the United States?

Doctor LAUGHLIN.  That average is C of the Army intelligence grading, which, interpreted in common language, means that a man of grade C makes a good common worker.  A man of grade C− means a man who is a good worker under direction; and a man of grade D is lacking in adaptability and needs much supervision; and in that class the cost of the supervision is greater than the value of the work [indicating grade D on paper]; below that, his labor has no net value.

If a man comes in the level of grade C+, he is an intelligent, skilled worker.  A man of grade B is a first-class executive.  And the men of grade A are the leaders in their respective occupations.

### IMMIGRATION STANDARDS IN RELATION TO INTELLIGENCE

Now, our immigration standards in reference to intelligence are much too low if we are to consider immigration from the seed-stock standpoint and desire to make it add to the average of our native intelligence.  Instead of drawing the line between very inferior and absolute feeble-minded persons, we should require of the immigrant an intelligence at least equal to that of our stocks already established.  If we set it below this, immigration will tend to pull down the level of native intelligence in our future generations of Americans.  This is, course, regardless of race.  It is a matter of family stocks within each race.  I have here a table (see Table III, p. 27) showing the results of a special survey of 50 institutions for the feeble-minded, made in 1925.  In these we found 36,347 native-born inmates and 1,514 foreign-born inmates.  Out of these, only 18 were returned as deportable; 15 were naturalized citizens.  It is pathetically strange that any American court would naturalize any feeble-minded person.  Only nine were reported as having become feeble-minded from causes arising since admission.  These nine may have been admitted as children and suffered from some disease or injury which stopped their mental development.  But as a rule, feeble-mindedness is potential at birth, and these nine exceptions only serve to emphasize the generality of the rule.

mj-20121-KSC   Document 32-1   Filed 08/07/20   PageID.253   Pag

TABLE III.—*Causes of nondeportability of foreign-born inmates of State institutions for the feeble-minded*

| State and institution | Number of foreign-born inmates | | | Foreign-born inmates deportable | | | Naturalized citizens | | | Resident of United States more than five years | | | Causes arising since admission to United States | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total |
| 1. Alabama: Home and School for Feeble-minded, Tuscaloosa.. | 1 | 0 | 1 | | | | | | | | | | | | |
| 2. California: Sonoma State Home, Eldridge | 70 | 71 | 141 | 1 | 0 | 1 | | | | 69 | 71 | 140 | | | |
| Colorado: | | | | | | | | | | | | | | | |
| 3. State and Training School, Ridge | 1 | 1 | 2 | 0 | 0 | 0 | | | | 1 | 1 | 2 | | | |
| 4. State Home and Training School for Mental Defectives, Grand Junction | 4 | 2 | 6 | 0 | 0 | 0 | | | | 4 | 2 | 6 | | | |
| 5. Delaware: Colony for the Feeble-minded, Stockley | 2 | 3 | 5 | 0 | 0 | 0 | 2 | 3 | 5 | | | | | | |
| 6. Florida: Florida Farm Colony, Gainsville | 1 | 2 | 3 | 0 | 0 | 0 | | | | 1 | 2 | 3 | | | |
| 7. Idaho: Idaho State Sanitarium, Nampa | 11 | 12 | 23 | 0 | 0 | 0 | | | | 11 | 12 | 23 | | | |
| 8. Illinois: State School and Colony, Lincoln | 25 | 57 | 82 | 1 | 1 | 2 | | | | 24 | 56 | 80 | | | |
| Indiana: | | | | | | | | | | | | | | | |
| 9. School for Feeble-minded Youth, Fort Wayne | 4 | 3 | 7 | 0 | 0 | 0 | 1 | 2 | 3 | 3 | 1 | 4 | | | |
| 10. Farm Colony for Feeble-minded, Butlerville | 5 | 0 | 5 | 0 | 0 | 0 | 1 | 0 | 1 | 4 | 0 | 4 | 0 | 0 | 0 |
| 11. Iowa: Institution for Feeble-minded Children, Glenwood | 11 | 15 | 26 | 0 | 0 | 0 | | | | 11 | 15 | 26 | | | |
| 12. Kansas: State Training School, Winfield | | | | | | | | | | | | | | | |
| 13. Kentucky: State Institution for Feeble-minded, Frankfort | 1 | 2 | 3 | 0 | 0 | 0 | | | | | | | 1 | 2 | 3 |
| 14. Louisiana: State Colony and Training School, Alexandria | 1 | 0 | 1 | 0 | 0 | 0 | | | | 1 | 0 | 1 | | | |
| 15. Maine: School for Feeble-minded, West Pownal | 3 | 9 | 12 | 0 | 0 | 0 | | | | 3 | 9 | 12 | | | |
| Massachusetts: | | | | | | | | | | | | | | | |
| 16. Wrentham State School, Wrentham | 12 | 37 | 49 | 0 | 0 | 0 | | | | 12 | 37 | 49 | | | |
| 17. State Hospital, Belchertown | 13 | 27 | 40 | 0 | 0 | 0 | | | | 13 | 27 | 40 | | | |
| 18. Michigan: Home and Training School, Lapeer | 73 | 61 | 134 | 4 | 1 | 5 | | | | 69 | 60 | 129 | | | |
| 19. Minnesota: School for Feeble-minded and colony for epileptics, Faribault | | | | | | | | | | | | | | | |
| 20. Mississippi: Colony for Feeble-minded, Ellisville | 0 | 0 | 0 | | | | | | | | | | | | |
| 21. Missouri: Colony for Feeble-minded and Epileptics, Marshall | 0 | 0 | 0 | | | | | | | | | | | | |
| 22. Montana: School for Deaf, Blind, and Feeble-minded Children, Boulder | | | 14 | | | | | | | | | | | | |
| 23. Nebraska: Institution for Feeble-minded, Beatrice | 7 | 14 | 21 | 0 | 0 | 0 | | | | 7 | 14 | 21 | | | |
| 24. New Hampshire: School for Feeble-minded, Laconia | 3 | 7 | 10 | 0 | 0 | 0 | | | | 3 | 7 | 10 | | | |
| New Jersey: | | | | | | | | | | | | | | | |
| 25. State Institution for Feeble-minded Women, Vineland | 0 | 56 | 56 | 0 | 0 | 0 | | | | 0 | 52 | 52 | | | |
| 26. State Colony for Feeble-minded Males, New Lisbon | 7 | 0 | 7 | 0 | 0 | 0 | | | | | | | | | |
| 27. State Colony for Feeble-minded Males, Woodbine | 4 | 0 | 4 | 0 | 0 | 0 | 4 | 0 | 4 | | | | | | |
| New York: | | | | | | | | | | | | | | | |
| 28. Letchworth Village, Thiells | 58 | 47 | 105 | 4 | 2 | 6 | | | | | | | | | |
| 29. Rome State School, Rome | 182 | 54 | 236 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | |
| 30. Newark State School, Newark | 0 | 109 | 109 | 0 | 2 | 2 | | | | 0 | 107 | 107 | | | |
| 31. Syracuse State School, Syracuse | 25 | 35 | 60 | | | | | | | | | | | | |

TABLE III.—*Causes of nondeportability of foreign-born inmates*—Continued.

| State and institution | Number of foreign-born inmates | | | Foreign-born inmates deportable | | | Naturalized citizens | | | Resident of United States more than five years | | | Causes arising since admission to United States | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total |
| 32. North Carolina: Caswell Training School, Kinston.......... | 0 | 0 | 0 | | | | | | | | | | | | |
| 33. North Dakota: Institution for Feeble-minded, Grafton...... | 20 | 21 | 41 | 0 | 0 | 0 | | | | 20 | 21 | 41 | | | |
| 34. Ohio: Institution for Feeble-minded, Columbus.. | 60 | 55 | 115 | | | | | | | | | | | | |
| 35. Oklahoma: Institution for Feeble-minded, Enid........ | 0 | 0 | 0 | | | | | | | | | | | | |
| 36. Oregon: State Institution for Feeble-minded, Salem....... | 11 | 10 | 21 | 1 | 0 | 1 | | | | 10 | 10 | 20 | | | |
| Pennsylvania: | | | | | | | | | | | | | | | |
| 37. Polk State School, Polk.... | 15 | 18 | 33 | 0 | 0 | 0 | | | | 15 | 18 | 33 | | | |
| 38. Laurelton State Village, Laurelton........ | 0 | 6 | 6 | 0 | 0 | 0 | | | | 0 | 6 | 6 | | | |
| 39. Pennhurst State School, Pennhurst............ | 29 | 27 | 56 | | | | | | | | | | | | |
| 40. Rhode Island: Exeter School, Slocum......... | 3 | 7 | 10 | 0 | 0 | 0 | | | | 2 | 6 | 8 | 1 | 1 | 2 |
| 41. South Carolina: State Training School for Feeble-minded, Clinton............ | 0 | 0 | 0 | | | | | | | | | | | | |
| 42. South Dakota: State Home and School for Feeble-minded, Redfield............ | 12 | 15 | 27 | 0 | 1 | 1 | | | | | | | | | |
| 43. Tennessee: Home and Training School for Feeble-minded Persons, Nashville........... | 0 | 0 | 0 | | | | | | | | | | | | |
| 44. Texas: State Colony for Feeble-minded, Austin........... | 1 | 3 | 4 | 0 | 0 | 0 | | | | | | | 1 | 3 | 4 |
| 45. Vermont: State School for Feeble-minded, Brandon..... | 2 | 6 | 8 | 0 | 0 | 0 | | | | 2 | 6 | 8 | | | |
| 46. Virginia: State Colony for Epileptics and Feeble-minded, Colony............. | 1 | 1 | 2 | 0 | 0 | 0 | 1 | 1 | 2 | | | | | | |
| 47. Washington: State Custodial School, Medical Lake........ | 0 | 0 | 0 | | | | | | | | | | | | |
| Wisconsin: | | | | | | | | | | | | | | | |
| 48. Northern Wisconsin Colony and Training School, Chippewa Falls........ | 7 | 16 | 23 | 0 | 0 | 0 | | | | | | | | | |
| 49. Southern Wisconsin Home for Feeble-minded and Epileptics, Union Grove. | 0 | 0 | 0 | | | | | | | | | | | | |
| 50. Wyoming: State School for Defectives, Lander.......... | 6 | 0 | 6 | 0 | 0 | 0 | | | | 6 | 0 | 6 | | | |
| Total. .................. | 691 | 809 | ¹1,514 | 11 | 7 | 18 | 9 | 6 | 15 | 291 | 540 | 831 | 3 | 6 | 9 |

¹ Includes 14 inmates not classified by sex.

## DEPORTATION OF THE INSANE

The CHAIRMAN. The second class in which we are particularly interested is the insane. Doctor Laughlin has made studies on this subject for this committee and has reported them in past hearings. Just now we are interested in the deportation of the class of persons suffering from mental disease.

Doctor LAUGHLIN. For practical purposes insanity is made to include all groups of mental disease except feeble-mindedness. Feeble-mindedness is simply the failure to develop intelligence. Insanity is a disorder which develops in both otherwise normal and in defective individuals. It constitutes the cause of the great bulk of costs for custodial care of the inadequates. In a study made by the

United States Bureau of the Census under date of January 1, 1923, the following facts were determined:

*Nativity and parentage of patients in hospitals for mental disease, January 1, 1923, for the entire United States*

| | |
|---|---:|
| Total number | 265, 829 |
| Per 100,000 | 252. 8 |
| White patients | 244, 968 |
| Per 100,000 | 259. 8 |
| Negro | 20, 084 |
| Per 100,000 | 192. 0 |
| Indian | 244 |
| Per 100,000 | 104. 5 |
| Chinese | 207 |
| Per 100,000 | 340. 6 |
| Japanese | 163 |
| Per 100,000 | 148. 3 |

*White patients*

| | |
|---|---:|
| Native white: | |
| Native parentage | 92, 943 |
| Per 100,000 | 159. 8 |
| Foreign parentage | 32, 271 |
| Per 100,000 | 207. 0 |
| Mixed parentage | 9, 409 |
| Per 100,000 | 135. 8 |
| Parentage unknown | 34, 673 |
| Foreign-born white | 69, 984 |
| Per 100,000 | 513. 9 |
| Nativity unknown | 5, 688 |

If the native-born and foreign-born whites are compared with reference to their respective rates in producing insane persons—insane enough to cause commitment to custodial institutions—we find the alien insane 3.22 times as frequent per 100,000 persons of their respective nativity group as the insane native whites of native parentage, 2.48 times as frequent as native whites of foreign parentage, and 3.78 times as frequent as native whites of mixed parentage. There may be something in the fact that the foreign-born immigrant suffers great stress in his attempts to make adjustments in the new country, and consequently he breaks down more frequently than the native, but after making due allowance for all this, it would seem that the immigrants of the present generation are more unstable mentally in their hereditary or constitutional make-up than were the immigrants of one and more generations ago. This difference of frequency is too great to be accounted for by the factor of mere additional stress on the immigrant compared with the present stress on families already established. One wonders whether or not the European countries are not supervising their emigration much more intelligently than the United States supervises her immigration policy. European nations seem to be appreciating the seed-stock idea, both in exporting their surplus stocks and in receiving new blood—all of which goes to emphasize the necessity for each nation looking after its own fundamental interests.

In time of onset, the insane differ from the feeble-minded primarily in the fact that most persons who become insane do not break down until adult life. Thus, the opportunity for coming through the immigration barrier by a potentially insane person is relatively easy, unless we study the particular individual in his home surroundings,

secure some of his individual history, and, above all, learn from what sort of family stock he springs.    All of this is made more possible and practicable by our new system of examining immigrants overseas.

## DEPORTATION OF CRIMINALS

The CHAIRMAN. The third special class has to do with criminals.

Doctor LAUGHLIN. Among the 74,170 aliens found in the State and Federal institutions, 11,224 were in such institutions on account of having committed crime of a serious nature in the United States. This does not include jails or workhouses, but only the penitentiaries and prisons.    It is interesting that of these criminalistic aliens, only 2,909 were reported as deportable.    The reasons why the rest were not deportable were given as follows: naturalized citizens, 2,030; residents of the United States more than five years, 4,272; criminalistic from causes arising since admission, 248; claimed by the authorities not to be deportable but no causes given, 2,265.

The CHAIRMAN. The committee will remember that some years ago Doctor Laughlin presented a study on "The Analysis of America's Modern Melting Pot," in which he showed that, so far as felons were concerned, the foreign-born person was no more apt than a native born to get in prison in the United States, but it should be pointed out that our laws seek to keep out all criminalistic persons, whereas our efforts have resulted only in keeping them out to about the frequency of our native stock.    Later studies seem to indicate that among the petty crimes, particularly the violation of the liquor laws, the foreign born are guilty, according to their numbers, to a much greater degree than the native stocks.

Doctor LAUGHLIN. Of course we should try to keep down the "quota fulfillment" of the criminalistic classes among the foreign-born to zero, but when, in spite of our efforts to do so, we find criminalistic aliens within our borders, it would seem that the next best step would be to deport them.    We can not here go into the causes of crime, but it seems strange that prison authorities would say that about one felon out of forty-six became so from "causes arising since coming to the United States."    It would be rather hard before a court to prove that the causes of crime were not much more fundamental and long-standing than that.    A person may be subjected to such strain that he may break down mentally, in which case he is not punished as a criminal but is generously cared for as an insane person; but to list an individual criminal in this exempt class seems almost impossible.    The criminalistic is one class for which it would seem most proper to remove the statute of limitations so far as deportability is concerned.

The CHAIRMAN. Any far-reaching plan to combat crime in the United States would fail to achieve its fullest possibility if it neglected the matter of crime among aliens.    According to the census of 1920, the foreign-born white population of the United States comprised 12.97 per cent of our whole population.    These aliens were admitted not as a right but as a privilege granted them by the United States.    It is the obvious intent of our law to debar all aliens who are criminalistic in tendency.    We have thus set up a bar against the admission of criminals.    But, in spite of our efforts along these lines, many aliens who are admitted are later found to violate

89604—28——3

**034**

our laws.  Thus in 1922, in a first-hand study by this Committee on Immigration and Naturalization, we found in 155 State and Federal prisons that, in proportion to their numbers, the foreign-born (quota fulfillment, 98.50) were approximately as numerous as our native-born (quota fulfillment, 100.26) prisoners.  This is for felons in the prisons.  If we turn from these more serious offenses to misde-meanors, we find the percentage of alien offenders somewhat increased. This ratio  is substantially verified by the Bureau of the Census, which, on January 1, 1923, found the foreign-born white prisoners (in all prisons for felons, and jails and workhouses for misdemeanants) to constitute 13.8 per cent of the total, a quota fulfillment of 106.39. These 13.8 per cent of prisoners were drawn from 12.97 per cent of the whole population.  It should be the business of our immigration laws and their administration to prevent altogether the admission of persons likely to violate our laws.  But if, in spite of our vigilance in debarring such aliens, we find an alien violating our laws in a serious offense, he should, after proof of his offense, be deported.

### INSTITUTIONAL INITIATIVE IN DEPORTATION

Doctor LAUGHLIN.  I will give a description of the way in which we went at this particular investigation.  First, the matter was consid-ered from the standpoint of several State governments.  From the governor, the secretary of state, or some other responsible official, we secured a statement from the particular State government concerning its practice of deportation.  I have these summaries, and with the consent of the committee I will print them in full in the report. (See appendix 4, p. 54.)

Besides the State survey which I have described very briefly, we made an institutional survey.  We appealed to each one of these 688 State and Federal institutions, asking each a number of ques-tions, and asking each to go into its files and give us certain data, such as the name of the institution, where it is located, the type, sex, and race of inmates it holds; then the classification of inmates by sex and by nativity, whether native or foreign born.  The next item calls for a report on the number of foreign-born inmates, and how many are now deportable—males, females, and total.  All this mate-rial I have already analyzed for you.  Then at that point in the questionnaire we gave reference to the Federal immigration act of February 5, 1917, with special reference to sections 18, 19, and 20. Further, we asked the superintendents of institutions about the inmates in their institutions who were deportable to other States and to other communities, and we asked for reference in the laws of the States as to how these processes of international and interstate deportation were carried on by the particular State.  Then we asked for an historical note; we asked each institution to state the num-ber of persons who had been deported from the particular institution since its first deportation.

We still have some institutions to hear from, but the returns will be practically complete in the near future.  The present results show the type of information which we have secured from the several in-stitutions.  For example, take an institution for the feeble-minded. Here is one at random, the Nebraska Institution for the Feeble-

minded, at Beatrice, Nebraska.  It is for both sexes, and on the date
of this return it had an inmate population of 756.  Of these, 747 were
native born and only 9 were foreign born.  That is a western agri-
cultural State.  But when it comes to the matter of deportation,
they reported none deportable, and since that institution was estab-
lished it had deported no aliens.

If we go to Massachusetts, in the Wrentham State School there are
1,311 inmates, of whom only 55 are foreign born, but they call none
of them deportable; 55 feeble-minded persons were foreign born and
were feeble-minded when they came to the United States, because
persons do not get feeble-minded afterwards—they do not "go
feeble-minded," we must remember—once feeble-minded, always
feeble-minded, but none was deportable, and in the whole history of
that institution they have listed only six persons deported.  The
annual turnover is, moreover, large.

And so the story goes on the feeble-minded.  Now for the insane—
these are only random samples.

### POPULATION TURNOVER IN INSTITUTIONS

The CHAIRMAN.  What do you mean by the "turnover"?  Do you
mean the feeble-minded in and out of these institutions?

Doctor LAUGHLIN.  Turnover refers to the period of renewal of
institution population.  It measures the duration of an "inmate
generation."  It measures also the average length of institutional
residence.  The feeble-minded in the State institutions average about
nine years' residence.  Then they die off.  That is the average
record.  Sometimes the higher grade feeble-minded, the morons, are
trained to do menial service, and are sometimes let out on parole,
but the average residence in institutions for the feeble-minded in the
United States is about nine years.  For the insane the average
period is only about two and one-half years.  Their turnover is much
more rapid than that of the feeble-minded on account of the shorter
period of commitment, and due principally to the fact that many of
the insane may be cured.  Of course, some classes of the insane, such
as the large group with dementia praecox, it would seem, never get
well.

Now, if you will take an institution for the insane—let us take
one right from the middle of the lot, because the stack of reports is
so large.  Here is one from Minnesota.  Here is Hastings, Minn.,
with an inmate population of 984.  They report 417 foreign born,
but they report only one deportable.

The CHAIRMAN.  Do they differentiate in these reports as to the
foreign-born and naturalized foreign-born?

Doctor LAUGHLIN.  Yes; our analysis of causes for nondeport-
ability shows that.

### CERTAIN DEGENERATE FAMILIES

Mr. HOLADAY.  From your analysis of this subject—for instance,
take a State highly specialized in manufacturing like New Jersey and
compare it with a State like California or Oregon, where the industry
is more agriculture than anything else—is there a larger percentage of

feeble-minded persons in the agricultural districts than in the thickly settled commercial and manufacturing districts?

Doctor LAUGHLIN. No, the feeble-minded families tend to gravitate toward the outskirts of the great cities, and in agricultural regions toward the poorest lands in the hills. Families of this sort do not have money enough to come down into the valleys and occupy valuable agricultural lands, nor do the lowest of them have intelligence enough to live in the towns and work in manufacturing or commercial enterprises, so they have gravitated toward the hills where they squat on the land, and to the outskirts of towns where they build shacks from which no one cares to drive them.

Mr. VINCENT. And they propagate rapidly?

Doctor LAUGHLIN. Very rapidly. They beg and steal, and were often convicted of petty crimes. They were often relatively easy to study from the pedigree point of view because of their tribal life, and because both the parents' and the children's names are often found on the books of the charity organizations.

The Ishmaels, who are living in Indiana, were studied by Dr. A. H. Estabrook, of the Carnegie Institution of Washington. They are called American gypsies; they go north in the summer time and south in the winter. Their pedigree records show that about four or five generations ago they came up from Kentucky, and the further history shows that into Kentucky they had come from Virginia, and it is thought—it has not yet been demonstrated beyond a doubt—that those early Virginians, persons who were exiled from Great Britain, were "dumped" into Virginia in very much the same manner as England "dumped" many of her degenerates into Botany Bay in Australia. Indeed "Botany Bay" has come to mean a place of exile for degenerate human stocks.

At any rate the occurrence of the Ishmaels is typical of what happens when we keep degenerate immigrants for seed stock. A few degenerate individuals arrive in Virginia, either voluntarily or by "dumping," they are pushed westward into Kentucky, and like camp followers on the trail of the substantial and capable pioneers, they move from Kentucky up into Indiana. That is where they are now.

The CHAIRMAN. In the meantime they intermarried with other peoples?

Doctor LAUGHLIN. Others of their own social level. They are mostly white, degenerate whites. The men hardly ever rise above the mentality of 8 or 9 years, consequently they are barely intelligent enough to go about and live and beg, but not intelligent nor energetic enough to live as intelligent farmers or factory hands.

Mr. BOX. But the women at an early age become subject to motherhood and increase rapidly. I want that to go into the record, because it is bearing on the matter that is before this committee. Is that a fact?

Doctor LAUGHLIN. They propagate rapidly. We can show you the pedigrees collected by Doctor Estabrook; they show the size of the families. In these degenerate families the increase is very rapid.

Mr. HOLADAY. I remember reading—I do not remember where I read it, whether in a book or in a newspaper—of a woman, an alien coming to this country, a criminal or partly insane, and she produced children—this was some 60 or 70 years ago, or maybe longer—and

the history was that the number of the same class that had been pro-
duced in this country by reason of that woman's coming here was
very large. Have you got anything like that that we can get hold of?

Mr. Box. Do you mean the Jukes family?

Doctor LAUGHLIN. Our office has studied a large number of de-
generate families. Some of those which have been investigated are
the Hill Folk, the Jukes, the Ishmaels, and the Nams. One interest-
ing thing which we find out about degenerate families, whenever we
send a field worker into a State to begin the study of pedigrees, making
as his central place of study an institution for the feeble-minded, is that
we can get, in any State, into a great network of degenerate families.
The Jukes and the Ishmaels and others are noted simply because they
have been studied. They are members of degenerate classes, but
they are not novel. There are hundreds of such families. The task
is to trace such families to their origin. The present-day lesson for
the Nation and for each State, community, and family is to prevent
the entrance of members of such families as human seed stock.

The CHAIRMAN. And they are not subject to the ordinary moral
or intellectual or social restraints that other people are?

Mr. Box. That is true, is it not?

Doctor LAUGHLIN. It is. In these degenerate families fecundity of
the tribe is limited by the physical fecundity of the women, married
and unmarried. That is the real limit.

Mr. WHITE. Are those people susceptible of improvement under
better environments?

Doctor LAUGHLIN. No. The Ishmael study was begun 40 years
ago. The original students had great hopes of rehabilitating these
people by charity and opportunity. But such of these people who
were given opportunities demonstrated that, despite opportunities
for education and for training and for positions, most of them could
not and did not make good. It was not in them. They could not
go on beyond their natural capacities.

Mr. WHITE. None of them has made good?

Doctor LAUGHLIN. None of the tribe—well, I will not say that.
Among these degenerates occasionally one will rise above the level, and
bud off from the tribe and become lost in the general population. I
had reference, however, to the general run, the "nine out of ten" of
them.

In New Jersey, take the State hospital at Morris Plains; there are
2,702 inmates, of whom 1,202 were foreign born. Of these foreign
born the superintendent reported only seven deportable.

Now, instead of taking up these different types of degeneracy, I
think I might as well go over this chart and give the summaries.
(See Table II, p. 8.)

Mr. Box. May I interrupt just a moment, Mr. Chairman? Isn't
there a restriction in our law about their deportation in addition to
the question of citizenship? They might be foreign born, unnatural-
ized, and still be in that class of nondeportable?

The CHAIRMAN. Yes.

Mr. Box. That is what I wanted to get.

The CHAIRMAN. And foreign born and not naturalized and con-
victed of certain crimes, and after a certain time not deportable?

Mr. HOLADAY. And they don't have to show in some cases that
the condition existed prior to their coming here?

The CHAIRMAN. This whole study is designed to point out the flaws in the deportation clauses of the act and the regulations.

Mr. VINCENT. In other words, up to date, the history of it makes it almost conclusive that there ought to be just one provision: If they violate any of these laws, deport them at any time.

Mr. HOLADAY. The Public Health Service makes a particular examination to find out the physical condition of the immigrant, so that if it comes up in the future, the question of deporting him, they can go back to the record and see what existed at the time he came in.

Mr. Box. Is it not true that in determining who should be sent to these institutions the local authorities often fail to make record of that? That very weakness could develop there, could it not?

Doctor LAUGHLIN. That is one place, of course.

The CHAIRMAN. Does it not further happen that the local authorities are unable to determine nativity?

Doctor LAUGHLIN. Often that is the case and even when they are able to, it is not required by the laws of some States, and many authorities were therefore not concerned with determining "place where born."

### DEFECTIVE ALIEN BLOOD IN THE SECOND GENERATION

Mr. Box. Is there anything to show the number of those in the institutions born of alien parents, either both or one?

Doctor LAUGHLIN. Not in this general survey. We found that very difficult, and only occasionally could we get a good return from an institution. For instance, the Connecticut School for Boys at Meriden, Conn., reported a total of 382 inmates, of whom 63 were foreign born and 319 were native born, but of those native born 90 had native-born parents, 14 had one parent foreign born, and 278 had both parents foreign born. Now, that is the sort of information we would like to get in every institution.

Mr. Box. But you did not get that in other institutions?

Doctor LAUGHLIN. No, sir. One other study that I mentioned in the last report as being appropriate for future investigation was mate selection, and I have already begun the collection of data on sex ratios. Now, the sex of the immigrant is very important, of course. We can see how the ultimate population of any country will be very different if the immigrants are 100 per cent males or if they are only 50 per cent males. So that is a question which would come under the head of mate selection, which I have indicated here (see p. 3). We hope to be able to make a study on this subject in the near future.

Mr. Box. Can you develop that idea?

Doctor LAUGHLIN. We desire to do that in an early study.

Mr. Box. Many young men of the best brain and brawn in this country have been absolutely sterile because of want of marriage. They work out their existence and fade away.

Doctor LAUGHLIN. An examination of such phenomena is one of the logical points to develop under the study of mate selection in relation to immigration, which we contemplate making.

This Connecticut institution just referred to, has made up an exceptionally thorough report. It is interesting to find that of the 382 who constitute the entire population of the institution, 278 have foreign-born parents, indicating that this institution for delinquent

boys is maintained not for American stock but for either aliens or children of persons who have been in this country only one generation. That is the report from Connecticut.

Mr. Box. What class of inadequates is that?

Doctor LAUGHLIN. Juvenile delinquents.

Mr. RAKER. Did you get any reports of the Government institutions here in Washington for boys and girls?

Doctor LAUGHLIN. Yes; these returns are from State and Federal institutions. The Federal Government has only about 15 custodial institutions. It has an institution for the insane here in Washington; it has also several Federal penitentiaries. About 15 out of 688 State and Feedral institutions are maintained by the Federal Government.

### THE PRINCIPAL LEGAL CAUSE OF NONDEPORTABILITY

The CHAIRMAN. Let me interrupt you there. I want to make a point in the matter of reasons for nondeportability.

Doctor LAUGHLIN. The reason most nondeportable foreign-born social inadequates are not deportable is because they have been in the United States more than five years. The insane come to the United States at the average age of 28 years. Those who break down and go to the hospitals for the insane do so at the average age of 41 years. Thus the average alien who goes to the hospital for the insane has been in the United States 13 years, and consequently is not deportable. This is the principal reason for the great difference between the number of foreign-born insane and the number of foreign-born insane persons who are deportable. The second factor of naturalization is relatively less important as a deterrent cause. (Table II, p. 8.)

### THE DIRECT COST OF ALIENS IN INSTITUTIONS

The CHAIRMAN. Now this is a good place to bring up the matter of statute of limitations—the five-year period. With the feeble-minded, five years is long enough, because if a person is feeble-midned now and found in an institution, that person is always feeble-minded. With the insane or the potentially insane, the five-year period of limitation is not enough, because, on the average, those persons are here 13 years before they are sent to institutions.

Then there is the matter of cost of aliens in institutions. What is the total amount?

Doctor LAUGHLIN. At $1 per inmate per day, it costs the State governments about $75,000 per day to maintain its foreign-born institutional inmates.

Mr. Box. Multiply it by 365 and see what that would be for the year.

Doctor LAUGHLIN. Of course the greatest expense to the Nation is not the dollars and cents for this maintenance, but the moral and social cost, and above all it is the biological cost. If these persons are potential parents, they are going to cost not only in dollars and cents now and in future time, but they are going to deteriorate and degenerate the whole population into which they and their children migrate.

### NORMAL INADEQUACY OF YOUTH AND OLD AGE

I mentioned the point of family and community and State and National responsibility, and how laws are gradually being enacted and administrative systems worked out to thrust upon or return to the community or the family or the State that permits production of the individual, the custody of that person.   In most of these studies the term "socially inadequate" is not applied to a person who is incapacitated on account of the normal inadequacy of young childhood and old age.   The child could not make a living, of course, until he was 15 or 16 years old, and a man 80 years of age is not apt to be able to care for himself.

Mr. VINCENT. Now wait a moment on that.  You say 15 or 16. You can put it down to 10 if you give them a chance and don't bind them down by laws.

Mr. Box. Of course Doctor Laughlin is assuming that the boy ought to be in school.

Mr. VINCENT. Yes, I know.

Doctor LAUGHLIN. The point is that the definition "social inadequacy" does not apply to the normal exigencies of childhood and old age.   They are both normal, and mean nothing from the eugenic standpoint.

Now the study of deportation naturally leads up to the question of registration, and if there were a registration system for aliens in operation in the United States at the present time, then information of the sort, but much more complete and refined than that which we have here, could be compiled, and such facts should be compiled and analyzed every year for the use of this committee and of the whole country.

### INITIATIVE BY THE FEDERAL IMMIGRATION SERVICE

I want to call attention to one phrase or one paragraph in the present immigration law and to point out its defects in not supporting properly or not supporting effectively a system for studying alien inadequates in the United States and locating them on the initiative of the United States.

In the act of February 5, 1917, section 23, it provides:

It shall be the duty of the Commissioner General of Immigration to detail officers of the Immigration Service from time to time  *   *   *  to secure information as to the number of aliens detained in the penal, reformatory, and charitable institutions (public and private) of the several States and Territories, the District of Columbia, and other territory of the United States, and to inform the officers of such institutions of the provisions of law in relation to the deportation of aliens who have become public charges.

That is in the law of 1917, but there is no provision for the maintenance of a thorough roster of State, Federal, and local institutions, nor of courts, nor of charity organizations, which latter are often the first to come in contact with a potential inadequate.

If an amendment to this section of the law just read should require such a roster to be kept up to date, then I think it would be much easier for the Immigration Service to maintain the deportation service and to maintain contact with all these sources of social inadequacy among the foreign born.   Not only should institutions

be listed in roster form, but all charitable societies which are not custodial should be listed and close contact kept with them. If the charitable organizations are not listed and used as collaborators, then the statute of limitations is pretty apt to exclude from deportation the average socially inadequate person, because individuals of this sort, very frequently, drift among charity organizations for several years before they are sent to the permanent custodial institutions. It is essential in effective deportation practice to find an individual early in his social breakdown; that is, before he is rendered nondeportable by the statute of limitations.

The CHAIRMAN. Even if they found them early, we would find that other countries were not willing to take them without a great exchange of letters which endeavor to show their place of nativity and proof of birth in a foreign country, and the extent of the breakdown here which makes it desirable for this country to turn them back to the country that gave them to us. That is one of the hard things of deportation. Now my experience is that the service down here, the Immigration Service, carries on correspondence with State institutions and asks them to report the number of deportable aliens frequently, and then sends crews around the United States gathering up these deportables, particularly criminals whose sentences are about to expire, and finally brings a carload to New York and sends them out.

Doctor LAUGHLIN. There is no criticism of the administration of the law, with the present machinery, and the present appropriation. It is simply the tremendous job that the law has imposed upon the Immigration Service. New standards, new procedures, better machinery, and larger appropriations are needed.

From the standpoint of a good many of these institutions, we find that they never heard of the deportation act, nor do they know how to initiate deportation procedure.

The CHAIRMAN. There is a big flaw somewhere, because the figures right here for the year just closed show only a few thousand deported. They show many thousand alien seamen deserted and a large number of stowaways in the country, to say nothing of the classes that begin after that, criminal and dependent.

Mr. HOLADAY. And thousands of excess quota over the borders, smuggled in.

Doctor LAUGHLIN. These studies are only of State and Federal institutions. Only a small portion of the Nation's deportables are found in such institutions. The service should deport from local institutions, as well as State institutions. This is a relatively small study of the whole population. There are only about 75,000 foreigners included in this whole study.

The new deportation act should provide for combing the Federal, State, local, and private institutions, and for keeping in touch with the courts and charity organizations, and otherwise actively searching out deportables in the whole population, both in institutions and at large.

The CHAIRMAN. Let us come to the conclusion of the whole matter.

## THREE PRIMARY FACTORS IN NATIONAL EUGENIC TREND

Doctor LAUGHLIN. Every nation in its racial trend depends primarily on three factors. It depends first on mate selection, which is very important. The States govern that without any reference to the Federal Government, but to know who marry and whom they marry is very important. Its control is a matter of custom much more than of statute law.

The second factor in racial destiny is differential fecundity—that is, not only the absolute number of children that a given mating will have, but the relative number of children which matings of the better classes produce, compared to the numbers which inferior classes produce. That, too, is a matter controlled largely by custom and by social and economic factors. The Federal Government has almost nothing and the State governments very little to do with differential fecundity.

Mr. Box. It is a matter of State control, as far as it is controlled at all, is it not?

Doctor LAUGHLIN. Yes, sir. Now the States, for instance, have tried in a small manner to lower the production degenerates. In all, 23 States have passed eugenical sterilization laws providing for the sexual sterilization of certain classes. Of course that is not a Federal matter.

The third factor in racial destiny is human migration, and under the form of government which we have in the United States it is, of course, entrusted to the hands of the Federal Government.

Mr. VINCENT. Now, will you restate the three basal factors, please?

Doctor LAUGHLIN. The first is mate selection; second, differential fecundity, and third, human migration.

Deportation is a phase of migration control. It is a matter of mixed Federal authority and State responsibility. The peculiar thing is this: that the States have the responsibility to go into the population at large to take custody of and care for social inadequates, such as the feeble-minded, the insane, and the criminalistic classes. It institutionalizes them and pays for their maintenance, whether they are foreign born or native born. The Federal Government has the sole authority to admit and to deport aliens, so that unless there is a close cooperation between the Federal Government with the authority, and the States with the responsibility, the last line of defense, or deportation, is going to break down, and the principal reason why the deportation system is not working in the United States is on account of this lack of coordination.

### DEFINITION OF "PUBLIC CHARGE"

There is another matter. Our laws should define "public charge" clearly. If a person is in an institution maintained by the State, the Federal Government, a city or a town, he is a public charge. The institution may be maintained in whole or in part by State funds, so that in order to cover the case clearly, a definition of "public charge" should be put into this clause to clarify it.

Mr. BACON. Would you advocate that?

Doctor LAUGHLIN. Yes, sir, I would add:

For the purpose of this act, a public charge is a person maintained in whole or in part by public funds in a Federal, State, city, county or township custodial or charitable institution, or who receives outdoor relief at public expense.

For maintenance, institutional inmates cost at least $1 per day. Moreover, there is a great overhead expense in buildings and administration in the operation of these institutions. In an earlier institutional survey, I found that in 1916, for 576 institutions in all of the States, the average investment in institutional plants per inmate was $1,034.71.

The computed cost of a "public charge" should include the entire cost and maintenance, including overhead and administration—that is, what it actually costs the State.

In 1915 our previous survey showed that Massachusetts spent 30.4 per cent of all of her State expenditures for State custodial institutions. In the same year Alabama spent 5.4 per cent of her appropriations for the same purpose, while the several States as a unit spent 15.8 per cent of their total State appropriations for this purpose. A large percentage of the inmates of these institutions are deportable aliens who are not deported. Thus, from the standpoint of dollars and cents, which is the least debit, failure of Federal deportation is costing the States a great deal of money.

ROSTER OF SOURCES FOR LOCATING INADEQUATE ALIENS

There is another item of importance. The Commissioner General of Immigration should be instructed to maintain, besides a roster of public custodial institutions, a list of and to make contacts with all agencies rendering outdoors relief at public expense. There is no roster of these public institutions and agencies kept now. When we want to make a special survey, we have to gather the names of these institutions from random and scattered sources.

The CHAIRMAN. Would you like a roster to go beyond the State institutions and to the counties and cities?

Doctor LAUGHLIN. Yes, sir; a roster of institutions for all classes of social inadequates where such institutions are maintained in whole or in part by the Federal Government, the State government, cities, or counties. I would include also the private institutions, the courts, and the charity organizations.

Besides producing and maintaining such a roster up to date, the law should require the deportation service to maintain friendly relations with all such institutions and agencies, and to take the initiative in explaining to the responsible authorities of each of these public institutions and organizations the law on deportation, and the procedure to be followed in deporting deportable aliens and in instituting deportation proceedings.

The CHAIRMAN. In the case of a person about to be deported, does the State pay the cost of transportation, say from Oregon to Ellis Island?

Doctor LAUGHLIN. The Federal deportation service generally pays that. The deportee or his friends pay the expenses of a friend or relative who accompanies voluntarily the deportee. Generally the deportee is a public charge and has no money. The State looks on deportation as a Federal matter. (See p. 15.)

EUGENICAL ASPECTS OF DEPORTATION

The CHAIRMAN. The immigration bureau in Portland, Oreg., in the month of October, 1924, spent $1,744 for railroad tickets alone for deporting aliens. Then do you think a bill somewhat enlarging the scope and making clearer certain processes is necessary?

Doctor LAUGHLIN. Yes, sir.

Mr. HOLADAY. Have you any idea of the cost to the States and counties of maintaining deportable persons?

Doctor LAUGHLIN. I have the figures. That may be computed by finding the number of deportable persons and assuming that it costs just as much to maintain an alien as it does a native-born citizen in the institution.

In a survey just completed we received returns from 684 out of 688 State institutions for all types of inadequates, including the criminalistic, the insane, the feeble-minded, and other classes. These are only the institutions maintained directly by the State, and do not cover those maintained by the municipalities, nor do they include private institutions. We found 74,170 foreign-born inmates. Of course the immigration law contemplated keeping these out, but nevertheless they got in. The next best thing is to provide for the deportation of most of them. Indeed, only 3,526 of this total number were certified as becoming inadequate through causes arising since their arrival in the United States.

### MAINTENANCE COST OF INADEQUATE ALIENS

We have made no exact computation of the direct cost of maintaining institutional inmates since 1915. In that year, however, we found that for all State custodial institutions the average maintenance cost was $17.35 per month. This varied from $15.21 for the feeble-minded to $40.64 for the leprous, the criminals averaging $18.93 maintenance cost per month. If, since 1915, the general cost of living has increased approximately 70 per cent, then it is a fair estimate that now these 74,170 alien inmates in State institutions are costing approximately $1 each per day for maintenance. This does not include any charges against institutional establishment.

So far as the Federal Government is concerned, the situation is this: The United States arrogates to itself the authority to control immigration, but the several States have the function of maintaining most of the social inadequates. There would be poetic justice in the States asking the Federal Government to permit itself to be sued in Federal courts to recover maintenance cost of aliens whom the Federal Government has admitted and who are thrust upon the States without any choice on their part, and whom the Federal Government is, it would seem, duty bound, at least, to deport. For the year ending June 30, 1927, the net cost to the Federal Government of the Immigration Service was $1,922,478. Against this the several States are spending approximately $27,000,000 per year for maintenance of alien adequates whom our Immigration Service has let into the country and whom our deportation service does not remove. The authority and the responsibility for controlling the admission and deportation of immigrants is a Federal matter, but the cost and responsibility for caring for inadequate aliens falls largely to the several States.

045

Of course, listing this direct cost of $27,000,000 per year is interesting and is a valuable piece of information because it is definitely measurable, but this direct cost is only a small fraction of the actual cost of inferior aliens. Their economic inefficiency and their destruction of property when at large amounts, in costs, to many millions of dollars more than the direct cost of those who fall so low as to become public charges, while the greatest costs of all are, of course, the lowering of national efficiency, the destruction of national ideals, and the position of inferior aliens as seed stock for the future generations of Americans. Superior aliens are needed in the United States for the same reasons that the inferior should be rejected. This is not a matter of race, but of family stock within each race.

Mr. Box. In the question of expense, has any one estimated the total cost or indirect expense to the country of the poor, indigent, and incompetent that come to this country that are not put into institutions?

The CHAIRMAN. You mean municipal and private aid to families and that sort of thing?

Mr. Box. Yes, and the economic drain on the whole country. You see that has been overlooked entirely in our discussion so far, and I thought possibly, before we got through, we might get that. Presumably that is much greater than the amount listed in these other figures. Is that capable of segregation?

Doctor LAUGHLIN. Not definitely now, but we could, by research, get at it reasonably near. Such a study of costs should include, first, direct institutional cost of defective and dependent aliens, such as we have already given; second, cost of outdoor relief; third, cost of loss of efficiency and in destruction of property by individual immigrants who are inadequate from constitutional causes; and fourth the social and biological costs chargeable to lower efficiency of the offspring of degenerate immigrants, compared with normal American efficiency, and the social and biological assets accredited to increased efficiency of superior immigrant strains. We should then strike a balance. It would be a big but a possible job.

The CHAIRMAN. Now I want to ask, do your figures take into consideration those admitted into hospitals to be cured of various deportable diseases? In other words, I visited Ellis Island one day and there saw several wards full of boys with scalp diseases.

Doctor LAUGHLIN. It is not the infectious disease which is eugenically the most dangerous. It is the constitutional diseases which are hereditary that concerns us. Of course we all understand that a person with almost any infectious disease, unless it is syphilis or leprosy or tuberculosis, can come to the United States and be cured and not affect the good citizenship or the individual effectiveness or the blood of the individual.

The CHAIRMAN. Just an inconvenience, not a danger.

Doctor LAUGHLIN. It is a job for quarantine, rather than for deportation.

Mr. WHITE. How do so many of these nonadmissible aliens—the class described by you—get into the United States?

Doctor LAUGHLIN. They get through the immigration sieve simply because the Immigration Service can not diagnose a man's prospect by the short examination given. Making a diagnosis is a big job, if properly done.

The CHAIRMAN. How do the States fail to connect up with the Federal deportation service—that is to say, if they are sleeping on their rights, why?

Doctor LAUGHLIN. The superintendents and boards of trustees of the custodial institutions in the States, having complete charge of persons committed to their keeping, rarely get in touch with the deportation service of the Federal Bureau of Immigration. The average alien lives in the institution the same as a native born, and when he crosses the five-year limit he is not deportable. That's the average history. The more thorough the examination—personal and family—the more surely would we exclude those who later become deportable. This examination should not only include the physical examination at Ellis Island but should be supported by the history or background of the immigrant. His individual or family history is really more important than his physical examination. The Johnson Act of 1924 is a step in this direction.

Mr. WHITE. So that, as a matter of fact, the trouble that the States and counties and the Federal Government are up against is that we are not furnishing a sufficient number of employees, medical assistants, both men and women, who are competent to pass upon the aliens and make the necessary examination? Is that not one of the biggest troubles?

Doctor LAUGHLIN. Yes, sir; that is one of the major troubles. Prevention of necessity for deportation is the best remedy. However, do the best the Nation can, there will always be need for deportation, or the "final selection," so long as we are an immigrant-receiving nation.

An inventory of aliens in the United States on the basis of racial and social values would constitute a measure of the degree to which our immigration laws, including provisions for deportation, are effective. One item in this inventory consists of the aliens in institutions. If we could have foreseen that the particular alien would have become a public charge we would not have admitted him. Also, if races which are not assimilable with the foundation American stocks are found in large numbers within the United States, this too is a measure of the failure of the immigration laws to work to the best interests of the country. Then, within each race, the lower qualities of individuals—those not inadequate enough to become custodial charges but much below the average of our own national efficiency—are not adding to our national welfare. Only those individuals of compatible race who are capable of reproducing offspring of superior quality, and who, themselves, are superior, constitute immigration assets.

### PARALLEL BETWEEN RECRUITING THOROUGHBRED STOCK BLOOD BY PURCHASE AND NATIONAL FAMILY STOCK BLOOD BY IMMIGRATION

I have made some studies with regard to a closely parallel thing for Mr. Walter J. Salmon of New York, one of the most distinguished and successful breeders of thoroughbred horses in the United States. When this gentleman recruits his stud farm, he never even considers acquiring a mare or a stallion not of the top level, judged by excellence of near-kin, and he has been very successful in racing for that reason. He weeds out from the lower levels and recruits by purchase, analo-

047

gous to immigration in man, to the top levels. Man is an animal, and so far as heredity and future generations are concerned, there is considerable real basis for the comparison just made.

Now, I will show you how this applies to our foreign-born population. The foreign-born population in the United States, if the standard had been, not the very highest, but barely above our native average, would, instead of having 13,000,000 foreign born in the United States in 1920, have refused admission to more than 8,600,000 of them. We have already discussed this particular matter. (See p. 26).

## PRESENT LOW LEGAL STANDARD FOR INTELLIGENCE IN THE IMMIGRANT

The present immigration laws of the United States, so far as intelligence is concerned, draw the line barely above feeble-mindedness. A person who has intelligence enough to keep out of custodial institutions has enough to conform to the immigration laws of the United States; whereas it seems to be logical, in studying population, if immigration is to recruit to the improvement of quality of our population, with reference to intelligence, this quality in the new human seed stock ought at least to be above the average, instead of below it.

Any sound immigration policy calls for setting our national standards in reference to the total number of immigrants we can assimilate; then in distributing them by the quota system according to race; then, inside of each race, selecting superior individuals, and, above all, in insisting that these individuals be of such sound hereditary endowment that their offspring will tend to raise the level of American intelligence, and to improve the standard of all other hereditary qualities which we prize in the American people, such as honesty, industry, intitiative, courage, natural reverence for law and order, altruistic instincts, artistic talents, ability to collaborate, ability to solve new problems, generally called inventiveness, and the like. These qualities, besides sound bodies, are the fundamental inborn possessions of a superior race. In administering such a standard, we have first to select, in his home territory, the would-be immigrant from among many applicants; then we can study him on board ship; then we can give him the thorough examination at the port of entry; then we can, if we choose, and doubtless shall have to, register him; then if he does not make good, we can deport him. Deportation is the last line of defense. If we do not deport the undesirable individual, we can not get rid of his blood, no matter how inferior it may be, because we can not deport his offspring born here. A child born here, regardless of race or degeneracy, is a citizen of the United States and is eligible to the Presidency, so far as birth and citizenship are concerned.

## GAP BETWEEN FEDERAL AND STATE DEPORTATION ACTIVITIES

In examining deportation, as it works at present, it is clear that the machinery is not perfectly adapted to its purpose. There is a great gap between the Federal authority and the State responsibility for the care of inadequate aliens. There is not much general knowledge, among people who deal with inadequate aliens, about the procedure to be followed in deportation. The Federal Government lacks sufficient funds for carrying on the work adequately, even if all other factors were favorable.

## THE USE OF IMMIGRATION

Immigration can be made to improve the quality of the American people, but if the present standard is not raised and rigidly enforced, and if the aliens of degenerate or inferior stock who are found within our borders, especially those who will become the parents of future Americans, are not deported, then, depending on the number of such cases, immigration will tend to work not toward the improvement but toward the degeneration of the American people.

The CHAIRMAN. This hearing, together with the charts and tables which have been worked out for it, will be published in due form for our use, and we thank Doctor Laughlin for his valuable services in making these researches and in presenting their findings to us. Immigration looks more and more like a biological problem, and if the work of this committee results in establishing this principle in our immigration policy we will be well repaid for our efforts.

# APPENDICES

Appendix 1. Historical development of the United States deportation statutes and rules. Prepared by Mrs. Marguerite Drake Conklin.

Appendix 2. Statutes and rules as chronologically developed for each deportable class of aliens. Prepared by Mrs. Marguerite Drake Conklin.

Appendix 3. Boundaries of immigration administrative districts of the United States, established by rule 28 of the Immigration Regulations, March 1, 1927. (See map opposite p. 52.)

Appendix 4. Practice of the several States in reference to the deportation of socially inadequate aliens, and to the return of socially inadequate citizens of other States. Prepared by Harry H. Laughlin.

Appendix 5. Report of the medical examiner of the New York State Bureau of Special Examinations, for the year ending June 30, 1925. Prepared by Spencer L. Dawes, M. D., medical examiner.

Appendix 6. Deportation of aliens and return of citizens to other States, by classes of social inadequacy. Survey ending January 1, 1923. Hitherto unpublished findings of a preliminary investigation on deportation made for the Committee on Immigration and Naturalization of the House of Representatives, by Harry H. Laughlin.

Appendix 7. The causes of nondeportability of foreign-born inmates of American State and Federal custodial institutions. This is a special memorandum prepared by Harry H. Laughlin, for Hon. Albert Johnson, chairman of the Committee on Immigration and Naturalization of the House of Representatives. This study consists of an analysis of the principal findings of the present investigations on deportation made for this committee.

Appendix 8. Set of the principal schedules used in securing data for the researches on deportation reported in this hearing. Prepared by Harry H. Laughlin.

## APPENDIX 1

*Historical development of the United States deportation statutes and rules*

[Prepared by Mrs. Marguerite Drake Conklin]

| Statute of rule | Provisions |
| --- | --- |
| Mar. 3, 1875, statute, sec. 3... | All convicts and prostitutes must be returned to the country whence they came, at the expense of the transportation agency by which they were brought to port of entry. |
| May 6, 1882, statute, secs. 1, 6, and 12. | All Chinese laborers are deportable. Every Chinese person other than a laborer who is entitled to enter the United States is deportable at any time by any justice, judge, or commissioner of the court of the United States at the cost of the United States, unless he possesses a certificate of admission by the Chinese Government. |
| Aug. 3, 1882, statute, sec. 2... | Lunatics, idiots, and persons likely to become public charges, added to excluded classes, are deportable at the expense of the transportation agency by which they were brought to port of entry. |
| Feb. 23, 1887, statute, sec. 7... | All contract laborers (except domestics, and skilled workmen for new trades not established in the United States, and all persons belonging to recognized professions) are deportable within one year after entry. |
| Sept. 13, 1888, statute, secs. 6 and 13. | All Chinese laborers who have returned to the United States are deportable at any time by any justice, judge, or commissioner of a United States court, unless the particular individual has a lawful wife, child, or parent in the United States, or property therein to the value of $1,000, or debts of like amount due him and pending payment. All Chinese persons, or persons of Chinese descent, found unlawfully in the United States or territories are deportable at any time. |
| Mar. 3, 1891, statute, secs. 11 and 5. | Insane persons, paupers, persons with loathsome or dangerous contagious diseases, polygamists, contract laborers coming in answer to advertisements abroad, and assisted persons who belong to any excluded class are deportable within one year after entry. |
| May 5, 1892, statute, secs. 2 and 6. | All Chinese laborers within the United States at the time of the passage of this act, and who are otherwise entitled to remain in the United States, are deportable after one year unless they possess certificates of residence issued by the collector of revenue of their respective districts. |
| Apr. 29, 1902, statute, sec. 1... | All Chinese laborers and Chinese persons or persons of Chinese descent are deportable from the island territories unless they comply with the rules and laws, which are the same for the island territories as for the mainland; and all Chinese laborers, who enter the mainland from island territories or who go from one portion of island territory to another, are deportable. |

89604—28——4

47

*Historical development of the United States deportation statutes and rules*—Continued

| Statute of rule | Provisions |
|---|---|
| Mar. 3, 1903, statute, sec. 21.. | All epileptics, insane persons who have had one or more attacks of insanity within 5 years previous to entry or who have had two or more attacks of insanity at any time previously, professional beggars, anarchists, and persons who attempt to bring in prostitutes are deportable within 1 year after entry.<br>All persons who are likely to become public charges are deportable within 2 years after entry.<br>All other aliens except contract laborers are deportable within 3 years after entry at expense of persons unlawfully bringing them in, or of the immigrant fund.<br>When aliens are to be immediately returned to the country whence they came, and when their physical or mental conditions are such as to require personal care, the particular vessel which brought the particular immigrant to port of entry pays the expense of the attendant. |
| Feb. 20, 1907, statute, secs. 2 and 20. | Imbeciles, feeble-minded persons, persons with tuberculosis, persons otherwise mentally or physically defective, public charges and children under 16 years of age unaccompanied by parent are deportable within 3 years after entry. |
| Feb. 5, 1917, statute, secs. 3 and 19. | Any alien who at the time of entry was a member of one or more of the classes excluded by law is deportable within 5 years after entry.<br>Alien violators of United States laws, aliens advocating or teaching the unlawful destruction of property, or teaching anarchy, or the overthrow of the Government of the United States are deportable within 5 years, at the expense of the transportation agency which brought the particular immigrant to port of entry.<br>All aliens who within 5 years have become public charges from causes not affirmatively shown to have arisen subsequent to landing are deportable.<br>All aliens who within 5 years have been sentenced to imprisonment for a term of 1 year or more, because of a crime involving moral turpitude, are deportable.<br>All aliens who are connected in any manner with a house of prostitution, or who receive benefits from any part of the earnings of any prostitute, are deportable within 5 years, at the expense of the transportation agency which brought the particular immigrant to port of entry.<br>All aliens who have entered the United States by water or land at any time or place other than designated by immigration officials, or who have entered without inspection, are deportable within 3 years after entry, at the expense of the transportation agency which brought the particular immigrant to port of entry. |
| Feb. 5, 1917, rule No. 3...... | All Chinese persons, who were members of one or more of the classes excluded by law under the immigration act of 1917, are deportable within 5 years after entry. |
| Feb. 5, 1917, rule No. 6...... | Every Chinese person refused admission to the United States, being actually or constructively on the vessel or other conveyance by which he was brought to port of entry, must be returned to the country whence he came, at the expense of the transportation agency owning such a vessel or conveyance. |
| May 19, 1921, statute, sec. 2.. | All aliens are deportable who have entered the United States after their respective 3 per cent quota allotments have been filled for that particular fiscal year. |
| May 26, 1924, statute, secs. 7 and 14. | Any alien who at any time after entering the United States is found to have entered without proper immigration visa, or to have remained therein for a longer time than permitted by regulations, shall be deported in the same manner as provided for in secs. 19 and 20 of the immigration act of 1917. |
| July 1, 1925 statute, sec. 10... | All aliens are deportable who have entered the United States after their respective 2 per cent quota allotments have been filled for the particular year. |

## SPECIAL CASES OF NONDEPORTABILITY

| | |
|---|---|
| 1917, rule 6.................. | Every child under 16 accompanied by either parent is deportable, unless a parent is already in the United States, or unless the board finds that the child is strong and healthy, and not likely to become a public charge. |
| 1917, rule 4.................. | The following classes of aliens over 16 years may enter and remain in the United States, whether such person can read or not, if otherwise admissible:<br>(1) Persons who are physically incapable of reading.<br>(2) Any alien or citizen of the United States may bring or send for his father or grandfather over 55 years of age, his wife, his mother, or grandmother, or his unmarried or widowed daughter, if such relative is otherwise admissible.<br>(3) Persons entering the United States to avoid religious persecution in the country of their last permanent address.<br>(4) Persons previously residing in the United States for 5 years who return to the United States within 6 months from the date of their departure therefrom.<br>(5) Persons in transit through the United States.<br>(6) Persons lawfully admitted and who later go in transit through foreign contiguous territory.<br>(7) Exhibitors and employees of fairs and expositions authorized by Congress. |

**051**

*Historical development of the United States deportation statutes and rules*—Continued

SPECIAL CASES OF NONDEPORTABILITY—Continued

| Statute of rule | Provisions |
|---|---|
| 1917 statute, sec. 3 | Skilled labor, if otherwise admissible, may remain in the United States if labor of like kind unemployed can not be found in this country. The provisions of this law shall not be held to exclude professional actors, artists, professors for colleges or seminaries, persons belonging to recognized learned professions, or persons employed as domestic servants. |
| 1917 statute, sec. 3 | Nothing in this act shall be construed to apply to accredited officials of foreign governments, nor to their suites, families, or guests. |
| 1917, rule 25 | Any alien brought to the United States in violation of law may be detained, if the testimony of such alien is necessary on behalf of the U. S. Government in the prosecution of offenders against any provision of this act or laws of the United States. |
| 1917 statute, sec. 18 | If the health and safety of an insane alien would be unduly imperiled by immediate deportation, such alien may, at the expense of the appropriation for the enforcement of this act, be held for treatment until such time as such alien may, in the opinion of such medical officer, be safely deported. If the wife or minor child of an alien resident in the United States arrives afflicted with tuberculosis or a loathsome or dangerous contagious disease which is easily curable, he or she may be detained for hospital treatment and not deported. |
| 1917 statute, sec. 21 | Any alien likely to become a public charge may remain in this country upon giving a suitable and proper bond. |
| 1917, rule 17, subdivision 1 | Aliens whose prompt deportation can not be accomplished because of war or other conditions may, upon permission secured from the department, be released and permitted to accept self-supporting employment. |

## APPENDIX 2

*Statutes and rules on deportation as chronologically developed for each deportable class of aliens*

[Prepared by Mrs. Marguerite Drake Conklin]

| Deportable classes | Statute or rule | Conditions |
|---|---|---|
| 1. Convicts (except for political offense only). | Mar. 3, 1875, statute, sec. 5. | Every convict must be returned to the country whence he came by the transportation agency bringing him to port of entry. |
| Do | Aug. 3, 1882, statute, sec. 4. | Expense of return voyage of all convicts is paid by owner of the vessel bringing them to port of entry. |
| Do | Mar. 3, 1891, statute, sec. 11. | All convicts are deportable within 1 year after entry. |
| Do | Mar. 3, 1903, statute, sec. 21. | All convicts are deportable within 3 years after entry, at the expense of the transportation agency bringing them to port of entry. Such agency also must pay one-half of the expenses to port of entry. |
| Do | Feb. 5, 1917, statute, sec. 19. | All criminals are deportable within 5 years after entry. |
| Do | May 1, 1917, rule, No. 22. | All aliens who, within 5 years, have been sentenced to imprisonment for a term of 1 year or more because of a crime involving moral turpitude are deportable. |
| 2. Prostitutes, or white slave traders. | Mar. 3, 1875, statute, sec. 5. | Women imported for purposes of prostitution are returned immediately. |
| Do | Mar. 3, 1903, statute, secs. 2 and 3. | All prostitutes and all aliens importing or attempting to import prostitutes, are deportable within 3 years after entry, at expense of the deportation agency bringing them to port of entry. |
| Do | Feb. 20, 1907, statute, secs. 2 and 3. | All aliens who are connected with a house of prostitution or who are receiving benefit from any part of the earnings of any prostitute or who are connected with any immoral practice are deportable by the amended law of 1903. |
| Do | Feb. 5, 1917, statute, sec. 19. | Aliens practicing prostitution, connected with houses of prostitution or places frequented by prostitutes, either as manager, employee, or sharer in proceeds, or persons importing or aiding in any way women entering for purpose of prostitution, or for any other immoral purpose, or aliens previously deported under a similar act are deportable within 5 years. |
| 3. Contract laborers | Feb. 23, 1887, statute, sec. 7. | All contract laborers, except domestics, and skilled workmen for new trades not established in the United States, and all persons belonging to recognized professions are deportable within 1 year after entry at the expense of the transportation agency bringing them to port of entry. |

*Statutes and rules on deportation as chronologically developed for each deportable class of aliens*—Continued

| Deportable classes | Statute or rule | Conditions |
|---|---|---|
| **3. Contract laborers** | Mar. 3, 1891, statute, sec. 5. | The provisions of the law of 1891 shall not be held to exclude private secretaries, and servants of foreigners temporarily residing in the United States, nor ministers, professors, or persons belonging to recognized learned professions. |
| Do | Apr. 29, 1902, statute, sec. 3. | Exhibitors and employees of fairs and expositions authorized by Congress are not deportable. |
| Do | Mar. 3, 1903, statute, secs. 20 and 21. | Skilled labor, if otherwise admissible, may remain in the United States if unemployed labor of like kind can not be found in this country. |
| Do | May 1, 1917, rule 27, subdivision 6. | Otherwise admissible aliens may enter under contract for purpose of learning skilled trade if $500 bond is given to guarantee their immediate return when the course of training is finished. |
| **4. Public charge** | Aug. 3, 1882, statute, sec. 2. | All aliens who are likely to become public charges are immediately deportable. |
| Do | Mar. 3, 1891, statute, sec. 11. | All aliens who are likely to become public charges are deportable within 1 year after entry, at expense of vessel bringing them to port of entry. |
| Do | Mar. 3, 1903, statute, sec. 20. | All aliens who have become public charges due to causes prior to entry are deportable within 2 years. at the expense of transportation agency bringing them to port of entry, or from immigrant fund. |
| Do | Feb. 20, 1907, statute, secs. 19, 21, 23. | All aliens who have become public charges due to causes prior to entry are deportable within 3 years at the expense of the transportation agency bringing them to port of entry, or from immigrant fund. |
| Do | May 1, 1917, rule No. 22, subdivision 11. | All aliens who have become public charges due to causes prior to entry are deportable within 5 years. at the expense of the transportation agency bringing them to port of entry, or from immigrant fund. Aliens likely to become public charges may be admitted under bond. |
| **5. Insane** | Aug. 3, 1882, statute, sec. 2. | All lunatics are immediately deportable at the expense of transportation agency bringing them to port of entry. |
| Do | Mar. 3, 1891, statute, sec. 1. | All insane persons are deportable within 1 year at expense of transportation agency bringing them to port of entry. |
| Do | Mar. 3, 1903, statute, secs. 2 and 21. | Insane persons who have had one or more attacks of insanity within 5 years previous to entry or who have had two or more attacks at any time previously are deportable within 1 year after entry. |
| Do | Feb. 5, 1917, statute, secs. 18 and 19. | If the health and safety of an insane alien would be unduly imperiled by immediate deportation, such alien may, at the expense of the appropriation for the enforcement of this act, be held for treatment until such time as such alien may, in the opinion of such medical officer, be safely deported. |
| Do | May 1, 1917, statute, secs. 5 and 23. | When insane aliens are to be returned to the country whence they came, and when their physical or mental conditions are such as to require personal care, the vessel which brought them to port of entry must pay the expense of the attendant. |
| **6. Feebleminded** | Aug. 3, 1882, statute, sec. 2. | All idiots are immediately deportable. |
| Do | Mar. 3, 1891, statute, sec. 1. | All feeble-minded aliens are deportable within 1 year after entry. |
| Do | Mar. 3, 1903, statute, sec. 21. | All feeble-minded aliens are deportable within 3 years. |
| Do | Feb. 20, 1907, statute, secs. 2 and 20. | All idiots, imbeciles, feeble-minded persons are deportable within 3 years. |
| Do | Feb. 5, 1917, statute, secs. 3 and 19. | All idiots, imbeciles, feeble-minded persons are deportable within 5 years. |
| **7. Loathsome or dangerous contagious disease.** | Mar. 3, 1891, statute, secs. 1 and 11. | Aliens afflicted with loathsome or dangerous contagious disease are deportable within 1 year. |
| Do | Mar. 3, 1903, statute, sec. 21. | All aliens afflicted with loathsome or dangerous contagious diseases are deportable within 3 years. |
| Do | Feb. 20, 1907, statute, sec. 2. | All aliens afflicted with tuberculosis are deportable within 3 years. |
| Do | Feb. 5, 1917, statute, secs. 11 and 22. | If the wife or minor child of an alien resident in the United States arrives afflicted with tuberculosis or a loathsome contagious disease which is easily curable, he or she may be detained for hospital treatment and not deported. |
| Do | | Aliens coming from country where an epidemic or disease is prevalent may be detained on board for examination pending deportation or admission. |
| **8. Anarchists** | Mar. 3, 1903, statute, secs. 2 and 21. | Persons who advocate the overthrow of United States Government by violence or of all government and forms of law, or the assassination of public officials are deportable. |

**053**

## EUGENICAL ASPECTS OF DEPORTATION

*Statutes and rules on deportation as chronologically developed for each deportable class of aliens*—Continued

| Deportable classes | Statute or rule | Conditions |
|---|---|---|
| 8. Anarchists | Feb. 5, 1917, statute, sec. 3. | Alien violators of United States laws, aliens advocating or teaching the unlawful destruction of property, or teaching anarchy, or the overthrow of the Government of the United States are deportable within 5 years. |
| 9. Epileptics | Mar. 3, 1903, statute, sec. 21. | All epileptics are deportable within 3 years. |
| | Feb. 5, 1917, statute, sec. 19. | All epileptics are deportable within 5 years. |
| 10. Chinese | May 6, 1882, statute, secs. 1, 6, and 12. | All Chinese laborers are deportable. Every Chinese person other than a laborer who is entitled to enter the United States is deportable at any time by any justice, judge, or commissioner of the court of the United States at the cost of the United States, unless he possesses a certificate of admission by the Chinese Government. |
| | Sept. 13, 1888, statute, secs. 6 and 13. | All Chinese laborers who have returned to the United States are deportable at any time by any justice, judge, or commissioner of a United States court unless the particular individual has a lawful wife, child, or parent in the United States or property therein to the value of $1,000, or debts of like amount due him and pending payment. All Chinese persons or persons of Chinese descent found unlawfully in the United States or Territories are deportable at any time. |
| Do | May 5, 1892, statute, secs. 2 and 6. | All Chinese laborers within the United States at the time of the passage of this act, and who otherwise are entitled to remain in the United States, are deportable after one year unless they possess certificates of residence issued by the collector of revenue of their respective districts. |
| Do | Apr. 29, 1902, statute, sec. 1. | All Chinese laborers and Chinese persons or persons of Chinese descent are deportable from the island territories unless they comply with the rules and laws, which are the same for the island territories as for the mainland, and all Chinese laborers who enter the mainland from island territories, or who go from one portion of island territory to another are deportable. |
| Do | Feb. 5, 1917, rule No. 3. | All Chinese persons are deportable within five years after entry who were members of one or more of the classes excluded by law under the immigration act of 1917. |
| Do | Feb. 5, 1917, rule No. 6. | Every Chinese person refused admission to the United States, being actually or constructively on the vessel or other conveyance by which he was brought to port of entry, must be returned to the country whence he came, at the expense of the transportation agency owning such vessel or conveyance. |
| 11. Entered without inspection. | Feb. 5, 1917, statute, sec. 19. | Any alien who has entered the United States by water or land at any time or place other than designated by Immigration officials, or who has entered without inspection is deportable within 3 years. |
| 12. Without proper immigration visa. | May 26, 1924, statute, secs. 7 and 14. | Any alien who at any time after entering the United States is found to have entered without proper immigration visa, or to have remained therein for a longer time than permitted by regulations, is deportable in the same manner as provided for in the immigration act of 1917. |
| 13. Unable to read | Feb. 5, 1917, statute, secs. 3 and 19. | All aliens over 16 years of age physically capable of reading are deportable who can not read the English language or some other language or dialect. |
| 14. In excess of quota limit. | May 19, 1921, statute, sec. 2. | All aliens are deportable who have entered the United States after their respective country's 3 per cent quota allotment has been filled for that particular fiscal year. |
| | July 1, 1925, statute, sec. 10. | All aliens are deportable who have entered the United States after their respective country's 2 per cent quota allotment has been filled for that particular fiscal year. |
| 15. Physical defectives | Feb. 5, 1917, statute, secs. 3 and 19. | All aliens are deportable who were found at the time of entry to have been certified by the examining surgeon as being mentally or physically defective, of such physical defect is of a nature which may affect the ability of such alien to earn a living. |
| 16. Reentered within year of deportation. | ......do................ | All aliens who have been deported under any of the provisions of this act, and who have reentered within one year after deportation are deportable. |

### APPENDIX 3

BOUNDARIES OF IMMIGRATION ADMINISTRATIVE DISTRICTS OF THE UNITED STATES, ESTABLISHED MARCH 1, 1927, BY RULE 28, BY THE COMMISSIONER GENERAL OF IMMIGRATION, WITH THE APPROVAL OF THE SECRETARY OF LABOR

(See map opposite p. 52)

#### RULE 28. ADMINISTRATIVE DISTRICTS

For convenience in enforcing both the immigration laws and the Chinese exclusion laws, the territory within which immigration officials are located is divided into districts, under the jurisdiction of commissioners of immigration or district directors numbered, defined, and with headquarters fixed, as follows:

| Dist. No. | Title of officer | Location of headquarters | Extent of district |
|---|---|---|---|
| 1 | Commissioner of immigration. | Montreal, Canada.. | Includes that part of the State of Maine lying east of meridian 68 and north of parallel 45; the counties of Carroll, Grafton, and Coos in the State of New Hampshire; that part of the State of Vermont lying north of the counties of Windham and Bennington; that part of the State of New York, lying north of the counties of Warren, Fulton, Oneida, and Oswego, and that part of Herkimer County north of Black Creek and Mill Creek; also that part of the southern peninsula of the State of Michigan lying north of the counties of Alcona, Oscoda, Crawford, Kalkaska, Grand Travers, and Benzie; and that part of the northern peninsula of said State lying east of the counties of Baraga and Iron: in addition to territory within the United States, has jurisdiction and control over ports of Halifax, Yarmouth, St. John, Quebec, and all Canadian interior stations within the contiguous Canadian territory. |
| 2 | District of director. | Portland, Me....... | Includes that part of the State of Maine lying west of meridian 68 and south of parallel 45; the counties of Belknap and Stratford in the State of New Hampshire and the township of Portsmouth, in the county of Rockingham, in said State. |
| 3 | Commissioner of immigration. | Boston, Mass....... | Includes the States of Massachusetts and Rhode Island; the State of Connecticut except the county of Fairfield; the county of Rockingham, in the State of New Hampshire, except Portsmouth Township and the counties of Hillsboro, Cheshire, Sullivan, and Merrimack; and that part of the State of Vermont lying south of the counties of Windsor and Rutland. |
| 4 | .....do............ | Ellis Island, New York Harbor, N. Y. | Includes that part of the State of New York lying south of the counties of Essex and Hamilton and that part of the county of Herkimer lying south of Black Creek and Mill Creek and east of Oneida County, and east of the counties of Madison, Chenango, and Broome: and that part of the State of New Jersey lying north of the counties of Ocean, Burlington, and Mercer, except the township of Upper Freehold in the county of Monmouth. |
| | Chinese inspector in charge. | United States barge office, New York, N. Y. | Includes States of New York and New Jersey; Chinese matters only. |
| 5 | District director. | Buffalo, N. Y....... | Includes that part of the State of New York lying west of the counties of Delaware, Otsego, Herkimer, and south of the counties of Lewis and Jefferson; the counties of McKean, Warren, Erie, and Crawford in the State of Pennsylvania; and that part of the State of Ohio lying north of the counties of Mahoning, Carroll, Tuscarawas, Holmes, Knox, and Morrow and east of the counties of Crawford, Seneca, Sandusky, and Ottawa. |
| 6 | Commissioner of immigration. | Philadelphia Immigration Station, Gloucester City, N. J. | Includes that part of the State of New Jersey lying south of the counties of Monmouth, Middlesex, Somerset, and Hunterdon, and the township of Upper Freehold in Monmouth County; the State of Delaware; and all that part of the State of Pennsylvania lying east of the counties of McKean, Elk, Clearfield, Blair, and Bedford. |
| 7 | District director. | Pittsburgh, Pa...... | Includes that part of the State of West Virginia lying north of parallel 39 and west of meridian 80; that part of the State of Pennsylvania lying west of Fulton, Huntingdon, Center, Cameron, and Potter, and south of McKean, Warren, and Crawford: and that part of the State of Ohio lying south of the counties of Mahoning, Stark, and Wayne and east of meridian 82. |



Administrative Districts of the Bureau of I
(Established March 1, 1927 by

NOTE.—The 28 districts referred to in the hearing (p. 10) were delimited by General Order No. 2, December 6, 1922, of the
immigration rule No. 28.   This later map is herewith printed because it shows the actual districts

**056**



the Bureau of Immigration of the United States Department of Labor.

rd   March 1, 1927 by Immigration Rule No. 28).

eral Order No. 2, December 6, 1922, of the Bureau of Immigration.  The boundaries of the 35 districts shown by the accompanying map were established March 1, 1927, by
rinted because it shows the actual districts which exist as this hearing goes to press.  (See Appendix 3, page 51, for the description of these boundaries.)

80004--28.   (Face p. 52.)

057

.

.

**EUGENICAL ASPECTS OF DEPORTATION** 53

| Dist. No. | Title of officer | Location of headquarters | Extent of district |
|---|---|---|---|
| 8 | Commissioner of immigration. | Baltimore, Md...... | Includes the entire State of Maryland; the District of Columbia; all that part of the State of Virginia lying north of parallel 38; and that part of the State of West Virginia lying east of meridian 80. |
| 9 | District director. | Norfolk, Va......... | Includes that part of the State of Virginia lying south of parallel 38; that part of the State of West Virginia lying south of parallel 38 and east of meridian 82; and those parts of the States of Tennessee and North Carolina lying east of meridian 82. |
| 10 | .....do........... | Jacksonville. Fla.... | Includes that part of the State of South Carolina lying east of meridian 82; that part of the State of Georgia lying east of meridian 82 and south of parallel 32, and that part of the State of Florida lying east of meridian 85. |
| 11 | .... do........... | Detroit, Mich....... | Includes that part of the State of Ohio lying west of the counties of Erie, Huron, Richland, and north of the counties of Morrow, Marion, Hardin, Auglaize, and Mercer; that part of the southern peninsula of the State of Michigan lying south of the counties of Alpena, Montmorency, Otsego, Antrim, and Leelanau, except the counties of Berrien and Cass; and that part of the State of Indiana lying east of the counties of St. Joseph, Marshall, and Fulton and north of the counties of Fulton, Wabash, Huntington, Wells, and Adams. |
| 12 | .....do........... | Cincinnati, Ohio.... | Includes those parts of the States of Virginia and West Virginia lying west of meridian 82; that part of the State of Ohio lying west of meridian 82 and south of the counties of Wayne, Ashland, Richland, Crawford, Wyandot, Hancock, Allen, and Van Wert; that part of the State of Indiana lying south of the counties of Allen, Whitney, Kosciusko, Fulton, Cass, Carroll, Tippecanoe, and Warren; and that part of the State of Kentucky lying east of meridian 88. |
| 13 | .....do........... | Atlanta, Ga......... | Includes that part of the State of Georgia lying north of parallel 32 and west of meridian 82; those parts of the States of South Carolina and North Carolina lying west of meridian 82; that part of the State of Tennessee lying west of meridian 82 and east of meridian 88; and that part of the State of Alabama lying east of meridian 88 and north of parallel 32. |
| 14 | .....do........... | Chicago, Ill......... | Includes that part of the State of Indiana lying north of the counties of Vermilion, Fountain, Montgomery, Clinton, Howard, and Miami, and west of the counties of Wabash, Kosciusko, and Elkhart; the counties of Cass and Berrien in the State of Michigan; all that part of the State of Wisconsin lying south of the counties of Florence, Forest, Oneida, Lincoln, Taylor, and Vernon and east of the counties of Clark, Jackson, and Monroe; that part of the State of Iowa lying east of the counties of Winneshiek, Fayette, Delaware, Linn, Johnson, Washington, Henry, and Lee; and that part of the State of Illinois lying north of the counties of Hancock, McDonough, Mason, Logan, Dewitt, Piatt, Douglas, and Edgar. |
| 15 | .....do........... | St. Louis, Mo....... | Includes that part of the State of Kentucky lying east of meridian 88; that part of the State of Illinois lying south of the counties of Vermilion, Champaign, McLean Tazewell, Fulton, Warren, and Henderson; the counties of Lee, Henry, Van Buren, Jefferson, Davis, Wapello, Appanoose, and Monroe in the State of Iowa; and all that part of the State of Missouri lying east of meridian 93. |
| 16 | District director. | Memphis, Tenn..... | Includes that part of the State of Alabama lying north of parallel 32 and west of meridian 88; that part of the State of Tennessee lying west of meridian 88; that part of the State of Arkansas lying east of meridian 93; that part of the State of Louisiana lying east of meridian 93 and north of parallel 32; and that part of the State of Mississippi lying north of parallel 32. |
| 17 | Commissioner of immigration. | New Orleans, La.... | Includes that part of the State of Florida lying west of meridian 85; those parts of the States of Alabama and Mississippi lying south of parallel 32; and that part of the State of Louisiana lying south of parallel 32 and east of meridian 93. |
| 18 | District director. | Grand Forks, N. Dak. | Includes that part of the northern peninsula of the State of Michigan lying west of the counties of Dickinson and Marquette; that part of the State of Wisconsin lying north of the counties of Price, Sawyer, Washburn, and Burnett; that part of the State of Minnesota lying north of the counties of Pine, Aitkin, Cass, Hubbard, Becker, Mahomet, and Norman; and that part of the State of North Dakota lying north of the counties of Cass, Barnes, Stutsman, Kidder, Burleigh, Oliver, Mercer, Dunn, and McKenzie. |

**059**

EUGENICAL ASPECTS OF DEPORTATION

| Dist. No. | Title of officer | Location of headquarters | Extent of district |
|---|---|---|---|
| 19 | District director. | Minneapolis, Minn. | Includes that part of the State of Wisconsin lying north and west of the counties of Crawford, Richland, Sauk, Juneau, Wood, Marathon, Langlade, Oconto, and Marinette except the counties of Douglas, Bayfield, Ashland, and Iron; that part of the State of Minnesota lying south of the counties of Carlton, Itasca, Beltrami, Clearwater, and Polk; that part of the State of North Dakota lying south and east of the counties of Traill, Steele, Griggs, Foster, Wells, Sheridan, McLean, Mountrail, and Williams; that part of the State of South Dakota lying north and east of the counties of Minnehaha, Turner, Hutchinson, Douglas, Charles Mix, Gregory, Tripp, Mellette, Washabaugh, Pennington, Meade, and Butte; and that part of the State of Iowa lying west, north, and east of the counties of Allamakee, Fayette, Bremer, Butler, Franklin, Wright Humboldt, Pocahontas, Buena Vista, O'Brien, and Osceola. |
| 20 | .....do............ | Omaha, Nebr....... | Includes that part of the State of Iowa lying west, north, and south of the counties of Appanoose, Monroe, Wapello, Jefferson, Henry, Louisa, Muscatine, Cedar, Jones, Dubuque, Clayton, Winneshiek, Chickasaw, Floyd, Cerro Gordo, Hancock, Kossuth, Palo Alto, Clay, and Dickinson; that part of the State of South Dakota lying south and west of the counties of Moody, Lake, McCook, Hanson, Davison, Aurora, Brule, Lyman, Jones, Jackson, Haakon, Ziebach, Perkins, and Harding; and that part of the State of Nebraska lying north and east of the counties of Scotts Bluff, Morrill, Garden, Keith, Lincoln, Frontier, and Red Willow. |
| 21 | .....do............ | Kansas City, Mo... | Includes that part of the State of Arkansas lying north of parallel 36 and west of meridian 93; that part of the State of Missouri lying west of meridian 93; that part of the State of Kansas lying east of meridian 100; and that part of the State of Oklahoma lying east of meridian 100 and north of parallel 36. |
| 22 | .....do............ | San Antonio, Tex... | Includes that part of the State of Louisiana lying north of parallel 32 and west of meridian 93; that part of the State of Arkansas lying west of meridian 93 and south parallel 36; that part of the State of Oklahoma lying south of parallel 36; and all that part of the State of Texas lying east and south of meridian 100, parallel 32 and meridian 102 except the counties allotted to New Orleans, La., District No. 17. |
| 23 | .....do............ | Helena, Mont....... | Includes that part of the State of Wyoming lying north of parallel 44; that part of the State of Montana lying south of parallel 48 and east of meridian 115, and that part of the State of Idaho lying east of meridian 115 and north of parallel 44. |
| 24 | District director. | Denver, Colo....... | Includes that part of the State of Kansas lying west of meridian 100; that part of the State of Nebraska lying west and south of the counties of Furnas, Gosper, Dawson, Custer, Logan, McPherson, Arthur, Grant, Sheridan, Box Butte, and Sioux; that part of the State of Wyoming lying south of parallel 44 and east of meridian 109; and the State of Colorado. |
| 25 | .....do............ | El Paso, Tex........ | Includes that part of the State of Texas lying west and north of meridian 102, parallel 31, and meridian 100; that part of the State of Oklahoma lying west of meridian 100; the State of New Mexico; and that part of the State of Arizona lying east of meridian 114. |
| 26 | .....do............ | Spokane, Wash..... | Includes all that part of the State of Montana lying north of parallel 48 and also that part lying west of meridian 115; that part of the State of Washington lying east of meridian 120; that part of the State of Oregon lying east of meridian 120 and north of parallel 44; and that part of the State of Idaho lying north of parallel 44 and west of meridian 115. |
| 27 | .....do............ | Salt Lake City, Utah. | Includes the State of Utah; that part of the State of Wyoming lying west of meridian 109 and south of parallel 44; that part of the State of Idaho lying south of parallel 44; and that part of the State of Nevada lying north of parallel 37 and east of meridian 117. |
| 28 | Commissioner of immigration. | Seattle, Wash....... | Includes all that part of the State of Washington lying west of meridian 120 except the counties of Klickitat, Skamania, Clarke, Cowlitz, and Wahkiakum and the townships in the county of Pacific bordering on the Columbia River in the State of Washington. |
| 29 | District director. | Portland, Oreg...... | Includes all that part of the State of Oregon lying south of parallel 44 and also that part lying west of meridian 120; the counties of Klickitat, Skamania, Clarke, Cowlitz, and Wahkiakum and the townships in the county of Pacific bordering on the Columbia River in the State of Washington. |

060

| Dist. No. | Title of officer | Location of headquarters | Extent of district |
|---|---|---|---|
| 30 | Commissioner of immigration. | San Francisco, Calif. | Includes that part of the State of Nevada lying west of meridian 117; that part of the State of California lying north of the counties of San Luis Obispo, Kern, and San Bernardino, and west of meridian 117. |
| 31 | District director. | Los Angeles, Calif... | Includes that part of the State of Arizona lying west of meridian 114; that part of the State of Nevada lying south of parallel 37; and that part of the State of California lying east of meridian 117 and south of the counties of Inyot, Tulare, Kings, and Monterey. |
| 32 | .....do........... | Ketchikan, Alaska.. | Includes the Territory of Alaska. |
| 33 | Commissioner of immigration. | San Juan, Porto Rico. | Includes Porto Rico and the Virgin Islands. |
| 34 | District director. | Honolulu, Hawaii... | Includes the Territory of Hawaii. |
| 35 | .....do........... | Galveston, Tex...... | Includes that part of the State of Louisiana lying west of meridian 93 and south of parallel 32; and that part of the State of Texas lying south and east of the counties of Panola, Rusk, Cherokee, Houston, Madison, Grimes, Waller, Austin, Colorado, Lavaca, De Witt, Goliad, Bee, Live Oak, Jim Wells, and north of the county of Kleberg. |

### APPENDIX 4

#### PRACTICE OF THE SEVERAL STATES IN THE MATTER OF DEPORTATION OF ALIENS AND OF THE RETURN OF CITIZENS OF OTHER STATES

#### (Prepared by Harrey H. Laughlin)

##### 1. ALABAMA

A. Authority: State board of administration; chief officer, L. A. Board, president.
B. Deportation of aliens:
    1. Initiative—Federal.
    2. Procedure.
    3. Aliens in population at large
    4. State laws: None.
    5. Statistical records.
C. Return of nonresidents:
    1. State laws: None.
    2. Procedure: Merely give transportation.
    3. Statistical records: None.
D. Criticisms:
    1. Should keep all aliens out.
    2. Aliens should be supported by State of legal residence.
    3. Registration of aliens would settle the problem.

##### 2. ARIZONA

A. Authority: None.
B. Deportation of aliens:
    1. Initiative: Federal.
    2. Procedure: Hearing before Federal officer; case reviewed at Washington; warrant for arrest and deportation executed.
    3. Aliens in population at large: No procedure.
    4. State laws: None.
    5. Statistical records: None compiled.
C. Return of nonresidents:
    1. State laws: None.
    2. Procedure: None.
    3. Statistical records: None.
D. Criticisms:
    1. Proof of legal entry; application for citizenship; five years residence prior to becoming a public charge.
    2. One year's residence in another State prior to becoming a public charge should establish legal residence in that State.
    3. Laws for enforcement of the foregoing.

### 3. ARKANSAS

A. Authority: None.
B. Deportation of aliens:
    1. Initiative: Federal.
    2. Procedure: None by the State.
    4. State laws: None.

### 4. CALIFORNIA

A. Authority: Department of institutions; chief officer, W. D. Wagner, director;
    State deportation agent, Charles F. Waymire.
B. Deportation of aliens:
    1. Initiative: State, through the above department.
    2. Procedure: Verification of entry; medical certificate presented; rest
    done by Federal authorities.
    3. Aliens in population at large: Department has jurisdiction only over
    State hospitals and industrial schools.   Has no information in regard
    to others.
    4. State laws: Section 2191, Political Code, 1923, as amended by chapter
    85.
    5. Statistical records: See second biennial report.
C. Return of nonresidents:
    1. State laws: Section 2191, Political Code, 1923, as amended by chapter
    85.
    2. Procedure: Legal settlement determined; patient returned to sheriff of
    home county.
    3. Statistical records: See second biennial report.
D. Criticisms:
    1. Institutions should be maintained only for bona fide residents of United
    States.
    2. Each State should care for its own inadequates.
    3. Interstate conference should be held to form uniform policy of reciprocal
    exchange.

### 5. COLORADO

A. Authority: Department of charities and correction; chief officer, Gertrude
    Vaile, secretary.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: Superintendent of institution reports to above department,
    which reports to United States Immigration Bureau.  If alien has
    become a public charge since entry into United States, State pays
    expenses to seaport.  Agreement between department and United
    States official as to payment of expenses of deportation and mainte-
    nance.
    3. Aliens in population at large: No provision in statutes.
    4. State laws: Chapter XVII Compiled Laws, 1921.
    5. Statistical records: See sheet attached to schedule.
C. Return of nonresidents:
    1. No provision.
    2. No provision.
    3. No provision.

### 6. CONNECTICUT

A. Authority: Department of State agencies and institutions; chief officer,
    Raymond F. Gates, State agent.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: Examination to procure prior cause certificate; verifica-
    tion of entry; report of case to United States officials.
    3. Aliens in population at large: Federal cases, procedure as above.
    State cases, procure case history, passport, United States income
    tax release, and accompany alien to port.
    4. State laws: Chapter 150, Public Acts, 1921.  Also Federal laws.
    5. Statistical records: See annual reports of department.

C. Return of nonresidents:
    1. State laws: Chapter 150, Public Acts, 1921.
    2. Procedure: Obtain case history; report to State to which return is to be made; agreement for voluntary return, or by warrant under above law.
    3. Statistical records: See reports of department.
D. Criticisms:
    1. Consider physical and mental condition of patient; consider dependents; whether case is desirable resident; whether expense will be temporary or for indefinite period.
    2. See 1.
    3. Authorize district commissioners of immigration to issue warrants for arrest of aliens; establish subdistrict offices when necessary.   Interstate: Uniform legal settlement laws.
E. Documents and records: Copy of laws, blank forms, and annual reports sent.
F. Remarks: Federal Government should reimburse State for maintaining dependents after they have been reported to United States officials.   Need larger force in immigration department.

### 7. DELAWARE

A. Authority: None.
B. Deportation of aliens:
    1. Initiative: Federal.
    2. Procedure: None by the State.
    4. State laws: None.

### 8. DISTRICT OF COLUMBIA

A. Authority: Board of charities; chief officer, George S. Wilson, secretary.
B. Deportation of aliens:
    1. Initiative: Local official, usually.
    2. Procedure: When local official finds deportable alien in an institution, he reports to United States officers.
    3. Aliens in population at large: Local officials do not deport aliens in the population at large.
    4. State laws: No local statutes.
    5. Statistical records: Local authorities keep no records.
C. Return of nonresidents:
    1. State laws: Section 7, Act of 1899, provides for removal of nonresident insane.
    2. Procedure: Cooperation with local authorities in other States to establish legal residence.
    3. Statistical records: Figures for 1924 given.
D. Criticisms:
    2. One year's residence as self-supporting individual or family.
    3. Federal Government should be allowed to define by statute conditions under which public charges can be transferred from one State to another.
E. Documents and records: Copy of law sent.
F. Remarks: The District of Columbia is different from the States in many respects, and has very limited experience with aliens.

### 9. FLORIDA

A. Authority: Board of commissioners of State institutions; chief officer, John W. Martin, Governor of Florida.
B. Deportation of aliens:
    1. Initiative: Federal.
    2. Procedure: None by the State.
    4. State laws: None.
    5. Statistical records: None.

### 10. GEORGIA

A. Authority: No bureau.
B. Deportation of aliens: No laws authorizing deportation.   "Banishment from the State is prohibited by the State Constitution."

### 11. IDAHO

A. Authority:
   1. State prison board, Boise.
   2. Idaho Insane Asylum, Blackfoot.
   3. Department of public welfare, Boise.
B. Initiative: Federal.
C. Return of nonresidents: State laws; Chapter 186, Laws of 1923.

### 12. ILLINOIS

A. Authority: Department of public welfare; chief officer, Judge C. H. Jenkins, director.
B. Deportation of aliens:
   1. Initative: State.
   2. Procedure: Deportation agent secures history of all patients committed to institutions.  One year establishes residence in the State.  Domestic cases are handled by the State; foreign cases are turned over to Federal deportation agent of the district.
   3. Aliens in population at large: These are handled exclusively by the social service department and the Federal agent.
   4. State laws: Duties of State deportation agent transferred to department of public welfare by section 53 of Civil Administrative Code.  These duties are to arrange for the deportation of alien inmates of the State hospitals for the insane and other charitable institutions of the State.  (See p. 43, General Information and Laws.)
   5. Statistical records: See the Institution Quarterly, Volume XV, No. 3, September, 1924, page 197.
C. Return of nonresidents:
   1. State laws: Gentlemen's agreement with many other States.  System of reciprocity which saves expense.
   2. If other States have no department of welfare or similar board, the matter is taken up with the county judge, which method is usually unsatisfactory.
   3. Statistical records: See page 197 of the Institution Quarterly for September, 1924.
D. Criticisms: Habeas corpus proceedings interfere.  Too much authority in hands of Secretary of Labor.  Too many small politicians interfering with regular method of deporting aliens.

### 13. INDIANA

A. Authority: Board of State Charities; chief officer, J. A. Brown, secretary.
B. Deportation of aliens:
   1. Initiative: State.
   2. Procedure: Institution reports case to board of State charities.  Board secures facts about alien's entry into United States and reports to United States official of the district.
   3. Aliens in population at large: Aliens reported to Federal authorities; nonresidents returned by board.
   4. State laws: Acts of 1917, chapter 56, page 142.
   5. Statistical records: Number of persons deported or returned under the law of 1917, 83.
C. Return of nonresidents:
   1. State laws: Acts of 1917, chapter 56.  Copy inclosed.
   2. Procedure: Investigation to determine legal settlement; correspondence with public agency in other State; deportation by board of State charities.
   3. Statistical records: 76 nonresidents returned.  Names of receiving States given.
D. Criticisms: One year constitutes legal residence in the State.

### 14. IOWA

A. Authority: No central bureau.
B. Deportation of aliens: No State law on deportation.  When an alien prisoner's term has expired, he is delivered to the United States agent.  Notice of warrant of deportation is filed with the warden 30 days before the date of release.  Sentence is sometimes suspended to effect deportation.

### 15. KANSAS

A. Authority: State board of administration; chief officer, Mr. A. B. Carney, chairman.
B. Deportation of aliens:
    1. Initiative: Federal.
    2. Procedure: Cases that might be deportable are reported to United States officials, who make the investigation. Soon after an alien's arrival in the penitentiary, a questionnaire is filled out and sent to the Federal authorities at Kansas City. Deportation is promptly instituted in all cases found deportable.
    3. Aliens in population at large: Above procedure in all State institutions. Frequently State officials or peace officers report undesirable aliens to United States authorities.
    4. State laws: None.
    5. Statistical records: None available.
C. Return of nonresidents.
    1. State laws: The State tries to admit only citizens or at least legal residents to its institutions. Nonresident insane and public charges are returned to an institution in their home State whenever possible.
    2. Procedure: Correspondence with institutions in the home State and relatives of the dependent person.
    3. Statistical records: None avilable.
D. Criticisms:
    1. Aliens should be cared for if only temporarily incapacitated, but should be deported if they are to be public charges permanently.
    2. Same as above.
    3. Larger appropriations for enforcing United States immigration laws. Removal of statute of time limitations.

### 16. KENTUCKY

A. Authority: No central bureau for the deportation of aliens. State institutions are under the jurisdiction of the State board of charities and corrections, whose chief officer is Joseph P. Byers, commissioner of public institutions.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: Superintendents of State institutions report to Department of Labor all aliens committed to their institutions.
C. Return of nonresidents:
    1. State laws: None.
    2. Procedure: Superintendents of institutions report to State board of charities and corrections all patients who are not legal residents of the State. The board communicates with authorities in the State of which the patient is a resident to arrange for his return. All expenses of such returns are paid by the State of Kentucky.

### 17. LOUISIANA

A. Authority: None.
B. Deportation of aliens:
    1. Initiative: Federal.
    2. Procedure: None by the State.
    4. State laws: None.

### 18. MAINE

A. Authority: No central bureau.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: State or local officials report alien paupers to United States officers, who do all in their power to deport them. The great majority of alien paupers belong in Canada, many of them having entered illegally.
    3. Aliens in population at large: No detailed procedure.
    4. State laws: None.
    5. Statistical records: None.

C. Return of nonresidents.
   1. State laws: Revised Statutes, chapter 29, section 40.
   2. Procedure: On complaint of overseer of poor, any judge of municipal or police court or trial justice may by his warrant cause a nonresident pauper to be removed from the State to the place where he belongs, at the expense of the town removing him.
   3. Statistical records: None.
D. Criticisms: Laws relating to admittance of aliens should be more rigid. Many are admitted who have no intention of becoming good citizens, and many enter illegally.

### 19. MARYLAND

A. Authority: Supervisors of city charities, Baltimore; chief officer, Nathaniel G. Grasty, secretary.
B. Deportation of aliens:
   1. Initiative: State, through the above board.
   2. Procedure: Cases are referred to above board. If board determines that case is deportable, it is reported to commissioner of immigration.
   3. Aliens in population at large: Procedure same as above.
   4. State laws: None.
   5. Statistical records: None available.
C. Return of nonresidents:
   1. State Laws: Baltimore has reciprocal agreements with a large number of States governing the nonresident problem. Copy of these nonresident articles attached.
   2. Procedure: If investigation of supervisors shows a person to belong in another State, and if permission can be secured, he is returned at the expense of the supervisors.
   3. Statistical records: None available.
D. Criticisms:
   1. Aliens not physically or mentally able to be self-supporting, and likely to become a public charge, should be deported.
   2. A nonresident who becomes a public charge within one year after arrival in the State should be returned to the State from which he came.
   3. A Federal law governing all States "would be a boone to the whole country."

### 20. MASSACHUSETTS

A. Authority:
   1. Department of public welfare; chief officer, Richard K. Conant, commissioner.
   2. Department of mental diseases; chief officer, Dr. George M. Kline, commissioner.
   3. Department of correction; chief officer, Sanford Bates, commissioner.
B. Deportation of aliens:
   1. Initiative: State.
   2. Procedure: History of each case is taken and Form 534 (proof that alien has become public charge from causes existing prior to landing) is sent to the institution; also Form 1, stating that alien is held for deportation. Form 534 filled out by hospital physician is returned to one of above departments, which sends it to the immigration commissioner at Boston. When Federal officers have arranged for deportation, written order for discharge of alien from institution is given to immigration commissioner by department concerned.
      In practice the department of correction has an agreement with the commissioner at Boston whereby it reports all aliens committed to penal institutions, with all available data in regard to arrival, place and date of birth, parents, relatives in United States, etc. The department has no authority to pay the expense of deportation, so all arrangements for deportation must be left to immigration commissioner.
   3. Aliens in population at large: In case of families liable to be permanently dependent, the department of public welfare, in a letter to the commissioner describes family conditions, instead of filling out medical certificates. Otherwise procedure is the same.
   4. State laws: (a) Criminals (ch. 127, sec. 114, general laws 1921); (b) paupers (ch. 121, sec. 9, general laws, ch. 122, sec. 21, 22); (c) insane (ch. 123, sec. 20, general laws 1921, as amended by ch. 245, acts of 1923).
   5. Statistical records: Figures from department of public welfare given

C. Return of nonresidents:
   1. State laws: (a) Criminals (ch. 127, sec. 114, general laws, 1921); (b) paupers (ch. 121, sec. 9–11; ch. 122, sec. 21; ch. 122, sec. 22); (c) insane (ch. 123, sec. 20, as amended by ch. 245, acts of 1923).
   2. Procedure: (a) The department of public welfare investigates each case brought to its attention, to establish legal residence in another State, and furnishes transportation, sending an attendant when necessary. Department is guided by transportation agreement of allied national agencies. (b) In cases where the department of mental diseases deports, the matter is taken up with central board of receiving State. Form 3 is sent to States having reciprocal agreement; otherwise letter describing case is sent.
   3. Statistical records: Figures supplied by department of public welfare.
D. Criticisms:
   1. (a) Department of public welfare believes State has no moral or legal responsibility to care for unnaturalized aliens for any considerable period, especially if they are likely to become permanent public charges.
   2. In absence of uniform State laws, State departments should be authorized by law to form agreements as to interchange of public charges.
   3. Commissioner of immigration of each district should have power to issue warrants of arrest and deportation, except in appealed cases.
E. Documents and records: Manual of laws, sample forms, etc., inclosed.
F. Remarks: Cost of maintenance pending deportation proceedings should be borne by Federal Government. Rule 22, subdivision 11 of the Federal law is inoperative, because alien who is dependent from causes arising subsequent to entry will seldom give his consent to deportation.

### 21. MICHIGAN

A. Authority:
   1. Auditor general.
   2. State hospital commission, chief officer, Mare Murray, director.
B. Deportation of aliens:
   1. Initiative: State.
   2. Procedure: Superintendent of institution reports to auditor general, who in turn reports to United States officials.
   3. Aliens in population at large: Reported to United States officials.
   4. State laws: Act No. 59 (public acts 1921); act No. 151 (public acts 1923); act No. 72 (public acts 1907).
C. Return of nonresidents:
   1. State laws: Same as above. Matter handled by reciprocal agreements.
   2. Procedure: If receiving state grants request to accept person, he is returned at expense of State making return.
   3. Statistical records: None.

### 22. MINNESOTA

A. Authority: State board of control; chief officer, R. W. Wheelock, chairman.
B. Deportation of aliens:
   1. Initiative: State.
   2. Procedure: Deportation agent of above board reports deportable aliens in insane hospitals to Federal deportation agent. Agents at penal institutionas report directly to Federal agent.
   3. Aliens in population at large: Reported to Federal agent by local authorities, chairty organizations, etc.
   5. Statistical records: Figures for 1923–24 inclosed.
C. Return of nonresidents: 1. State laws: Sec. 4046 General Statutes, 1913.

### 23. MISSISSIPPI

A. Authority: No central bureau. Separate board for each institution.
B. Deportation of aliens:
   1. Initiative: Federal.
   3. No information. White population is almost 100 per cent Anglo-Saxon.
   5. Statistical records: None.
C. Return of nonresidents: 3. Statistical records: None.

**067**

### 25. MONTANA

A. Authority: No central board.
B. Deportation of aliens:
    1. Initiative: Federal.
    2. Procedure: United States agent notifies warden of prison whenever an alien inmate is wanted for deportation.   Alien is discharged on condition that he be deported.
    3. Aliens in population at large: No central board to deport aliens at large.
    5. Statistical records: None.
C. Return of nonresidents:
    2. Procedure: Superintendent of State hospital for the insane makes a recommendation to the board of commissioners for the insane for the discharge of any inmate who has not resided in the State for one year.

### 26. NEBRASKA

A. Authority: State board of control.   Chief officer: A. E. Allyn.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: Guardian appointed by proper court procedure, and case reported to district director of immigration.
    3. Aliens in population at large: Reported to district director.
    4. State laws: Copy of law inclosed.
C. Return of nonresidents: Matters handled by various county boards or commissions.

### 24. MISSOURI

A. Authority: None.
B. Deportation of aliens: No State laws or procedure pertaining to this subject.

### 27. NEVADA

A. Authority: No central bureau.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: Upon report of warden of State prison, board of parole commissioners orders alien surrendered to United States officials when called for.
    3. Aliens in population at large: No such activity.
    4. State laws: None.
    5. Statistical records: None.
C. Return of nonresidents:
    1. State laws: Revised laws of Nevada, 1912 (Vols. I and II); revised laws of Nevada, 1919 (Vol. III).
    2. Procedure: When a mutual agreement can be made with the State in which the alien has legal residence, he is returned under contract drawn up by superintendent of institution and confirmed by its governing board.
    3. Statistical records: See biennial report of superintendent of Nevada Hospital for Mental Diseases.
D. Criticisms:
    1. Prior criminal record; conviction for crime here; prior record of pauperism or abandonment of family elsewhere, on the one hand.   On the other hand, evident misfortune sustained here.
    2. Cases of dependency, especially with criminal tendencies, should be returned to original community legally charged with their care and supervision.
    3. There should be appropriations for this work available all the year around.

### 2). NEW JERSEY

A. Authority: Department of institutions and agencies.   Chief officer: Burdette G. Lewis, commissioner.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: Department obtains information as to date and port of landing, and name of steamship, and forwards it to institutions where alien is confined.   The superintendent then fills out medical certificates and sends them to the Federal authorities

C. Return of nonresidents:
   1. State laws: Section 424–425, chapter 147, laws of 1918.
   2. Procedure: Facts in regard to nonresidents are collected and sun-
   mitted to hospital commission or some other board in State where
   patient is supposed to have legal residence. If return is authorized
   patient is sent back at expense of the State of New Jersey.
D. Criticisms: 3. Psychological examinations should be given in all cases.

### 28. NEW HAMPSHIRE

A. Authority: State board of charities and correction; chief officer, Wm. J.
   Ahern, secretary.
B. Deportation of aliens:
   1. Initiative: State.
   2. Procedure: Cases are referred to Federal authorities by anyone inter-
   ested, usually trustees of an institution or State board of charities
   and correction.
C. Return of nonresidents:
   1. State laws: No definite regulations. Each case settled by agreement.
   2. Procedure: Trustees of State Hospital for Insane have reciprocal agree-
   ment with Massachusetts and several other States whereby persons
   becoming insane within two years after entering the State may be
   transferred from an institution in that State to an institution in the
   State from which they came. Feeble-minded persons may also be
   removed from the State within two years after arrival. Trustees of
   New Hampshire State Hospital act as a board of lunacy in making
   agreements.

### 30. NEW MEXICO

A. Authority: No central board.
B. Deportation of aliens:
   1. Initiative: Usually Federal.
   2. Procedure: Immigration officer makes periodical visits to State peni-
   tentiary, interviews prospects and files notice of intention to deport
   with officers of penitentiary.
   3. Aliens in population at large: Handled by Federal authorities.
   5. Statistical records: None.
C. Return of nonresidents:
   1. State laws: None.
   3. Statistical records: None.
D. Criticisms: Present Federal and State laws seem adequate.

### 31. NEW YORK

A. Authority: No central board. (See 1919 report of bureau of deportation,
   p. 9.)
B. Deportation of aliens:
   1. Initiative: State.
   2. Procedure: Landing is verified; Form 534 is issued; clinical and medical
   history secured and issued with Form 534; request for warrant of
   arrest is made.
   3. Aliens in population at large: No knowledge of any such procedure.
   4. State laws: Insanity law (Art. II, sec. 19).
   5. Statistical records: None.
C. Return of nonresidents:
   1. State laws: Insanity law (Art. II, sec. 19).
   2. Procedure: Case is submitted to State or local officials or relatives or
   friends, and upon acceptance the nonresident is returned to the
   institution or individual designated.
   3. Statistical records: None available.
D. Criticisms:
   1. An alien who is a public charge or who belongs to an excluded class,
   whether or not he is a public charge, and irrespective of the time he
   has been in the United States, should be liable to deportation.
   2. "The right to legal settlement should be acquired and lost in the same
   manner as is the right of franchise and should be modified only on
   humanitarian grounds and then only on acceptance of responsibility
   by the State of which the patient is a legal resident."

D. Criticisms—Continued.
   3. Modification of Federal law indicated under "1" above. No Federal
      law should be made to interfere with State rights as to citizenship.

## 32. NORTH CAROLINA

A. Authority: No central bureau.
B. Deportation of aliens:
   1. Initiative: State.
   2. Procedure: If an alien is found to be insane, the clerk of the court
      notifies the governor of name of such alien and as many facts about
      the case as possible, sending also a copy of the examination taken.
      The governor sends this information to the Secretary of State in
      Washington, requesting him to inform the minister resident or
      plenipotentiary of the country of which the insane person is citizen.
   3. State laws: C. S., section 6211.
C. Return of nonresidents:
   1. State laws: C. S., section 6210.
   2. Procedure: If a nonresident is found to be insane, the clerk of court
      notifies the governor of the State of which he is a citizen of the facts
      in the case. Meanwhile the insane person is confined within the
      county, but not committed to a State hospital. If the home State
      does not provide for his return, the county commissioners turn him
      over to the sheriff of his home county or the superintendent of a
      State hospital, the county removing him bearing the expense.

## 33. NORTH DAKOTA

A. Authority: State board of administration; chief officer, R. B. Murphy,
   chairman.
B. Deportation of aliens:
   1. Initiative: State.
   2. Procedure: If a deportable alien inmate of an institution was a resident
      of another State before entering the institution, that State is notified
      and alien transferred there. Completion of deportation takes
      place from that State.
   3. Aliens in population at large: Same procedure as "2," above, except
      that case is presented to the Federal court.
   4. State laws: No definite law.
   5. Statistical records: None.
C. Return of nonresidents:
   2. Procedure: Each case is brought to attention of authorities of State of
      which patient is a resident. If the facts given are accepted as con-
      clusive evidence, deportation takes place. Immigration commis-
      sioner (filling out schedule) believes exceptions can be made in
      many cases without injury to the State.
   3. Statistical records: None.
D. Criticisms:
   1. Rigid inspection at port of arrival. "Better eliminate where they
      live than attempt to ferret them out after arrival here."
   2. State should approach each case without prejudice, and after consid-
      ering rights of alien and people as a whole, do what seems best for
      all concerned.
   3. Better and more easily interpreted laws, and an efficient organization
      to enforce them.

## 34. OHIO

A. Authority: Department of public welfare; chief officer, J. E. Harper, director.
B. Deportation of aliens:
   1. Initiative: State.
   2. Procedure: Aliens thought to be deportable are reported to district
      immigration officer.
   3. Aliens in population at large: No State provision. Reported by local
      officials to Federal authorities.

C. Return of nonresidents:
    1. State laws: Revised Statutes, sections 1817–1820, inclusive.
    2. Procedure: Nonresidents are not admitted to State institutions except in special cases. Application for admission is made to the judge of probate court or superintendent of the institution, who makes an investigation to establish the legal residence of the patient. These findings are reported to the Ohio board of administration. Judge or superintendent may recommend to board that patient be admitted, even though a nonresident, and board further investigates and decides on the case.
    3. Statistical records: See figures inclosed.
D. Criticisms:
    1. The only type of alien public charge for whom we have legal or moral responsibility is one who has declared his intention of becoming a citizen, and who is dependent from causes arising since admission to the United States.
    2. Only those who came to the State intending to make it their permanent home, and whose insanity began during residence there, should be cared for.
    3. Undesirable aliens should be deported irrespective of the time they have been in the United States.

### 36. OREGON

A. Authority: Oregon State board of control; chief officer, Carle Abrams, secretary.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: State board of control reports all cases found to the Federal immigration agent at Portland, who arranges for their deportation.
    3. Aliens in population at large: State board of control reports all cases to the Federal immigration agent at Portland, who arranges for their deportation.
    4. State laws: Chapter 216, general laws of Oregon, 1921; chapter 218, general laws of Oregon, 1925.
C. Return of nonresidents:
    1. State laws: Chapter 216, general laws of Oregon, 1921.
    2. Procedure: Reciprocal agreements exist with other States for the mutual exchange of public charges from one State to the State where they have legal residence. Two years' residence in the State constitute legal settlement.
    3. State records: None supplied.

### 35. OKLAHOMA

A. Authority: State board of public affairs; chief officer, Carl L. Rice, chairman.
B. Deportation of aliens:
    1. Initiative: Federal.
    2. Procedure: None except through Federal Government.
    4. 5. No laws or statistics.
C. Return of nonresidents: No laws or procedure on this subject.

### 37. PENNSYLVANIA

A. Authority: No central office.
B. Deportation of aliens:
    1. Initiative: State, occasionally through pardon board.
    2. Procedure: Pardon board and penitentiary authorities cooperate with Federal department to bring about deportation of criminal alien. An application for pardon is made to the pardon board and is granted on condition that Federal authorities insure his deportation immediately upon release.
    3. Aliens in population at large: No procedure.
    4. State laws: None.
    5. Statistical records: No records of deportation.

66                    EUGENICAL ASPECTS OF DEPORTATION

C. Return of nonresidents:
    1. State laws: There is an arrangement by comity between Pennsylvania and adjoining States whereby citizens of other States found in Pennsylvania insane asylums are transferred to the States of which they are citizens.
    2. Procedure: Department of welfare cooperates with similar departments in adjoining States to effect return of insane persons to the institutions of the State of which they are citizens.
    3. Statistical records: No records. Very few instances of interstate deportation.
D. Criticisms:
    1. Pennsylvania desires to have alien public charges deported whenever Federal laws permit but has not attempted to work out the problem.
    2. Pennsylvania is willing to receive Pennsylvania citizens who have become dependent and to send back nonresident public charges to other States but has not been able to work out an economical system.

### 39. SOUTH CAROLINA

A. Authority: None.
B. Deportation of aliens: No law, procedure or statistics on this subject.
C. Return of nonresidents: State laws: Removal of insane persons, section 5086, vol. 3, Code of 1925.

### 40. SOUTH DAKOTA

A. Authority: State board of charities and correction; chief officer, Charles M. Dry, president (?).
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: Federal authorities attend to such cases when requested to do so by State officials.
    3. Aliens in population at large: If not a Federal case, "we run them out."
    4. State laws: None.
    5. Statistical records: Figures sent with second report.
C. Return of nonresidents:
    1. State laws: None.
    2. Procedure: Chief deportees are itinerants who seek aid from the town or county. If possible their return is arranged by negotiation; otherwise their fare is paid and they are sent on their way. However, instances are rare.
    3. Statistical records: None.

### 42. TEXAS

A. Authority: None.
B. Deportation of aliens: No State laws in regard to deportation of aliens or return of nonresidents to other States, and no organized efforts to bring about such returns. This work is carried on to a very limited extent by charitable organizations.

### 43. UTAH

A. Authority: None.
B. Deportation of aliens:
    1. Initiative: State in insane cases; Federal in prison cases.
    2. Procedure: Superintendent of State Mental Hospital reports insane cases to Federal inspector, and he comes and checks over records with superintendent. Inspector visits Utah State prison periodically and prison officials cooperate with him in bringing about deportation.
    3. Aliens in population at large: Immigration inspector arranges for deportation of all aliens reported to him by institutions. Some counties are very indifferent to the subject, probably through ignorance.
    4. State laws: None.
    5. Statistical records: Perhaps they would be available for the Utah subdivision at the main office at Denver.
C. Return of nonresidents: Salt Lake County, one-third of the State's population, investigates all cases of persons applying for charitable, medical or hospital aid, and reports deportable cases to inspector. County official welfare worker often secures aid of relatives in deportation. Statistical records of deportation might be obtained from the Denver office.

### 44. VERMONT

A. Authority: No central bureau.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: About the only cases that come up are those of aliens committed to State prison. The superintendent of the prison makes arrangements with the Federal authorities to have the prisoner deported upon his release.
    4. State laws: None.
C. Return of nonresidents: State laws: Reciprocal agreements with several States whereby insane persons committed to State hospitals are exchanged.

### 45. VIRGINIA

No provision by law for deportation of aliens, and while there is a provision for returning nonresident insane and other dependents, this provision is rarely acted upon.

### 46. WASHINGTON

A. Authority: Department of business control; chief officer: W. J. Hays, director.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: Inclosed form 1045 is filled out when patient enters hospital for insane, and is sent to State deportation agent. Request for verification of landing then sent to district immigration commissioner, followed by medical certificate of physician in charge of patient, on which warrant is based.
    3. Aliens in population at large: No provision in State laws.
    4. State laws: Chapter 82 (laws of 1915); chapter 158 (laws of 1921); chapter 100 (laws of 1923).
    5. Statistical records: Figures inclosed covering period from September, 1919, to September, 1924. Biennial report of above department also.
C. Return of nonresidents:
    1. State laws: Chapter 158, sessions laws of 1921, provides for return of nonresident insane inmates of State hospitals, but does not provide for social inadequates at large.
    2. Procedure: Correspondence with friends and relatives to establish legal residence; then person is returned to relatives or county sheriff. Copy of reciprocal agreements with New York, California, and Oregon inclosed.
    3. Statistical records: Figures given from September, 1919, to September, 1924. Very little was accomplished prior to 1919 when the first State deportation agent was appointed.
D. Criticisms:
    1. All aliens of excluded classes should be deported without time limitation by the agency which admitted them, the Federal Government.
    2. Legal residents of other States should be returned when they become public charges.
    3. Time limitation should be removed from Federal law. The law would be strengthened if recommendations of interstate conference on immigration (New York, October, 1923) were adopted. There should be a uniform law in all States to permit reciprocal agreements.
E. Documents and records: Forms, biennial reports, tables, etc., sent.
F. Remarks: The State Department must take action if Federal laws are to be inforced. Lack of passport from foreign consul is greatest obstacle to deportation.

### 47. WEST VIRGINIA

A. Authority: State board of control; chief officer, James S. Lakin, president.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: State board of control reports cases to Federal service at Pittsburgh, Pa., and deportation is executed by Federal Government. No fixed procedure.
    3. Aliens in population at large: No knowledge of any such procedure.
    4. State laws: Section 27, chapter 58, Barnes's Code of 1923.
    5. Statistical records: None available.

EUGENICAL ASPECTS OF DEPORTATION

C. Return of nonresidents.
  1. State laws: Section 27, chapter 58, acts of 1921.   Copy inclosed.
  2. Procedure: Board secures permission to return patient to State of legal residence by corresponding with authorities in that State.
  3. Statistical records: None available.

### 48. WISCONSIN

A. Authority: State board of control; chief officer, Dr. Wm. F. Lorenz, president.
B. Deportation of aliens:
  1. Initiative: Both State and Federal.
  2. Procedure: Federal Government files request with institutions and takes charge at expiration of time.
  3. Aliens in population at large: Procedure suggested by United States Department of Labor.
  4. State laws: None.
  5. Statistical records: See Chicago office of United States Department of Labor.
C. Return of nonresidents:
  1. State laws: No rules.   Each case handled under general administration.
  2. Procedure: No such practice.   Occasionally an insane patient is transferred by request to another State.

### 49. WYOMING

A. Authority: State board of charities and reform, chief officer: Governor Nellie T. Ross, president.
B. Deportation of aliens:
  1. Initiative: State.
  2. Procedure: If aliens are found in the State penitentiary, the Federal officer at Denver is notified and he attends to their deportation.
  3. Aliens in population at large: These are rarely, if ever, deported.
  4. State laws: None.
C. Return of nonresidents:
  1. Procedure: When the superintendent of the hospital for insane finds a nonresident in the institution, he communicates with authorities in the patient's home State and he is returned at the expense of the State of Wyoming.
  2. Statistical records: Figures given for 1923–24.

----

### APPENDIX 5

REPORT OF THE MEDICAL EXAMINER OF THE NEW YORK STATE BUREAU OF SPECIAL EXAMINATIONS, FOR THE YEAR ENDING JUNE 30, 1925, PREPARED BY SPENCER L. DAWES, M. D., MEDICAL EXAMINER

ANNUAL REPORT OF THE MEDICAL EXAMINER

*To the State hospital commission:*
  The medical examiner respectfully submits herewith the annual report of the bureau of special examination, State hospital commission, for the fiscal year ending June 30, 1925.
  During the fiscal year this office has investigated 2,123 cases, and from this number we have certified to the Federal authorities 400 aliens, as public charges, insane from causes not affirmatively shown to have arisen subsequent to landing, an increase from the previous year of 88.   This is the largest number certified by this office in many years.   As a matter of fact, there has been a steady rise in the number of certificates issued ever since the adoption of what is known as the "quota" law.   Logically either the character of aliens coming into this country since 1919 is distinctly inferior, or else the inspection and examination at ports of entry is less adequate than ever before.   The actual number deported in the past fiscal year was 241, 30 less than were deported the previous year and 159 less than the number certified by us.   Surely if this department with its woefully inadequate force can certify 400 aliens, the Federal Government should be able to remove more than 241 in the same period.

A comparative table of certifications and deportations for seven fiscal years in succession follows:

| Year | Certifi-cates | Deported |
|------|------|------|
| 1919 | 170 | 87 |
| 1920 | 186 | 147 |
| 1921 | 199 | 329 |
| 1922 | 293 | 172 |
| 1923 | 523 | 250 |
| 1924 | 312 | 271 |
| 1925 | 490 | 241 |

This serves to emphasize the statements just made.

The difficulties in securing passports have not lessened, but have rather been increased. As a matter of fact, the attitude of the Polish and German Governments is so unfriendly as to make it practically useless to apply for passports. On the other hand, the attitude of most other governments is distinctly friendly, and the aid and courtesy granted the State by the majority of them, notably Great Britain, Italy, and France, is worthy of comment.

There have been repatriated 212 aliens without expense to the Federal Government, almost as many as that Government deported. Most of these should never have been admitted to this country and practically all should have been sent back under Federal warrant had the intent of the immigration act been observed. Of these so repatriated, 135 were sent at the expense of friends and relatives. In this latter class we show an increase of 58 over the preceding year.

Our difficulties in the removal of nonresidents are still increasing owing to the rulings of the courts as to legal residence, compelling the State in many instances to care for and support individuals who have been in the State but a few days or a few weeks, a manifestly unfair and illogical situation. Of nonresidents removed we have a total of 676. Of these, 462, or more than two-thirds, were removed without cost of any kind to the State.

If we sum up the total removed from the State, of repatriates and nonresidents at the expense of friends and relatives, we see that it amounts to 597, and inasmuch as the average cost of removal from the State is about $103, this office was responsible for a saving in this respect to the State of $61,491.

If we refer to Table 2 it will be seen that 250 patients were removed directly from Bellevue and King's County Hospital, observation wards, without previous commitment to one of our State institutions, a great saving in cost and labor to the State and the municipality, to say nothing of the delay incident to the removal of a patient once committed. The Veterans' Bureau still cooperates most heartily with this office, as may be seen by referring to the same table and noting the fact that 77 patients were removed from Veterans' Bureau Hospital No. 81. The Veterans' Bureau still reports all nonresident cases to this bureau for our approval before removal to or acceptance from other States; and we still report all ex-soldier cases to them before removal.

The total removals during the year were 1,129, or 37 less than the year preceding. This slight decrease may be wholly attributed to the fact that early in the month of July the funds appropriated by the legislature for repatriation and transfer were entirely exhausted, and for a large part of the month of June no removals were made at the expense of the State. As a matter of fact, within certain bounds the number of removals is practically limited to the amount of money and the office force available, and it would seem that a wise, economic viewpoint on the part of the legislature would persuade them to give us a greater appropriation and a larger working force.

It is a fact that the per capita cost of care, maintenance, and up-keep of a patient in one of our State hospitals is about $425 per year. It is therefore purely a matter of arithmetic to know that our 1,129 removals during the year represent a gross saving to the State of New York for one year alone of $179,825. The entire cost of administration of this office, which includes not only salaries, but rent, transportation, and incidentals is under $37,000, a net saving to the State through the operations of the bureau of special examination for the fiscal year ending June 30, 1925, of $142,825.

70                    EUGENICAL ASPECTS OF DEPORTATION

### RELATIONS TO THE FEDERAL GOVERNMENT, TO OTHER STATES

Our relations with the local government officials continues to be most pleasant, especially with the Commissioner of Immigration for Ellis Island, and there can be no adverse criticism as to their attitude. On the contrary, the attitude of the Federal Government, as represented by the Department of Labor in Washington is so arbitrary, unjust, and unfair as to make unbiased comment almost impossible. The Department of Labor continues to cancel warrants of arrest without vouchsafing reasons, or giving anything but ex parte hearings to the interested aliens. More warrants of arrest and warrants of deportation have been canceled by the Department of Labor during the past fiscal year than ever since records have been kept by the State of New York.

The great majority of these cases appear upon the records as clearly within the intent of the law, and only the decision of the Secretary of Labor is responsible—so far as the State of New York is aware—for retaining them in the country and to contravening the intent of the statute in the matter of these undesirable aliens.

The medical examiner visited Great Britain during the month of July and was there accorded every facility for making inspections and examinations by the American consuls general at Liverpool and London and by the consul at Southampton. He was also assisted in his investigations by the White Star Line and the Cunard Line. He found that the so-called examination abroad (the passport regulations instituted under the new immigration act by the Secretary of Labor and relating to visas for immigrants) were even less effectual and practical, and more annoying and troublesome than it had been believed they could be.

The prospective immigrant must appear before the consul general and answer a series of questions stating that he is neither an imbecile, idiot, epileptic, mental defective, or an insane person; that he is not afflicted with constitutional psychopathic inferiority, and very many and various other questions which it actually takes him over a half hour to answer, with the representative of the consul working at top speed. He of course does not know the meaning of most of these terms, if any of them, nor is it believed he would answer them correctly if he did. He swears to the fact that they are correct, and yet there is no penalty fixed which can be enforced.

This procedure must be carried out, even for babes in arms, so that the only practical advantage accruing from this procedure would seem to be giving extra work to the already overworked consular staff. The law, of course, provides for the issuance of a medical certificate by some physician to be attached to the application for a visa, but does not provide that it shall be true, nor does it specify the kind, character, or official position (if any) of the physician. It is plain to see that the alien may employ any physician, and if his first certificate does not please him, he may discard it and employ others until he finds one whose certificate does suit.

The medical examiner has had two hearings, most helpful and courteous, from the House Committee on Immigration and Naturalization, and has aided in formulating new legislation which passed the last House of Representatives and will undoubtedly pass both Houses of the coming Congress. Several important changes are likely to occur in the new immigration act bearing upon time of deportation and the elimination of the question of public charges, as well as serving warrants of arrest by the local immigration officers.

The medical examiner has delivered many addresses regarding immigration in various parts of the country and believes that sentiment in general is in line with the modifications in the immigration laws which were adopted by the interstate conference on immigration held under the auspices of the State hospital commission in 1923.

In the last report of the medical examiner, the following recommendation was made:

"As the courts have recently held that legal residence (and thus legal settlement) in New York is one of intent, so that a resident of another State may acquire a legal residence in New York over night, the medical examiner suggests that the commission secure a change in the law which will provide that legal residence may be had in New York in the same manner as is the right to vote in this State."

As far as I am aware, no steps were taken in this respect; the medical examiner therefore once more urges this recommendation to the attention of the State hospital commission, all of which is respectfully submitted.

SPENCER L. DAWES,
*Medical Examiner.*

**TABLE 1.—*Monthly record of removals, year ended June 30, 1925***

|  | Total | July | August | September | October | November | December | January | February | March | April | May | June |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Aliens deported and repatriated:** | | | | | | | | | | | | | |
| Deported under Federal warrant | 244 | 21 | 14 | 11 | 34 | 17 | 23 | 24 | 23 | 30 | 14 | 16 | 14 |
| Repatriated— | | | | | | | | | | | | | |
| Expense of State | 77 | 5 | 11 | 2 | 8 | 3 | 2 | 3 | 3 | 27 | 2 | 2 | 9 |
| Expense of friends | 135 | 12 | 9 | 8 | 18 | 18 | 5 | 10 | 4 | 12 | 8 | 17 | 14 |
| **Nonresidents removed:** | | | | | | | | | | | | | |
| Expense of State | 211 | 16 | 16 | 18 | 18 | 21 | 19 | 39 | 9 | 32 | 20 | 12 | 13 |
| Expense of friends | 462 | 16 | 44 | 30 | 31 | 46 | 26 | 25 | 24 | 38 | 60 | 48 | 74 |
| Total | 1,129 | 70 | 94 | 69 | 109 | 105 | 75 | 82 | 63 | 139 | 104 | 95 | 124 |
| Certificates issued | 400 | 24 | 42 | 41 | 45 | 20 | 50 | 40 | 30 | 20 | 50 | 10 | 28 |
| Cases investigated | 2,123 | 196 | 199 | 150 | 181 | 189 | 162 | 179 | 142 | 171 | 200 | 141 | 213 |

**TABLE 2.—*Patients removed from State hospitals and other institutions***

| State hospitals | Grand total | Aliens deported and repatriated | | | | Nonresidents returned | | |
|---|---|---|---|---|---|---|---|---|
|  |  | Total | United States Immigration Service | Expense of State | Expense of friends | Total | Expense of State | Expense of friends |
| Binghamton | 16 | 7 | 3 | 2 | 2 | 9 | 8 | 1 |
| Brooklyn | 27 | 16 | 11 | 2 | 3 | 11 | 4 | 7 |
| Buffalo | 19 | 10 | 3 | 3 | 4 | 9 | 4 | 5 |
| Central Islip | 178 | 102 | 54 | 22 | 26 | 76 | 36 | 40 |
| Dannemora | 5 | 3 | | 3 | | 2 | 2 | |
| Gowanda | 30 | 11 | 3 | 2 | 6 | 19 | 13 | 6 |
| Harlem Valley | 1 | | | | | | | 1 |
| Hudson River | 61 | 13 | 10 | 2 | 1 | 48 | 21 | 27 |
| Kings Park | 70 | 37 | 25 | 5 | 7 | 33 | 23 | 10 |
| Manhattan State Hospital | 303 | 186 | 109 | 29 | 48 | 117 | 47 | 70 |
| Matteawan | 29 | 7 | 4 | 3 | | 22 | 7 | 15 |
| Middleton | 10 | 4 | 1 | | 3 | 6 | 4 | 2 |
| Rochester | 9 | 5 | 1 | 1 | 3 | 4 | 1 | 3 |
| St. Lawrence | 10 | 5 | 4 | | 1 | 5 | 2 | 3 |
| Utica | 14 | 8 | 5 | 1 | 2 | 6 | 3 | 3 |
| Willard | 15 | 1 | 1 | | | 14 | 3 | 11 |
| Bellevue | 243 | 30 | 5 | 2 | 23 | 211 | 34 | 178 |
| Kings County | 7 | 1 | | | 1 | 6 | 2 | 4 |
| Veterans No. 31 | 77 | 1 | | | 1 | 76 | | 76 |
| Grasslands | 1 | | | | | 1 | 1 | |
| Albany Hospital | 1 | 1 | | | 1 | | | |
| Bloomingdale | 1 | 1 | | | | | | |
| Home | 4 | 1 | 2 | | 2 | | | |
| Total | 1,129 | 453 | 244 | 77 | 135 | 676 | 214 | 462 |

**Certificates issued by the State hospital commission and alien patients deported from this State by the United States Government in the fiscal years 1919–1926**

| Year ending | Certificates issued | Patients deported | Year ending | Certificates issued | Patients deported |
|---|---|---|---|---|---|
| June 30, 1919 | 170 | 87 | June 30, 1923 | 325 | 239 |
| June 30, 1920 | 186 | 147 | June 30, 1924 | 312 | 271 |
| June 30, 1921 | 199 | 329 | June 30, 1925 | 400 | 241 |
| June 30, 1922 | 283 | 172 | Dec. 31, 1925[1] | 215 | 124 |

[1] 6 months.

**077**

### APPENDIX 6

**DEPORTATION OF ALIENS AND RETURN OF CITIZENS TO OTHER STATES, BY CLASSES OF SOCIAL INADEQUACY. SURVEY ENDING JANUARY 1, 1923**

(Hitherto unpublished findings of a preliminary investigation on deportation made for the Committee on Immigration and Naturalization of the House of Representatives, by H. H. Laughlin)

TABLE A.—*Institutional findings on international deportation and interstate return of socially inadequate inmates. Reported by 667 institutions with a total of 451,048 inmates, in a survey ending January 1, 1923*

| Class of institution | Number of institutions reporting | Total number of inmates | Aliens deportable | | Citizens returnable to other States | | Aliens deported [1] | | Citizens returned to respective home States [2] | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Number | Per cent | Number | Per cent | Number | Per cent | Number | Per cent |
| Feeble-minded | 49 | 38,036 | 4 | 0.20 | 13 | 0.04 | 57 | 2.82 | 174 | 0.55 |
| Insane | 160 | 225,553 | 920 | 1.95 | 816 | .61 | 7,647 | 16.20 | 8,676 | 6.45 |
| Criminalistic adults | 117 | 80,223 | 1,109 | 9.50 | 218 | .34 | 1,786 | 15.62 | 1,066 | 1.56 |
| Criminalistic juveniles | 81 | 24,263 | 8 | .36 | 205 | .99 | 25 | 1.12 | 1,452 | 7.03 |
| Epileptics | 12 | 9,439 | 8 | 1.16 | 2 | .03 | 4 | .58 | 20 | .27 |
| Tuberculous | 71 | 11,691 | 48 | 2.20 | 3 | .03 | 109 | 5.00 | 7 | .07 |
| Leprous | 6 | 5,955 | | | | | 14 | 5.43 | | |
| Blind | 41 | 5,421 | | | 11 | .22 | | | | |
| Deaf | 32 | 6,669 | | | 4 | .07 | 15 | 15.31 | 8 | .14 |
| Deformed | 7 | 883 | | | | | | | | |
| Dependent adults | 62 | 33,155 | 49 | .79 | 68 | .27 | 210 | 1.11 | 1,047 | 4.19 |
| Dependent children | 29 | 4,463 | | | | | | | | |
| Total | 667 | 451,048 | 2,187 | 5.07 | 1,490 | .47 | 10,482 | 11.71 | 13,320 | 4.22 |

[1] These are the total numbers, as given by the institutional authorities as having been deported from the beginning of deportations, from the several institutions, to Jan. 1, 1923.
[2] Total number returned from beginning of such returns to Jan. 1, 1923.
[3] During the period of the survey (1922) the number of institutions varied slightly from time to time

#### FEEBLE-MINDED

Total number of institutions: 52.
Number of institutions reporting: 49.
Total number of inmates reported: 38,036.
Nativity: Native born, 82.72 per cent; foreign born, 5.31 per cent; unknown, 11.97 per cent.
Number of aliens deportable: 4.
Number returnable to other States: 13.
Historical notes: (1) Number of feeble-minded aliens reported by 49 institutions as having been deported since the establishment of the institutions, by States: Iowa, 1; Massachusetts, 31; New York, 18; North Dakota, 1; Virginia, 3; Wyoming, 3; total, 57. (2) Feeble-minded residents of other States returned by these 49 institutions to their respective home States: 174.

#### INSANE

Total number of institutions: 165.
Number of institutions reporting: 160.
Total number of inmates reported: 225,553.
Nativity: Native born, 59.68 per cent; foreign born, 20.90 per cent; unknown, 19.42 per cent.
Number of aliens deportable: 920.
Number returnable to other States: 816.
Historical notes: (1) Number of insane aliens reported by 160 State institutions as having been deported since the establishment of the institutions, by States: Alabama, 2; Colorado, 4; Connecticut, 294; Delaware, 2; Idaho, 3; Illinois, 171; Indiana, 20; Iowa, 10; Maine, 10; Maryland, 9; Massachusetts, 479; Michigan, 175; Minnesota, 445; Montana, 18; Nebraska, 27; New Jersey, 66; New York,

5,139; Ohio, 79; Oregon, 76; Pennsylvania, 36; Rhode Island, 203; Tennessee, 1; Texas, 3; Virginia, 18; Vermont, 6; Washington, 303; Wisconsin, 1; Wyoming, 7; total, 7,637.   (2) Insane residents of other States returned by these 160 institutions to their respective home States: 8,676.

### CRIMINALISTIC

Total number of institutions: 207.
Number of institutions reporting: 201 (117 prisons and penitentiaries, 84 juvenile reform schools).
Total number of inmates reported: Juvenile, 23,263; adult, 80,253; total, 103,516.
Nativity: Native born—juvenile, 88.82 per cent; adult, 80.50 per cent. Foreign born—juvenile, 9.62 per cent; adult, 14.24 per cent.   Unknown—juvenile, 1.56 per cent; adult, 5.26 per cent.
Number of deportable aliens: Juvenile, 8; adult, 1,109; total, 1,117.
Number returnable to other States: Juvenile, 205; adult, 218; total, 423.
Historical notes: (1) Number of criminal aliens reported by 201 State institutions as having been deported since the establishment of the institutions, by States and Territories: Arizona, 53; California, 67; Colorado, 58; Connecticut, 1; District of Columbia, 3 (juvenile); Idaho, 29 (4 juvenile); Illinois, 12; Iowa, 27 (1 juvenile); Indiana, 40; Kansas, 30; Louisiana, 2; Maryland, 2; Massachusetts, 13 (1 juvenile); Michigan, 96 (2 juvenile); Missouri, 1; Nevada, 7; New Jersey, 2; New York 51 (53 juvenile); Ohio, 8 (juvenile); Oklahoma, 72; Oregon, 1 (juvenile); Pennsylvania, 5; Texas, 91; Utah, 7 (2 juvenile); Vermont, 8; Washington, 93; Wisconsin, 15; West Virginia, 2; Canal Zone, 1,002; Hawaii, 10; total, 1,811. (2) Criminal residents of other States returned by these 201 institutions to their respective home States: Juvenile, 1,452; adult, 1,006; total, 2,458.

### EPILEPTIC

Total number of insitutions: 13.
Number of instututions reporting: 12.
Total number of inmates reported: 9,430.
Nativity: Native born, 79.36 per cent; foreign born, 7.34 per cent; unknown, 13.30 per cent.
Number of aliens deportable: 8.
Number returnable to other States: 2.
Historical notes: (1) Number of epileptic aliens reported by 12 States institutions as having been deported since the establishment of the institutions, by States: Massachusetts, 1; Texas, 1; Illinois, 2; total, 4.   (2) Epileptic residents of other States returned by these 12 institutions to their respective home States: 20.

### TUBERCULOUS

Total number of institutions: 75.
Number of institutions reporting: 71.
Total number of inmates reported: 14,691.
Nativity: Native born, 64.30 per cent; foreign born, 14.83 per cent; unknown, 20.87 per cent.
Number of aliens deportable: 48.
Number returnable to other States: 3.
Historical notes: (1) Number of tuberculous aliens reported by 71 State institutions as having been deported since the establishment of the institutions, by States and Territories: Connecticut, 26; Maryland, 6; Massachusetts, 10; Missouri, 2; Oregon, 3; Pennsylvania, 5; Hawaii, 57; total, 109.

### LEPROUS

Total number of institutions: 7.
Number of institutions reporting: 6.
Total number of inmates reported: 5,955.
Nativity: Native born, 95.67 per cent; foreign born, 4.33 per cent.
Number of aliens deportable: 1.
Historical note: Number of leprous aliens reported by six State institutions as having been deported since the establishment of the institutions: Canal Zone, 13; Louisiana, 1; total, 14.

### BLIND

Total number of institutions: 45.
Number of institutions reporting: 41.
Total number of inmates reported: 5,421.
Nativity: Native born, 93.41 per cent; foreign born, 1.79 per cent; unknown, 4.80 per cent.
Number of inmates returnable to other States: 11.
No inmates reported as having been deported or returned to other States.

### DEAF

Total number of institutions: 33.
Number of institutions reporting: 32.
Total number of inmates reported: 6,669.
Nativity: Native born, 87.75 per cent; foreign born, 1.47 per cent; unknown, 10.78 per cent.
Number of inmates returnable to other States: 4.
Historical notes: (1) Wisconsin School for the Deaf has deported 15 aliens since the establishment of the institution. (2) Deaf residents of other States returned to their respective home States: 8.

### DEFORMED

Total number of institutions: 7.
Number of institutions reporting: 7.
Total number of inmates reported: 883.
Nativity: Native born, 97.96 per cent; foreign born, 0.04 per cent.
No inmates deported or returned to other States.

### DEPENDENT

Total number of institutions: 93.
Number of institutions reporting: 86 (66 homes for the aged and infirm, 20 homes for children).
Total number of inmates reported: Adult, 35,155; children, 4,463; total, 39,618.
Nativity: Native born—Adult, 71.13 per cent; children, 99.80 per cent. Foreign born—Adult, 14.43 per cent; children, 0.20 per cent. Unknown—Adult, 14.44 per cent.
Number of aliens deportable: 40.
Number returnable to other States: 68.
Historical notes: (1) The State infirmary at Tewksbury, Mass., has deported 210 dependent aliens since the establishment of the institution. (2) Dependent residents of other States returned to their respective home States: State infirmary at Tewksbury, Mass., 1,043; Confederate Home, Higginsville, Mo., 4.

---

### APPENDIX 7

#### THE CAUSES OF NONDEPORTABILITY OF FOREIGN-BORN INMATES OF AMERICAN STATE CUSTODIAL INSTITUTIONS

(This is a special memorandum prepared by Harry H. Laughlin, for Hon. Albert Johnson, chairman of the Committee on Immigration and Naturalization of the House of Representatives. This memorandum gives an analysis of the principal findings of the present investigations on deportation made for this committee.)

EUGENICS RECORD OFFICE,
CARNEGIE INSTITUTION OF WASHINGTON,
*Cold Spring Harbor, N. Y., January 1, 1928.*

MR. CHAIRMAN. In response to your request I submit this letter as a short summary of the recent investigations on deportation of social inadequates which I have been conducting for the Committee on Immigration and Naturalization of the House of Representatives. This survey supplied first-hand data in reference to inmate population nativity and deportability of 684 out of 688 State and Federal institutions covering all types of social inadequacy in the several States. These institutions ha ¹ on the dates of their respective returns which were

made during the calendar years 1925 and 1926, a total of 478,433 inmates, of whom 74,170, or 15.50 per cent, were definitely known to be of foreign-born birth. There were doubtless many more aliens among this total institutional population because the institutions reported being unable to determine the nativity of 16.58 per cent of their total charges.

Our present task is to study these 74,170 foreign-born inmates in reference to their deportability. We find that only 3,798, or 5.12 per cent, of the total number of foreign-born inmates were reported by their custodians as definitely deportable. However a survey made several years in the future would undoubtedly show only a fraction of this number as actually having been deported, because many of them will die before possible deportation; a very small number will be discharged or reported as "recovered," but the great majority of them will find themselves retained in their respective institutions until they severally attain five years of residence in the United States, at which time they will automatically cease to be deportable.                   •

NOTE.—See Table II, p. 8, for the essential data analyzed in this memorandum.

There are three principal reasons why the foreign-born inmates of our custodial institutions are not deportable. These are, first, the foreign-born person may be a naturalized citizen; second, he may have been a resident of the United States until the statute of limitations has made him nondeportable; third, he may have become inadequate and dependent, actually or technically, from causes arising since his admission into the United States.

The accompanying table (Table II, p. 8) gives an analysis in reference to these three causes of nondeportability. Of these 74,170 foreign-born inmates, 15,363, or 20.71 per cent, were not deportable because they were naturalized citizens; 33,447, or 45.10 per cent, were not deportable because they had resided in the United States more than five years; while only 3,526, or 4.75 per cent, were not deportable because they were inadequate and dependent from causes technically reported as arising since their admission into the United States. While the authorities claimed nondeportability for 18,036, or 24.32 per cent, but gave no reasons for such claim. Contrasted with these 70,372, or 94.88 per cent of nondeportables only 3,798, or 5.12 per cent were listed as deportable.

Permit me to summarize our findings by causes and classes. Among the foreign-born feeble-minded persons in institutions of the United States we find that only 15 or 0.94 per cent are naturalized citizens. It is a strange commentary on our naturalization procedure that any court should naturalize a feeble-minded individual. For the insane, the excuse is more reasonable. The alien might be behaving normally in every respect when naturalized, but might later break down with insanity, but persons do not break down with feeble-mindedness. The latter are cases of retarded mental development. They never reach normality. Nine or 0.56 per cent of the feeble-minded alien inmates were declared to be nondeportable because they became feeble-minded from causes arising since their admission into the United States.

Of course, in childhood, disease or accident may cause an otherwise perfectly normal child to suffer an arrested mental development. So these cases seem reasonable and are not deportable under our policy. If it can be shown definitely that in certain cases the causes really arose after admission into the United States, then it would seem that our just duty would be to maintain these unfortunates in our institutions. But, on the other hand, of the total of 1,602 foreign-born feeble-minded inmates we find only 21, or 1.31 per cent, listed by their institutional authorities as deportable; 926, or 57.80 per cent, are not now deportable because they have been residents of the United States for more than five years; 631 individuals, or 39.58 per cent, were claimed by their custodians as being nondeportable, but for this number the authorities gave no reason for claiming such immunity. This means, of course, that the feeble-minded persons were always so; that feeble-mindedness is a constitutional defect; that this whole particular group was admitted into the United States contrary to the law which forbids the admission of feeble-minded persons; and that because they were not located and deported within five years after their arrival these mentally defective persons must remain a permanent expense to the several States, and a social and biological drag on the population of the country.

The insane show a very different situation. Here, of the 53,986 foreign-born inmates, we find that only 1,223, or 2.27 per cent, are deportable; 11,439, or 21.19 per cent, are not deportable because they are naturalized citizens. This means that, at the time of immigration, and for a number of years afterwards, the members of this particular group were ostensibly sound citizenship material

and were therefore naturalized.    Later on they developed psychoses, the incipient signs of which were not recognized at admission into the United States, nor at naturalization.    Next we find that 25,730, or 47.66 per cent, are nondeportable because they have been residents of the United States more than five years; while 1,615, or 2.99 per cent, are reported as nondeportable because they became insane from causes arising since their admission into the United States.    While 13,979, or 25.89 per cent, of the foreign-born insane were listed as nondeportable, but for such nondeportability the institutional authorities could supply no reason. The relatively small percentage of alien insane becoming so from causes arising since their admission reflects, statistically, the constitutional nature of insanity. Only in case of a very severe injury or poisoning, or infection with certain types of diseases, can insanity be said to be caused, primarily, by factors other than those which are constitutional and therefore inborn and hereditary in the individual.

With the criminalistic classes the situation statistically parallels that for the insane.    By figures and percentages, we find 11,224 foreign-born persons in prisons for the more serious crimes, who are reported, in this survey, as being criminalistic.    Of these, 2,409, or 25.02 per cent, are reported as deportables; 2,032, or 18.09 per cent, are not deportables because they are naturalized citizens. Next, 3,272, or 29.15 per cent, are nondeportable because they have been residents of the United States for more than five years; only 248, or 2.21 per cent, were reported by their respective institutions as being criminalistic from causes arising since their admission into the United States; while 3,265, or 29.09 per cent, of the foreign-born inmates in our prisons and reformatories were reported nondeportable, but no reason for such nondeportability was given.    Thus, statistically, we find that the foreign-born potential criminal is, in general, a constitutionally inadequate person, but that, in many cases, he was able to present so normal an appearance to the immigration officials and to the naturalization officers that, before he was taken in charge by the State as a criminalistic person, he was admitted and naturalized as a normal and desirable citizen.

Among the epileptic, 741 foreign-born inmates were reported.    Of these, only 10, or 1.34 per cent, are deportable.    Of those who were not deportable, 71, or 9.48 per cent, were naturalized citizens; 668, or 89.78 per cent, were in the United States more than five years, while not a single one of this class of aliens was reported as having become inadequate from causes arising since admission into the United States.    Thus, as with other types, statistically, the epileptic show constitutional rather than environmental causes of this particular inadequating defect.

Among the tuberculous class 2,608 foreign-born patients were found.    Of these, 118, or 4.52 per cent, were designated as deportable.    Among the nondeportable, 858, or 32.90 per cent, were naturalized citizens.    One thousand and eleven, or 38.77 per cent, were residents of the United States for more than five years; 541, or 20.74 per cent, were reported as having become tuberculous from causes arising since their admission into the United States; while 80, or 3.07 per cent, of the tuberculous aliens in State institutions were listed as nondeportable with no reason for such given.    Tuberculosis is an infectious disease which is most likely to hit the young and undernourished, but there is also an element of heredity in its cause.    Some families and individuals are especially susceptible to it by heredity, others seem to inherit comparative immunity.    While we seek earnestly to prevent and to cure tuberculosis in this country, we should logically enough aid such prevention by guarding against the immigration of infected persons and of persons who are, by inheritance, most susceptible to this disease.

Among the 52 foreign-born lepers, there were no naturalized citizens; none had contracted leprosy after coming to the United States; but all, or 100 per cent, were nondeportable because they had been here for more than five years.

The blind showed 130 foreign-born inmates, none of whom was deportable; of these 44, or 33.85 per cent, were nondeportable because of naturalization; while 45, or 34.62 per cent, showed a residence of more than five years' duration; and 15, or 11.54 per cent, were blinded from causes arising since their arrival in the United States; and 26, or 20 per cent, were listed as nondeportable but with no reason given.

The deaf showed only 57 foreign-born inmates, of whom only 3, or 5.76 per cent, were listed as deportable; 11, or 1,930 per cent, were not deportable because of naturalization; 33, or 57.89 per cent, because of more than five years' residence. No alien deaf in institutions claimed immunity from deportation on account of causes arising since admission; while the authorities listed 10 alien deaf, or 17.54 per cent, of this group as nondeportable but gave no reason why.

The deformed and crippled showed only 16 alien inmates being maintained by the States primarily on account of deformity apart from dependency or other inadequating causes. Of these 16, none was listed as deportable. The reason for nondeportability in the case of 12 individuals, or 75 per cent, was more than five years residence; and of 4 individuals, or 25 per cent, was dependent from causes arising since admission.

In the dependent classes there were 3,746 foreign-born inmates; only 14, or 0.37 per cent, of whom were deportable. The causes of nondeportability parallel closely with those for the insane and the criminalistic classes. We find that 895, or 23.89 per cent, were naturalized citizens; 1,698, or 45.33 per cent, had been residents of the United States more than five years; 1,094, or 29.20 per cent, were nondeportable from causes reported as arising since admission into the United States; while 45, or 1.20 per cent, were listed as nondeportable but the authorities gave no reason why.

Normally, if necessary, the American people seem glad to support, in their institutions, their foreign-born residents who are homeless, aged, or crippled, or who are disabled by accident, provided such persons came to the United States in sound health and mind, and who, at the time of admission, so far as the most critical examination could determine, were promising citizenship material. But one can not doubt that most all of our foreign-born dependents would show, in a more careful working out of their personal and family histories, a bad reputation and a high percentage of different kinds of constitutional or hereditary inadequacy among their near kin. There are, of course, exceptions, but in general these inadequates have not tended to raise our standards of citizenship and efficiency. They have, contrary to the intent of our laws, somehow gotten into the country.

Permit me to enumerate what seem to be the logical conclusions of this particular research:

1. The five-year limitation provides the principal cause of nondeportability, and consequently the principal cause of current expense in maintaining foreign-born inadequates and dependents of all types.

2. Practically one in five of our foreign-born institutional inmates claim immunity from deportation on account of naturalization. This is not a large percentage, but it speaks rather poorly for this phase of our naturalization practice.

3. The small percentage, about 1 in 20, of foreign-born inmates reported as nondeportable from causes arising since admission into the United States, shows that, generally speaking, the causes of inadequacy are constitutional rather than environmental or accidental, and that, except in occasional instances, the foreign-born in American custodial institutions represent defective human breeding stocks.

4. From the standpoint of race conservation, justice, charity, and economy, these studies demonstrate the necessity—

(a) For establishing higher standards, and for exercising greater vigilance and strictness in sorting out defectives, and particularly potential inadequates, who attempt to enter the United States as immigrants.

(b) For exercising greater scrutiny to avoid naturalizing potential criminals and other inadequates, particularly the potentially insane and ne'er-do-wells.

(c) Biologically, the whole situation points toward the practical necessity for providing, in the immigration statutes and regulations, agencies for securing more information concerning the background of the would-be immigrant, with special reference to his personal and family history and his reputation, and for making the attainment of high personal reputation and a sound family history prerequisites for the admission of immigrants.

Of course, only in so far as our foreign-born inadequates of bad blood have become parents of children, or may in the future become such, are they a permanent menace. The principle of requiring each country and community which produces an inadequate to care for him requires, as a matter of square dealing—that is, as a matter of economic, social, and biological justice—the general rather than the exceptional return of foreign-born inadequates to their home countries and communities. It is much more important in all phases of immigration to look more after the next generation than after the present.

Respectfully submitted.

HARRY H. LAUGHLIN.

## APPENDIX 8

Set of the principal schedules used in securing data for the researches on deportation reported in this hearing. Prepared by Harry H. Laughlin.

### FORM A

This form was used to secure the correct list of State institutions for the social inadequate. A list had been previously prepared as of January 1, 1921, and the present form brought this list down to the time of the present investigation, January 1, 1926.

EUGENICAL INVESTIGATIONS OF THE COMMITTEE ON IMMIGRATION AND NATURAL-IZATION OF THE HOUSE OF REPRESENTATIVES, WASHINGTON, D. C.

Subject: New custodial institutions opened and old custodial institutions closed in the State of ———— since January 1, 1921.

(For the list already in hand, and which we desire to correct and bring down to date, see "Statistical Directory of State Institutions for the Defective, Dependent, and Delinquent Classes," United States Bureau of the Census)

For the present purpose, a custodial institution is one devoted to custodial or other continuous care, treatment, or education of persons belonging to one or more of the following classes: (1) Feeble-minded; (2) insane (including the nervous and psychopathic); (3) Criminalistic (including the delinquent and wayward); (4) epileptic; (5) inebriate (including drug habitués); (6) Diseased (including the tuberculous, the syphilitic, the leprous, and others with chronic infectious segregated diseases); (7) blind (including those with greatly impaired vision); (8) deaf (including those with greatly impaired hearing); (9) deformed (including the crippled); and (10) dependent (including children and old folks in "homes," ne'er-do-wells, tramps, and paupers).

#### (A) NEW STATE INSTITUTIONS OPENED SINCE JANUARY 1, 1921

| Name of institution | Where located | Date opened | Type of persons provided for |
|---|---|---|---|
| (1) | | | |
| (2) | | | |
| (3) | | | |
| (4) | | | |
| (5) | | | |
| (6) | | | |

#### (B) OLD STATE INSTITUTIONS CLOSED SINCE JANUARY 1, 1921

| Name of institution | Where located | Date closed | Why closed and other remarks |
|---|---|---|---|
| (1) | | | |
| (2) | | | |
| (3) | | | |

Kindly fill out this schedule and return it to H. H. Laughlin, expert eugenics agent, Committee on Immigration and Naturalization, House of Representatives, Cold Spring Harbor, Long Island, N. Y.

Filled out by ............................................
Position. ............................................
Date. ............................................

084

## Form B

This form gave the first returns for all State and Federal institutions:

**EUGENICAL INVESTIGATIONS OF THE COMMITTEE ON IMMIGRATION AND NATURAL-IZATION OF THE HOUSE OF REPRESENTATIVES, WASHINGTON, D. C.**

Special subject: Deportation of public charges.
1. Name of institution. ------------------------------------------------
2. Where located------------------------------------------------------
3. Social or pathological classes provided for-----------------------------
4. Are there any limits to the races or nationalities provided for?---------
   If so, describe--------------------------------------------------------
   ----------------------------------------------------------------------
5. Sexes provided for: Males only, females only, or both sexes?-----------
6. Inmate population------------- Date------------------------------
   (a) Of this number, how many are native born?
       Males -----------, females -----------, total ----------
   (b) How many are foreign born?
       Males -----------, females -----------, total ----------

                                        Grand total -----------

7. Aliens deportable.—Of the present foreign-born inmates, how many are now deportable?
       Males -----------, females -----------, total ----------
   (Under sections 18, 19, and 20, immigration act of Feb. 5, 1917, providing for deportation of aliens who become public charges within five years after admission.)

8. Residents of other States returnable.—Of the present inmates, how many are returnable or deportable to other States of the Union, under the State laws?
       Males -----------, females -----------, total ----------
9. Please give reference to State laws and regulations governing such returns
   ----------------------------------------------------------------------
   ----------------------------------------------------------------------
10. Historical note.—How many inmates of the institution have been deported or returned since its establishment (state whether estimated or compiled data)—
    (a) To foreign countries? Male ------, female ------, total ------
    (b) To other States of the Union? Male ------, female ------, total----
    (c) Date of first return of inmate to other State or nation -----------
                    (Signed)-------------------------------------------
                    (Position)-----------------------------------------

Date--------------------

## Form C

This form supplied supplementary returns in reference to the initiative taken in securing the deportation of institutional inmates, to supply data on collaboration between State and Federal authorities, and to inquire into the policy of the several States in reference to the return of nonresident institutional inmates.

**EUGENICAL INVESTIGATIONS OF THE COMMITTEE ON IMMIGRATION AND NATURALI-ZATION OF THE HOUSE OF REPRESENTATIVES, WASHINGTON, D. C.**

Special subject: Supplementary notes on the deportation of public charges.
1. Name of institution-------------------- ---------------------------
2. Where located--------- -----------------------------------------
A. Deportation of aliens:
   1. With what Federal deportation office, if any, has your institution made immediate contacts? --------------------------------------
   2. In the case of deportation of aliens from your institution, who has taken the initiative, your institution or the Federal authority?---
      ----------------------------------------------------------------
   3. In the case of deportation of aliens from your institution, who pays the cost of transportation and other deportation expenses to the border or port of departure, your institution (that is, your State) or the Federal Government?  (Explain system of charges.)------
      ----------------------------------------------------------------
      -- -- ---- -- --- ----------- --- --- -- -------- --

B. The return of citizens of other States who are inmates of your institution:
    1. When a citizen of another State is returned from your institution, to what officer in his home State is he delivered? _____

    2. In such cases, what is the nature of the cooperation given by the receiving State? _____

    3. In the case of such returns, who pays the transportation and other return charges? _____

    4. What practical rule determines whether an inmate shall be returned to his home State? _____

C. Remarks: _____

            (Signed) _____
            (Position) _____
Date _____

## FORM D

This form supplied data on the reasons for nondeportability of nondeportable alien inmates:

### Causes of nondeportability of foreign-born inmates

Name of institution _____
Where located _____

| | Number | | |
|---|---|---|---|
| | Male | Female | Total |
| Number of foreign-born inmates............ | ....... | ....... | ....... |
|   A. Foreign-born inmates deportable........... | ....... | ....... | ....... |
|   B. Foreign-born inmates not deportable......... | ....... | ....... | ....... |
|     (a) Not deportable because naturalized............ | ....... | ....... | ....... |
|     (b) Not deportable because in United States five years or longer......... | ....... | ....... | ....... |
|     (c) Not deportable because dependent from causes arising since admission to United States............ | ....... | ....... | ....... |

Date _____ (Signed) _____

## FORM E

This form secured still further detailed information concerning policies of the several States in reference to deportation of aliens and the interstate return of inadequates:

COMMITTEE ON IMMIGRATION AND NATURALIZATION,
HOUSE OF REPRESENTATIVES,
*Washington, D. C.*

SPECIAL RESEARCH OF THE DEPORTATION OF ALIENS, WITH PARTICULAR REFERENCE TO THE PRACTICES OF THE SEVERAL STATES

State of _____

_____
_____
_____

YOUR EXCELLENCY: The Committee on Immigration and Naturalization of the House of Representatives is making a study of the deportation of aliens.

In order to perfect this research, we need certain data about State practice in the matter. We should be very grateful if you would request the proper State official to fill out the inclosed questionnaire and to return it, with other appurtenant data, to Harry H. Laughlin, expert eugenics agent, Committee on Immigration and Naturalization, House of Representatives, Cold Spring Harbor, Long Island, N. Y.

Very sincerely,

ALBERT JOHNSON, *Chairman.*

---------------------------------

## FILING RECORD

1. Received by the governor of the State on ------------------and referred
                                (Date)

to ----------------------------------------- for reply.
        (Name of officer)

2. This questionnaire was filled out, and the accompanying schedules supplied,
by -----------------------------------------------------------------------
        (Name)                (Official position)

------------------------------------------------------------------------
        (Address)           (Date)

3. Date received by the Committee's agent-------------------------------

NOTE.—When this questionnaire is filled out, kindly return it, accompanied by the records asked for in Item E, page 4, to Harry H. Laughlin, Expert Eugenics Agent, Committee on Immigration and Naturalization, House of Representatives, Cold Spring Harbor, Long Island, N. Y.

State of --------------------

### DEPORTATION LAWS, REGULATIONS, AND PRACTICES

A. State authority:

    Official designation of any central State board or office having charge of the State's custodial institutions, relief cases, the deportation of aliens, and interstate return of inadequate citizens.

        Official name of board or office -- -----------------------------
        Present chief officer--------------------------------------------
                (Name)          (Position)

        ----------------------------------------------------------------
                  (Address)

B. Deportation of aliens:

    1. In case of deportation of deportable aliens found in the custodial institutions of this State, or in the State's population at large, who takes the initiative—the Federal Government or the State?

    2. Please describe in some detail the procedure followed in effecting the deportation of deportable aliens found in the *custodial institutions* of the State -----------------------------------------

    3. Also, please describe in some detail the procedure followed by the State officials in deporting deportable aliens found in the State's population at large:-----------------------------------------------

    4. References to and copies of the laws of the State under which the above practices are carried out: -----------------------------------

    5. Statistical deportation records, by date, sex, age, type of defect, nation or race, from the central State authority: ----------------
    -----------------------------------------------------------------

C. The interstate return of socially inadequate American citizens from your
State to the State of which the deportee is a citizen and legal resident:
    1. Kindly give reference and quote any State law, regulation, order,
or practice under which a custodial inmate or public charge, or a
socially inadequate individual in the population at large, may be
returned by and from your State to the State of which the deportee
is a citizen and legal resident:_____

    ----------------------------------------------------------------
    2. What is the procedure followed in such interstate deportations?____

    ----------------------------------------------------------------
    3. Statistical interstate deportation records, by date, sex, age, type of
defect, and receiving State: _____

    ----------------------------------------------------------------
D. Criticisms and recommendations:
    1. What history and condition of an alien would, in your opinion, form
an equitable basis for the line of demarcation between (a) the
moral and legal responsibility of the State or community to care
for an alien public charge, and (b) public policy to deport a socially
inadequate alien found within or becoming inadequate within the
territories of a given State or community?_____

    ----------------------------------------------------------------
    2. Where would you draw this line in the case of American citizens
legally residents of other States or cities?_____

    ----------------------------------------------------------------
    3. What Federal or State laws, regulations, or practice would, in your
opinion, insure the more certain and prompt deportation of deport-
able aliens, and the interstate return of citizen public charges to
their home States or communities?_____

    ----------------------------------------------------------------
E. Documents and records:
    Kindly accompany the return of this questionnaire with copies of laws,
regulations, forms, orders, records, statistics, and other appurtenant
data.
    List of such material which will accompany or follow the return of this
questionnaire:
        1._____
        2._____
        3._____
        4._____
        5._____
F. Remarks:
    ----------------------------------------------------------------

# INDEX

|  | Page |
|---|---|
| Administrative districts of Bureau of Immigration | 10, 51 |
| Administrative initiative in deportation | 14, 15 |
| Alien inadequates in institutions in 1923 | 71 |
| Aliens deported | 6 |
| Basic principles of immigration policy | 19 |
| "Botany Bay" | 33 |
| Chinese immigration, legal and eugenical aspects of | 23 |
| Contact with Federal deportation office | 15 |
| Costs of alien deportation | 15, 41 |
| Costs of interstate return | 13 |
| Crime among aliens | 3 |
| Criminals, deportation of | 30 |
| Criteria for interstate return | 13 |
| Dawes, Dr. Spencer L | 07 |
| Degenerate families | 32 |
| Deportability and actual deportations | 9 |
| Deportation facilities | 8 |
| Deportation statutes and rules, historical development of | 46, 48 |
| Desirable and undesirable exiles | 22 |
| Differential fecundity | 3, 18 |
| Direct cost of aliens in institutions | 36, 41 |
| Economic costs | 42 |
| Estabrook, Dr. A. H. | 33 |
| Exiling and "dumping" of inadequates | 22, 29 |
| Family stock standard for immigration | 18, 76 |
| Federal and State collaboration in deportation | 16, 39 |
| Federal Immigration Service, initiative by the | 37 |
| Feeble-minded, deportation of | 25 |
| Field survey, outline of schedules used in | 77 |
| Foreign-born inmates of custodial institutions | 5 |
| Future investigations | 2 |
| Gap between Federal and State deportation activities | 44 |
| Humanitarian advance | 7 |
| Immigration districts, map of | opp. p. 52 |
| Immigration standards | 24, 44, 76 |
| Inadequate aliens, roster of sources for locating | 40 |
| Insane, deportation of | 28 |
| Institutional initiative in deportation | 31 |
| Institutional inmates by classes | opp. p. 6 |
| Intelligence distribution among foreign born | 25 |
| Intelligence, immigration standards in relation to | 26, 44 |
| Interstate cooperation | 12 |
| Interstate return of social inadequates | 11 |
| Mate selection | 3, 17 |
| Naturalization of the feeble-minded | 26, 74 |
| Nativity and parentage of the insane | 29 |
| New York State Bureau of Special Examinations, report of | 67 |
| Nondeportability, causes of | 5, opp. pp. 8, 27 |
| Nondeportability, special cases of | 47 |
| Obligation of home country to receive its nationals | 20 |
| Overseas examinations | 7, 30 |
| Parallel between immigration and recruiting thoroughbred stock | 43 |
| Population increase | 3 |
| Population turnover in institutions | 32 |
| Previous investigations | 1 |
| Primary factors in national eugenic trend | 39 |

| | |
|---|---|
| Principal legal cause of nondeportability | 36 |
| Public charge, definition of | 39 |
| Quarantine versus deportation | 42 |
| Race crossing | 3, 18 |
| Registration—"keeping track of aliens" | 9, 21, 37 |
| Responsibility for the production of inadequates | 11, 16, 21, 24, 76 |
| Salmon, Walter J | 43 |
| Scope of present investigation | 4 |
| Second generation, defective alien blood in | 35 |
| Seed stock, human | 6, 10, 17, 18, 20, 23, 33, 35, 36, 39, 42, 43. 44, 45, 76 |
| Sound family, definition of | 19 |
| Sources of American immigration | 2 |
| Sovereign right to deport aliens | 20 |
| Sovereign rights in human migration | 24 |
| State claims against Federal Government | 41 |
| State deportation officers | 17 |
| State officers concerned in immigration | 12 |
| State practice in deportation of inadequate aliens | 54 |
| State practice in interstate return of inadequate nonresidents | 54 |
| Statute of limitations | 8, 9, 30 |
| Sterilization, eugenical | 39 |
| The Hill Folk, the Jukes, the Ishmaels and the Nams | 34 |
| Use of immigration | 45 |
| Would-be immigrants debarred | 6 |
| Youth and old age, normal inadequacy of | 37 |

✕

# EXHIBIT B

Mr. YON. Mr. Speaker, will the gentleman yield?

Mr. CONNERY. Yes.

Mr. YON. There is one question that I would like to ask of the gentleman. I have been a shoe man—not a manufacturer, but a dealer—and I am sympathetic with the shoe industry. While I was in Boston not long ago one of the big leather men outlined the situation relative to the supply of leather. He said that the supply had decreased from 1920 from 13,000,000 down to less than 2,000,000 of the available supply. The urgent requirement at that time was to use low-cut shoes. They were bringing in substitutes for leather, and at the same time they were asking protection on shoes, all the while knowing that when they asked protection on shoes the producers of hides and leather are entitled to protection on hides.

Mr. CONNERY. If the gentleman will examine the record, he will find that the 1,500,000 pairs of shoes that came in last year from Czechoslovakia paid no tariff at all. There was no duty on them at all.

Mr. YON. I understand that those shoes are made where a great deal of extra work is placed upon them, and those shoes so made carry no duty; and the majority of the shoes manufactured are of that general character of manufacture. As I say, I want to do the fair thing and believe in doing the fair thing for the shoe manufacturer.

Mr. CONNERY. I will say to the gentleman that I believe firmly that if Congress does not put a tariff on boots and shoes the shoe industry in my city will be wiped out within the next five years. I am not saying that for effect. I know what I am talking about.

Mr. SCHAFER. Mr. Chairman, will the gentleman yield?

Mr. CONNERY. Yes.

Mr. SCHAFER. In the district that I have the honor to represent we have a great many shoe manufacturers and tanneries. I want to have a tariff which will protect these industries and labor employed therein from unfair competition of foreign products. I will, however, oppose a tariff on shoes if the shoe manufacturers keep up their propaganda for a tariff on shoes and opposition to a tariff on hides and finished leathers.

Mr. CONNERY. Every shoe manufacturer that I have talked with has hardly mentioned the question of hides. If you will ask them about it, you will find they will say to the Committee on Ways and Means when they appear before it next week, "If you see fit to put a duty on hides, all we ask is to have a compensatory tariff placed on shoes." I will say to the gentleman that the propaganda that he mentions certainly does not come from my district.

Mr. MORGAN. Mr. Speaker, will the gentleman yield?

Mr. CONNERY. Yes.

Mr. MORGAN. If we destroy the shoe factories and the tanneries, will not the hide market be wiped out ultimately?

Mr. CONNERY. Yes; because there will be nobody to buy hides.

Mr. McCORMACK. Does the gentleman know where the capital comes from that is put into the manufacture of these shoes in Czechoslovakia?

Mr. CONNERY. I believe that the capital that is behind the Czechoslovakia shoe manufactures comes from the United States. The manufacturers here have put money into business over there, because they say they can not compete here, and with cheap labor costs over there they can, and thereby throw thousands out of employment in the United States. That is admitted by business men in New York.

Mr. LOZIER. Mr. Speaker, will the gentleman yield?

Mr. CONNERY. Yes.

Mr. LOZIER. Is it not a fact that in the last few years millions of dollars of American money have been loaned to countries in Europe in order that European industry may come in competition with domestic products here?

Mr. CONNERY. I understand so.

Mr. MORGAN. Does the gentleman stand on the Democratic platform, where protection is demanded?

Mr. CONNERY. I certainly stand on the Democratic platform, which demands that our industries be protected.

But, of course, the Democratic platform says we should have protection. I have no argument with my distinguished friend from Texas on that point.

Mr. JONES. The occasion for my question was this: I received a printed letter—and I am sure all the Members received it—from the National Boot & Shoe Manufacturers' Association urging a tariff on boots and shoes and urging free hides. Now, it seems to me it is going pretty far to ask the ranchmen and farmers who produce hides to sell their products in a free market and at the same time compel them to buy their supplies in a protected market. Does the gentleman think that is fair?

Mr. CONNERY. No; I do not. And, I repeat, I believe a tariff on hides will only inure to the benefit of the packers, and

I am not interested at all in the packers; I am interested in the farmers. I want to see the farmers protected.

Mr. JONES. I want to say in that connection that the farmer sells the whole animal to the packer. The packer in turn sells to others. The packer is an intermediate agent. If he can get more for the hides, he can pay more for the animal. That is elemental.

Mr. CONNERY. And when the packers get the animal they skin him and dispose of the hide.

Mr. JONES. I want to say to my friend that hides can be brought in free from other places. These packers have big plants in other countries—in South America and elsewhere—and they can bring hides in free of duty. The same is true of other concerns which use hides.

The SPEAKER pro tempore. The time of the gentleman from Massachusetts has expired.

## DEPORTATION OF ALIENS

Mr. JOHNSON of Washington. Mr. Speaker, I move that the House resolve itself into the Committee of the Whole House on the state of the Union for the further consideration of the bill (S. 5094) making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law.

The motion was agreed to.

Accordingly the House resolved itself into the Committee of the Whole House on the state of the Union for the further consideration of the bill S. 5094, with Mr. BACON in the chair.

The Clerk read the title of the bill.

Mr. JOHNSON of Washington. Mr. Chairman, before we proceed with the reading of the bill, I ask unanimous consent that I may be permitted to address the committee for three minutes.

The CHAIRMAN. The gentleman from Washington asks unanimous consent to proceed for three minutes. Is there objection?

There was no objection.

Mr. JOHNSON of Washington. Mr. Chairman and gentlemen, when the committee was about to rise last night an agreement was reached by which we agreed to proceed with Senate bill 5094 to-day in accordance with the rule under which we were operating. As we were about to rise, it was apparent that amendments would be offered to provide for a paragraph which would include violators of certain parts of the liquor laws. They would be alien violators, of course. One or more Members had sent to the Clerk's desk amendments to that effect, and your Committee on Immigration, after surveying the situation and feeling rather of the opinion that an amendment of some kind along that line would be voted, met this morning and perfected an amendment. I think, in fairness to the gentleman from Georgia [Mr. TARVER], who was claiming recognition at the time we made the agreement, that his proposed amendment might as well be read, after which the chairman of the committee will offer the committee amendment as a substitute.

Mr. EDWARDS. Will the gentleman yield?

Mr. JOHNSON of Washington. Yes.

Mr. EDWARDS. Is the proposition the committee has agreed on, in effect, the amendment as offered by the gentleman from Georgia?

Mr. JOHNSON of Washington. I think it is rather more embracing.

Mr. BRIGGS. It relates not only to violations of the prohibition laws but to other violations?

Mr. JOHNSON of Washington. In order to save time I will read the amendment. It will add one more classification, and it will be as follows:

(5) An alien who is convicted of manufacturing, selling, or transporting intoxicating liquor, for which he is sentenced to imprisonment for a term of one year or more, or who is convicted of manufacturing, selling, or transporting intoxicating liquor, for which he is sentenced to imprisonment for a term which, when added to the term or terms to which sentenced under one or more previous convictions of manufacturing, selling, or transporting intoxicating liquor, amounts to one year or more. This subsection shall apply only in the case of offenses committed after the enactment of this act.

Mr. LOZIER. Will the gentleman yield?

Mr. JOHNSON of Washington. Yes.

Mr. LOZIER. In other words, the language makes the terms cumulative; that is, adds one to the other?

Mr. JOHNSON of Washington. Yes; cumulative for liquor violations and separating them from general violations. With that explanation, I will ask that the Clerk read the bill.

Mr. TARVER. Mr. Chairman, I offer an amendment.

The CHAIRMAN. The gentleman from Georgia offers an amendment, which the Clerk will report.

The Clerk read as follows:

Amendment offered by Mr. TARVER: Amend by adding a new paragraph to be numbered "2-A" after line 7, on page 3, as follows:

"2-A. An alien who hereafter violates or conspires to violate any statute of the United States or of the several States by manufacturing or selling intoxicating liquors for beverage purposes, and is convicted of such offense in a court of record when such conviction is for a second offense of the same character."

Mr. TARVER. Mr. Chairman and gentlemen of the committee, the purpose of this amendment, of course, is to authorize the deportation of those who have manufactured or sold intoxicating liquors in violation of the laws of the United States. It does not affect any other class of violators of our prohibition laws. It provides that conviction must be had in a court of record and not only that but it must be a second conviction. It does not have anything to do with the length of the sentence that may be imposed, and I respectfully submit to you that an amendment such as was described by the chairman of the committee, the gentleman from Washington, will not have the effect of authorizing the deportation of a large majority of these alien violators of our prohibition laws, for the reason that in those sections of the country where such violations are most rampant and where there are the largest number of alien violators of the prohibition laws the judges who customarily pass upon such cases do not impose sentences of the length of one year for the offense of selling intoxicating liquors or for the offense of manufacturing intoxicating liquors, in the vast majority of cases.

The penalties imposed by the judges, range from a small fine to a few days in jail. The minimum punishment for a first offense under the law may be as small as one day in jail or a penny fine. For a second offense, it may be as small as 30 days in jail or a fine, I believe, of $200.

Now, I contend that an alien who has engaged in the business of manufacturing or selling intoxicating liquors to the extent that he has been twice caught and twice convicted in a court of record has no right to insist upon his being allowed to remain in this country.

The bill as it is at present, without the amendment of the gentleman from Washington [Mr. JOHNSON], would require not merely one year's sentence but two years, and the amendment changes that condition to some extent, if it should be adopted, but only to the extent of requiring that the aggregate sentences shall be one year; and I submit to you that in those sections of the country, the large cities, where these aliens ply their illegal trade, it would be a long, long time before you would find sentences in very many cases imposed by the judges in those jurisdictions aggregating 12 months.

The question is, Do you consider an alien who engages in the business of violating the Constitution of the United States and the laws enacted in pursuance of the Constitution of the United States, a desirable citizen of the United States? If you do not, then you ought to vote down the committee substitute and adopt this amendment.

Mr. SCHAFER. Will the gentleman yield?

Mr. TARVER. No; I have not time to yield, I am sorry to say to the gentleman. I only have five minutes.

The gentleman from Texas [Mr. Box] on yesterday made some statement to the effect that the reason for not including a provision of this kind was because it would result in placing in the deportable class such a large number, in addition to those already authorized to be deported, that they might not be properly handled under the appropriations which are now available. The same objection would apply to every other provision of this bill. It is admitted that there are at least several hundred thousand aliens in the United States subject to deportation under our laws who can not be deported for lack of sufficient appropriation. If the gentleman's argument is correct, then why should we add any number to that class?

The CHAIRMAN. The time of the gentleman from Georgia has expired.

Mr. TARVER. Mr. Chairman, I ask unanimous consent to proceed for five minutes.

The CHAIRMAN. The gentleman from Georgia asks unanimous consent to proceed for five additional minutes. Is there objection?

There was no objection.

Mr. TARVER. This bill, gentlemen of the committee, provides that an alien who is guilty—not convicted in a court of record, but who is guilty of any sort of a violation of the laws of the United States against the handling of narcotics—shall be subject to immediate deportation upon order issued by the Commissioner General of Immigration.

Why should there be such a tremendous distinction between the violator, in a small way, of the narcotic laws, who may be deported even without trial or conviction, and the violators of the prohibition laws of the country?

My amendment, as I have said, provides it shall apply only to two classes of cases, those who manufacture and those who sell, and that it shall not apply to them unless there shall have been two convictions for the same offense.

I submit this presents to the committee the sole question of whether or not they believe aliens who have twice violated and been convicted of violating the prohibition laws of the country are desirable residents of the country and ought to be permitted to remain here.

Mr. SCHAFER. Will the gentleman now yield?

Mr. TARVER. I yield to the gentleman.

Mr. SCHAFER. Why not also include those who are found guilty of buying and transporting?

Mr. TARVER. So far as I am concerned, I believe that violators of the prohibition laws of the character indicated by the gentleman should be included, but I have sought to put this amendment in such form as that any man who even pretends to believe in prohibition and in the enforcement of prohibition could give it his support.

I want to say to the House, in explanation of my own position, that I am sincerely an advocate of prohibition. I am offering this amendment as a friend of prohibition. I believe that the eighteenth amendment to the Constitution of the United States is the best legislation enacted by this Congress in the last 50 years, and I do not believe that the wholesale violation of it in certain sections of this country any more calls for its modification or repeal than that the wholesale machine-gun murders which we have been reading about, occurring in the city of Chicago, require the repeal of the laws against murder, and I believe that if you pass this amendment and write it into law, it will go a long way toward effectively enforcing the prohibition statutes of this country, and it will rid the country of some of the foreigners who have been carrying on this illegal business in a wholesale way in certain sections of the country.

If you adopt the amendment of the committee, adopted by the committee since yesterday afternoon in order to prevent your adoption of a more vigorous amendment, you leave the matter almost where it is now, because there will be very few cases in which the aggregate penalties will be as much as 12 months in those sections of the country which stand most in need of legislation of this character. [Applause.]

Mr. JOHNSON of Washington. Mr. Chairman, I desire to be recognized in opposition to the amendment.

Gentlemen, this is quite a serious matter. The gentleman from Georgia has made a very earnest statement. We ought to analyze it. We are dealing with aliens, even though the words of his amendment have been reduced to two or three phases—transporting and manufacturing—the facts remain that if an alien should be fined once $5 for a violation in a court of record, and then again fined $5 you have provided that he must be deported provided the Secretary of Labor thinks him an undesirable citizen.

Mr. TARVER. If the gentleman will yield, the police courts are not courts of record.

Mr. JOHNSON of Washington. Is the gentleman sure? How about the State of California?

Mr. TARVER. I think there is no question but that police courts are not courts of record in any State.

Mr. JOHNSON of Washington. They have a different system in California.

Mr. EVANS of California. If the gentleman will yield, I want to say that the police court in California is not a court of record.

Mr. JOHNSON of Washington. Then I am mistaken. It is agreed, however, that many of these offenses are punished by imprisonment for 30 days or 60 days, and with fines in proportion. You must understand that we are creating one or two additional classes of aliens who commit crimes of a serious nature, and they must be proceeded against by the Secretary of Labor. This amendment which has been proposed would confer so much possibility of a burden in the name of deportation that the Department of Labor would be greatly interfered with and would have to have a third branch of the Government for this phase of prohibition enforcement.

Mr. CRAIL. Will the gentleman yield?

Mr. JOHNSON of Washington. Yes.

Mr. CRAIL. As I understand the amendment, the alien would first have to be determined to be an undesirable citizen——

Mr. JOHNSON of Washington. That would come after he was convicted.

Mr. CRAIL. If he is an undesirable citizen, would it not be better to deport him on a minor offense than to wait until he has committed a felony?

Mr. JOHNSON of Washington. If you carried it out in that detail, the Department of Labor would not be able to function at all. The work and burden on the department would be terrible. I will ask the House to vote down the amendment offered by the gentleman from Georgia and vote up the substitute which I shall offer as a committee amendment.

Mr. GIFFORD. Will the gentleman yield?

Mr. JOHNSON of Washington. I yield.

Mr. GIFFORD. Considering the various paragraphs, when it comes to deportation to Russia, we not having recognized the Government in that country, what is the attitude of the department in that respect?

Mr. JOHNSON of Washington. We would be unable to deport.

Mr. SABATH. Mr. Chairman, the gentleman from Georgia is a prohibitionist and believes in the enforcement of the law, but, unfortunately, he is under the impression that all the violations of the law are committed by aliens. Now, I will say that many aliens are arrested; they have now no to intercede for them; they have no influence, and when they are arrested they are fined. On the other hand, the influential citizen, in the gentleman's State of Georgia, or any other State, do the same thing; they make it; they sell it; they consume it, to a much greater extent than many of the aliens, but they very seldom are convicted or even arrested.

What I want to bring home to you is that we have very stringent provisions in the present deportation act which provides for the deportation of aliens committing any kind of an offense, whether it is violation of the Volstead Act or whether it is larceny, robbery, or any other offense or crime. Now, why should we have a special provision in the act applicable to those who happen to violate the Volstead Act, a thing which has been made illegal only a few years and which up to the time before hysteria had taken possession of our legislative bodies, was recognized to be legal all over the United States. Lo and behold, to-day we must have a special law which must be much stronger than the law which applies to a man guilty of robbery, larceny, or any kind of a real crime against the laws of the States. It is to be regretted that people go or are carried away by blind prejudice to such an extent and can not see the situation as it really should be seen by sane and sensible men.

I feel that the present-day hysteria and intolerance on the part of certain organizations and individuals should cease, and that we should legislate sanely as men and not be overlorded by an organization simply because a few years ago it was powerful, but which now is fast disintegrating. It is to be regretted that its accredited officials still come down here or by a word of influence Members of Congress who are elected by the people to believe that they must do as this organization tells them, regardless how vicious, otherwise the organization will bring about their defeat. We ought to be big enough to say to all such organizations and their agents that we are men who are sworn to uphold the Constitution of the United States, and who at the same time have the right and privilege to cast our votes according to the dictates of our conscience and not according to the dictates of these prohibition leaders or people who really do not know what it is all about, and are being misled and used by the professional prohibitionists on one hand, and, on the other, the restrictionists, who are about as narrow-minded and bigoted, and who are forcing this legislation now before us.

Unlike the gentlemen from Georgia, Florida, Washington, or Maine I am frank enough to admit that there are many violations of the prohibition law in my State and in my city.

I exceedingly regret to say that there are many bootleggers, and many killings among these bootleg gangs, something that was unheard of before prohibition, and for which the prohibition law is responsible. This, however, the professional prohibitionist, or the prohibitionists on the floor of this House, dislike to concede, notwithstanding that it is a fact, and is recognized by those who are not blinded with prejudice or who are not crazed on the question of prohibition.

In a measure, I do not blame certain gentlemen in trying to secure a special provision in this act, applicable to aliens guilty of violating the Volstead Act. I take it they want that lucrative business to be solely conducted by and be in the hands of native-born Americans.

In view of the tremendous importation of liquors, it does not affect the price of their native manufactured white mule and moonshine, because the greater importation of these liquors the lesser the price of white mule and moonshine, but surely they can not maintain that aliens are guilty of violating the prohibition law in their respective States, because there are no aliens there, and, notwithstanding that fact, the records will show, that there are as many stills confiscated as there are in any other section in the United States.

I grant that there are not as many arrests made, but we know, and it can not be denied, and, in fact, it has been demonstrated and proven on the floor of this House, that the prohibition law is not being enforced in the South, and that the same southern hospitality of old still prevails.

Mr. LaGUARDIA. Mr. Chairman, I move to strike out the last word. I can understand the attitude of the gentleman from Georgia [Mr. TARVER] in presenting his amendment. After all, in these days of tariff revision and protection of American industry, it is natural and logical that America's greatest and most profitable industry should be reserved to citizens of the United States. [Laughter.] The gentleman states that there are thousands of bootleggers. Of course, we have not had the benefit of the Census Bureau in classifying these bootleggers as to citizens and noncitizens, but again I want to point out to the House and to repeat at the risk of becoming tiresome, that you would not have thousands of bootleggers if you did not have millions of drinkers. It is because of the great demand for liquor that you have this large number of bootleggers. Just how the gentleman from Georgia [Mr. TARVER] is going to differentiate between the alien bootlegger and the native consumer, I do not know. There can be no serious objection to the gentleman's amendment. In fact, I rather welcome it, because it will answer a great many of the charges based upon misinformation, that the bootlegging industry is in the control of aliens. I assure the gentleman from Georgia that in his State, and in many of the States of the Union, business is too good to be left in the hands of aliens.

Mr. TARVER. Mr. Chairman, will the gentleman yield?

Mr. LaGUARDIA. Yes.

Mr. TARVER. The gentleman on previous occasions has made statements of this character concerning my State upon the floor of the House, and I rise to inform the gentleman now that in my district in Georgia the prohibition laws are enforced, and if the gentleman will take the trouble on some occasion to visit my district, as I hope he will, he will discover that to be true. He will find that his charges made against my State at least are not correct.

Mr. LaGUARDIA. I shall permit the records of the gentleman's own State to speak for themselves, and if the gentleman will consult them he will find an alarming increase in violation of both the Federal and the State prohibition laws, and I believe that the conditions in the State of Georgia as to violation of the liquor law is such that this House can take judicial and legislative notice of it.

Mr. McCORMACK. Mr. Chairman, will the gentleman yield?

Mr. LaGUARDIA. Yes.

Mr. McCORMACK. Might I also call to the gentleman's attention the fact that in the report of the provost marshal general to the Secretary of War on the operations of the selected-service system, to December 20, 1918, one of the States mentioned where forcible resistance to the draft existed was the State of Georgia.

Mr. LaGUARDIA. That has nothing to do with this, but I want to say this about the State of Georgia in all fairness, that the State of Georgia in so far as liquor conditions are concerned is no worse than other States of the Union.

Mr. TARVER. May I ask the gentleman a question?

Mr. LaGUARDIA. Certainly.

Mr. TARVER. The statement of the gentleman made with reference to violation of the liquor laws in Georgia was based upon the records, I presume, indicating the number of distilleries seized?

Mr. LaGUARDIA. And the number of arrests and convictions.

Mr. TARVER. The fact that the law is enforced and that violators of the law are arrested is no evidence to sustain the gentleman's charge. The fact that in some sections of the country violators go unpunished and no arrests are made does not sustain the contention that the law is not violated there.

Mr. LaGUARDIA. I refuse to yield further and say as to the gentleman's very clumsy innuendo as to my State, that he will find that in comparison to population, the conditions in the State of New York are better than in his State.

Mr. JOHNSON of Washington. Mr. Chairman, I call for the reading of my amendment, which I offer as a substitute for the amendment offered by the gentleman from Georgia.

The CHAIRMAN. The Clerk will report the substitute.

The Clerk read as follows:

Substitute offered by Mr. JOHNSON of Washington for the amendment offered by Mr. TARVER: Page 4, after line 9, and after the committee amendment already inserted by the committee amendment, insert a new subsection (8) to read as follows:

"(9) Any alien who is convicted of manufacturing, selling, or transporting intoxicating liquor, for which he is sentenced to imprisonment for a term of one years or more; or who is convicted of manufacturing,

selling, or transporting intoxicating liquor, for which he is sentenced to imprisonment for a term which, when added to the term or terms to which sentenced under one or more previous convictions of manufacturing, selling, or transporting intoxicating liquor, amounts to one year or more. This subsection shall apply only in the case of offenses committed after the enactment of this act."

Mr. TARVER. Mr. Chairman, I make the point of order against the amendment when it is offered as a substitute. The amendment which I propose is to page 3 of the bill after line 7, adding a new paragraph to follow subsection 2 of section 1. The amendment proposed by the committee through its chairman is to page 4 of the bill, and an entirely different part of the bill, and can not be properly considered as a substitute for my amendment. There ought to be a vote upon my amendment, and then a vote upon the gentleman's amendment.

The CHAIRMAN. Both the amendment and the substitute are offered to the same section, and the Chair thinks the substitute is clearly germane and overrules the point of order.

Mr. JOHNSON of Washington. I think this matter has been fully debated and the committee has looked as carefully as it could and given consideration to this. I think we should now have a vote and proceed with the reading of the bill.

Mr. EDWARDS. Mr. Chairman, ladies, and gentlemen of the committee, it is unfortunate that in the consideration of matters here we should at any time legislate with respect to what has happened in this State or that State. We should, at least, be broad enough to approach legislative matters in the interest of the whole country. Every once in a while slurs are made at some State. The gentleman from Massachusetts, very unkindly, so far as the statement that Georgia resisted the draft, put it in the RECORD that Georgia resisted the draft. He read and quoted from some War Department report. I do not care where that statement emanates from, it does our great State an injustice. In the name of the great State I have the honor to, in part, represent, I brand it as false. We just as well have this thing out now as later. The statement is not true. There were, perhaps, men in Georgia, as there were men in Massachusetts, as well as other States, who objected to the draft, but the citizens of the great State of Georgia were as loyal to the Stars and Stripes as were those of the great State of Massachusetts. [Applause.]

It is unbecoming a Member of this House to make these nasty digs and mean slurs at any of the States. As a Representative of the State that has thus been insulted, I resent the remarks, and whether they come from the War Department, or wherever they come from, I denounce them as unkind and unfounded. [Applause.] The people of a whole State ought not be indicted by the War Department report because of the attitude of some of its citizens. I claim no superior patriotism for Georgians but they are patriotic, and the State of Georgia is one of the great sovereign States of this Union, and is entitled to proper respect here and elsewhere.

Mr. BLACK of New York. Mr. Chairman, I rise in opposition to the amendment.

Mr. JOHNSON of Washington. Mr. Chairman, I move that all debate on this section and all amendments thereto close in five minutes.

The CHAIRMAN. The gentleman from Washington moves that all debate on this section and all amendments thereto close in five minutes. The question is on agreeing to that motion.

The motion was agreed to.

The CHAIRMAN. The gentleman from New York is recognized.

Mr. BLACK of New York. Mr. Chairman and gentlemen of the committee, supplementing the remarks of the gentleman from Georgia [Mr. EDWARDS], I want to say that we saw in New York City a great number of men of alien blood march forth to the war and perform nobly, as did those living in other cities and States. When the leaders of the immigration restrictionist movement and the drys get together they can furnish a melting pot that would satisfy a witch burner. This amendment is another tower to hypocrisy in America.

I am surprised that the chairman of this Committee on Immigration and Naturalization has capitulated to the drys. This matter has nothing whatever to do with the immigration bill. The committee refused to leave anything to do with it at first, but they are now panic-stricken when the gentleman from Georgia [Mr. TARVER] offers his amendment, so that immigration is going to be tainted with the corruption of prohibition. But I am not much surprised. I think the Labor Department is one of the best departments in this Government; and if there is any gravy in this thing, I think they ought to have some of it. That department will be as much corrupted as any other department with which the prohibition fanatics have come in contact.

Who in this day and generation is going to say that the bootlegger is undesirable? How are you going to get by common sense on this proposition? I am not surprised that the gentleman from Georgia [Mr. TARVER] should offer his amendment. He speaks of violations of the Volstead Act as being on a par with violation of the narcotic act. Quite evidently there is a great difference. Narcotics poison the minds of American people, and the bootleggers are catering to the ordinary appetites of Americans. This amendment can not only affect the violators; it affects their families also. It affects thousands of men because they happen to sell booze a couple of times and get caught. Here is an American citizen buying liquor from an alien bootlegger. The alien bootlegger goes into the business in order to support his family. You give three cheers for the American violator. I suppose this amendment will prevail, although it is nonsense on the face of it. The House was off its feed when by its vote it turned down the $24,000,000 additional appropriation for prohibition enforcement. I congratulate all the dry gentlemen on once more answering "present" when the captains of the drys demand it. [Applause.]

The CHAIRMAN. The question is on the substitute offered by the gentleman from Washington for the amendment offered by the gentleman from Georgia.

The question was taken, and the substitute was agreed to.

The CHAIRMAN. The question now occurs on the amendment as amended.

The question was taken, and the amendment as amended was agreed to.

Mr. SABATH. Mr. Chairman, I offer an amendment.

The CHAIRMAN. The Clerk will report the amendment offered by the gentleman from Illinois.

The Clerk read as follows:

Amendment offered by Mr. SABATH: Page 3, line 18, after the word "false," strike out the words "or misleading," so that paragraph 5 will read as follows:

"(5) The alien who hereafter willfully enters the United States at any time or place other than as designated by immigration officials, or eludes examination or inspection by immigration officials, or obtains entry to the United States by the willfully false representation or the willful concealment of a material fact."

Mr. SABATH. That is the amendment I submit.

Mr. JOHNSON of Washington. Mr. Chairman, I believe that the debate has closed on all amendments to this section.

The CHAIRMAN. The gentleman from Washington is correct. The question is on the amendment of the gentleman from Illinois.

The question was taken, and the amendment was rejected.

The CHAIRMAN. The Clerk will read.

Mr. HUDSON. Mr. Chairman, a parliamentary inquiry.

The CHAIRMAN. The gentleman will state it.

Mr. HUDSON. The House has adopted an amendment of the committee. Would it now be proper to offer an amendment to that amendment adopted by the committee?

The CHAIRMAN. The Chair thinks not.

Mr. HUDSON. It is part of the section, is it not, and would it not be in order to amend it?

The CHAIRMAN. The gentleman should have offered an amendment to the amendment when it was pending. It is too late now. The Clerk will read.

Mr. SABATH. Mr. Chairman, I offer the following amendment: On page 4 strike out the "ten" and substitute "five" for it.

Mr. JOHNSON of Washington. Mr. Chairman, that amendment was offered yesterday and voted down.

Mr. EDWARDS. Mr. Chairman, I make the point of order that there is no amendment pending. The gentleman has not sent it to the desk in writing.

The CHAIRMAN. The point of order is sustained. The Clerk will read.

The Clerk read as follows:

SEC. 2. For the purposes of subsections (6) and (7) of section 1—
(a) No conviction shall serve as a basis for deportation proceedings unless such conviction is in a court of record and the judgment on such conviction has become final;
(b) In the case of a sentence for an indeterminate term in which the minimum term under the sentence is less than one year, the term actually served shall be considered the term for which sentenced; and
(c) An offense of which an alien, after conviction, has been unconditionally pardoned, shall not be considered an offense.

Mr. JOHNSON of Washington. Mr. Chairman, I offer a committee amendment.

The CHAIRMAN. The gentleman from Washington offers an amendment, which the Clerk will report.

095

The Clerk read as follows:

Committee amendment offered by Mr. JOHNSON of Washington: On page 4, line 10, strike out "(6) and (7)" and insert in lieu thereof "(6), (7), (8), and (9)."

The committee amendment was agreed to.

The Clerk read as follows:

SEC. 3. (a) If any alien has been arrested and deported in pursuance of law, he shall be excluded from admission to the United States whether such deportation took place before or after the enactment of this act, and if he enters or attempts to enter the United States after the expiration of 60 days after the enactment of this act, he shall be guilty of a felony and upon conviction thereof shall, unless a different penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years or by a fine of not more than $1,000, or by both such fine and imprisonment.

(b) For the purposes of this section any alien ordered deported (whether before or after the enactment of this act) who has left the United States shall be considered to have been deported in pursuance of law, irrespective of the source from which the expenses of his transportation were defrayed or of the place to which he departed.

(c) An alien subject to exclusion from admission to the United States under this section who is employed upon a vessel arriving in the United States shall not be entitled to any of the landing privileges allowed by law to seamen.

(d) So much of section 3 of the immigration act of 1917 (U. S. C. title 8, sec. 136(j)) as reads as follows: "persons who have been deported under any of the provisions of this act, and who may again seek admission within one year from the date of such deportation unless prior to their reembarkation at a foreign port or their attempt to be admitted from foreign contiguous territory the Secretary of Labor shall have consented to their reapplying for admission" is amended to read as follows: "persons who have been excluded from admission and deported in pursuance of law, and who may again seek admission within one year from the date of such deportation, unless prior to their reembarkation at a place outside the United States or their attempt to be admitted from foreign contiguous territory the Secretary of Labor has consented to their reapplying for admission."

(e) So much of section 18 of the immigration act of 1917 (U. S. C. title 8, sec. 154) as reads as follows: "or knowingly to bring to the United States at any time within one year from the date of deportation any alien rejected or arrested and deported under any provision of this act, unless prior to reembarkation the Secretary of Labor has consented that such alien shall reapply for admission, as required by section 3 hereof " is amended to read as follows: "or knowingly to bring to the United States any alien excluded or arrested and deported under any provision of law until such time as such alien may be lawfully entitled to reapply for admission to the United States." The amendment made by this subsection shall take effect on the expiration of 60 days after the enactment of this act, but the provision amended shall remain in force for the collection of any fine incurred before the effective date of such amendment.

Mr. SABATH. Mr. Chairman, I offer an amendment.

The CHAIRMAN. The gentleman from Illinois offers an amendment, which the Clerk will report.

The Clerk read as follows:

Amendment offered by Mr. SABATH: Page 4, line 24, strike out all after the word "deported," on line 24, all of line 25, and up to and including the word "or," in line 1, page 25, so that provision (a), section 3, will read as follows:

"SEC. 3. (a) If any alien has been arrested and deported after the enactment of this act, and if he enters or attempts to enter the United States after the expiration of 60 days after the enactment of this act, he shall be guilty of a felony, and upon conviction thereof shall, unless a different penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years or by a fine of not more than $1,000, or by both such fine and imprisonment."

Mr. SABATH. Mr. Chairman, I hope the chairman and the members of the committee will agree to this amendment. I feel they are interested in drafting a law that will be upheld by the courts. As this section is now drafted there is no question that it is a retroactive provision, because it provides for the punishment of those who have committed offenses, long before the adoption of this act. My amendment provides for the same deportation but for offenses committed by those who have been deported since the adoption of this law into this act, so as to make it lawful, and make it legal, and so the courts will uphold it.

I do not believe it should be the policy of this House to pass laws that are retroactive or exposte facto, laws which the courts have frequently held are void. For that reason I am hopeful the chairman and the committee will agree to this amendment. It will strengthen the provision; it will make it absolutely legal, and I feel justice requires that we should not enact legislation, as I have stated, which is retroactive.

Mr. BURTNESS. Will the gentleman yield?

Mr. SABATH. Yes.

Mr. BURTNESS. What offense committed in the past does the gentleman claim is punishable by this section?

Mr. SABATH. It provides for deportations which took place before the enactment of this act.

Mr. BURTNESS. But the act which is punishable is the attempt to come in again, is it not?

Mr. SABATH. No; that is not the fact. This is the provision, that if at any time a man has been deported, for instance, for overstaying his leave, we will say, three, four, or five years before this law was enacted, he should not be punished under this act. I say that such a stringent provision should not apply to him in view of the fact that when he was ordered deported, years ago, this was not the law of the land. That is my position.

Mr. BLANTON. Will the gentleman yield?

Mr. SABATH. Yes.

Mr. BLANTON. There are thousands of Mexicans who have come across the line unlawfully and who are now within the United States. Has not the Congress the right to pass a law to deport them?

Mr. SABATH. There is no question about that.

Mr. BLANTON. Is that ex poste facto?

Mr. SABATH. No.

Mr. BLANTON. Can not Congress provide for the deportation of any certain class of people?

Mr. SABATH. Yes.

Mr. BLANTON. It is not ex poste facto if it applies to a whole class.

Mr. SABATH. I agree with the gentleman that there are many of them here in violation of the law and that they should be deported. We have embodied such a provision in this act and that is being taken care of. There is no question about that.

Now, I am again going to appeal to the gentlemen of the committee to grant my request for an amendment of paragraph 5 of section 2, which I believe should be eliminated.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Illinois.

The question was taken, and the amendment was rejected.

The Clerk read as follows:

SEC. 6. Proceedings for the deportation of an alien made deportable by this act may be begun at any time after the entry of such alien, without regard to any of the periods prescribed in the immigration act of 1917; but no proceedings based on subsection (6) or (7) of section 1 of this act shall be begun after the expiration of three years after the termination of the imprisonment.

Mr. JOHNSON of Washington. Mr. Chairman, I offer a committee amendment.

The CHAIRMAN. The gentleman from Washington offers an amendment, which the Clerk will report.

The Clerk read as follows:

Committee amendment offered by Mr. Johnson of Washington: Page 7, line 20, strike out "(6) or (7)" and insert in lieu thereof "(6), (7), (8), or (9)."

The committee amendment was agreed to.

Mr. JOHNSON of Washington. Mr. Chairman, I ask unanimous consent to return to section 5 to offer an amendment striking out the word " of," in line 14, and inserting the word "to."

The CHAIRMAN. The gentleman from Ohio asks unanimous consent to return to section 5, for the purpose of offering an amendment. Is there objection?

Mr. JOHNSON of Washington. Mr. Chairman, I object, pending a statement as to what the amendment is.

Mr. CROSSER. It is for the purpose of correcting the language, changing the word "of." in the last part of line 14, and making it "to." It is not good English as it stands.

Mr. JOHNSON of Washington. I will have to object to that. Mr. Chairman. The last several bills contain that language.

Mr. CROSSER. If they do contain such language in like connection, they were wrongly phrased, and I insist that the English at least should be proper. There is no reason why we should use wrong phraseology or bad grammar merely because there are other matters in dispute.

Mr. JOHNSON of Washington. Let us avoid diction and grammar in this connection.

Mr. CROSSER. But the diction in this case is important.

Mr. JOHNSON of Washington. I object, Mr. Chairman.

Mr. COOPER of Wisconsin. Mr. Chairman, I ask unanimous consent to return to subparagraph (6) of section 1, on page 3, because it seems to me, from a reading of the two or three lines there, that there is a contradiction. It provides that one of the aliens who may be deported is—

An alien who is convicted of any offense (committed after the enactment of this act and at any time after entry).

If this provision were enacted into law to-day, the alien could not be convicted, under the first language, unless the offense was committed after to-day; but the next language provides that he shall not be convicted unless his offense is "committed after the enactment of this act and at any time after entry." Suppose he came in a year ago?

Mr. TILSON. The gentleman will notice that the language is inclusive. Two distinct things must take place. The offense must be committed after the enactment of this act and it must be committed after entry.

Mr. COOPER of Wisconsin. Then say so, and leave out the words "at any time," because his entry may have been a year ago, and "any time after entry" means any time within that year.

Mr. TILSON. It provides "at any time after entry" and something else—"after the enactment of this act."

Mr. COOPER of Wisconsin. It is a direct contradiction in language to say "after enactment of this act and at any time after entry."

The CHAIRMAN. The gentleman from Wisconsin asks unanimous consent to return to subparagraph (6) of section 1, on page 3. Is there objection?

Mr. JOHNSON of Washington. I shall have to object, Mr. Chairman.

The CHAIRMAN. Objection is heard.

Mr. SABATH. Mr. Chairman, I did not have the time to prepare the amendment I desired, so I move to strike out the last word, and I fully recognize it matters not how carefully the amendment might be prepared, it will not receive much consideration to-day. Still, I want to bring it to your attention for just a few moments.

Section 6 provides:

Proceedings for the deportation of an alien made deportable by this act may be begun at any time after the entry of such alien, without regard to any of the periods prescribed in the immigration act of 1917.

The present law provides when these deportations can be had. This proposed law says, regardless of the time that the alien may have resided in the United States, he should be deported. Now, there may be men who have resided here for 12, 15, 18, or 20 years. He may be a married man, and may have three, four, or five children born in the United States, and he may be guilty of making a little home brew at home, yet some neighbor who does not like his looks reports him, and he is convicted, and then is convicted, perhaps, a second time, for taking a drink with a friend. Under this provision of the bill it matters not whether that be ascertained 3, 5, or 10 years hence, or whether it has occurred 10 years ago, he can be apprehended and deported. I just want you to know what you are voting on to-day.

Mr. BLANTON. Mr. Chairman, I rise in opposition to the pro forma amendment. There is one good thing the bill does, and that is that some Mexicans who have come into the United States unlawfully within the last five years may be deported if the department can get enough money to apprehend them. But how about those who came in six, seven, or eight years ago? There were thousands that came across the border unlawfully. You can go up and down the Mexican border in Texas for 10 and 15 miles and you will not see a house, and sometimes you will not see an immigration agent for 40 miles. They can wade across the river in lots of places. They come into Texas by hordes all of the time. If you take the Texas & Pacific Railroad, that runs from Texarkana to El Paso, 900 miles, you will find that practically every section hand is a Mexican. Take the hotels close to the border, and practically all the employees who work in the hotels are Mexicans. Take many of the stores, and the employees are Mexicans because they can get them for a stipend by the month. They are taking away jobs from American citizens. I am surprised that this committee would permit that to exist any longer.

I know that my friend Judge Box has been making a just fight against this situation for years. He gets a little hand-out now and then from the committee, but it does not help him much. Why could not the committee have put a provision in here, and why could not the Appropriations Committee give the department enough money to apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there? Then you would not have the report coming in here from Austin, Tex., and many other places that many Americans are going to be without jobs and many Mexicans are to be without jobs until another cotton crop comes in.

Mr. SABATH. Will the gentleman yield?

Mr. BLANTON. I yield.

Mr. SABATH. Mexicans can come over here by the thousands—they do not come illegally, they come because there is no quota against them; they could come in by the thousands or

5,000 a day. They are not here illegally, because they come under the law and because there is no restriction against them. There is no quota.

Mr. BLANTON. What about the head tax? They do not pay the head tax required by law.

Mr. SCHAFER. Will the gentleman yield?

Mr. BLANTON. I yield to the gentleman from Wisconsin.

Mr. SCHAFER. These Mexicans also come into Wisconsin in droves, and take the places of American citizens in the factories and on the farm. Often we see the spectacle of war veterans walking the streets unable to obtain employment because of the unfair competition of cheap Mexican labor.

Mr. BLANTON. Why does not the energetic, enterprising 300-pound Member from Wisconsin put some of his energy into action along that line and stop it?

Mr. SCHAFER. If the gentleman will read the hearings he will see that I appeared before the Immigration Committee in behalf of the Box bill, which would put the nationals of Mexico under the quota restrictions.

Mr. LaGUARDIA. Even the payment of the head tax would not disturb this influx for the reason that the sugar-beet growers and the railroads would pay the head tax in order to get the Mexicans in. You have got to stop it.

Mr. BLANTON. Why does not the committee stop it?

Mr. LaGUARDIA. Because the influence of the sugar-beet growers and the railroads is too strong.

Mr. JOHNSON of Washington. Does the gentleman know why it has not been stopped?

Mr. BLANTON. Yes.

Mr. JOHNSON of Washington. In my opinion, the employment of a quota on both borders and contiguous territory in South American and in Central America is inevitable, but you have not the laws in accord with it that will permit it without several preliminary amendments.

Mr. BLANTON. If the gentleman from Washington will go down to the international bridge at Brownsville, or if he will go to the one at Laredo, or at El Paso, or any of those international bridges——

Mr. JOHNSON of Washington. I have been to several of them.

Mr. BLANTON. And stand there, he will see the hordes that come across the bridges with no intention of ever going back, coming across to get jobs of Americans, and if he would ride up and down the Rio Grande River for miles and see them coming in in hordes, the gentleman would take some action to stop it. I am sorry that he is not going to be able to take much action along that line, but somebody else in his place ought to do it, and it ought to be stopped, and if we do not do it we are going to have Americans starving to death in the Hoover administration.

Mr. LaGUARDIA. And a bringing down of a standard of wages.

Mr. BOX. Mr. Chairman, I move to strike out the last word.

Mr. JOHNSON of Washington. Will the gentleman yield to me for a moment?

Mr. BOX. Yes.

Mr. JOHNSON of Washington. Mr. Chairman, I move that all debate upon this section and all amendments thereto close in five minutes.

The motion was agreed to.

Mr. BOX. Mr. Chairman and gentlemen of the committee, you have been discussing for a few minutes a matter with which I as one member of the committee have been wrestling for some years. I have not been inclined to inject that question into this debate because it is not the question at issue, but the situation pointed out by gentlemen during this debate exists. It is a very serious condition. It seriously embarrasses the whole purpose of the immigration law. There are conditions created by the incoming of people from Mexico and other American countries which it was and is the purpose of the immigration laws to prevent. The law is poorly enforced, mainly because the appropriations made for the border patrol are not adequate. There are great sections that under present provisions can not be adequately guarded. There are many interested in the importation of these poor peons. They are often imported and left in pitiful condition. They do take the places of American workmen, who are already put to it to find jobs; in fact, there are hundreds of thousands, possibly millions, of Americans out of employment now. They are raising a serious race question. During this month a riot occurred at a point in Texas where a crowd of white men who had been superseded by Mexicans, and who, after having notified the Mexicans to leave, fired into the camps of the Mexicans. This Congress ought to have statesmanship enough in it to look over the past and see what grave problems have been injected into our national life by the importation for labor purposes of great numbers of people essentially different

from us in character, in social position, and otherwise. We are breeding another one of those great race questions. We are degrading labor, we are defeating all of the essential purposes of the immigration laws. These facts explain why I have worked so hard in committee and before this House and everywhere else to get this subject adequately dealt with. Seeing this big question, while I have the honor to remain one of you and on this committee, I shall continue to press it on you for attention. We have the opposition of the classes mentioned.

Practically every big beet-sugar manufacturer in the country opposes it, and every Class A railroad except one in the United States appeared before your committee and opposed the passage of this bill because they want their cheap subservient labor. Many other selfish and powerful influences have arrayed themselves against the restriction of this immigration. As against such influences, a few men, thinking only of the public welfare, are not strong enough to get action even when they have justice and patriotic considerations of every kind on their side.

Mr. W. T. FITZGERALD. Mr. Chairman, will the gentleman yield?

Mr. BOX. Yes.

Mr. W. T. FITZGERALD. Another feature I suggest to the gentleman is from a moral standpoint. They are poisoning the American citizen. They are of a class that come across the line which are very undesirable from that standpoint alone.

Mr. BOX. The gentleman from Ohio is correct. I had the privilege of making a statement covering several hours before the committee. And I tried to place before the committee some of the facts that have come to my knowledge. They are badly infected with tuberculosis and other diseases; there are many paupers among them; there are many criminals; they work for lower wages; they are objectionable as immigrants when tried by the tests applied to other aliens. Of course I am not talking about the better class of people of our neighboring countries, but I am talking about the poor unfortunate beings who are poverty stricken and drifting about the country hunting for work at any price. Quite often they are induced to come here by our own people, who employ them for a while and then leave them to drift from one place to another, the victims of all kinds of suffering and mistreatment. We will correct this evil some time, perhaps after it is too late, though I hope we will deal with it in time to remedy the situation before it becomes much worse than it now is.

The CHAIRMAN. The time of the gentleman from Texas has expired. All time has expired, and the Clerk will read.

The Clerk read as follows:

SEC. 7. If any alien is liable to deportation upon any ground specified in any paragraph of this act, he shall be deported whether or not he is liable to deportation upon a ground specified in any other paragraph of this act or in any other law, and any alien who is liable to deportation upon a ground specified in any law other than this act shall be deported whether or not he is liable to deportation upon a ground specified in this act.

Mr. FREE. Mr. Chairman, I move to strike out the last word. Mr. Chairman and members of the committee, a great deal has been said in the last few moments about the situation on the Mexican border. Since we have adopted the quota plan of immigration we have watched the borders on the Pacific coast and on the Atlantic coast very thoroughly, and it is, indeed, difficult for the aliens to get through those borders, but we have not looked after the borders to the north or south. It is not the fault of the Department of Labor. I think we have as fine a lot of men along those borders as we could possibly get, but we have not enough, nor do we provide enough money to enable the department to protect those borders. The question of Mexican immigration has been mentioned here to-day. I would like to see the laws we have at the present time enforced. Mexican immigrants are subject to the following provisions to-day:

That the following classes of aliens shall be excluded from admission into the United States: All idiots, imbeciles, feeble-minded persons, epileptics, insane persons; persons who have had one or more attacks of insanity at any time previously; persons of constitutional psychopathic inferiority; persons with chronic alcoholism; paupers; professional beggars; vagrants; persons afflicted with tuberculosis in any form or with a loathsome or dangerous contagious disease; persons not comprehended within any of the foregoing excluded classes who are found to be and are certified by the examining surgeon as being mentally or physically defective, such physical defect being of a nature which may affect the ability of such alien to earn a living; persons who have been convicted of or admit having committed a felony or other crime or misdemeanor involving moral turpitude; polygamists, or persons who practice polygamy or believe in or advocate the practice of polygamy; anarchists, or persons who believe in or advocate the overthrow by force or violence of the Government of the United States, or of all forms of law, or who disbelieve in or are opposed to organized gov-

ernment, or who advocate the assassination of public officials, or who advocate or teach the unlawful destruction of property; persons who are members of or affiliated with any organization entertaining and teaching disbelief in or opposition to organized government, or who advocate or teach the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers, either of specific individuals or of officers generally, of the Government of the United States or of any other organized government, because of his or their official character, or who advocate or teach the unlawful destruction of property; prostitutes, or persons coming into the United States for the purpose of prostitution or for any other immoral purpose; persons who directly or indirectly procure or attempt to procure or import prostitutes or persons for the purpose of prostitution or for any other immoral purpose; persons who are supported by or receive in whole or in part the proceeds of prostitution; persons hereinafter called contract laborers, who have been induced, assisted, encouraged, or solicited to migrate to this country by offers or promises of employment, whether such offers or promises are true or false, or in consequence of agreements, oral, written, or printed, express or implied, to perform labor in this country of any kind, skilled or unskilled; persons who have come in consequence of advertisements for laborers printed, published, or distributed in a foreign country; persons likely to become a public charge (this clause excluding aliens on the ground likely to become a public charge has been shifted from its position in section 2 of the immigration act of 1907 to its present position in section 3 of this act in order to indicate the intention of Congress that aliens shall be excluded upon said ground for economic as well as other reasons and with a view to overcoming the decision of the Supreme Court in Gegiow v. Uhl, 239 U. S. 3 (S. Rept. 352, 64th Cong., 1st sess.)); persons who have been deported under any of the provisions of this act, and who may again seek admission within one year from the date of such deportation, unless prior to their reembarkation at a foreign port or their attempt to be admitted from foreign contiguous territory the Secretary of Labor shall have consented to their reapplying for admission; persons whose tickets or passage is paid for with the money of another, or who are assisted by others to come, unless it is affirmatively and satisfactorily shown that such persons do not belong to one of the foregoing excluded classes; persons whose ticket or passage is paid for by any corporation, association, society, municipality, or foreign government, either directly or indirectly, stowaways, except that any such stowaway, if otherwise admissible, may be admitted in the discretion of the Secretary of Labor. (See rule 3, subdivision O.)

In addition to the aliens who are by law now excluded from admission into the United States, the following persons shall also be excluded from admission thereto, to wit:

All aliens over 16 years of age, physically capable of reading, who can not read the English language, or some other language or dialect, including Hebrew or Yiddish (see rule 3, subdivision N) : Provided, That any admissible alien, or any alien heretofore or hereafter legally admitted, or any citizen of the United States, may bring in or send for his father or grandfather over 55 years of age, his wife, his mother, his grandmother, or his unmarried or widowed daughter, if otherwise admissible, whether such relative can read or not; and such relative shall be permitted to enter.

In addition the Mexican is required to pay a head tax of $8. I believe we could keep out most Mexicans to which objection has been made to-day if we simply enforced the laws above mentioned. [Applause.]

Mr. EDWARDS. Will the gentleman yield?

Mr. FREE. I will.

Mr. EDWARDS. Would the passage of the Box Act accomplish what the gentleman has in mind?

Mr. FREE. No sir. Unless we provide the money to enforce it. The reason I took my feet to-day is this. We have a feeling here that by passing a law you will stop immigration. Unless you back it up with the money for enforcement and the protection of your borders it will not mean a thing. We are not enforcing the laws we have to-day on the northern and southern borders of our country.

Mr. EDWARDS. Why not? We have the money.

Mr. FREE. The committee has been criticised because we have not done anything in reference to this situation. We have been appealing to this House for eight years to my personal knowledge for money to protect the borders. We had an increase of a million dollars in the last Congress, but why pass another law when we do not enforce those we already have on our statute books?

Mr. EDWARDS. How much will it take?

Mr. FREE. Several million dollars in addition to what we have at the present time.

Mr. EDWARDS. Why not put it up to the Appropriations Committee?

Mr. NEWTON. Will the gentleman yield?

Mr. FREE. I will,

Mr. NEWTON. What the gentleman has said about the borders is also true of getting rid of undesirables—we ought to have more money to deport them.

Mr. FREE. Absolutely. We have investigated, and there are over 200,000 people in this country who should be deported. We only deport a few and from the places where they can be easily found.

Mr. HUDSON. Will the gentleman yield?

Mr. FREE. I will.

Mr. HUDSON. Does the gentleman not recognize that if we can have a coordination of the enforcement departments that have to do with enforcement laws we might have sufficient money to enforce those laws, but as long as we have a system that puts four different groups of enforcement officers on the borders, each one to do a litle particular thing while allowing the violation of any of the other laws, we will have the very conditions suggested.

Mr. FREE. That would help a great deal. I want to say concerning the men along the border, that they have been cooperating to a remarkable degree, and they are a fine lot of men, and they are doing the job as best they can; but we need more of them and more authority to cooperate.

Mr. HUDSON. I am not complaining about the inefficiency of these gentlemen. I am simply complaining of the fact that from the deviousness of the law their activities are made inefficient. The law makes them inefficient. A man in the department of the service has not a right to arrest a man for doing something that does not come within his jurisdiction. The whole thing is wrong in theory and in practice.

Mr. FREE. I agree with the gentleman.

Mr. SABATH. Mr. Chairman, it is believed from what we hear that we receive a tremendous immigration from Mexico. I have been asked by a number of Members how it is that our present restriction of immigration admits only 165,000, and, notwithstanding that, over 300,000 arrived last year? There is no restriction, no quota, on Mexico, Canada, Central and South America, Cuba, and the West Indies, and for that reason they can come in in as large numbers as they desire. But they should be, and they are, subject to the literacy test and to the provisions of the law of 1917. I agree that if the law is rigidly enforced on the Mexican border hundreds of thousands could not have qualified or have been admitted.

But do not lose sight of this fact: What applies to Mexico in a great measure applies also to Canada. Why, last year alone we received from Canada—though our total immigration from entire Europe was but 165,000—81,506 of which a record is made. So it is not only immigration from Mexico, but also from Canada, because what the gentleman from Massachusetts said a moment ago is true; there are thousands of our own people unemployed in Massachusetts, and why should we permit that tremendous number to come in here without the quota from Canada and Mexico?

I introduced, three times, and advocated unsuccessfully, a bill placing Mexico, South and Central America, Canada, Cuba, and the West Indies under quota as it is applicable to European immigration. We need a few more men on our border line. I know the chairman of the Committee on Immigration and Naturalization has tried to secure larger appropriations, and he did. I have advocated the proposition of the gentleman from Michigan [Mr. HUDSON], who spoke a little while ago on the centralization of our forces and activities along the border line. I do not know why we should have a revenue patrol, and an immigration patrol, and a prohibition patrol on the border, one not cooperating with the other. They can be merged into one, and then we would have efficient control, and that would control not only immigration but also prohibition and revenue violations and other violations that are going on. I hope, therefore, that the chairman will be strong enough to convince the Treasury Department and the Department of Labor and other officials, who have the power, to bring about unification that it be done.

Mr. JOHNSON of Washington. Mr. Chairman, I move that all debate on this section be now closed.

The CHAIRMAN. The gentleman from Washington moves that all debate on this section be now closed. The question is on agreeing to that motion.

The motion was agreed to.

The CHAIRMAN. The Clerk will read.

The Clerk read as follows:

SEC. 8. Upon the final conviction of any alien of any offense in any court of record of the United States or of any State or Territory it shall be the duty of the clerk of the court to notify the Secretary of Labor, giving the name of the alien convicted, the nature of the offense of which convicted, the sentence imposed, and, if imprisoned, the place of imprisonment, and, if known, the place of birth of such alien, his nationality, and the time when and place where he entered the United States.

Mr. BLACK of New York. Mr. Chairman, I move to strike out the last word.

The CHAIRMAN. The gentleman from New York is recognized.

Mr. BLACK of New York. Mr. Chairman, I want to make a very friendly suggestion to the men from the border States, which I hope will be taken in good part. For about six years you have been passing legislation to regulate conditions in New York City, telling us how to raise a family, what to eat and what to drink, and when to eat with a knife and when to eat with a fork. In the meantime you have been neglecting your own doorsteps. I say, keep you hands off New York for a while and see that you enact a little good, wholesome national legislation for the benefit of your own constituents. [Applause.]

The CHAIRMAN. The Clerk will read.

The Clerk resumed and completed the reading of the bill.

The CHAIRMAN. The question now is on agreeing to the substitute to the Senate bill as amended.

The committee substitute for the Senate bill was agreed to.

The CHAIRMAN. Under the rule, the committee automatically rises and reports the bill to the House.

Accordingly the committee rose; and Mr. TILSON, as Speaker pro tempore, having assumed the chair, Mr. BACON, Chairman of the Committee of the Whole House on the state of the Union, having under consideration the bill (S. 5094) making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law, reported that that committee had directed him to report the same back to the House with an amendment, with the recommendation that the amendment be agreed to and that the bill as amended do pass

The SPEAKER pro tempore. Under the rule, the previous question is ordered, and the question is on agreeing to the amendment.

The amendment was agreed to.

Mr. JOHNSON of Washington. Mr. Speaker, I ask that the title be amended.

The SPEAKER pro tempore. That can be done after the passage of the bill. The question is on the third reading of the Senate bill.

The Senate bill was ordered to be read a third time, and was read the third time.

Mr. LAGUARDIA. Mr. Speaker, I offer a motion to recommit.

The SPEAKER pro tempore. Is the gentleman opposed to the bill?

Mr. LAGUARDIA. I am.

The SPEAKER pro tempore. The gentleman from New York offers a motion to recommit, which the Clerk will report.

The Clerk read as follows:

Mr. LAGUARDIA moves to recommit the bill to the Committee on Immigration with instructions to report back the bill forthwith with the following amendments:

Page 3, line 20, after the word "offense," insert "involving moral turpitude."

On page 4, line 3, after the word "offense," insert "involving moral turpitude."

Mr. JOHNSON of Washington. Mr. Speaker, I move the previous question on the motion to recommit.

The previous question was ordered.

The SPEAKER pro tempore. The question is on agreeing to the motion of the gentleman from New York to recommit the bill with instructions.

The question was taken, and the motion to recommit was rejected.

The SPEAKER pro tempore. The question is on the passage of the bill.

The question was taken, and the bill was passed.

On motion of Mr. JOHNSON of Washington, a motion to reconsider the vote by which the bill was passed was laid on the table.

The SPEAKER pro tempore. Without objection, the title will be amended.

There was no objection.

Mr. SABATH. Mr. Speaker, I ask unanimous consent to extend and revise the remarks I have made from time to time.

The SPEAKER pro tempore. The Chair is informed that all Members have that right for six days.

### DRY VALLEY ROAD—CONFERENCE REPORT

Mr. WAINWRIGHT. Mr. Speaker, I present a conference report on the bill (S. 3881) to provide for the paving of the Government road, known as the Dry Valley Road, commencing where said road leaves the La Fayette Road, in the city of Rossville, Ga., and extending to Chickamauga and Chattanooga National Military Park, constituting an approach road to said park, for printing under the rule.

# EXHIBIT C

Case 3:20-mj-20121-KSC   Document 32-1   Filed 06/07/20   PageID.323   Page 102 of 218

that they are the exceptions. I will take an example and stand by it any lowly, inconspicuous, humble immigrant—I will take the average Jewish immigrant. Where will you find him? You will find him in the factories, you will find him in the shop, you will find him back of the pushcart, you will find him doing the most laborious work from the moment he lands here until he is laid away. What is he doing it for? He is doing it because he has come here for one great purpose, and that is to give his children an opportunity which was denied to him and his ancestors for centuries. This humble Jewish immigrant, and he is typical of 999 out of 1,000, kisses the land the moment he gets here, thanks God for his arrival here, and it is one uninterrupted, continuous life of sweat and labor from that moment to the very end. His children know no other land, owe allegiance to no other flag, love no other country but the United States. I speak for the Jewish immigrant because I have the honor of representing a great Jewish district, and I will say that there are no more loyal people in this country than the Jewish immigrants and their children. The children of the Jewish immigrant, given an opportunity of an education, they will take their place in the community; and in every city where Jewish immigrants have settled I will show you development, progress, business industry as the result of their labor, determination, and efforts.

The Italian immigrants—let us take the most humble again as example—leaving a country, unlike the Jew, a country that was his for centuries, where the sky is clear and the climate good, where he is surrounded by beauty that has been his for generations, leaves that home for the same laudable reason that prompted the Jewish immigrant. To come here he sells his little piece of land, his little home, and knocks at the door at Ellis Island for admission. He lands, and where do you find him? You soon find him with the pick and shovel building our railroads, digging our canals, boring our subways, or in the depths of our mines. He saves money, you say. Yes; saves money and saves money so that he may send to the other side for his wife and babies or for his bride who is awaiting him, and he establishes his little home, he builds his little house—you show me the house of an Italian laborer, no matter how humble, and I will show you every inch of the ground of his back yard cultivated as a garden; I will show you every place where there is space enough for one seed a beautiful flower; I will show you that Italian laborer on his day of rest, with his coat off, working around his home to beautify it—it is his only home and he wants to make it a real home. Come to our schools in New York and you will see hundreds of thousands of little black-headed sons of Romans poring over their a, b, c's in the grade schools; in the high schools preparing themselves for the duties and responsibilities of American citizenship. Is it fair, is it manly, is it accurate to paint an instance here and there out of a population running into millions of a crime committed and hold that such a case is typical of the immigration of an entire race? The Croatians, hard working, honest, industrious, you will find in the mines all over the country, and what better example of assimilation than that of the Croatian and the Italian—why, on the other side a Croatian and an Italian can not get along; they have been instigated and primed to hate each other by the cunning and trickery of European politics. They come here, work side by side, live in the same neighborhood, their children go to the same schools, no hatred, no hard feeling, living in perfect harmony, friendship, and love, their children intermarry. Why? Because they have immediately become entirely and absolutely assimilated. They are Americans in thought, spirit, and in attitude, and yet you come here and say that this newer immigration can not be assimilated.

Gentlemen, you will have to find some other justification for this law. I do not hesitate to say why I am against it. I am against it because it is unscientific, because it does not fit with the economic condition of the country, because it is the result of narrow-mindedness and bigotry, and because it is inspired, prompted, and urged by influences who dare not come out in the open, by the influences who have no intelligent information of conditions, but who have a fixed obsession on Anglo-Saxon superiority, who have an obsession as to religious dominance, and who believe that it is proper to take vengeance upon these humble, harmless, helpless immigrants, in the course of the work allocated by themselves to themselves, and in so doing believe they are rendering service to their country.

I feel sorry for them. As was stated by the very gentlemen who are sponsoring this bill in a boastful spirit, the districts they represent have no immigration problem to use their own phrase. If these people could only see, could only hear, could only know, they would understand. If they could observe in

an unbiased manner the immigrant in his labors, in his work, their children in their studies, their development and progress, their devotion to the country, all of this prejudice and fear would disappear and how much happier we would be in this country if we could abolish forever religious differences, racial hatreds, and concentrate all our efforts and reconcentrate ourselves as one people, regardless of race or origin to service and united loyalty to our country.

While the Jewish immigration is not charged to any country because it comes from various parts of Europe, I think it can be approximately located. We have no statistics of religions as far as I can ascertain, and prior to 1920 statistics account for country of origin only. That would leave us entirely to the immigration records which sometimes classify immigrants as Hebrew "nationality." From my own experience at Ellis Island I find that this classification is incorrect owing to many Jewish immigrants being classified as Austrian, Hungarian, Russian, or Polish. The Census Bureau in the 1920 census compiled statistics in accordance to "mother tongue of the foreign white stock" and from that it will be seen that 1,091,820 were classified as "Yiddish and Hebrew mother tongue," with a total of 2,043,613. Of these 1,091,820 were foreign born, classified principally as follows:

| | |
|---|---|
| Russia | 791,181 |
| Austria | 90,273 |
| Rumania | 87,587 |
| Hungary | 16,964 |
| England | 9,845 |
| Germany | 3,196 |
| Canada | 2,687 |

The remainder being scattered among foreign countries, principally, I believe, Jewish immigrants from the above-named countries who emigrated first to another country.

Several explanations have been offered why the 1890 census is now taken and why the 1910 census was taken in the original quota law. The truth of it, gentlemen, is that the 1910 census was taken because at the time the original act was approved on May 19, 1921, it was the last United States census and the only census that should have been taken. You will find that the 1920 census was transmitted by the Director of the Census to the Department of Commerce on November 21, 1921, the census containing the number of foreign born in this country. The census of 1910 was not arbitrarily taken, as some might have been led to believe. When the original act was enacted it was the last census. Since then the 1920 census has been made available. As I said just a moment ago, the percentage or whatever percentage you decide should be based on the last available census, namely, 1920, as was done in the original act in 1921.

I pointed out, gentlemen, in my remarks Saturday when the rule was under consideration that the doors are left wide open on the Mexican line. I stated—and no one dares contradict, because the report of the Commissioner General of Immigration shows that 67,000 Mexicans entered the United States last year; also that the Secretary of Labor has publicly stated that an equal number unlawfully entered. It is not disputed that several hundred thousands came in in 1917 and 1918 and that they have not left the United States but are going from place to place where cheap labor is desired and where manufacturers or growers are specially enthused to want to exploit this poor labor at the expense of natives, yes, and of decent immigrants who come here to make their home and want to live up to the American standard, so that as long as the proponents of this measure permit the intolerable condition of the exploitation of cheap Mexican labor at starvation wages then they can not be heard to say that they are seeking to protect American wages and the American standard of living.

Let me point out some of the testimony given before the committee and received with a great deal of interest by the committee. Mr. W. B. Satterfield appeared. He stated he was not a real-estate promoter but interested in the development of the "alluvial territory along the Mississippi River and its tributaries." To give you an idea first of this gentleman's attitude toward immigrants, he states, and you will find his testimony on page 1652 of the hearing:

We believe there has been too much of the scum of Europe, so to speak, to use the original expression, coming into this country.

Then, again, he says, on page 1657:

The reason we have been advocating a selective form of immigration is because we made "a survey of these birds that come over here." If you will pardon that common expression, to see if we could not induce them.

I mention these expressions to show the attitude of this gentleman toward these very people that he seeks to bring to his "alluvial territory" and tells the committee he is not a real-

Case 3:20-mj-20121-KSC   Document 32-1   Filed 08/07/20   PageID 324   Page 103 of 218

estate promoter. This very "scum," these "birds" that he refers to, ought to be induced, he asks, to go out to his territory.

Mr. VAILE. Will the gentleman yield?

Mr. LaGUARDIA. Yes.

Mr. VAILE. Does the gentleman know how far he got with that proposition?

Mr. LaGUARDIA. I am telling you.

Mr. VAILE. Let me tell the gentleman that the southern Members of the committee repudiated that proposition with the same scorn they would repudiate a proposition to let in unassimilable people from anywhere else.

Mr. LaGUARDIA. But he was in favor of your bill, nevertheless.

The negroes can not do the work, continues Mr. Satterfield, and because the negroes, he claims, will not till the undeveloped ground. Then, the witness continues, he does not want to draw from other sources of the country, although later on he says an attempt was made and he just could not get people to go down to his alluvial territory after "combing the country." What "does he offer them? He offers them to go down, mark you this is not a land scheme at all, says he, to buy the land; he will finance it, says he, and he wants $10 an acre for this undeveloped land and he holds this "purchase" for 14 years at $10 an acre. In other words, he wants the immigrant to go there, stay on his land for 14 years, pay $140 a acre for absolutely untilled, undeveloped land which the poor immigrant himself has to develop, and by the time he has developed the land at the end of 14 years he will be so much in hock, as every farmer in this country knows, that what he will have to do is to pick up, go to some place near by, leaving the fruit of 14 years of labor of himself and his family to this generous Mr. Satterfield and his corporation. Why, this offer is so attractive that he is unable to find anyone in this country who will accept his generosity. He states on page 1054 of the hearing, "We are sending out constant literature to try to get people in the Southland to raise cotton," and yet he can not get them, notwithstanding that he paints a pretty picture as to the possibilities of cotton and the high price of cotton in the future, although some of the very gentlemen from the Southland who will vote for this bill will take every opportunity to protest and properly so, against conditions in the Cotton Belt and the need of doing something for the cotton grower.

Again to show the attitude of this generous Mr. Satterfield:

If there is a Greek—

He says at page 1084—

except in the restaurant business, or a few of those dark-complexioned persons, we do not know it; and there are a few of those Italians down there that we commonly called "dagoes." If our white folks mix with them, I do not know it.

What a splendid type of man to come forward and suggest a colonization scheme to make landowners out of the immigrant. A swell chance the poor, unfortunate immigrant who falls victim to the claws of this man with hatred in his heart, seeking to get rich on the labor and exploitation of the poor immigrant. He wants to stock up this land with Nordics; and on behalf of the Nordics I protest against any such land scheme—any such promotion scheme—and I tell you right now if you are friends of the Nordics you will prevent them from becoming the victims of Mr. Satterfield and his gang of exploiters of human beings.

Reference is made from time to time concerning the statistics of aliens in our insane asylums. Gentlemen, when you refer to statistics in an insane asylum and you charge that to racial causes, when you charge that to immigration, I say with all due deference and respect that you do not know what you are talking about. It is true we have aliens in our insane asylums in New York, and you have them in other asylums in other parts of the country, but, gentlemen, they are not there because they are aliens. If they were at home and never came to this country they would not be in an insane asylum. If instead of aliens we had to draw entirely from your native Nordic stock to put in our factories, in our mills, in our shops, under the river-boring tunnels, the toll of the industry of modern industry under our production system, just as your toll of death and casualties of war, you would have an equal number in those insane asylums of your preferred Nordic stock. It is the pressure, the tension, of modern machine industry to which human beings are subjected that accounts for the number of insane. It is the constant, continuous go, go, of your big industrial centers that breaks the human system. Do not believe that in stopping immigration from Italy and Rumania and Russia that you are going to stop insanity. As long as

under the present competitive system we use human beings as cogs in a machine we will have our insane asylums occupied. No greater mistake has ever been made than to charge that cost up to immigration. Charge it up where it belongs—to the inevitable casualties and cost of modern industry, competitive system, and the existing economic condition under which we are living.

Let me give you a few statistics as a proof of the industry and thrift of the alien. Let us not take Atlanta or the insane asylum, and I believe that a careful, honest, unbiased analysis of the figures of either of these institutions would wipe away entirely the conclusions presented by the sponsors of this measure, but let us take the records of the postal savings banks. Surely those figures are not juggled. I have before me the annual report of the operation of the Postal Savings System for 1923 as contained in the letter from the Postmaster General to the Speaker of the House of Representatives dated December 6, 1923, Sixty-eighth Congress, first session, document 102. The gentleman from South Carolina [Mr. BYRNES], who is as keen and able a Representative as there is in this House and for whom I have the greatest admiration, took the floor last Saturday in defense of this restrictive immigration measure and finished in an eloquent expression that in his district he did not have one-half of 1 per cent of alien population. The gentleman from South Carolina hails from the city of Aiken and according to the report of the Postmaster General there is not a single solitary depositor in the city of Aiken in the postal savings system of the United States. To-day the gentleman from Chattanooga brought out the same point, and we find there are just 22 depositors in the postal savings bank. Mr. CABLE who comes from Lima, Ohio, and in the city of Lima there are just 18 depositors having funds in the Postal Savings System; and the energetic whip, the gentleman from Anderson, Ind. [Mr. VESTAL], who made a passionate appeal for restrictive immigration a few days ago, we find that he has 31 depositors in his city putting their savings with the postal system. Now, along comes the gentleman from California [Mr. RAKER], a member of the committee, and he, too, refers to these terrible aliens, and in the city of Alturas, Calif., from whence the gentleman comes, there is just one depositor with $10 deposit, and I bet you a dollar to a doughnut that that $10 comes from some little Greek peanut dealer who has saved a penny at a time. The chairman of the committee, Mr. JOHNSON, who is given to the country by the citizens of Hoquiam, Wash., boasts of 349 depositors in the postal savings bank, while the champion of restriction, the gentleman from Colorado, Mr. VAILE, coming from Denver, has 1,096 depositors, and knowing Denver as I do, I tell you that if you inspect the list of the depositors making up this 1,096, you will find they are Italians, Jews, and Poles and among the foreign population of the city of Denver who make up the list.

Now, let us take New York City, my little town with its terrible, tremendous foreign population. When you mention it you gasp and you refer to it as the vicious evil that you are seeking to obliterate. Why, my town has 186,086 depositors with a total deposit in Uncle Sam's bank of $50,486,025, out of a total savings in the entire United States of $131,671,300 [applause], and if you will take the centers where you have large foreign populations and add them up you will see how much is left in the territories where there is no foreign population and who are bonding their Congressman to pass this vicious law. From an inspection of the list from New York City you will find that it is the humble Jew, Italian, Pole, Russian, and Greek immigrant bringing his savings to Uncle Sam because he trusts him, because he knows him, because he loves him, and because he is here to stay. These savings represent the sweat of their brow, the fruit of their honest labor, their part and contribution to the wealth, greatness, and the welfare of their adopted country.

I am willing to take the savings not only in Uncle Sam's savings bank but the savings banks generally, and show you where you have big foreign populations, you have big savings deposits. You tell us that these immigrants are a drain on the country; that they send money home. How contrary to American spirit, to real American generosity, it is to throw into their face the few pennies of their hard-earned money which they send to an aged parent or to a poor relative. The figures of the postal savings bank in Uncle Sam's bank are figures which belie that statement and show entirely the contrary to be true, that these millions of newly arrived immigrants not only contribute to the country their labor, but use the fruits of their labor for the benefit of the entire country by putting it in these institutions.

Mr. WATKINS. Mr. Chairman, will the gentleman yield?

Mr. LaGUARDIA. Yes.

Case 3:20-mj-20121-KSC   Document 32-1   Filed 08/07/20   PageID.325   Page 104 of 218

Mr. WATKINS. They are contributing something else, too. The Attorney General says that despite the fact that the foreign born is less than 11 per cent, they contribute more than 50 per cent of the criminal record in this country.

Mr. LaGUARDIA. If the gentleman had been in this Chamber when I began my remarks he would have heard my statement on that point. If you take the average, you will find that it is nothing like as much as 50 per cent. While that is suggested by the gentleman from Oregon, let me say that the way to assimilate, the way to teach Americanism, is by setting a good example. You talk about keeping out radicalism; you talk about keeping out Bolshevism. You can not keep it out by an immigration law or by a censorship. But we are in no danger of radicalism or Bolshevism in this country.

Our form of government is as perfect a form of government as imperfect human beings can live under. The way to keep out radicalism and bolshevism is to put honest, decent officials in office, and kick out officials who betray the confidence the people. That is the way to do it. Set a good example to these new Americans. [Applause.] Let us end these hatreds, these prejudices; let us restore to the people the kind of representative government the liberty-loving framers of our Constitution intended, and drive from public office men who have violated the trust given them. By all means let our conduct on the floor of this House be an example and inspiration to every newly arrived immigrant of American fair play, American manhood, and the spirit of brotherhood and love which our Republic typifies.

Mr. OLIVER of New York. Will the gentleman yield?

Mr. LaGUARDIA. Yes.

Mr. OLIVER of New York. May I say to the gentleman, in regard to Oregon, that the district court of appeals recently declared un-American a law passed by referendum in the great State of Oregon, where our teacher on Americanism comes from.

Mr. LaGUARDIA. That is correct. The forceful gentleman from Tennessee [Mr. McReynolds] criticized a meeting I attended. Gentlemen, that meeting was public; everybody could come to that meeting, and at that meeting everybody's face was visible. [Applause.]

Yes; the opponents of this bill were directly charged with being influenced by the aliens in our respective districts. It has been repeatedly stated by the sponsors of this bill that pressure was being brought to bear by the foreign-born citizens. I say in reply to that that the foreign-born citizen as I know him, and I think I know him intimately, would not ask their Representative in Congress to vote against any measure that was for the good of the entire country, and I say with equal force that when the foreign born is made the target of a small organized minority who do not understand him and who refuse to learn to know him are directly framing legislation to hurt him and his family at the expense of the welfare of the country, it is only natural that loyal American citizens should call upon their chosen Representatives in Congress and ask them to oppose this measure. There has been no secret about it; protest meetings have been held in every large center. Petitions have been filed right here in the basket, witnesses have appeared before the committees—how can you create any improper influence out of anything, out of a movement carried on in the open honestly. A great deal has also been said about the foreign press. The foreign press is not the only kind of press taking an interest in this proposition. I have here in my hands a publication which has featured restrictive immigration legislation for a long time. If you will read the Fiery Cross of January 18, 1924, you will find there an alarming headline entitled "Americans' Heritage Menaced," says Doctor Evans; and who is Doctor Evans? Why, the Fiery Cross says that he is no less than their imperial wizard, Knights of the Ku-Klux Klan, and a five-column article carrying the imperial wizard's views, opinions, and instructions to Congress is printed in detail in the Fiery Cross publication of the hooded knights. Then the imperial wizard says:

Ku-Klux Klansmen have been underlining it for some years, and now many leading American journals and publicists are sounding a deep and loud alarm. Action can not be too quick. Something has been done, but not enough; the quota law is but a step in the right direction. Illiteracy, disease, insanity, and mental deficiency are still pouring in upon us. Immigrants are streaming into cities to make modern Sodoms and Gomorrahs. Up to 1890, 95 per cent of our immigration was of the Nordic types—kindred, desirable, easily assimilable people. * * * What Nordic greatness has wrought in this country, if the Ku-Klux Klan has anything to say—and it is going to have something to say—neither shall be torn down by political madness nor shall be dragged down by disease and imbecility.

And in the Fiery Cross issue of Friday, March 28, 1924, we find that the energetic gentleman from Ohio [Mr. Cable] put the floor leader of the majority on record and required him to do so in writing, according to the news report in the flaming paper, and I read:

Congressman Cable, one of the sponsors of the immigration bill, was determined that a vote be urged with the least possible delay, so he obtained the following written promise from Mr. Longworth—

Then the written promise we find was the statement given to the press by Mr. Longworth in outlining the legislative program of the House some 10 days ago and I quote from the so-called written promise as contained in the paper:

The immigration bill will be considered immediately following the passage of these bills.

The bills referred to being the regular appropriation bills. Then turning the page of the Fiery Cross to the editorial section, we find this startling pronunciamiento:

For those who may not be aware of it, it might be stated here that Ohio is one of the chief strongholds of the Klan, ranking next to Indiana, which at this time leads the Nation to Klandom. Taking Ohio as a single unit, Dayton is one of the strongest Klan cities in Ohio. Dayton is "Klan all through"—

And then let me read the next editorial criticizing one of the great New York dailies, the Brooklyn Eagle, and it is not necessary for me to go to the defense of that great daily. There is no better, more loyal nor square daily in this whole country than the Brooklyn Daily Eagle. That paper is not of bi-political faith, nor of my school of politics. It often criticizes me and does so squarely, but I will say right here that its ownership, its editorial staff, is of the very highest type of Americans, and nothing that may be said by the Fiery Cross can in the slightest affect the standing of that paper or its personnel. But let me read:

The entire country is aware that the Catholic and the Jew are for unrestricted immigration. Americans, however, are not. They see the deadly menace that faces America at this critical time. It is possible that the editor of the Eagle, too, sees the menace; but with less than 1,000,000 people who are of white Protestant, Gentile, American extraction in a city of approximately 6,000,000 souls, it is only natural that the Eagle should play to the overwhelming majority.

There is hardly any doubt but that the editor really meant the people of New York City are not for it. Some kind person should send the Eagle editor a map of the United States that he might learn that America only starts in New York and runs clear to the Pacific Ocean before stopping. Also inform him that the opinion of "the average New Yorker" is not necessarily the opinion of the millions of Americans west of Jersey City.

I read these quotations to show the warp-minded attitude of the official organ of the hooded organization and to demonstrate the one-sidedness of its argument; why, gentlemen, every Member of this House knows that the word of the floor leader is his bond. The Fiery Cross, of April 4, 1924, states that thousands of letters are being received by Mr. Johnson from New York, and that New Yorkers complain that they have to depend upon Congressman Johnson and upon the efforts of the Ku-Klux Klan, because their Representatives in Congress are going to vote against the bill. Why, gentlemen, I have a whole file full of the publications, and I say to you that the leaders responsible for the activities of the Ku-Klux Klan are doing more to divide this country and to divide the people of a country than any agency that ever existed in the history of the world. These arguments, these articles, are read all over the country. You can not prevent the people of the East forming their opinion of this organization.

They can not understand how you can stand up for Americanism, how you want to shut the doors against those who you believe do not understand American traditions, and how, in the darkness of night, these same people, with masks or hoods, will take some poor defenseless negro and chastise him by corporal punishment or by hanging him, and burning down the houses of the poor undefended negro—they can not understand why, in order to create law and fear, to establish brutal dominance, it is necessary to burn the very symbol of Christianity, which they have been brought to, from infancy to revere and worship; they can not understand why it is that this organization has directed its activities and the power of its organized force as a group of people, at races, and religions who are defenseless, who want to take their place in the one big American family. Do you not see what harm is being done, what irreparable harm is being done, and in the name of the same God we all worship and for the glory of our only flag, I ask the Ku-Klux Klan to take off their mask and to meet us in the light of day to

talk these things over and to act in accordance with the best interests and in accordance with the tradition and spirit of America.

I will tell you gentlemen that he who steals my purse steals trash but he who attempts to take my Americanism away from me takes all I have and all that is dear to me. Gentlemen, I was raised out in the big State of Arizona, and anyone who seeks to question that Americanism, I do not care how big he is, will do so at his peril. [Applause.]

Mr. BAKER. Will the gentleman yield?

Mr. LaGUARDIA. Certainly.

Mr. BAKER. Would the gentleman mind telling the committee, if he knows, about an organization composed of about 1,200 lodges with about 150,000 members in which you can not belong unless you speak and write a foreign language?

Mr. LaGUARDIA. Yes; and let me tell the gentleman something——

Mr. BAKER. I am asking for information.

Mr. LaGUARDIA. I want to be perfectly fair. Let me inform my colleague that he is laboring under a mistaken translation. I have their by-laws and have had a translation made. What it says is: "Without regard to language, religion, or political affiliations." I have a correct translation here, Mr. RAKER.

Mr. BAKER. I am asking for information.

Mr. LaGUARDIA. Well, the gentleman has obtained it.

The CHAIRMAN. The time of the gentleman from New York has again expired.

Mr. RAKER. Mr. Chairman, I yield myself 20 minutes.

The CHAIRMAN. The Chair will state to the gentleman from California that the present condition of the time does not permit that.

Mr. RAKER. We have from now until half past 5 o'clock, and I was to have one-fourth of that time.

The CHAIRMAN. Let the Chair state what the parliamentary situation is. By the rules of the House the time is divided four hours on a side. By a subsequent unanimous-consent agreement, after the expiration of that time, the general debate will run on until recess, and run on commencing at 8 o'clock until the House shall adjourn, which shall not be later than 11 o'clock. The Chair has no means of knowing whether there will be any more than eight hours used, and except by unanimous consent the Chair will allow the gentleman from Washington but four hours until after the gentleman from Illinois [Mr. SABATH] has consumed four hours.

Mr. SABATH. May I inquire how much time the gentleman from Washington [Mr. JOHNSON] has remaining?

The CHAIRMAN. The gentleman from Washington has personally used two hours and two and a half minutes, and has yielded the gentleman from California [Mr. RAKER] 1 hour and 56 minutes, which leaves the gentleman from Washington with one minute and a half.

Mr. JOHNSON of Washington. That will be sufficient for me to close the debate.

The CHAIRMAN. The gentleman from Illinois has consumed 3 hours and 42 minutes. I have no doubt there will be plenty of time for this speech, but——

Mr. JOHNSON of Washington. I ask unanimous consent, Mr. Chairman, that the gentleman from California have 15 minutes in addition to the time remaining to his credit and that the gentleman from Illinois have 15 minutes additional.

Mr. SABATH. In addition to the time I have left?

Mr. JOHNSON of Washington. Yes; that the gentleman from Illinois have 15 minutes additional.

Mr. SABATH. In other words, that I have as much time additional as the gentleman will use above his time.

Mr. JOHNSON of Washington. That will be 15 minutes additional, and thereafter we will see about the hour of rising.

Mr. MADDEN. Reserving the right to object, I understand the gentleman from Washington has one and a half minutes, and the gentleman from Illinois [Mr. SABATH] has 18 minutes, and that closes the debate.

Mr. BAKER. I have four minutes.

Mr. MADDEN. And the gentleman from California four minutes. This would close the debate until 8 o'clock to-night.

Mr. RAKER. No; we had an agreement that it should run until we adjourned, which would be at half past 5 or 6 o'clock to-night. That was the agreement this morning, the gentleman from Illinois will recall.

Mr. SABATH. That was the unanimous-consent agreement day before yesterday, as I understand it.

Mr. MADDEN. Let us see what you are going to do with the time.

Mr. JOHNSON of Washington. I am perfectly willing that the gentleman from California [Mr. RAKER] shall have 15

minutes in addition to the 4 minutes and the gentleman from Illinois [Mr. SABATH] 15 minutes additional.

The CHAIRMAN. The Chair is of the impression that the Committee of the Whole can not by unanimous consent change the order set by the House, and the Chair is of the opinion that until the eight hours have been exhausted the Chair must follow the order which was directed by the House, and that even by unanimous consent in the committee we can not change it. I might suggest to the gentleman from Illinois that if he desire to yield time to the gentleman from California, on the presumption the House will have plenty of additional time, the gentleman can do so; but so far as the Chair is concerned, he will leave the time in the control of the gentleman from Illinois, with a minute and a half in the control of the gentleman from Washington.

Mr. SABATH. Mr. Chairman, for the convenience of the House, I am willing to yield the time to the gentleman from California now, with the understanding that later on I will be yielded that time back by the gentleman from Washington.

The CHAIRMAN. The gentleman from Washington yields to the gentleman from California the balance of his time.

Mr. SABATH. And I yield him the balance of my time.

The CHAIRMAN. And the gentleman from Illinois yields the balance of his time, and therefore, under the rule, the gentleman from California is recognized for nineteen minutes and a half.

Mr. RAKER. And also my four minutes.

Mr. JOHNSON of Washington. Yes.

Mr. RAKER. Mr. Chairman and gentlemen of the House, I do not know whether a man ought to attempt to qualify himself or not, but I feel I ought to say just a word or two on this matter before proceeding.

For 13 years I have been a member of this committee. I assisted in the bill when President Taft was in office, and it was vetoed; and then, as a member of the committee during all the legislation that brought about the act of 1917, which was vetoed twice and then passed over the President's veto, and also assisted in the subsequent legislation.

The Committee on Immigration was given the power to study the immigration question. The committee took testimony in Washington and went to New York and other places and spent two months and a half in the Western States taking testimony relating to immigration.

In addition to that, during the last year I spent practically all of my time after the adjournment of Congress on March 4 in going over the United States and visiting practically all the cities of the United States. I spent two and a half months on the Hawaiian Islands and I visited every island and saw every sugar plantation there except one. I visited every nationality and every organization that had any headquarters. I went there at my own expense and in my own time for the purpose of seeing the situation. I then again crossed the American continent and spent over two and a half months in Europe, having been there three years before, shortly after the armistice, when we went over a great part of Europe. This last time I went there for the purpose of seeing the conditions as they then existed and as they exist now.

In addition to this the committee has taken possibly 8,000 pages of testimony during the last four years. We have heard every conceivable question that relates to immigration discussed. We have studied the Mexican situation. We have gone into the labor situation, and we have gone into the different methods that have been suggested.

Mr. MADDEN. Will the gentleman yield for a question?

Mr. RAKER. I yield.

Mr. MADDEN. Now that the gentleman has given us a certificate of his own qualifications, I would like to ask him what it was that induced him and the rest of the committee to leave the floodgates open for the admission of people from Mexico?

Mr. RAKER. In one word I will answer that. The committee gave great thought to that question. We had 25 or 30 witnesses before us some four years ago and went into it in every particular, and the committee also looked into the law, and I am convinced absolutely that with the literacy test and the $8 head-tax provision, and under the law regarding contract labor, I will say to the distinguished gentleman from Illinois I believe, as I believe now, that if the contract labor law was enforced to-day there would not be a thousand Mexicans who would cross the border.

That is the reason we did not pass on that.

Mr. VAILE. How would it be enforced?

Mr. RAKER. They took some 78 guards away about four years ago. It needs men and money to enforce it. A man told me the other day testified under oath before another committee, that he saw 58 Chinamen cross the border. The in-

Case 3:20-mj-20121-KSC   Document 32-1   Filed 00/07/20   PageID.327   Page 106 of 218

spectors were within half a mile. They walked up to the immigration station and said they wanted to be sent back to China.

Mr. SABATH. Is it not a fact that daily Mexicans do come here under the law?

Mr. RAKER. No; they do not; if the law were enforced they would not do so.

Mr. SABATH. They do come in legally?

Mr. RAKER. They do not come in legally. I stand on that as I stand on my two feet here.

Mr. SABATH. The department says——

Mr. RAKER. I do not care what the department says.

Mr. DICKSTEIN. Will the gentleman yield?

Mr. RAKER. Yes; I yield.

Mr. DICKSTEIN. How does the gentleman justify the exclusion of families and children and that they have to reside in Mexico 10 years before it gives them the right to come in?

Mr. RAKER. Well, it does not mean that. That is intended for people who have been advised to get in that way. There would be a perfect stream of steamboats going to Mexico if there was no limitation, and that was intended that if they went to Mexico they would have to live there 10 years before they could come in. That was to plug up that hole.

There has been much discussion here as to the ineligible clause—those ineligible as citizens of the United States. I will make the statement here now that this bill as now presented does not violate a single treaty that has been entered into by the United States with any foreign government. I make that statement and stand on it, and will be prepared to meet it if it comes up later.

There has been only one treaty since the formation of this Government whereby we dealt with immigration, and that treaty was with China. That has been abrogated, and we have now an exclusion law. Since the beginning of the Government we said that these people of the race on the Pacific coast, such as Malays, and Chinese, and Japanese and others were not entitled to be citizens, and that they could not be naturalized. That has been the law for 137 years. The Supreme Court of the United States has decided that Chinese can not be naturalized. The Supreme Court of the United States says that Hindus can not be naturalized, and the Supreme Court of the United States has said the Japanese could not be naturalized. The Supreme Court of the United States has said that Filipinos can not be naturalized, as well as every Malay. So from the beginning of the Government those people can not be naturalized under our fundamental law, which has been the law down to the present time.

For the last 20 years the people of the West have been struggling as no people ever struggled before to keep out these people ineligible to become citizens and be naturalized. The people of California and many States have passed similar laws that these ineligible citizens can not come in under our laws. The Supreme Court of the United States has held that that act is valid and is not against the treaty; so that covers that. The Supreme Court has also used the language that it would be a dangerous thing to admit these people to obtain agricultural lands who were not subject to our laws, and who were not able to become citizens of the United States.

I want to say here that every man who has been opposing this law and has said that we would have trouble with Japan has made the same argument in regard to that question, and some who have appeared before the Supreme Court of the United States made the same argument they make in regard to the exclusion of these people who have been declared ineligible to become citizens of the United States.

Now, here is the story of a century: Look at this chart. Here is a graphic presentation of the past, present, and future of Hawaiians disappearing, Japanese already risen to predominance, and whites in hopeless minority.

You will see here demonstrated that in 1900 there were 230,000 Hawaiians. Look at the line coming down and you will see that there are now 23,723 Hawaiians on the Hawaiian Islands.

Now look again; Hawaiians, 18,000. For awhile they were many others, but they pinched them out.

With the gentlemen's agreement that there was to be no increase in the Japanese population in the islands or the possessions of the United States or in continental United States, starting in 1880 down to 1900 they got very few, and they ran up until there was 100,274 Japanese in the Hawaiian Islands. I visited the schools of the Hawaiian Islands, one where the teacher told me there were over a thousand pupils present. So help me God, there were not over six white people attending that school. Anybody knows that within the last 10 years with those born in Hawaii they can dominate everything in the island of Hawaii and elect all the officers. Then they say there is no danger in this increase of population.

Let me take from the census, and I will tell you another thing that I was unable to get into the RECORD and which I tried to prove. I talked with the immigration official. He told me that when the student goes out, the native-born student, he registers as a Japanese. He gets a Japanese passport. When he comes into the country he comes in as an American citizen, and there is no record kept in regard to his entrance as a Japanese. Then people talk about an increase! There are 15,000 native Japanese in the Japanese schools, and when they come back they come in as American citizens, and they tell us that because there is not as large an increase because of this fact, there is no increase in the islands.

Let us take the map of continental United States—Japanese and Chinese population—continental United States, 1870 to 1920. In 1870, we had only 55 Japanese in continental United States. Follow the line up to 1880, 1890, up to 1900, and then it will be seen that between 1905 and 1907, when they were working on the gentlemen's agreement that the Japanese population had increased tremendously. The Department of Labor has never seen this gentlemen's agreement and we have their letter on file. No man has seen it except the Secretary of State and his officials. The committee members have been there and the members of the delegation have been there, and I call attention again to the fact that even the treaty, with that postscript upon it, is still a secret document and among the secret files in the Senate, and I have the letter from the Secretary of the Senate within the last three weeks about that. They have never yet admitted the American people to see how, or why, or what was done when they adopted the treaty of 1911. While they were doing that, we find, coming to the United States during that period, over 20,000 Japanese, and then when they adopted the gentlemen's agreement for about a year, it will be noted that the invasion slackened. Since that time, up until 1920, we find that they have now over 110,000 and they have been coming in continually and are coming in to-day.

During that period from 1912 to 1915 there were over 30,000 Japanese picture brides who came to the United States, and I have here a list on one vessel. The Committee on Immigration saw them coming, from 50 to 100 in a vessel. In the year 1923 I saw the same thing with my own eyes in the Hawaiian Islands. I saw them landing over 90 picture brides at one time, and 50 others during the month of May and June of last year. They shut out the picture brides so far as the continental United States is concerned in 1920. Within the last week I received this paper from Tokyo itself and here is one family which runs up to about a hundred. There is a memorandum showing that before the picture-brides order was made in 1919—it took effect in 1920, in August—they began coming over as picture brides. The Japanese Government, when a Japanese returned to Japan, made him enter the military service. They have abandoned that and they now give him from six months to a year, so that he goes himself to Japan and gets his bride and brings her in. The Japanese Government encourages that and the steamship companies give him credit, so that it really does not cost him any more to go over and get his bride than to go and come back. Here is a list showing that there were some 50 in the last month. That is a paper that is published in Japan and a friend of mine sent it to me.

Every child born in the United States is an American citizen. They want to own the land. It is transferred to them immediately, and then they appoint a guardian. We have gone so far in California in order to save our own homes and save the western part of continental United States as to provide by law that a person ineligible to become a citizen of the United States can not be the guardian of his own child, for the purpose of preventing the Japanese and their Government from controlling the lands in that country. At one place in Placer County there were 23,000 acres of deciduous fruits growing there. They use the old mining ditches that brought water down in the early days for hydraulic purposes, and when the mining ceased they converted those into irrigation ditches for deciduous fruits.

One-third of all of the deciduous fruits raised in California are raised there. Judge Box saw it and Mr. VAILE saw it. We took testimony in that locality. We saw where the white schools used to be, and we saw them abandoned. We saw where the American churches used to be, and we saw the windows knocked out and unused; but in the Japanese colony we saw where they were occupying the land and running the country. In that year, 1920, over 19,000 acres of that land were under the domination and control and use of the Japanese in that one locality. That is the situation. We went through the State of Washington, down through the valley between

Seattle and Tacoma, and we found in that wonderful valley over 80 per cent of the land in the control of the Japanese. We found that in the city of Seattle 47 per cent of every hotel in that great city was under the control and domination of the Japanese. We found the fish markets in Seattle under their domination and supervision. We found the vegetable markets under their control and supervision. We found banks and every other enterprise—barber shops, small stores, and others—under their domination and control. Go on down through California and down into Los Angeles, and the people there did the work themselves. We found that over 75 per cent of these occupations in these places are being controlled by these people, and then some people say that we do not have occasion to worry. As a boy I went to the normal school down near San Jose.

The CHAIRMAN. The time of the gentleman from California has expired. The entire eight hours provided in the rule have now expired, and the time from now on is to be equally divided between the gentleman from Washington and the gentleman from Illinois.

Mr. JOHNSON of Washington. Does the Chair hold that I can not ask unanimous consent——

The CHAIRMAN. The Chair holds that the gentleman can now yield time. The time is now under the control of the gentleman from Washington and the gentleman from Illinois.

Mr. JOHNSON of Washington. Mr. Chairman, I yield 10 minutes to the gentleman from California [Mr. RAKER].

Mr. RAKER. They had great orchards of almonds, peaches, and apricots. They had great fields of other work. In those days of 1883 and 1884 the American boy and the American high school and college girl assisted in doing this work. There were not any Chinese in the fields; there were not any Japanese in the fields. We go back 25 years and we find these boys and girls driven from their places of employ. You know and I know that high-strung American girls would rather go hungry than work in the same field with a Chinaman or a Jap. The same way with the American boy.

Mr. DICKSTEIN. Will the gentleman yield?

Mr. RAKER. I will.

Mr. DICKSTEIN. Will the gentleman kindly make it clear to the House that the minority is with the majority on this proposition?

Mr. RAKER. I did, and I state this in fairness to all: This matter came up before the committee, and the committee unanimously voted for these provisions in this bill. [Applause.] So we have the united strength of the entire committee on that part of this bill. I took this time for this reason.

There has been considerable agitation and there has been some literature circulated in regard to this provision that we were violating treaties, and now everybody yields and concedes that we do not violate any treaty. The next question is as to the gentlemen's agreement, which is not written, unknown, unseen, unworkable; and above and beyond all of that my contention is in reading our Constitution, reading the decisions of our Supreme Court, the treaty-making power itself could not enter into a treaty and give a foreign country the control of who should come to the United States. [Applause.] If Congress itself, if every vote cast upon it in the House and Senate, and the President should sign it, should pass a law yielding to a foreign country, as this gentlemen's agreement does, to say that Japan should say who should come to our country, it is against our Constitution, it is against our very sovereignty, and can not be done. [Applause.] Now the only point that we desire is that this matter might be fully and fairly presented to the House, so that we might put in positive law that the gentlemen's agreement is not in operation any longer, and that the statutes of Congress may control, and that our officials may determine who shall come to the United States. The immigration officers hold up their hands when you ask them, "Why do you not exclude these persons?" They have not a word to say. When a Japanese comes to our shores and presents a passport and he is admissible we can not exclude him unless he is diseased. Now, the dignity and honor and stability of our country demand that all the other nations of the earth abide by and with our sovereignty as a Nation. And we must say that one nation we have been good and kind to, and we have a high regard for their people and their civilization, but we want them to stay where they are. They said there would be war when we kept these grown men from sitting side by side with our little girls in school; they said war and the breaking of friendly relations would come when we passed the alien land laws; when we said our territories could not be used by an alien race of whom we could not make citizens—but the legislature took its usual,

even course and the cases went into the courts, and from the lower courts to the Supreme Court of the United States, and the best brains and ability the Japanese could muster and bring together there argued and reargued, and the Supreme Court without a dissenting voice held in five cases, one from the State of Washington and four from the State of California, first, that they had the right to pass the law and it was not against any treaty.

Second, that they could not even lease, they could not belong to a corporation of which the majority of stock was held by aliens; and, next, they could not even have a copying contract, because it affected the soil, and they have been moving along in an even way; and, as the distinguished President said, if Japan ever increased her population we can and will pass an exclusion law, and then the gentlemen's agreement is wiped out. Now, I will just ask men to look at the map of Hawaii and then look at the map of continental United States.

Mr. BOX. I have here the words of the President.

Mr. RAKER. Will the gentleman read them?

Mr. BOX. I will read just that section:

> I secured an arrangement with Japan under which the Japanese themselves prevented any immigration to our country of their laboring people, it being distinctly understood that if there was such immigration the United States would at once pass an exclusion law.

Mr. RAKER. Yes. That is the part of the "gentlemen's agreement" that was never put into the report of 1908. That is the part of the "gentlemen's agreement" that everybody left out. That is the part of the "gentlemen's agreement" that we ask to be enforced. It was dictated by the great President Roosevelt, and nobody will complain, nobody will object to our asserting our sovereign rights in such matters as this.

There is just one other thought that I wish to leave with the attention of the committee, and that is that we have been patient, we have done everything that has been within the human power of man to prevent any infractions of the law, believing in our Government, and believing that we would get legislation. We have secured it all except this, and there was sent here the other day by an organization from Los Angeles the statement that the American Legion refused to permit Japanese to build a church in Hollywood. Those are great boys.

Mr. McLAUGHLIN of Michigan. Mr. Chairman, will the gentleman yield?

Mr. RAKER. Yes.

Mr. McLAUGHLIN of Michigan. It is my recollection that when the legislature of the State of California was considering the passage of a land law relating to Japanese matters President Roosevelt asked the legislature not to pass that law, and later when one or both of these matters was up in California President Wilson sent Mr. Bryan, the Secretary of State, to California to intercede with the legislature not to pass it.

Mr. RAKER. Yes. I will refer to that. When President Roosevelt was in office we had a long telegram from him to this effect:

> Be patient, gentlemen. We will have it adjusted, so that there will be no more need of legislation.

That was the "gentlemen's agreement." Then you had Governor Johnson's administration in California, and this legislation was pending; and President Wilson, thinking that this thing could be disposed of and adjusted, proposed to send Secretary Bryan out to California. Before Secretary Bryan left, the Committee on Immigration had Secretary Bryan before it, on two several days, most of the forenoons, and he said it would be adjusted.

And without any egotism—far be it from me—when we heard that Mr. Bryan was to leave Washington, I went to see the President a number of times, and I begged him to recall Mr. Bryan and not send him to California, because, as I said, "Just as sure as he goes, the legislature will pass that bill, irrespective of anything relating to the treaty." It was all right so far as the treaty was concerned. I think that answers it.

Mr. MILLER of Washington. Mr. Chairman, will the gentleman yield?

Mr. RAKER. Yes.

Mr. MILLER of Washington. In order to satisfy some Members here, will the gentleman explain whether there is anything in this bill prohibiting immigration of Japanese to the Hawaiian Islands and the Philippines?

Mr. RAKER. It cuts them off from the Hawaiian Islands.

Mr. MILLER of Washington. And from the Philippines?

Mr. RAKER. Yes; and from the Philippines. We except a certain class—Government officials, and so forth.

Case 3:20-mj-20121-KSC   Document 32-1   Filed 08/07/20   PageID.329   Page 108 of 218

Now, one word in conclusion. The Supreme Court has said that the treaty of 1911 was a treaty of navigation and trade, and therefore we provide in this legislation that those who come to this country for the purpose of engaging in foreign trade are permitted to enter. So we will have no question about the treaty. We will admit those who come here to engage in trade, in interstate and foreign commerce; but we limit it, and the question will be settled, once and for all, to the satisfaction not only of the West but of the entire United States.

Mr. MADDEN. Mr. Chairman, will the gentleman yield?

Mr. RAKER. Yes.

Mr. MADDEN. If their children are born here, of course they will become Americans?

Mr. RAKER. I will answer that by saying they become Americans by virtue of the Constitution, but God knows they will never become Americans at heart, no matter how long they stay here.

Mr. MADDEN. I mean literally.

Mr. RAKER. Yes; literally, I say. I want to thank the House for its courtesy. [Applause.]

Mr. SABATH. Mr. Chairman, I desire to take five minutes for the purpose of making clear to the House that the minority of the committee, realizing that the four members of the committee who have sponsored this provision are from that part of our country confronted with the Japanese situation, and were better informed as to the conditions than we, we of the minority have agreed to their views. Therefore there is no question as to the Japanese and Chinese proposition to-day.

I also wish to say, in connection with a statement that has been made here as to foreign powers, that we of the minority also resent interference on the part of any foreign nation or any foreign people. Unfortunately some of the Members are sometimes under the impression that because people who are born here have foreign names, that they are foreigners. That is not true. These people, though of foreign parentage, and those naturalized here, under the Constitution, the same rights and the same privileges, I believe, as American citizens whose parents might have been born of so-called Nordic parents.

Now, as to the picture brides I wish to state that my colleague [Mr. RAKER] and the rest of the Members worked hard, and I have cooperated with them, to eliminate that practice, and am mighty glad that it has been eliminated. [Applause.]

Mr. CHAIRMAN, I yield five minutes to the gentleman from Rhode Island [Mr. ALDRICH]. [Applause.]

The CHAIRMAN. The gentleman from Rhode Island is recognized for five minutes.

Mr. ALDRICH. Mr. Chairman and gentlemen of the committee, in speaking against this bill I desire to make it clear that my opposition is not to the administrative features of the bill, but to that provision which limits the number of quota immigrants who can enter this country in any one year to 100 and 2 per cent of the number of foreign-born individuals of a particular nationality residing in the United States as determined by the census of 1890, instead of using the census of 1910 as the quota basis. The administrative features are, for the most part, a great improvement over those contained in the present law, and that part of the bill which grants exemption in favor of parents, husbands, and wives, and children is especially commendable from a humanitarian standpoint. I recognize the importance of some restriction upon immigration, at least until the present disturbed economic conditions of the world have quieted down and until this country has had an opportunity to more completely assimilate those people who have already taken up their residence among us. But I believe that this should be done according to American principles and without discrimination against the nationals of any country or group of countries.

The principal argument of the committee in its report in favor of numerical restriction of immigration is that we should prevent foreigners from coming into our country faster than we are able to assimilate and Americanize them, and at the same time they present a bill which will have the effect of slowing up the Americanization of those nationals of foreign countries who are already among us. It is my opinion that this bill, in so far as it discriminates against the nationals of the countries of southern Europe by taking the census of 1890 as a basis for the quotas to be admitted, fails completely in its avowed purpose of Americanizing our foreign-born population. We tell the immigrant when he arrives upon our shores that you have now arrived in a land of liberty and equal opportunity, where all people are treated alike and without discrimination. He is asked to live under a Constitution based upon these principles. He is taught the evils of class legislation, and he

is rightly looked down upon if he does not enter into the spirit of our institutions.

We expect him to become a thoroughly American citizen, and now by the provisions of section 10 of this bill we are attempting to put into the law a provision which says to a very large group of those people, who are already naturalized or about to become so, that we do not consider you particularly good citizens and are, therefore, materially reducing the number of your kind that may come into this country hereafter.

It must be apparent to every fair-minded Member of this House that this is the worst kind of discrimination against a large class of individuals and absolutely opposed to our American ideas of equality and justice. Is it not also apparent that a law of this kind will not have the effect of Americanizing our foreign born more rapidly but, on the contrary, will have the opposite effect and cause them to doubt our sincerity, to lose faith in the fairness of our Government, and to lose their desire to become loyal American citizens? In discussing the reasons for limiting admission of quota immigrants to 2 per cent of our foreign-born population based on the census figures of 1890, instead of 3 per cent based on the census of 1910, the committee said in its original report:

An impelling reason for the change is that it is desired to slow down the stream of the types of immigrants which are not easily assimilated. Naturalization does not necessarily mean assimilation. The naturalization process can not work well with the continued arrival in large numbers of the so-called new immigration. The new type crowds in the larger cities. It is exploited. It gains but a slight knowledge of America and American institutions. It has grown to be a great undigested mass of alien thought, alien sympathy, and alien purpose. It is a menace to the social, political, and economic life of the country. It creates alarm and apprehension. It breeds racial hatreds, which should not exist in the United States and which need not exist when the balance shall have been restored.

Does not this statement show that the committee has taken upon itself to decide that the nationals of certain European countries are undesirable citizens, and has it not practically insulted all the people from those countries living in the United States, whether they are American citizens or not? It is true that they disclaim this intention in rather apologetic and unconvincing language on page 17, where they say:

Our citizens do not speak of any type of peoples as actually undesirable. Nonassimilable or slow of assimilation is meant. The undesirables are the criminals, the insane, the paupers, and the other classes excluded by section 3 of the act of 1917.

In the later majority report they modify their language somewhat, but the fact remains they have made very serious accusations against the nationals of these countries; and this is hardly the way to encourage the Americanization of these nationals. Discrimination against those already here does much more to "breed racial hatred" than anything else. If we desire assimilation, we must treat all alike.

There is another reason advanced for limiting immigration numerically, and that is to protect our own workingmen from abnormal competition from foreign countries; for example, when there is a general industrial depression in foreign countries, such as exists in some European countries to-day, there are likely to come into our country unusually large numbers of foreign laborers, a great many of them coming for a short time only, who come here for the purpose of making a living in competition with our own people, with the result that the standard of living of our own workers, who have built up this country, is temporarily, if not permanently, impaired by this abnormal competition. The committee has not discussed this phase of the question, and I simply call attention to it, as I believe it is the reason why a large number of national organizations have filed petitions with the committee registering their approval of this bill. I believe their reasoning is sound, but they are not interested in the question whether we adopt the census of 1890 or the census of 1910 as the basis of figuring the quotas, but favor some limitation on immigration and indorse the Johnson bill, as it is the only immigration bill before the House.

Now, let us see who the people are that are discriminated against by this bill. I happen to come from a State which has next to the largest foreign-born population of any State in the Union. Twenty-eight and seven-tenths per cent of our total population is foreign born and probably about one-half of the population is foreign born or born of foreign parents. As a result I have had an opportunity to observe intimately the Americanization of the foreign-born population and what they have done in the way of becoming assimilated and how they have adapted themselves to our industrial, social, and political life. One of the countries which would be most severely dis-

Case 3:20-mj-20121-KSC   Document 32-1   Filed 08/07/20   PageID.330   Page 109 of 218

criminated against by going back to the census of 1890 for our quota basis is Italy. Under the present law 42,057 Italians are admissible each year. Under the proposed law this number would be cut to 4,089. What is true of the Italians, I think, is also true to a very great extent of the nationals of the other countries of southern Europe; but let us take the Italians as an example, and I shall speak of them as Italians for the sake of brevity, although a large part of them are Americans of Italian descent.

Industrially the Italians of our State have been extremely successful, and this is noteworthy when we consider the fact that a large number of them were unskilled laborers when they first arrived in this country. They are thrifty and a great many of them have acquired their own homes. Some have farms, and even those who have not are extremely skillful in raising agricultural products upon the lands which they possess or on small gardens around their houses. They do not confine their efforts to any one line of industry. They work on our farms, in our mills, and in our stores. We have successful Italian farmers, bankers, lawyers, doctors, and business men, and many of them rank at the top of their respective businesses or professions, having worked their way up from humble beginnings. For instance, one of the justices of our superior court was born in Italy, having come to Rhode Island in his youth, and because of its remarkable ability was chosen for the position he now holds.

Those Italians who have lived among us for a number of years have proved by their interest and activities in civic affairs that they are rapidly becoming completely Americanized and have adopted our social customs. They take an interest in the development of our institutions and charities. Whenever there is an effort made to raise funds for building hospitals or supporting charitable institutions the Italians always do their part, and do it cheerfully and energetically.

In regard to the political tendencies of the Americans of Italian descent and also the nationals of the other southern European nations there is a popular impression that they are inclined to be radical, but an examination of the citizens in Rhode Island, where we have as large a percentage of these people as any State in the Union, shows this to be untrue. For example, at the last election for governor in Rhode Island there were less than 1,000 votes cast for the socialist candidate. The New England States are traditionally conservative, and the large increase of foreign population during recent years has done nothing toward destroying this traditional conservatism. The Italians are becoming naturalized rapidly and are taking a deep and active interest in our political affairs. In the city of Providence one member of the board of aldermen and several members of the common council are of Italian descent. Several members of our State legislature and an assistant attorney general are also of Italian extraction. In examining the votes of these members of the various political bodies there is nothing to indicate that they are radical, and there is nothing to indicate that they are influenced by any racial considerations, but vote according to what they consider is for the best interest of the country and of the State of Rhode Island.

If we compare the radicalism existing in Rhode Island, where 28 per cent of our population is foreign born and largely from those countries against which this bill would discriminate, with some of the Western States, where the foreign-born population is made up largely of Nordic races, I think that we will find that there is much less radicalism in Rhode Island than there is in these Western States.

The record of American soldiers of Italian parentage during the war has already been called to our attention on the floor of this House, and I simply wish to add that what has been said of them is borne out by the opinion of a friend of mine who, as a colonel during the World War, commanded a regiment which contained a large number of these soldiers from Rhode Island, and he speaks of them as extremely brave and efficient.

Furthermore, let us not forget what men like Dante, Michael Angelo, Leonardo Da Vinci, Verdi, Galileo, Marconi, and innumerable other illustrious Italians have contributed to literature, art, music, and science. Should we hesitate to welcome the descendants of these men to our citizenship? Are they not likely to contribute something of value to our country and our civilization?

If we adopt the census of 1890 as the basis for the quotas to be admitted under our immigration law, we will greatly discriminate against the nationals of Italy and the other countries of southern Europe. If we amend this bill and retain the census of 1910 as our quota basis, we avoid this discrimination and we will have an opportunity to enact an immigration

law which will be fair and just to the nationals of all countries and which will not offend any of our citizens. Whether our ancestors were born in northern or southern Europe or elsewhere we have all done our share in building up this great country of ours, and we are entitled to equal consideration in the framing of its laws, and I trust that the Members will keep this fact in mind in voting on the bill now before the House. [Applause.]

Mr. SABATH. Mr. Chairman, I yield 15 minutes to my colleague from Illinois [Mr. KUNZ].

The CHAIRMAN. The gentleman from Illinois is recognized for 15 minutes.

Mr. KUNZ. Mr. Chairman and gentlemen of the committee, let us be as generous in peace as we have been brave in battle.

There seems to be a great deal of alarm among the Members of Congress and more so than there is amongst the people of this country. There seems to be a great deal of national hatred among some of the Members of Congress, and I regret it very much. In the last year or two, since I have been a Member of Congress, I have observed it. I remember a year or two ago that I attended the Army and Navy game. I rose in my seat, with some of my friends from Chicago, and a Congressman from the State of Tennessee was asked who I was, and he stated I was a Polish Jew.

Now, gentlemen, if I were a Polish Jew I would be proud of it, because I believe the same sun that shines upon me shines upon that gentleman; that the very sun which enlightened him enlightened me, and there is no difference between him and me; that the same Lord and Creator created him who created me, and I believe when the day of judgment comes he will be judged as I will be judged, whether he belongs to one creed or another, whether he worships in one church and I in another. It will not be a question as to the church in which he worships, but the question will be, What have you done for humanity and what kind of a man have you been during your time of life? [Applause.]

I was very much impressed when I heard the gentleman from Tennessee [Mr. McREYNOLDS] mention Gen. Andrew Jackson, a name so eminently known in history, one who led an army of men through the hills and valleys of Tennessee and through the swamps and lowlands of Louisiana during the War of 1812.

I put me back to my days of youth, when history recited that in 1776 not only did the Anglo-Saxons fight for the liberty of this country—who were here and had to defend their rights—but history tells us that in 1778 Kosciusko, Pulaski with a Polish army, Lafayette [applause], Rochambeau, and others came to this country, not to defend themselves or their rights but to defend the honor of liberty, to defend a home for those who were persecuted and those who desired to live under the banner of freedom and liberty. General Pulaski fell in battle at Savannah, Ga.

I read in the Appendix only yesterday where my worthy colleague of West Virginia [Mr. ALLEN] stated that in some Jersey town some foreign paper had published the fact that a Polish judge was elected.

That must be a crime. I do not know whether it is a felony or whether it is a crime against the Constitution of this country. I remember when in the city of Chicago, which is known to be a cosmopolitan city, Frederick A. Busse was elected mayor of Chicago on the Republican ticket by an overwhelming majority, and I remember reading in the German papers where they took pride in the fact that Fred Busse was a German and the heading was "Busse, one of our Germans, elected mayor of Chicago." There was no crime in that. When President Harding appointed Mr. Davis as Secretary of Labor, I have heard it said by a great many Welshmen who took pride in the fact, that Mr. Davis, one of the Welshmen in this country, was appointed in the President's Cabinet, and there was no crime in that. In every locality, in a great country like ours, the melting pot of the world, where the people of every nation come to better themselves, we find instances of that kind. Why, gentlemen, it ought to be a lesson to us. When we go back to Germany we find that after the partition of Poland, Prince Bismarck tried to Germanize Germany. Those Poles who were partitioned and cast into Germany were prevented from using their language. Their schools were closed and they were forced to use the German language. They, being God-fearing and law-abiding, abided by the law; but when opportunity was offered them they took arms with the Allies against their persecutors.

Mr. VAILE. Will the gentleman yield?

Mr. KUNZ. Yes, sir.

Mr. VAILE. As the gentleman has remarked on the floor here, this is a very important subject, and while I do not care to raise the point of no quorum, as the gentleman did the other

day, I am sorry the gentleman has not a quorum present to hear his remarks.

Mr. KUNZ. Well, I wish there was a quorum present. If the gentleman raises the point, I will be glad of it. Does the gentleman raise the point?

Mr. VAILE. No; I am a little more considerate than the gentleman was to me the other day when I was speaking.

Mr. KUNZ. I feel, Mr. Chairman, it is the duty of every Member of Congress, on a question so vitally important to the people of this country, to be here in order to be thoroughly advised without prejudice as to the conditions about which we all can learn.

I want to state to the gentlemen that in 1922 I visited Europe. Congressman Rainey, who is now dead, and myself spent 10 weeks in Europe studying the conditions of emigration, and I am better versed than a great many men who are on the floor of this House and have taken up this bill for consideration. [Applause.] The fact is I visited those countries and I did not need an interpreter to find out conditions, and I would like to tell you what happened there and the conditions as they are, but I have not the time. If I could have sufficient time it would be a great pleasure for me to tell you the conditions as they were.

Mr. CABLE. Will the gentleman yield?

Mr. KUNZ. Yes, sir.

Mr. CABLE. Could the gentleman give us any idea how many would come to this country if we did not have a quota law?

Mr. KUNZ. If the gentleman will give me the time I will be only too glad to describe the conditions as they were at that time.

Mr. CABLE. I have not control of the time.

Mr. KUNZ. If I had the time I would be only too glad to do it.

There has been a great deal of alarm among the Members of Congress in talking about bolshevism, about nihilism and a great many other disturbances in this country, and it is all placed in front of the foreigner. I am not here protecting the foreigner. I am an American, just as good an American as there is upon the floor of this House and just as good an American as there is in this country, and I can prove my Americanism way back yonder while some of the other gentlemen probably can not.

When you talk about communism and nihilism, you say it is the foreigner that breeds it. Why, gentlemen, let me call your attention to some facts. You remember the I. W. W., do you not? You remember Mr. Debs and you remember Mr. Foster.

You remember that whole aggregation. Were they of southern Europe or were they Anglo-Saxons? Then why point your finger to one nation as against the other? Why say to one, You shall enter the gates of heaven, and you shall enter the gates of hell? He who created you and me will pass judgment as to inferiority and as to qualifications without our passing judgment upon people of that kind. [Applause.]

In August, 1922, I was in Berlin. I was there while the chairman of the Committee on Appropriations was in London, England. I was in Munich and talked to the minister of Germany. I was in Berlin and met every German official in that country. I was in Helsingfors, Finland. I was in Warsaw, Poland. I was in the office of the consul of America there when I saw 1,500 refugees from Russia waiting to have their passports viséed to come to America. In every country that I visited there were people who were waiting anxiously to come to this country; and while I was in Munich talking to the minister of Germany, Von Karl, with Congressman Rainey, who is now dead, Mr. von Karl said to Mr. Rainey and myself, "You gentlemen are both from America. Let me tell you that we have not been treated fairly or honestly by America. After the war and before the election emissaries were sent to the German people with the promise of helping out Germany, but after the election Mr. Harding washed his hands and said he wanted nothing to do with the entanglements of Europe; but," he said, "remember that three-fifths of the population of America is German, and we will send a propaganda to America before the next election that will compel the American Congress to give the Germans aid."

At that time I paid very little heed to it; but only a few days ago our American Congress passed a measure, and while I voted for the measure because I believe there is a great deal of suffering there, yet our American Congress appropriated $10,000,000 to help the suffering Germans.

Now, you might say to me, "Well, they need it." I want to say to you in return, without fear of contradiction, that I have not visited a place in Germany where there was not a house of amusement where you did not have to reserve your seat

three days in advance. There was not a public restaurant that was not crowded, and in the hotels when you registered as an American you had to pay 4,500 marks a day for a room where a native European would come in and receive the same accommodations for 1,000 marks. Of course, we were in the hotel where there were a great many people; Germans mixed with all other nations. I want to say that I talked with a great many Germans and they said that if it was not for President Wilson Germany would not be in the position it is, and they were only waiting the time when Germany would come back on its feet and be where it was before the war.

Now, gentlemen, there is no question in my mind but that Germany will be back on its feet. There is no question but that we desire to be friends with Germany, but I want to call the attention of the chairman of the Committee on Labor and Members so deeply interested in this bill to the fact that you are discriminating against other nations. As the gentleman from Colorado [Mr. VAILE] said, the 1920 census would give southern Europe five times more than they have now.

The CHAIRMAN. The time of the gentleman from Illinois has expired.

Mr. SABATH. I yield to the gentleman five minutes more.

Mr. KUNZ. What difference would it make how many times more any nation would get if it was an honest deal? Do you intend to give Germany more? You know that in the last war we fought Germany bitterly and I have the courage to tell you, in spite of the German influence I speak as an American to you and stand up as an American. With what Von Karl told me and Mr. Rainey, that they would send propaganda to this country because three-fifths was German; under your bill you had approximately 50,000, which will strengthen the Germans, and finally you will be run by the German element and not by the Anglo-Saxon and those from southern Europe.

According to your census figures under the 1910 census Germany received 45,000; under the 1900 they received 48,000; and under the 1890, 50,000. It makes no difference to me what figure you give to Germany, whether you give 50,000 or 100,000; if they are justly entitled to 100,000, if it be just according to the census of 1920, I would say give it to them; but you are trying to discriminate in going back to the census of 1890 against other nations, and then you inject into it this assertion that they are inferior.

The American people just emerged from the thick darkness of national distress, and emerged as no other nation could reasonably have expected to from such dangers—triumphant, though bleeding at every pore. The first impulse of a great people on being delivered from imminent perils is that of joy and thanksgiving. Then comes gratitude for those by whose achievements, under the guidance of the Almighty, safety has been attained; then a sad reflection upon the fearful sacrifices by which success has been purchased and a tender recollection of those who have fallen in the strife; and finally the composed mind gathers up the teachings of such a fearful experience—wisdom for the guidance of future years.

On the surrender of Germany and Austria, when the armistice was signed, our people gave themselves up to the wildest rejoicings. For a time the tolls, the trials, the sufferings of five dreadful years were all forgotten. Business places were closed, our people rushed out of doors, impromptu processions filled the streets with all nationalities participating. Music led our exultant emotions as far as musical sounds could conduct them. Bands played, whistles blew, bells rang, and the shoutings of the multitude took up the joyful strains and bore them in tumult to the skies. Our people are fond of excitement and may be aroused to enthusiasm upon slight provocation. But then the grounds for national rejoicing were adequate and philosophical. Such dangers as had threatened our Government had been averted; such dangers as the world had never seen before had been suppressed; such results as had never before been accomplished by war had been achieved. We plunged into the war unprepared, sending millions of our fellow men across the sea. We came forth a Nation of free men no longer recognizing any distinction of nationalities or creed. Our Republic had successfully ended the experiment of its existence and took its place, a full, round, high place—first—among the powers of the earth. We had to thank the Almighty after the storms of war had passed than we had come out of the terrible conflict with the knowledge that we had fought for the right and had upheld the traditions of our fathers. [Applause.]

The brother love of man, the absolute equal rights of all men, the right of all to participate in the privileges and benefits of civil government, as they share its burdens, although to our minds familiar and self-evident truths, have dawned gradually

Case 3:20-mj-20121-KSC   Document 32-1   Filed 08/07/20   PageID.332   Page 111 of 218

upon the earth and made their way slowly into the creeds of men. The Jew denied to everyone not a Jew not only the rights of citizenship in temporalities but all hope of enjoying the blessings of heaven.

The gentile might indeed be adopted into the Jewish commonwealth, but as gentile he was as nothing. When Pericles boasted that in Athens all men enjoyed equal privileges and were preferred for their merits and not for their birth, he spoke in a city of which no inconsiderable portion of its inhabitants were slaves. By all men he meant all Athenians; he did not recognize that any but Athenians were men. Jesus first burst the bonds of national selfishness. He came to establish a kingdom that should know no end; to be united with the destinies of no nation; which should survive all and supersede all, and its foundations were laid broadly accordingly. The Jew, the gentile, the Scythian, the barbarian, the bond, the free, the black, and the white were invited to share equal benefits in His kingdom. He first taught principles broad enough to include without discrimination all nations, races, and colors in a common benefit.

The Declaration of Independence, the corner stone of our nationality, was man's first attempt to introduce the liberal principles of Christian faith into the framework of civil government. It was a declaration, not that all Americans, all Englishmen, all Frenchmen were equal, but that all men were equal, no matter where born, no matter whether educated or ignorant, rich or poor, black or white. It deduced the right to equality before the law, the right to participate in civil government, not from the accident of birth or condition, nor yet from race or color, but from the fact of manhood alone. [Applause.]

Upon this principle, as the one great faith of our people, the ideal we intended to realize, the consummation to the accomplishment of which we pledged ourselves, our fathers appealed to the God of battles and succeeded. A more solemn covenant was never entered into between a nation and the God of nations. Upon that principle we stood through years of bloody wars against some of the most powerful nations of the world. Without an army, without a navy, without an exchequer we stood and withstood all the power of England, because the truth will always stand and right triumph over wrong while God sits on the throne of the universe.

Thousands of brave young men, without discrimination, left our shores to suppress war, with the Declaration of Independence in their minds—embodying liberty, freedom, and equality to all men—steep in bloody graves across the seas, with tombstones above their graves, bearing foreign unpronounceable names, yet live in our tender and grateful memories. Their example should appeal to our manhood and our conscience.

They helped to carry our Government through a crisis in its existence; they strove to establish it firmly upon immutable truth and to give it the noblest opportunity a nation ever had to benefit mankind. It now devolves upon us who survive to determine whether their lives were laid down in vain and in no way, I conceive, can we so truly honor them as in studying well and performing faithfully the duty they have helped to cast upon us. If we prove equal to our opportunity; if we stand for justice and for equality among men; if we keep the lamp of liberty trimmed and burning and allow its light to shine from our altitude throughout the world, we honor them; they have not died in vain. Therefore, it seems to be appropriate to inquire into our duties to the best of our ability and gird ourselves for their performance. They died for others, not for themselves. Therefore let us so live as to exert the influence of the exalted position that has been conferred upon us for the welfare of mankind and not for the attainment of selfish ends.

The policy of our Government as expressed by the act which was passed in Congress in 1917 for a distinctive selective immigration measure has been to welcome to our shores all foreigners who are desirable, namely, those who are mentally, physically, and morally fit and friendly to our form of government. We are all the extract of the foreigner and the only question is, when did our forefathers touch the shores of this land of promise and freedom? Those people born here of foreign parentage and those born in foreign countries comprise one-third of the entire population of this great Nation, and 20 per cent of the recent immigration constitutes the young men and women of to-day's laboring classes so necessary to our industrial prosperity. We are in need of both skilled and common laborers, also domestic help, but this bill tends to keep out that class of immigrants best suited for such occupations. Under the provisions of the bill now under consideration it would not bring into this country a better class or a more assimilable body of immigrants than have come under the present law. This bill goes further than the present law in fixing an arbitrary number of immigrants than can be admitted. It is the purpose of this bill to embody our permanent policy of immigration and bind us to a program which will be inflexible, unscientific, and unjust; and furthermore, it is an attempt to treat a human problem upon a cold mathematical formula, since it is based on quantity rather than quality.

The present bill is particularly objectionable because it discriminates against certain nationalities already going to make up a great portion of our population and fans the flames of racial, religious, and national hatreds and brands forever those already here as an inferior stock. It discriminates against Poland, the home of culture and art and literature, from whence came Copernicus, the astronomer; two of our Revolutionary heroes, Thaddeus Kosciusko, who history tells us planned the defense of West Point and whose statue stands on the West Point parade grounds; and Kasimir Pulaski, who died on the battle field at Savannah, Ga., fighting for the freedom of these United States of America. Both of these heroes of Polish birth have been honored with statues and monuments in the Capital of our Nation and in several of the States. America has a strong artistic bond with Poland in the memory of Helena Modjeska, the tragedienne; in the memory of Chopin, the composer; Adam Mickiewcis, the poet. This bill discriminates against the Poles, who have volunteered their services in the late World War, and who, when opportunity was offered by our Congress have taken the oath of allegiance to fight for the Stars and Stripes and the freedom of the world against their land of birth. It discriminates against Italy, from whence came the discoverer of this great continent and to whom the world owes a great debt. It discriminates against France from whence came the immortal Lafayette and Rochambeau, both defenders in our great cause for freedom and liberty. Have we so soon forgotten the World War when the soldier was a hero, when the youth of those same nationalities residing in the United States joined hands with their relatives across the seas and brought victory to us and our allies in that great conflict? Shall we exclude these compatriots in arms, now claiming them to be inferior, by a mere mathematical formula? Is it fair? Is it American? Is it within the meaning of the Declaration of Independence of this great Nation? Statistics show that over 400,000 foreigners—that is, of immediate foreign extraction and foreign born—enlisted in the military forces of this country and when Congress passed the special act granting the privilege to become citizens to aliens having served in the allied forces, living in the United States one year, approximately 300,000 took advantage of this privilege. At that time no cry was raised against the foreigner, many of whom were of Polish ancestry, born in Germany, Austria, and Russia, and who took up arms against their land of birth to fight for the principles and ideals of their adopted country. Statistics also show that in the large cities, thickly populated by the foreign element, the sale of Liberty bonds far overreached the quota.

That in itself shows the loyalty of the alien to his adopted country. However, there seems to be a determined effort to be as unfair as possible. In addition to reducing the percentage from 3 per cent, this bill takes as a basis census figures 34 years old, before the resurrection of Poland and the birth of Czechoslovakia, Yugoslavia, Latvia, and so forth, instead of taking the census of 1920 now available, or even the census of 1910, the basis of the present law. There is no provision in our Constitution as to seniority by birth or naturalization; once you become a citizen your rights are equal. Then why should we give preference to those of the 1890 census as against those who are here and have the same rights and privileges legislating this present date. This basis was deliberately selected to favor the so-called Nordic races and to discriminate against the races of southern and eastern Europe, which discrimination is a perilous doctrine for democratic America, founded upon the Declaration of Independence that all men are created equal. I believe that there have come from the Nordic race, noble as it is, those whom they would not recognize as their children; and so with other countries celebrated for the noble characteristics of their race as a whole.

Our country is still large enough geographically, politically, and socially to receive those immigrants knocking at our doors, whether of brain or brawn, who answer our moral, mental, and physical requirements, and who can contribute to our art, our science, our literature, our commerce, and our industry. We have acres enough, industries enough, mechanical and natural resources enough, and sources of credit enough to make out of

this Nation the greatest nation on earth under our Constitution which gives us freedom and under our self-government, under which it has its rise and growth.

I realize the force of what has been said here by several gentlemen who are supporting the bill, that the first and the main obligation of an American, especially a Member of Congress, is to look out for the welfare of the American people. If the admission of immigrants to this country, however it might ease conditions in Europe, would in the slightest degree imperil not merely the safety of our institutions but the prospects of employment for our own laborers, or of the prosperity of the American people as a whole, I would advocate not only lessening immigration but prohibiting it. But because I believe the immigrant who cultivates our soil contributes to the welfare of the country as much, if not more, than he derives from it, I am opposed to discriminately restricting a force of benefit so important to our country.

Our most developed industrial States are those which have had the largest immigration. Our most backward States, industrially, are those which have had no immigration to speak of. The extraordinary and unprecedented growth of the United States is undoubtedly due to the effect of immigration. The States of the South pride themselves on keeping the foreigner from their territory, and yet it is a fact that their industrial progress has been slow. A new feature now confronts those States. The negro, to the number of 500,000, has migrated to the North to fill the places in factories, street jobs, and domestic places that have formerly been filled by the immigrant. This migration of the negro can only mean a decrease in the population of the South, which will have the effect of reducing the representation of the South in Congress.

The proponents of this bill repeat the exploded theory that there have been two periods of immigration—the good period before 1890 and the bad period since that time. The strange feature in our history is that the greatest progress we have made in industry, in science, and even in the last war, where no question was raised as to nationality, and everyone fought, whether he happened to be a foreigner or an American, for the preservation of our institutions and the freedom of the entire world, has occurred since 1890. Immigration yields the incalculable advantage of affording means by which the skilled labor of the country can be employed. It is true in some respects that the foreign laborer does displace the American laborer, but he displaces him by lifting him on his shoulders up to a higher plane of employment, where his wages are higher, his hours of labor shorter, and his conditions immeasurably improved.

The claim that there has been a great influx of foreigners to come into this country since the war by the proponents of this bill is somewhat in error. For instance, take the year 1923. The total immigration for that year was 522,919—215,397 female immigrants and 302,522 male immigrants, of which 40,241 were under 16 years of age. During the year of 1923 statistics show that 81,450 aliens left the United States and returned to their native countries. During that year 137,011 Canadians and 63,768 Mexicans crossed our borders and were classed as nonquota immigrants. I for one, Mr. Chairman, believe that if we are to have a restrictive measure it should also apply to these bordering countries. These people do not come into this country to become citizens, but only to accumulate wealth and return to enjoy the fruits of their labor in their native country.

For the welfare of the American laborers, for the prosperity of our country, for the safety of our Government, for the welfare of humanity, and for the progress and peace of the world, I believe this bill should be amended, striking out the discriminating feature and the 1890 census. The pending question before the American people is to keep the undesirables out of this country. Even under the discriminating limitations of this bill, as of the 1890 census, it will permit the entry of a great many friends and relatives of those against whom charges have been brought as being disloyal to this country. We will find in most cases where a man is opposed to the institutions of our country that he does not willingly take the oath of allegiance and is free to do as he pleases. It is he who breeds nihilism and bolshevism, being imbued with that idea before he arrives on account of the conditions in the country from whence he came where every effort was made to throttle his spirit of manhood, birth, and ancestry. My remedy would be that instead of permitting a certain percentage of any census of foreign born that we amend the bill to read "quota of foreign-born naturalized citizens," which would decrease the number under the present quota and permit bringing into this country relatives of citizens only who have been loyal to our

Nation. We have in the United States a large number of foreign-born aliens who have willfully neglected their duty in becoming citizens and who to-day, on account of the progress they have made, are anxious to bring their relatives to this country so that they may benefit by the prosperity of our country. But if this law was limited to citizenship alone we would keep away those who come here for profit and to carry away our money.

We stand upon the broad platform of the Declaration of Independence that—

All men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness.

We say that these rights are not given by laws, they are not given by the Constitution, but they are the gift of God, given to every man born in the world. Oh, sir, how glorious is this great principle compared with the inhuman—I might say the heathenish—appeal to the prejudice of race against race; the endeavor further to excite the strong against the weak; the endeavor further to deprive the weak of their rights of protection against the strong. God never made a man for the sake of making him nor that he might amass wealth and corrupt himself with its enjoyment.

Every man is sent into this world with certain qualities to be cultivated and developed; charged with duties to be performed and clothed with responsibilities commensurate with his power; sent into the world that some other may be better for his having lived and then say, do you believe God had no part, no design in all those wonderful events? He saw the end from the beginning, and the beginning would not have been if the end had not been intended. It is true that the love of liberty and freedom in their hearts, the critical condition of their countries, their fleeing to these shores, their founding of a free commonwealth, their growth in education and power as a people are all natural events.

The result of my observations thus made is that there is nothing to be more dreaded in this country than tends arising from exaggerated feelings of religion and nationality. On the other hand, the one thing needed for making our country the happiest of nations is to rub down all sharp angles and to remove those asperities which divide our people on questions of origin and religious profession. The man who says this can not be done consistently with any set of principles founded on the charity of the gospel or on the right use of human reason is a "know-nothing," as every bigot is; while under the influence of his bigotry he sees no further than his nose. For a man who has grown to years of discretion, though some never do come to those years—who has not become wedded to one idea, who like some are ready to regulate their conduct as to set their watch when the church clock declares it wrong; who is ready to be taught by high as well as by low and to receive any stamp of truth—I may say that such a man may come to this conclusion: That there are in all origins, races, and religions men good, bad, and indifferent; yet for my part my experience has been that in all classes the good predominate. [Applause.]

Mr. WHITE of Kansas. Mr. Chairman, I have strongly favored the admission of a nonquota class of aliens, as defined in section 4 of this bill. For it should appeal to the fair-minded man that the man who has come here with the fixed purpose to establish a home and become a citizen, who has lived up to that purpose, who has become a citizen, and who, by his industry and frugality, has accomplished that worthy achievement—the establishment of a home—is entitled to and should be permitted to have admitted his wife and minor children to share in the enjoyment of that home. For has he not proven beyond question that he is a highly desirable citizen, and it is highly desirable to him, to his family, and to the public welfare that in all such instances the home circle should be restored and preserved.

For it is well approved that upon the integrity and prosperity of the American home rests the strength, and through it is guaranteed the perpetuity of the social structure. It may further be said with absolute confidence the record of such a man furnishes the very best proof that those for whom he seeks admission will not become a public charge. He is here; we have admitted him; he has made good; and the admission of his immediate family carries with it the very minimum of risk for society and the Government.

I believe the sentiment in favor of limitation of immigration by a strong restrictive measure is almost unanimous. The necessity for such a measure must be apparent to every thoughtful American.

5898 CONGRESSIONAL RECORD—HOUSE APRIL 8

More and more is the welfare of America bound up in the solution of this problem. The statement of Chairman JOHNSON in the RECORD of April 5, calling attention to the vast number of applications—400,000—for passports and visés by persons in Russia, awaiting an opportunity to come to their relatives in the United States, and his further statement that the reports that there are near in Warsaw 70,000 people trying to get to the United States are true, has been questioned, but has not been disproven. And the very fact that many, many refugees are temporarily domiciled in the countries on the western border of Russia, waiting to come here, temporarily domiciled, because those adjacent countries will not receive them as permanent residents, proves that those countries, in their own best interests, are now pursuing a policy more drastic than is proposed in this bill. And in further support of the chairman's statement, I desire to here call the attention of this House to the statement of Mr. Nathan Grosshandler, of Youngstown, Ohio, a native of Hungary and a citizen of the United States for 23 years, a publisher of several newspapers, two of them foreign language—Hungarian and Slavic. His testimony gave evidence throughout of his intense Americanism.

Even the gentleman from Illinois could not, nor has he in the employment of his expressive phraseology portrayed a higher type. The witness said he had traveled in 14 countries in northeastern Europe as a student of economic, financial, and industrial conditions, and had this to say when interrogated on the subject of wages—the prevalence of the desire of the people of those countries to come to America. I quote:

Speaking of the psychology of the masses that prevails in Europe to-day, I might as well say in per honestly, you ask a hundred men if they want to come to America, and 99 out of the 100 responses will be that they want to come to America. Those are the conditions.

It would seem superfluous to pursue further the argument to prove this condition, but I here introduce one more quotation from Mr. Grosshandler's statement:

Mr. CABLE of Ohio (a member of the committee). How many people did you ask that question?
Mr. GROSSHANDLER. I have asked that question by the thousand.
Mr. CABLE. Were you were in Europe?
ANSWER. Yes, sir.
Mr. CABLE. And if we did not have the 3 per cent law, all would migrate here?

Now note the language of the witness:

ANSWER. I believe of course, I will be honest with you, if the doors were open too, you might just as well figure, if the boats could carry them, they would come here by the millions.

And to be perfectly fair with the witness, he afterwards stated it would take a man four years to earn money to pay his passage to America.

A carpenter in Budapest earns 42,000 crowns a day, or 80 cents in American money. In the United States, from $6 to $10, and the proceeds of one day's labor for a mechanic in the United States will purchase from six to ten times as much flour as in Budapest. That is the main reason they are pressing to come to our shores.

ADMINISTRATION OF THE LAW

We have wisely provided by law that this country shall not be the dumping ground of undesirable elements of foreign population from whatsoever source they may seek to enter.

It can not be reasonably expected that foreign governments will have a great care for the interests or rights in this respect. Indeed, reliable statistics prove beyond question that there have been grave and serious abuses in this particular, whether with the connivance of foreign governments I do not pretend to say. But every loyal American admits the imperative need of the strictest enforcement of the provisions of law in relation to this subject.

I have believed and have spoken before to-day for the mitigation of the harsh and distressing features of the law's administration. I have always been in favor of some flexibility in administration as against iron rigidity. Certainly when we come to the quota line in any case where a mother comes within the count we should not exclude her baby, although outside the quota. For this reason I have not severely criticized the temporary admittance, under bond, of some slight excesses of arrivals above the fixed quota. While strong criticisms have been directed against what seemed in the instances I have quoted a lax enforcement of the law, I have felt that the error has been on the side of a recognition of humane sentiments.

I believe the present bill will eliminate any excuse for such procedure in the future. Now, as to whether there is unjust discrimination in the 1890 census as a basis of computation of quotas, the subject has been much discussed. Gentlemen who feel that it discriminates against certain nationalities have insisted that the peoples referred to have rendered great service to America in time of war and have contributed by their industry to her advancement in time of peace. This is true; and I would withhold from them no meed of praise that is justly theirs. And if that is a fair argument in their behalf, and if they who have been here so short a time have done well, and are entitled for that reason to be given a basis of admission most propitious for their former countrymen, is it then an unfair argument that the basic stock of America should be given commensurate consideration in the adjustment of this great problem, who have cherished the memory and the principles of those men who laid the foundation of civil and religious liberty in this country more than 300 years ago, principles which later found expression in our Constitution, a document which represented all the progress in government from the beginning of history until that good day? If it shall be true, is it strange that the millions of our population derived from that basic origin should believe because the principles enunciated in our organic law imbues within their very souls, who think with veneration and contemplate with gratitude the names and public service of the men who promulgated that great document? Is it strange that these millions who have borne the storms and trials of all the centuries should ask at least as much consideration as those who have come at a later date?

It is a question for America to decide, and to decide in the light of her own best interest—not for to-day alone, not for this generation, but for America and posterity. [Applause.]

Mr. SABATH. Mr. Chairman, I now yield to the gentleman from Connecticut [Mr. O'SULLIVAN].

Mr. O'SULLIVAN. Mr. Chairman, of all the changes contemplated by the proposed immigration bill none appeals with greater force than does that which abolishes the brutality of existing law whereby this Government, after an invitation to the immigrant, turns him back to his own country because the quota for his race is exhausted when he reaches our shores. I can conceive few things more cruel than, having permitted these helpless immigrants to travel over the watery wastes, to compel their returning over the same useless journey to their homeland. Such unfortunate instances should not occur as where, during the past year, a steamship arrived at New York with a number of immigrants on board who were threatened with deportation because the vessel had reached its destination a few minutes before the time when a new monthly quota would begin. A certificate granted by the American authorities in the foreign land should be a ticket of admission, and the immigrant should not be permitted to sail on a useless journey to this country unless he is to be admitted, providing, of course, he can pass such tests as are by law provided.

However, the main thought of the bill is its restrictive feature, and the weakness of its restrictive philosophy revolves around that section which takes the census of 1890 as the basis upon which the various quotas are to be computed. This will cause an extraordinary change in the present immigration law, which is based on the census of 1910 for quota computation. The following table of figures will best explain what this proposed change involves:

| | Present quota, 3 per cent, 1910 | 2 per cent, 1890 |
|---|---|---|
| Albania | 169 | 4 |
| Armenia | 230 | 12 |
| Austria | 7,451 | 1,182 |
| Belgium | 1,585 | 510 |
| Bulgaria | 302 | 41 |
| Czechoslovakia | 14,357 | 3,361 |
| Danzig | 301 | |
| Denmark | 5,619 | 2,735 |
| Finland | 3,921 | 472 |
| France | | 74 |
| Germany | 67,607 | 51,222 |
| Greece | 3,294 | 47 |
| Hungary | 5,638 | 976 |
| Iceland | 75 | 47 |
| Italy | 42,057 | 3,912 |
| Luxemburg | 92 | 58 |
| Malta | 150 | 14 |
| Netherlands | 3,607 | 1,657 |
| Norway | 12,202 | 6,466 |
| Poland | 30,977 | 5,105 |
| Eastern Galicia | 3,746 | 302 |
| Rumania | 7,419 | 603 |
| Russia | 24,405 | 2,248 |
| Yugoslavia region | 6,426 | 671 |
| Portugal | 4,394 | 503 |
| Estonian region | 1,348 | 124 |
| Latvian region | 1,540 | 142 |
| Lithuanian region | 2,310 | 344 |

# 1924 CONGRESSIONAL RECORD—HOUSE 5899

As usually happens in movements of national import, those most active in the interest of a measure are those least affected. The State of Connecticut, with a large foreign-born population, is naturally vitally interested in the immigration problem. Yet Connecticut has raised no cry against the Italian, the Hungarian, or the Pole as an inferior type. To be sure, there are some among their number who are not the most desirable, but of what nation or race is not the same thing true? Rascals and scamps may be found in any country, whether it be American, Italy, or Sweden. It is no just criticism of a nation to single out the exceptions and base a critical conclusion thereon.

As one who has rubbed shoulders all his life with the immigrant from almost every land, in a State where the immigrant has settled in large numbers, I feel that I know something of their habits, their lives, and their desirability. Take the Italian. Wherever he has settled, he has been industrious, law-abiding, and ambitious. He buys a little farm to till the soil; he starts a little business; or perhaps he works in the mill. But wherever he is, he adds to our prosperity. He is ambitious for his children and their education, and, thank God, he usually has plenty of them, in fact most unhappily criticized by some of our modernists, as though the bringing of little tots into the world was a sign of inferiority.

He becomes naturalized in a comparatively short time; he tries to become Americanized. His tendencies are not those of a radical. The foreign-born population of Rhode Island, consisting largely of Italians and Slavs, amounts to 42.6 per cent, yet the total Socialist vote in that State at the last election was but 2.6 per cent. Wisconsin, which has a small population of the newer immigration, but a large number of the Nordic stock, polled a Socialist vote of 12.1 per cent. Connecticut, which is second in the number of foreign-born whites with a total of 41.2 per cent, cast but 2.8 per cent for the Socialist Party. Practically all the great leaders of radicalism in this country come from the old-time stock, while few, if any, are the product of the newer immigration.

But the crowning insult to the peoples of southern Europe arrives when we exclude them at the front door and permit to enter at the back door hoards of Mexicans. Last year 63,768 Mexicans came into the States, and a million more could have done likewise, had they so desired, for there is no quota law, or restriction of any sort for our southern neighbors. I do not know what standard is used to measure desirability, but I do know that the average Italian is as much superior to the average Mexican as a full-blooded Airedale is to a mongrel. Yet this bill will permit every Mexican in Mexico to enter the United States, and the same bill limits the number of Italians to 3,912 immigrants.

The impression is prevalent among some of the Members of this Congress that the Johnson bill develops a sharp issue between the sons of Italy and the sons of the American Revolution. A statement of that sort always suggests to my mind a cheap vaudeville team which drags into its closing number the American flag to pull the act out of mediocrity. However, there are some associations which appear to have taken a position against this bill whose names indicate a background of good American stock. Such a list includes, among others, the following organizations:

Federated Industries of Washington.
West Virginia Manufacturers' Association.
Wisconsin Manufacturers' Association.
American Cotton Manufacturers' Association.
American Electric Railway Association.
American Hardware Manufacturers' Association.
American Malleable Castings Association.
American Paper and Pulp Association.
American Pig Iron Association.
Electrical Manufacturers' Council.
Institute of Makers of Explosives.
Manufacturing Chemists' Association of the United States.
National Association of Cotton Manufacturers.
National Association of Farm Equipment Manufacturers.
National Association of Finishers of Cotton Fabrics.
National Association of Manufacturers of the United States of America.
National Association of Sheet and Tin Plate Manufacturers (Inc.).
National Association of Wool Manufacturers.
National Automobile Chamber of Commerce.
National Boot and Shoe Manufacturers' Association of the United States (Inc.).
National Electric Light Association.
National Erectors' Association.
National Founders' Association.

National Industrial Council.
National Lumber Manufacturers' Association.
National Metal Trades Association.
Railway Car Manufacturers' Association.
Rubber Association of America (Inc.).
Silk Association of America.
Tobacco Merchants' Association of the United States.
United States Rubber Co.
Labor Department, Michigan Sugar Co.
National Association of Manufacturers of the United States.
National Founders' Association.
California Manufacturers' Association.
Manufacturers' Association of Connecticut (Inc.).
Manufacturers' Association of Wilmington (Del.).
Associated Industries of the Inland Empire (Idaho).
Indiana Manufacturers' Association.
Iowa Manufacturers' Association.
Associated Industries of Kansas.
Associated Industries of Kentucky.
Associated Industries of Maine.
Merchants and Manufacturers' Association of Baltimore.
Associated Industries of Massachusetts.
Michigan Manufacturers' Association.
Associated Industries of Missouri.
Nebraska Manufacturers' Association.
Associated Industries of New York State (Inc.).
Ohio Manufacturers' Association.
Oklahoma Employers' Association.
Manufacturers and Merchants' Association of Oregon.
Pennsylvania Manufacturers' Association.
Employers' Association of Rhode Island.
Manufacturers and Employers' Association of South Dakota.
Tennessee Manufacturers' Association.
Utah Associated Industries.
Associated Industries of Vermont.
Virginia Manufacturers' Association.

Mr. Chairman, there is a mighty big difference between restriction and discrimination. If it is restriction we seek, you may rely on my support. The workers in our mills and factories must be protected against an influx of millions who will seek their places. But I can not agree to any policy that violates all prior adopted American ideas. With such a bill, grounded on discrimination, we do violence to traditions that have come down to us from the fathers, and as well do we offer insult to those large groups of our citizens of the blood of southern Europe by proclaiming that they are of an inferior brand of human being.

But the main thought is a criticism of those societies with foreign-sounding titles, such as the Order of the Sons of Italy, which have petitioned against the passage of this bill. Since when has a man's love for this country been tested by the name of some fraternal or singing society of which he may be a member? What if those people of foreign parentage bind themselves together for beneficial reasons so long as the love of this land is not placed in jeopardy? Am I any the less an American if I, perchance, belong to some society with a name suggestive of Ireland? And who will deny my Americanism if I take pride in the glory of that land or hope for her prosperity and happiness, or if, forsooth, I hum a little Irish ditty on St. Patrick's Day, or wear a spray of shamrock?

My own humble judgment is that he lacks some element in his make-up who does not retain some affection for the land of his forebears.

A short journey it is from this building to Arlington Cemetery, where rests amid lavish appointments the body of the unknown soldier. Perhaps he was an Italian, who may have belonged to the Order of the Sons of Italy, for our Army numbered 250,000 Italians, of whom 20,000 were killed. Is there anyone with soul so shriveled with prejudice as to lower this unknown from his unattainable plane of homage because, forsooth, he was an Italian? Let me relate the tale of a little Italian lad, whom I had the privilege and honor of knowing. During the winter after the war I met him for the first time. He was tottering up the street, a decrepit, pathetic figure, almost lost in an oversized army overcoat that seemed to swallow his whole form. He had been almost in two, partly from pain, but mainly from his new deformities. His eyes were like burning coals; his face, while flushed, was gaunt and furrows wrinkled his forehead. The overcoat was tattered and ragged, while the shoes he wore had fallen to pieces, and at the ends you could see his toes. He told me his name was Jimmy Coniglino. He had been in the country a short time when the war was declared, and he had joined the army. He had been gassed, and it was most apparent he was suffering severely

from tuberculosis. He had been hit with a bit of shrapnel in the back and legs, and a part of his spine had been affected. The wonder of it all was that the lad was alive to tell it. Whether it was due to his fault or to that of the Veterans' Bureau, is immaterial. The fact was that Jimmy was receiving no attention from the Government—from his Government—and he was eking out his meager living in the hands of his good friends. But not a whimper would he utter against the delay of the Government in providing him with his due. Eventually his claim was recognized, and he received his first real money. I met him again when he was given a day off from the hospital. "Jimmy, why don't you go back to Italy, where your folks are?" I said to him. "You have nobody near to you in America, and it might do you a lot of good to go back to your country." Jimmy's English was wretched; I doubt if he could read or write. But I did understand him when he said, "Italy is a not-a my countree. This-a countree is-a my countree. I fight for him; I die in him." Jimmy's prophecy came true, for he died shortly thereafter. He has gone to the land that does not discriminate against the Italian. And in the days to come when the records of loyalty to country are disclosed, I will wager that Jimmy's name will stand out with greater glory than many of those self-proclaimed perfect Americans who want to keep other Congillines from our shores, because they do not make good Americans.

I insert an article entitled "Eight American soldiers," which carries its own moral:

### EIGHT AMERICAN SOLDIERS
#### (By Samuel McCoy)

The heroism of the eight Americans whom I am about to name was duplicated in every one of the hundreds of regiments which were sent from America to serve in France; I name these eight men merely because their war records happen to be before me at the moment and because much has been said of late in regard to the proper qualifications for American citizenship.

Each of these men was awarded the distinguished-service cross. Twenty thousand men who fought in the same division to which they belonged all acquitted themselves with honor in the face of danger. A thousand men of the division were singled out to appear in the division citations for feats of heroism performed in that campaign. But these eight were ranked even higher than all these. They were of the handful who won the distinguished-service cross—a decoration awarded only "for extraordinary heroism in action."

The first man, a sergeant, in the assault launched against the seemingly impregnable Hindenburg line, "although twice wounded, refused to leave the field, but remained with his platoon, exhibiting magnificent courage and bravery, until he was wounded a third time. His devotion to duty set a splendid example to the men of his company."

The second, a corporal, in the same fearful fire of the enemy, "was an advance scout for his platoon. The platoon was temporarily halted by machine-gun fire from a section of the enemy trench in their immediate front. He rushed through the heavy enemy fire to the trench, and at the point of his rifle compelled 12 of the enemy to surrender. He then signaled for the platoon to advance."

The third, also a corporal, "left shelter, went forward under intense machine-gun fire, and carried a wounded officer to safety. In accomplishing this mission he was severely wounded."

The fourth man, a private, first class, "when the advance of his battalion was checked by heavy machine-gun fire, went forward, with two other soldiers, under heavy fire to reconnoiter the enemy position. By effective rifle fire they drove the gunners from two machine-gun nests into a dugout near by, which they captured, together with 35 prisoners, including 3 officers."

The fifth man, also a private, "after being severely wounded by shrapnel, took shelter in a shell hole somewhat in advance of his company, from which he had become separated in the fog and smoke. He saved the lives of four of his wounded comrades who were occupying the shell hole by throwing live grenades, which had been tossed into the shell hole by members of his own company in the rear, into the enemy's lines."

The sixth, a private, "under heavy shell and machine-gun fire, left the shelter of his trench, and going forward under a thick smoke screen, single handed captured between 30 and 40 prisoners. * * * Three weeks later, in a second battle, after the advance of his company had been stopped by strong hostile machine-gun fire, he, with three companions, advanced far ahead of the front line to attack an enemy position located in a large farmhouse. By skillful maneuvering in the broad daylight they covered all entrances to the house and forced the surrender of the entire force of the enemy, numbering 36 men and 2 officers. During the exploit they killed 2 of the enemy, who attempted to take cover in the cellar."

The seventh, a private, "exhibited exceptional bravery by leaving shelter and going into an open field under heavy machine-gun and shell fire to rescue wounded soldiers."

The eighth man, also a private, "while the advance against the Hindenburg line was at its height, seeing an American machine gunner exposed to the enemy, ran to his assistance. On the way he was seriously wounded, but continued on, reaching the position and using his body to shield the gunner while the latter poured a fire into the enemy. He was wounded three times, finally losing consciousness, but after his wounds were dressed he insisted on leaving the field unaided."

The names of these eight American soldiers, all of whom are still living, are John N. F. Bilitski, Lonnie J. Muscow, Aloizy Nagowski, Isaac Rablasowits, Epifanio Affaiate, Wasyl Kolenescyk, Daniel Moskowitz, and Antony Selafont.

Mr. JOHNSON of Washington. Mr. Chairman, I yield to the gentleman from New York [Mr. BACON], a member of the committee.

Mr. BACON. Mr. Chairman, that we are facing a crisis in our policy as a people toward immigration there can be no doubt. We must determine whether the old plan in vogue before the Great War of permitting all to come to our shores without limit shall be reverted to, whether all further immigration shall be shut off, whether there shall be a reduction based upon census figures, such as in the extension of the present law, or whether some other solution shall be found.

I dare say that no question confronting the country during the entire period of its history has ever been fraught with such momentous consequences as this one of what new bloods shall be fused with our stock, what new energies shall be added to the future of American life, what new elements shall compete with our labor, and what new points of view shall contribute to our political and social ideas and ideals. The scientific results of immigration are so exact that our children and our children's children can not but enjoy or suffer from the effects of what we do at this time. Therefore it devolves upon us to consider all the facts in the broadest and most patriotic light possible. As a member of the Committee on Immigration, I have tried to do so.

I have tried to approach this subject with an open mind, but solely, however, from the viewpoint of what is best for the country of ours and for no other country. I am convinced that what is for the best interest of the United States on this immigration question may be diametrically opposed to the selfish interest of other countries.

We are the greatest immigrant-receiving country in the world to-day, and probably the greatest in history. Nearly 10,000,000 immigrants have come to our shores during the past 15 years, and during 4 of these 15 years the World War stopped immigration entirely. The vital influence on the history of civilization of the migrations of people can not be minimized and should not be ignored. The Secretary of Labor recently has said:

One of the prime factors in the molding of civilization since the days when the first prehistoric man preempted for his dwelling the cave of the bear that he had killed has been the migration of peoples. Throughout the ages, wherever a given race or people has set up a strong, prosperous, comfortable state of life there have flocked the throngs of less advanced races seeking the ease of the better civilization. There is no instance in all history since the Goths, starving and in danger of extinction by their enemies, succeeded in begging their way into the Roman Empire, which does not demonstrate that soon or late the immigrant people overthrow the older civilization. This has not been accomplished by force or by armed invasion. In almost every instance great civilizations have perished through peaceful penetration of aliens who were admitted to do the work of the community. In some cases they drifted in as free labor, many entered as slaves, or as soldiery in the employ of the higher civilization. In every case, however, these migrations have resulted in the overthrow of the higher civilization by the infiltrating aliens.

But few of these migrations of the past have been characterized by great movements of population in short periods of time. Only some 200,000 Goths were in the original group which the Emperor Valens accepted as residents of Italy. There has never been in the history of all mankind a like movement of peoples of the magnitude of the tide of immigration which has come to the United States during the last century and a half.

Every nation, at least of Europe, is an emigrant-sending country. There you have at once the great clash of divergent interests. Every foreign country and every foreign representative here in Washington is watching the debate on this bill with intense interest. It behooves Americans to watch also.

We can be sympathetic to Europe's efforts to solve some of their problems by encouraging their people to come to this country, but we must never lose sight of the fact that this is an American problem and only an American problem. Unless we in this country look after ourselves and our own interests no one will do it for us.

# EXHIBIT D

Mr. SPEAKS.  Have I the right, Mr. Speaker, to demand a separate vote upon the amendment which I introduced and which was agreed to in the committee?

The SPEAKER.  Any gentleman may demand a separate vote on any amendment.

Is a separate vote demanded on any other amendment?  If not, the Chair will put the other amendments in gross.

The other amendments were agreed to.

### CONSTRUCTION OF PUBLIC BUILDINGS

Mr. ELLIOTT.  Mr. Speaker, I submit a conference report on the bill (H. R. 278) to amend section 5 of the act entitled "An act to provide for the construction of certain public buildings, and for other purposes," approved May 25, 1926.

### MISSOURI RIVER BRIDGE, GLASGOW, MONT.

Mr. DENISON.  Mr. Speaker, there is a Senate bill (S. 1501) on the Speaker's table.  I ask unanimous consent that it may be indefinitely postponed, a similar bill having passed the House and also the Senate.

The SPEAKER.  The gentleman from Illinois asks unanimous consent that the bill (S. 1501) on the Speaker's table be indefinitely postponed.  Is there objection?

There was no objection.

### LEAVE OF ABSENCE

By unanimous consent, leave of absence was granted as follows:

To Mr. SEARS of Florida, indefinitely, on account of sickness in family.

To Mr. CELLER, for one week, on account of sickness.

### RESTRICTION OF MEXICAN IMMIGRATION

Mr. BOX.  Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD by printing an address delivered by me at an immigration conference.

The SPEAKER.  Is there objection to the request of the gentleman from Texas?

There was no objection.

Mr. BOX.  Mr. Speaker, under authority granted by the House, I submit for printing in the RECORD an address delivered by me on January 19, 1928, before the immigration conference held in Memorial Continental Hall, Washington, D. C., under the auspices of the Key Men of America, a patriotic organization composed of authorized representatives of a great number of other affiliated patriotic societies engaged in the study of immigration problems.

The address is as follows:

Mr. Chairman, ladies, and gentlemen, during the present session of Congress immigration discussion and legislation will probably center around four important questions:

(1) Shall our deportation laws be strengthened, extended, and better enforced?

(2) Shall the endless chain of relationship existing between immigrants and their kindred abroad be permitted to start dragging out of Europe thousands of those whom the laws now exclude?

(3) Shall we retain in the law the national-origins provisions, written into the act of 1924, making it more accurately and adequately serve the Nation's purpose to keep itself American, or shall they be suspended or repealed at the dictation of certain hyphenated minorities of our population?

(4) Shall the quota provisions of the immigration law be made applicable to Mexico, South America, and adjacent islands?

To this last question I shall devote my brief remarks.

The people of the United States have so definitely determined that immigration shall be rigidly held in check that many who would oppose this settled policy dare not openly attack it.  The opposition declares itself in sympathy with the policy and then seeks to break down essential parts of the law and opposes any consistent completion of it making it serve the Nation's purpose to maintain its distinguishing character and institutions.  Declaring that they do not believe that paupers and serfs and peons, the ignorant, the diseased, and the criminal of the world should pour by tens and hundreds of thousands into the United States as the decades pass, they nevertheless oppose the stopping of that very class from coming out of Mexico and the West Indies into the country at the rate of 75,000, more or less, per year.

Every reason which calls for the exclusion of the most wretched, ignorant, dirty, diseased, and degraded people of Europe or Asia demands that the illiterate, unclean, peonized masses moving this way from Mexico be stopped at the border.  Few will seriously propose the repeal of the immigration laws during the present Congress, but the efforts of those who understand and support the spirit and purpose of these laws to complete them and make them more effective by the application of their quota provisions to Mexico and the West Indies, will be insidiously and strenuously opposed.

The admission of a large and increasing number of Mexican peons to engage in all kinds of work is at variance with the American purpose to protect the wages of its working people and maintain their standard of living.  Mexican labor is not free; it is not well paid; its standard of living is low.  The yearly admission of several scores of thousands from just across the Mexican border tends constantly to lower the wages and conditions of men and women of America who labor with their hands in industry, in transportation, and in agriculture.  One who has been in Mexico or in Mexican sections of cities and towns of southwestern United States enough to make general observation needs no evidence or argument to convince him of the truth of the statement that Mexican peon labor is poorly paid and lives miserably in the midst of want, dirt, and disease.

In industry and transportation they displace great numbers of Americans who are left without employment and drift into poverty, even vagrancy, being unable to maintain families or to help sustain American communities.  Volumes of data could be presented by way of support and illustration of this proposition.  It is said that farmers need them.  On the contrary, American farmers, including those of Texas and the Southwest, as a class do not need them or want them.  I state the rule as of country-wide application, without denying that a small percentage of farmers want them, and that in some restricted regions this percentage is considerable.  I doubt if a majority of the bona fide farmers of any State want or need them.  I have given much attention to the question and am convinced that as a state-wide or nation-wide proposition they are not only not needed and not wanted, but the admission of great numbers of them to engage in agricultural work would be seriously hurtful to the interests of farmers, farm workers, and country communities.  They take the places of white Americans in communities and often thereby destroy schools, churches, and all good community life.

American farmers are now burdened with a surplus of staple farm products which they can not sell profitably at home or abroad.  That surplus weighs down the prices of the entire crop in both the domestic and foreign markets until it threatens agriculture with financial ruin.  Individual farmers, farm organizations, their Representatives in Congress, students of farm economics, bankers, and business men of the farming sections, all are striving to find a means of getting rid of this surplus of farm products, with its dead weight upon the price of farmers' crops.  Congress is continually being urged to make appropriations to help carry the farmers' surplus, to levy taxes on farm products, to restrain overproduction, and otherwise to provide a method of getting rid of this oversupply of the farmers' leading crops.  The President in his messages to Congress has repeatedly discussed this surplus and dealt with proposed remedies for it.

The importers of such Mexican laborers as go to farms at all want them to increase farm production, not by the labor of American farmers, for the sustenance of families and the support of American farm life, but by serf labor working mainly for absentee landlords on millions of acres of semiarid lands.  Many of these lands have heretofore been profitably used for grazing cattle, sheep, and goats.  Many of them are held by speculative owners.

A great part of these areas can not be cultivated until the Government has spent vast sums in reclaiming them.  Their development when needed as homes for our people and in support of American communities is highly desirable.  Their occupation and cultivation by serfs should not be encouraged.  These lands and this mass of peon labor are to be exploited in the enlargement of America's surplus farm production, possibly to the increased profit of these speculative owners, but certainly to the great injury of America's present agricultural population, consisting of farmers, living and supporting themselves by their own labor and that of their families, on the farms of America.

The dreaded surplus, which already makes an abundant crop worse for farmers as a whole than a scant one, is to be made more dreadful by the importation of foreign labor working for lower wages and under harder conditions.  The surplus which I have mentioned often hurts worse than a pest of locusts on the wheat crop or of boll weevil in the cotton fields.

While farmers, business interests in agricultural sections, Congress, and the President are deep in the consideration of the great problem presented by the farm surplus, and when presidential campaigns may turn on the condition and its consequences, labor importers are scheming and propagandizing for the purpose of bringing in armies of alien peons, claiming that they are needed on the farms, where they would only make the farm-surplus problem worse.  If the Government tries to relieve this distress of the farmer caused by surplus production, shall it at the same time be de-Americanizing farms and farming communities and making the surplus and price situation worse by importing masses of serf laborers?  Some think that agricultural prices can be sustained by a high tariff.  Why have a tariff wall to keep out the products of pauper labor abroad and at the same time be bringing in armies of peons to increase the oversupply inside the tariff wall to the ruin of our own farmers?

Another purpose of the immigration laws is the protection of American racial stock from further degradation or change through mongrelization.  The Mexican peon is a mixture of Mediterranean-blooded Spanish peasant with low-grade Indians who did not fight to extinction

but submitted and multiplied as serfs. Into that was fused much negro slave blood. This blend of low-grade Spaniard, peonized Indian, and negro slave mixes with negroes, mulatoes, and other mongrels, and some sorry whites, already here. The prevention of such mongrelization and the degradation it causes is one of the purposes of our laws which the admission of these people will tend to defeat.

Every incoming race causes blood mixture, but if this were not true, a mixture of blocs of peoples of different races has a bad effect upon citizenship, creating more race conflicts and weakening national character. This is worse when the newcomers have different and lower social and political ideals. Mexico's Government has always been an expression of Mexican impulses and traditions. Rather, it is an exhibition of the lack of better traditions and the want of intelligence and stamina among the mass of its people. One purpose of our immigration laws is to prevent the lowering of the ideals and the average of our citizenship, the creation of race friction and the weakening of the Nation's powers of cohesion, resulting from the intermixing of differing races. The admission of 75,000 Mexican peons annually tends to the aggravation of this, another evil which the laws are designed to prevent or cure.

To keep out the illiterate and the diseased is another essential part of the Nation's immigration policy. The Mexican peons are illiterate and ignorant. Because of their unsanitary habits and living conditions and their vices they are especially subject to smallpox, venereal diseases, tuberculosis, and other dangerous contagions. Their admission is inconsistent with this phase of our policy.

The protection of American society against the importation of crime and pauperism is yet another object of these laws. Few, if any, other immigrants have brought us so large a proportion of criminals and paupers as have the Mexican peons. If time permitted, I could present masses of authentic reports sustaining the truth of this statement. As one of a great many instances, I read a news item from the Dallas News of January 5, 1928:

MEXICANS SUFFERING FROM UNEMPLOYMENT, AGENCY MAN REPORTS

"Unemployment conditions among Mexicans in Dallas is the most acute in the history of 'Little Mexico,' A. Luna, operator of an employment agency, said Wednesday. He declared that hundreds of families are suffering severely, especially on account of the recent cold weather.

"'These people are badly in need of immediate relief,' Mr. Luna said, 'perhaps much more relief than is now available.'"

Note the term "Little Mexico" used in this news item. These "Little Mexicos" are springing up in many sections in and about the cities and industrial centers and all over the Nation. Some of them are assuming large proportions, and all of them together are becoming disturbingly large.

The number of such reports coming from California, Colorado, Arizona, New Mexico, and the whole Southwest, through the press and from public and private charity organizations, is very great and covers the whole period of mass peon immigration from its beginning until now.

The statements made in connection with each of these propositions are presented to this company, containing many students of the problem and a large percentage of those with whom the present and future public welfare is a paramount consideration, with the assurance that such citizens will give further attention to the question and disprove or verify the statements made.

The volume of Mexican immigration, the attending circumstances, and the prospects for its continuance and enlargement are such as to make this an important part of one of the Nation's greatest problems. Mexico has nearly 15,000,000 people who are prolific breeders, capable of producing millions of new inhabitants every year.

Their economic condition will continue worse than ours for an indefinite time and cause their laborers to want to migrate to the United States. Under a well-known law of population, the gaps left at home by those who come from year to year will be rapidly refilled by a natural increase. Thus Mexico will become an inexhaustible source of this low-grade immigration.

Immigrants who have poured upon our shores from Europe and Old World countries have had to pay the expense of land travel in reaching foreign seaports, after which the heavy expense of ocean transportation had to be paid. Mexico's masses have only to tramp to the border. The expense of their transportation, whether paid by them or others, is trifling compared to the cost of crossing the ocean from Europe or Asia to America. The methods by which labor importers reach them and induce them to come are inexpensive and easy. The building of barriers against the flood flowing in from elsewhere must increase the inpouring from Mexico. Unless it is checked it will continue with increasing volume.

The most dangerous mass immigration now menacing us is that from Mexico.

Our efforts to deal wisely and adequately with Mexican peon immigration from the standpoint of public and patriotic interest are opposed by the same selfish interests which have hindered all the Nation's efforts in dealing with our immigration, namely, the short-sighted, present profit-seeking interests of those who want cheap labor. If it were not for this opposition, the grave question which I am suggesting would be settled soon and the settlement made would be with a patriotic view to the public welfare now and hereafter.

If we ask Mexico, Haiti, Cuba, and South America to consent to the application of this necessary restriction, they will, of course, refuse and the evil stream will continue to pour its pollution into the mass of our population.

Efforts to obtain the consent of foreign countries to our immigration policy have been an unbroken failure throughout the history of our dealing with the problem. More than one presidential administration tried to settle the Chinese immigration question by the Burlingame treaty, in which it was recited that the right of races to migrate was inherent and inalienable. This was to apply as between the hundreds of Chinese millions and America. The United States Congress had to cut the Nation's way out of that ruinous entanglement.

Italy did not consent to our present law, but wanted to handle the subject by treaty to which her consent would be necessary, but the Constitution had vested this power in Congress, and Congress exercised it, accomplishing the Nation's purpose and helping to save its future. Other instances could be cited; one more will be enough. Japan had interests and a will concerning Japanese immigration in conflict with the interests and will of the United States. Every effort was made to avoid having America declare its will by congressional action as our Constitution contemplates. So long as we dickered with that question, consulting any but our constitutional rule, it remained unsettled and troublesome. It would have been with us yet had Congress waited for the consent of a foreign power or left that question to be settled in any but the constitutional way; but the will of America was accomplished in the manner provided by the fathers. The world did not crumble, its peace was not disturbed, but our friends of former times remain our friends, respecting us and being by us respected. Any other course would have continued the question and the irritation it caused.

These and other national experiences in dealing with the immigration problem should be recalled by the public when men say that in this instance we must consult the wishes of the people south of the Rio Grande or farther south.

Ladies and gentlemen, practically all of the reasons which have moved the United States to adopt and adhere to the policy of restricting immigration from Europe and Asia argue for the restriction of peon immigration from Mexico and the countries to the south and east. The difficulties which folly and greed have heretofore thrown in the Nation's path are being thrown in its way now. Let us hope that the people of these times and the membership of this Congress will be as wise and courageous as those who have preceded us.

LEAVE TO FILE MINORITY VIEWS

Mr. GIBSON. Mr. Speaker, I ask unanimous consent that the gentleman from Wisconsin [Mr. LAMPERT] may file minority views on the so-called market site bill, and that I may have the privilege also of filing separate minority views on the same bill.

The SPEAKER. The gentleman from Vermont asks unanimous consent that the gentleman from Wisconsin [Mr. LAMPERT] and himself may file separate minority views on the market site bill. Is there objection?

There was no objection.

AGRICULTURAL RELIEF

Mr. CONNALLY of Texas. Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD.

The SPEAKER. Is there objection to the request of the gentleman from Texas?

There was no objection.

Mr. CONNALLY of Texas. Mr. Speaker, under leave granted me to extend my remarks in the RECORD, I desire to include my speech before the Committee on Agriculture on February 9, 1928, which is as follows:

Mr. CONNALLY. Mr. Chairman and gentlemen of the committee, I thank you for giving me this opportunity to make a few observations in reference to agricultural legislation, and I thank also the gentleman from Michigan, Mr. KETCHAM.

Probably most of you know I voted against the McNary-Haugen bill. I have been abused by many cooperative representatives here who are drawing pretty handsome salaries. But I have been trying to vote for the farmer, whether he belonged to a cooperative organization or not; and what I wanted to suggest to the committee this morning is that it seems to me as a Member of Congress that it is about time for this committee and for the Congress to quit fooling the farmer and really pass some practical measure that stands some chance of becoming a law.

# EXHIBIT E

Case 3:20-mj-20121-KSC Document 32-1 Filed 08/07/20 PageID.342 Page 121 of 218

to do so was of doubtful construction. They have introduced no bill to the present Congress, doubtless because of the Walsh resolution pending in the Senate for the investigation of the power companies; but there are two bills for Government operation or lease, and it is probable that they will gain control of the electric power under these if the Madden bill is not enacted. It is also quite certain if the Madden bill is not passed in the present Congress there will be no proposition from a company manufacturing fertilizers in the future, and the Muscle Shoals power will all pass into the hands of the power companies and be lost to the agricultural interests of the country.

There is another point I would call your attention to: The Air Nitrates Corporation and the American Cyanamid Co. are chemical manufacturing companies and not water-power companies. The construction of the dams on the Clinch River will assure ample power at Muscle Shoals all the year to conduct their business to produce the maximum amount of fertilizers provided for in the lease. They must dispose of the power produced by the dams on the Clinch River, and it will be more profitable for them to sell it to manufacturing companies located near the dams, which will be of very great advantage to Tennessee in the increase of population and taxable property. They in all probability will have no expensive distribution lines to transmit it a distance or out of the State.

I do not wish anything I have said in this letter to be construed as a criticism upon the members of the Railroad and Public Utilities Commission of Tennessee, for they are all gentlemen of integrity and ability and are patriotically asserting and defending the sovereign rights of Tennessee and the people in the water power resources of Tennessee and are not and can not in any way be influenced in the discharge of their duties contrary to the interests of the people of the State by anyone. I favor and approve their assertion of the State's rights which the power companies have ignored and are now attacking by a bill in the chancery court of Nashville.

I have written you quite at length about this matter because I am deeply interested in the manufacture of cheap fertilizer at Muscle Shoals, the provisions for the national defense, and the development of the water-power resources of the Tennessee River for the benefit of the people of Tennessee.

Yours truly,

JOHN K. SHIELDS.

## PERMISSION TO ADDRESS THE HOUSE

Mr. CASEY. Mr. Speaker, I ask unanimous consent that, following the special order just made, I may address the House for one hour on Tuesday on the coal-strike situation.

The SPEAKER. The gentleman from Pennsylvania asks unanimous consent that on Tuesday, following the address of the gentleman from Indiana [Mr. VESTAL], he may address the House for one hour on the coal-strike situation. Is there objection?

Mr. BARBOUR. Reserving the right to object, Mr. Speaker, would not some other day be just as convenient to the gentleman from Pennsylvania?

Mr. CASEY. I will say to the gentleman that I had an allotment of time in the general debate on this bill, but I was compelled to postpone speaking on account of attendance on a hearing on another appropriation bill.

Mr. BARBOUR. I do not want to object to the gentleman's request, but I am very anxious to dispose of this appropriation bill at the next session of the House, and if an hour were allowed to the gentleman on Tuesday that could not be done.

Mr. TILSON. I doubt if next Calendar Wednesday will be crowded. Perhaps the gentleman might get time on Calendar Wednesday. He can get it by unanimous consent.

Mr. CASEY. Then I modify my request, Mr. Speaker, to the extent that I be given one hour on Calendar Wednesday, immediately after the reading of the Journal and the disposal of business on the Speaker's table.

The SPEAKER. The gentleman from Pennsylvania asks unanimous consent that on Wednesday, immediately after the reading of the Journal and the disposal of business on the Speaker's table, he may address the House for one hour. Is there objection?

There was no objection.

## IMMIGRATION AND THE CRIME WAVE

Mr. LANKFORD. Mr. Speaker, on January 27, 1928, my colleague, Hon. ROBERT ALEXIS GREEN, of Florida, delivered an address over the radio on the subject of "Immigration and the crime wave," which address I ask may be inserted in the RECORD by unanimous consent.

The SPEAKER. The gentleman from Georgia asks unanimous consent to extend his remarks in the RECORD by inserting an address recently delivered over the radio by the gentleman from Florida [Mr. GREEN]. Is there objection?

There was no objection.

Mr. LANKFORD. Mr. Speaker, under leave granted me to-day, I herewith insert in the RECORD an eloquent and patriotic address delivered by the Hon. ROBERT ALEXIS GREEN, Representative of the second congressional district of Florida, over the radio on January 27, 1928, discussing the subject Immigration and the Crime Wave. The address is instructive, entertaining, and worthy of the careful consideration of the Nation.

The address is as follows:

Friends and citizens of America, the subject of immigration is so wide in its scope that it will be impossible for me to give a detailed discussion of it in the short time which I will talk to you this evening; however, it is one of the most important subjects now affecting the citizenship of our great Nation. A high order of citizenship is vital to any nation. A nation's strength is in itself and its power and position in the affairs of other nations is established and maintained solely by the stable type of citizenship comprising it.

Our Constitution vested in the Congress the power to regulate and control immigration. However, the subject of immigration was vainly attempted to be regulated by treaty up until about the year 1882, when the American Government tried to settle the Chinese question by a treaty in which it was recited that the right of races to migrate was inherent and inalienable. This was to apply as between the Chinese millions and the United States. Thus it was found imperative that the United States should pass her first immigration law. The influx of aliens grew steadily until by the year 1907 the high peak was reached with the admission of 1,285,349 persons.

This alarming situation brought about the passage of the illiteracy test act in 1917, which only retarded slightly the great influx of foreign hordes. In 1910, 1,041,570; in 1913, 1,197,892; and in 1914, 1,218,480 entered. The abnormal conditions during the World War period, of course, directed the attention of the world in channels other than that of immigration, but soon after the World War—during the reconstruction period—again immigrants by the hundreds of thousands turned their eyes and hopes toward the United States, causing the necessity of the 1921 numerical control act. This act was found inadequate to cope with the situation, and on May 20, 1924, Congress made its third effort to limit the annual influx of aliens. The immigration department of our Government is now working rather effectively under the provisions of this and subsequent acts of Congress, but in spite of all efforts of Congress and the diligence of immigration officials there are to-day in the United States probably 16,000,000 persons of foreign birth, 7,000,000 of whom are not American citizens. Thus you will see the necessity of all efforts at the restriction of immigration.

### NEED MORE HELP

The immigration department employs about 2,700 persons. Of this number, nearly 800 are immigrant inspectors and more than 700 are border patrolmen. It can readily be seen that this number is inadequate to cope with some 7,000,000 aliens and some 10,000 miles of border to patrol.

If the border to be patroled could be averaged among the few patrolmen on the 8-hour basis, making allowance for sick leave and other possible absentees, it would be reasonable to approximate 25 miles of border per day to be inspected by one patrolman. Then when we consider that the quota law does not apply to Canada, Mexico, Central America, South America, and some of the islands, it is very easy to see the weakest place of our present immigration laws and their enforcement. Hundreds of thousands of aliens cross these borders annually, thousands of whom remain in the United States. Millions of aliens come into this country either by land or sea annually; the admissibility of these people has to be passed upon by our Bureau of Immigration. Of course, this number includes tourists, students, and aliens of all classes. I merely mention this to show how impossible it is for the limited personnel of our department to cope with this tremendous situation.

### GIGANTIC TASK

Our country has a total population of more than 100,000,000, 15 per cent or possibly 20 per cent of which is foreign born, and in almost every case speaking a language foreign to ours. It is readily seen that we have a great task to Americanize, assimilate, and amalgamate these foreigners. These 15,000,000 or possibly 20,000,000 persons of foreign birth, 7,000,000 of whom are aliens, are indeed a heavy burden for American society and for American institutions to carry. These foreigners, in general, exact a tremendous toll from our civilization. In January, 1927, 113,105 aliens were inmates of United States prisons, penitentiaries, jails, insane asylums, hospitals, and poorhouses. The economic loss represented by these figures is appalling. Each of these aliens, considered economically, is less than zero; he is a distinct liability. The amount of money expended annually to support these aliens would, within a few years, build hard roads enough to "checker-board" the United States from the Atlantic to the Pacific and from the Rio Grande to Canada. I know of no good reason why the United States should be so foolish as to permit these conditions to continue.

There are many suggestions to the Congress which would strengthen our National immigration and deportation laws. Recently the House Committee on Immigration, of which I am a member, approved a depor-

tation law which, if passed, will help a great deal; however, my feeling in the matter is that any and all aliens in the United States who are found guilty of violating any law whatsoever of the United States or of any State of the Union, should be, without delay, deported. Aliens who are found guilty of operating gambling houses, "gun-toting," violating in any manner State or Federal prohibition laws, or any other infraction of our minor laws, should be instantly deported the same as if he had committed a graver offense. Probably 80 per cent of those who violate the laws are "repeaters." You can examine the statistics of almost any penal institution and find that a high percentage, in some cases more than 80 per cent, of those who are in prison have been convicted of offenses other than the one for which they are serving.

### ALIENS SHOULD BE REGISTERED

In my opinion all aliens, by law and practice, should be compelled to register upon entering the United States and should be compelled to carry on their person such certificate of registration. I believe further that omission of or refusal of any alien to avail himself of the United States laws of naturalization should be grounds for his deportation at the discretion of the trial court. No alien should be permitted to stay in the United States more than five years without becoming a naturalized citizen. To-day there are hundreds of thousands of foreigners in the United States who have been here for years and years, have never declared their intention of becoming citizens of the United States, do not desire to be citizens of the United States; but on the other hand many of them are ready, waiting, and willing at all times to foment trouble and disloyalty to the United States Constitution, laws, and institutions.

A few months ago the United States was brought face to face with the underhanded bolshevistic and communistic working of undesirable aliens. This was brought to a climax during and just after the notorious Sacco-Vanzetti trial. These two depraved and abhorrent murderers committed their acts some seven years before justice was administered to them. A perverted sympathizer of Sacco and Vanzetti, named Edward H. James, a socialist or Red, referring to the trial said:

"You had a crazy judge and jury in Plymouth. You had the same crazy judge and jury in Dedham. You had a crazy Supreme Court of Massachusetts sitting in the courthouse in Boston, saying it was right. The trial of these men was an infamy that cries to Heaven. Take them out from prison. Then punish those who committed the infamy. I am not telling you what to do. I am interpreting history for you. * * * Justice is terrible when it strikes. Revolutions are not made to order. Either we break the Government or the Government breaks us."

These statements of his were taken up by sympathizers of Sacco and Vanzetti and so radical did their minds incline until the courthouse, the court, and other officials had to be guarded and protected from unlawful attacks. Even the homes of the judge and attorney had to be protected by armed guards. After the conviction of these men their friends perpetrated a series of outrages all over the world, exploding bombs and blowing up buildings. So vicious were their designs until when the veterans of the Allied Armies of the World War made a pilgrimage back to Paris and other scenes of their great deeds of heroism, it was necessary for these exponents of humanity and democracy to have guards against the inroads of these numerous Reds.

A leader in the movement to set free these two murderers was Felix Frankfurter, who worked for the defense of Mooney and Billings, red murderers. Notable among this array of reds may be mentioned Charlotte A. Whitney, who was convicted of criminal syndicalism in California for advocating the overthrow of the State by force, and who was not long ago pardoned by the Governor of California. A petition purporting to contain almost half a million signatures protested the execution of Sacco and Vanzetti; thus we see there are hundreds of thousands of these reds, communists, bolshevists who are here working in this country to destroy our Constitution, our people, our Army, our Navy, our churches, our schools, our homes.

It is time that the United States should have a general awakening and educate her citizens to the needs of the hour; educate them to pure Americanism and the protection of our Nation and her institutions. It is time that our immigration and deportation laws have teeth put into them whereby the courts and other officials of our country can instantly ascertain the activity of aliens in crime, lawlessness, and red propaganda and promptly deport them.

### CRIME WAVE

The crime wave is engulfing America. Almost every newspaper you pick up has a startling headline like the following: "Fireburg sets seven fires;" "Paroled moron sought as girl's slayer;" "Lost girl sought on Island;" "Hickman, fiendish slayer, captured;" "Fox (Hickman) wins plea for new judge;" "Hotelling confesses attacking and slaying 5-year-old girl;" "Hickman seeks highbrow jury;" "Remus declared insane." This, my friends, is evidence that the crime wave is sweeping the United States because the red-blooded American citizens are apparently becoming careless relative to the enforcement of the laws of the country and apparently careless relative to properly educating the rising generation.

It is time we were instilling in the youth of our land their duties as courts, as peace officers, jurors, and law-abiding citizens. The youth of to-day will fill these places to-morrow. It is time the citizens of the United States should look with disgust and contempt upon the violation of laws and discontinue signing requests for pardons, paroles, and other impediments to the justice of the law. It is time that Americans should look upon real American laws and institutions as theirs and endeavor to protect them instead of taking the side of and protecting and shielding criminals, law violators, and enemies of society. It is time the country should denounce so-called alienists along with other deterrents to law enforcement, justice, and civilization. Often the origin of these ills can be traced to undesirable immigrants. I do not mean to say that all aliens are undesirable; some are high type, splendid people, and make good citizens.

### ACROSS THE BORDERS

From south of the Rio Grande hundreds of thousands of Mexicans are pouring into our country, oftentimes at the behest of the various employers of large industrial enterprises. These who would decoy to our lands and then employ undesirable alien labor in competition with the splendid American laborer surely should be stopped. Cheap labor to-day may be an expensive liability to-morrow, and surely in the Mexican peon laborer this condition has obtained. The American laborer resides among us, pays taxes, contributes to the welfare and upbuilding of society and really stands at the helm of the ship of state of our mighty Nation. On the contrary, foreign labor drifts into our country, obtains what it can for its hire, gives as little return as possible, in most cases, and then invariably thrusts itself for a charitable existence upon society, in the founding of which it has not assisted.

Another reason why the quota should apply to the country south of the Rio Grande and the islands is because their population in the main is composed of mixtured blood of white, Indian, and negro. This makes their blood a very great penalty upon the society which assimilates it. The United States already has sufficient race and blood troubles.

Influx of all types of undesirable aliens and their amalgamation with our people will cause a general weakening, physically and mentally, of our civilization; and instead of our Nation then being the mistress of the world, leading in art, science, invention, finance, statesmanship, culture, and general civilized development, would it not be reasonable to believe that we would assume a secondary place as compared to those nations which have kept their blood white and purely Caucasian? I do not tell you that these things will come to pass, but I do say we already have enough Japanese, Chinese, Italians, Negroes, and other foreign strains. It is time to entirely stop the islands, Europe, Asia, and Africa from dumping their scum and riffraff on our beautiful American shores.

### PERMISSION TO ADDRESS THE HOUSE

Mr. MORIN. Mr. Speaker, I ask unanimous consent that the gentleman from New York [Mr. LaGuardia], who is now in the coal districts investigating the conditions there, be permitted to address the House for half an hour on Monday. I do that in pursuance of a request by wire that I have just received.

Mr. GARRETT of Tennessee. The gentleman says he is in the coal districts?

Mr. MORIN. Yes. I have just received a wire from him. I did not know before that he was there.

Mr. GARRETT of Tennessee. That is the same subject that the gentleman from Pennsylvania [Mr. CASEY] wishes to speak about?

Mr. MORIN. Yes.

The SPEAKER. The Chair will endeavor to discourage unanimous consent for talking on Monday, which is set aside for the Consent Calendar.

Mr. MORIN. Then I make it Wednesday.

The SPEAKER. The gentleman from Pennsylvania asks unanimous consent that on Wednesday, at the conclusion of the speech of the gentleman from Pennsylvania [Mr. CASEY], the gentleman from New York [Mr. LaGuardia] may be permitted to address the House for half an hour. Is there objection?

There was no objection.

### AMENDMENT OF THE HOUSE RULES

Mr. SNELL. Mr. Speaker, I submit a privileged report from the Committee on Rules.

The SPEAKER. The gentleman from New York presents a privileged report from the Committee on Rules, which the Clerk will report.

The Clerk read as follows:

Report to accompany House Resolution 107, amending paragraph 34 of Rule XI of the Rules of the House of Representatives.

The SPEAKER. Ordered printed.

### CHANGE OF REFERENCE

Mr. ARENTZ. Mr. Speaker, I have here a bill (H. R. 6461) for the construction of an irrigation dam on Walker River, Nev. It is an Indian matter. It was referred to the Committee

# EXHIBIT F

# DEPORTATION

## HEARINGS

### BEFORE

## THE COMMITTEE ON
## IMMIGRATION AND NATURALIZATION
## HOUSE OF REPRESENTATIVES

### SIXTY-NINTH CONGRESS

#### FIRST SESSION

JANUARY 12, 1926

#### STATEMENTS OF

### HON. ROBE CARL WHITE, HON. HARRY E. HULL, MR. W. H. WAGNER

ON

#### PROPOSED DEPORTATION ACT OF 1926

HEARING No. 69.1.3



WASHINGTON
GOVERNMENT PRINTING OFFICE
1926

78672

**123**

## COMMITTEE ON IMMIGRATION AND NATURALIZATION

### HOUSE OF REPRESENTATIVES

#### SIXTY-NINTH CONGRESS

ALBERT JOHNSON, Washington, *Chairman*

J. WILL TAYLOR, Tennessee.
HAYS B. WHITE, Kansas.
ARTHUR M. FREE, California.
WILLIAM P. HOLADAY, Illinois.
BIRD J. VINCENT, Michigan.
WILLIAM I. SWOOPE, Pennsylvania.
ROBERT L. BACON, New York.
THOMAS A. JENKINS, Ohio.
BENJAMIN M. GOLDER, Pennsylvania.

ADOLPH J. SABATH, Illinois.
JOHN E. RAKER, California.
RILEY J. WILSON, Louisiana.
JOHN C. BOX, Texas.
SAMUEL DICKSTEIN, New York.
SAMUEL RUTHERFORD, Georgia.
JOHN W. MOORE, Kentucky.

P. F. SNYDER, *Clerk*

II

**124**

# DEPORTATION

HOUSE OF REPRESENTATIVES,
COMMITTEE ON IMMIGRATION AND NATURALIZATION,
*Washington, D. C., January 12, 1926.*

The committee met at 10.30 o'clock a. m., Hon. Albert Johnson (chairman) presiding.

The CHAIRMAN. This committee is considering a bill which it is proposed to call the deportation act of 1926, introduced by Mr. Holaday, and which passed the House in the last Congress. The first few paragraphs deal with the arrival of sailors, and we will defer consideration of that for the present and look at page 5, on line 14, beginning with section 19, referring to aliens who shall be taken into custody and deported, as follows:

SEC. 19. (a) At any time after entering the United States (whether the entry was before or after the enactment of the deportation act of 1926) the following aliens shall be taken into custody and deported:

(1) An alien who at the time of entry was a member of one or more of the classes excluded by law from admission to the United States;

(2) An alien who entered the United States at any time or place other than as designated by immigration officials, or who eluded examination or inspection, or who obtained entry by a false or misleading representation. This paragraph shall not apply to any alien who entered the United States before June 3, 1921;

(3) An alien who remains in the United States for a longer time than authorized by law or regulations made under authority of law;

(4) An alien who is a public charge from causes not affirmatively shown to have arisen subsequent to entry into the United States;

(5) An alien who, from causes not affirmatively shown to have arisen subsequent to entry into the United States, is an idiot, imbecile, feeble-minded person, epileptic, insane person, person of constitutional psychopathic inferiority, or person with chronic alcoholism;

(6) An alien who is convicted of any offense (committed after the enactment of the deportation act of 1926) for which he is sentenced to imprisonment for a term of one year or more;

(7) An alien who is convicted of any offense (committed after the enactment of the deportation act of 1926) for which he is sentenced to imprisonment for a term which, when added to the terms to which sentenced under one or more previous convictions of the same or any other offense (committed after the enactment of the deportation act of 1926) amounts to eighteen months or more;

(8) An alien who is convicted of a violation of, or conspiracy to violate (committed or entered into after the enactment of the deportation act of 1926) any statute of the United States or a State or Territory prohibiting or regulating the manufacture, possession, sale, exchange, dispensing, giving away, transportation, importation, or exportation of intoxicating liquors for beverage purposes, for which he is sentenced to imprisonment for a term which, when added to the terms to which sentenced under one or more previous convictions of a violation of or conspiracy to violate any of such statutes (such previous violations or conspiracies having been committed or entered into after the enactment of the deportation act of 1926), amounts to one year or more;

(9) An alien who was convicted, or who admits the commission, prior to entry, of an offense involving moral turpitude;

1

125

(10) An alien who has, after the enactment of the deportation act of 1926, violated or conspired to violate, whether or not convicted of such violation or conspiracy, (A) the white slave traffic act, or any law amendatory of, supplementary to, or in substitution for, such act; or (B) any statute of the United States prohibiting or regulating the manufacture, possession, sale, exchange, dispensing, giving away, transportation, importation, or exportation of opium, coca leaves, or any salt, derivative, or preparation of opium or coca leaves;

(11) An alien who is found practicing prostitution or is an inmate of, or connected with the management of, a house of prostitution, or who receives, shares in, or derives benefit from, any part of the earnings of any prostitute, or who manages or is employed by, in, or in connection with, any house of prostitution or music or dance hall or other place of amusement or resort habitually frequented by prostitutes or where prostitutes gather, or who in any way assists any prostitute, or protects or promises to protect from arrest any prostitute, or who imports or attempts to import any person for the purpose of prostitution, or for any other immoral purpose, or who enters for any such purpose, or who has been convicted and imprisoned for a violation of any of the provisions of section 4 hereof;

(12) An alien who willfully conceals or harbors, attempts to conceal or harbor, or aids, assists, or abets any other person to conceal or harbor, any alien liable to deportation;

(13) An alien who willfully aids or assists in any way any alien to unlawfully enter the United States;

(14) An alien who is found employed on a vessel engaged in the coastwise trade of the United States without having been admitted to the United States for permanent residence. This paragraph shall not apply to any alien who entered the United States before July 1, 1924.

(b) No conviction shall serve as a basis for deportation proceedings under paragraph (6), (7), or (8) of subdivision (a) unless such conviction is in a court of record and the judgment on such conviction has become final. In the case of a sentence for an indeterminate term in which the minimum term under the sentence is less than one year, the term actually served shall, for the purposes of paragraphs (6), (7), and (8) of subdivision (a), be considered the term for which sentenced. An alien who has been pardoned after conviction of an offense as specified in paragraph (6), (7), or (8) of subdivision (a) shall not be deported.

(c) An alien sentenced to imprisonment shall not be deported under any provision of law until after the termination of the imprisonment.

The CHAIRMAN. Other sections of the bill need not be read for the purposes of this hearing.

You will notice this enlarges the present deportation clauses of the law and goes into detail on each one of these classes, and the committee would like to know from the officers of the Department of Labor something about the number of deportations, the cost of deportations, and the possible number of deportations, based on your best estimate, under these provisions.

Mr. ROBE CARL WHITE. The Commissioner General has the figures with him and I will ask him to furnish them.

The CHAIRMAN. Then we will hear Mr. Hull.

## STATEMENT OF HON. HARRY D. HULL

Mr. HULL. You want to know the number of deportations. They are on the increase, and are now running something like 900 a month. May I be permitted to give you an analysis of this bill before I answer your question?

The principal purpose of the pending deportation bill is to provide legislation for ridding the country of several classes of undesirable aliens who could not be reached because of shortcomings or defects in the act of February 5, 1917.

The principal characteristic of the new legislation would be the factor which the so-called "statutory period" now bears to the deportation problem. In other words, aliens would be deportable regardless of the length of time which has elapsed since their entry into the United States.

Under the present law we are limited in our activities with respect to deporting alien criminals, first, by the period of their residence here; second, by the vexatious question whether the offense of which they have been convicted involves moral turpitude; and, lastly, the duration of the sentence imposed.

Under the act of February 5, 1917, convictions must result in a sentence of one year or more imposed within five years after entry, or there must be two such sentences for convictions after May 1, 1917, and, of course, the offense must be one which can be said to involve moral turpitude.

With respect to the foregoing feature the new legislation proposes to wipe out the moral turpitude question which is one that has vexed the law officers of the bureau and the department for almost 20 years. There was a time when the question was comparatively simple, because whether or not a particular offense involved moral turpitude depended upon whether the crime was malum prohibitum or malum in se.

If the former, then the tendency was to hold that the offense did not come into the category which made deportation possible even at this late date, although, as when heretofore stated, case after case has arisen in the courts, we have not yet concluded as a matter of department policy that alien violators of the Harrison narcotic law (as distinguished from those who are convicted under the act of May 26, 1922, which relates only to those having knowledge that narcotics were imported contrary to law) should be deported.

The same, of course, applies to violators of the prohibition law, and because of the solicitor's opinions holding that the offenses do not involve moral turpitude the bureau has as a rule denied applications for warrants of arrest in these cases, notwithstanding the fact that the Supreme Court of the District of Columbia decided (in a divided opinion) that this means of determining whether an offense involves moral turpitude is a thing of the past and that violation of the liquor laws constitute an offense involving moral turpitude.

Then, too, as you are aware, many States have legislation covering indeterminate sentences; that is, defendants are sentenced, for example in New York, to serve from six months to three years for a specified offense. The District Court for the Southern District of New York has held such a sentence to be one of three years within the meaning of the immigration law and that the alien could upon the expiration of his imprisonment be deported. There are several States, however, where, were the question tried in the courts, we could not with confidence look forward to similar favorable decisions. The new legislation, if passed, would once and for all dispose of these two important questions which in the past have been generally decided in favor of the alien.

One of the most far-reaching and important features of the new law is that section which proposes to vest in such officials as you

**127**

## DEPORTATION

may designate the right to issue warrants of arrest, without the necessity of submitting applications to the bureau as has been the practice since warrant procedure as such became established. Undoubtedly at those stations where we have officials expert in that line material advantages (solely in the way of saving time, however) will result, but what we may expect from extending the authority to the average immigration officer in charge I hesitate to say. If the number of applications which the warrant division here has denied is any criterion, I know that, in the past, we would have found ourselves in very serious difficulties, not only financially but legally as well.

Another important feature of the new law is that by means of "tacking" sentences, it becomes possible to deport aliens who are chronic petty offenders. For instance, there recently came to our attention the case of an alien who had been sentenced no less than thirty times, but as he did not receive two sentences of at least one year, we are unable to deport him. Such a situation can not arise under the new law.

So far as the 1917 law relating to the deportation of criminal classes, its language is as follows:

> Any alien who is hereafter sentenced to imprisonment for a term of one year or more because of conviction in this country of a crime involving moral turpitude, committed within five years after the entry of the alien to the United States, or who is hereafter sentenced more than once to such a term of imprisonment because of conviction in this country of any crime involving moral turpitude, committeed at any time after entry.

The pertinent portion of the proposed legislation with respect to criminal classes reads:

> An alien who is convicted of any offense (committed after the enactment of the deportation act of 1925) for which he is sentenced to imprisonment for a term of one year or more.
>
> An alien who is convicted of any offense (committed after the enactment of the deportation act of 1925) for which he is sentenced to imprisonment for a term which, when added to the terms to which sentenced under one or more previous convictions of the same or any other offense (committeed after the enactment of the deportation act of 1925), amounts to eighteen months or more.
>
> An alien who is convicted of a violation of, or conspiracy to violate (committed or entered into after the enactment of the deportation act of 1925), any statute of the United States or a State or Territory prohibiting or regulating the manufacture, possession, sale, exchange, dispensing, giving away, transportation, importation, or exportation of intoxicating liquors for beverage purposes, for which he is sentenced to imprisonment for a term which, when added to the terms to which sentenced under one or more previous convictions of a violation of or conspiracy to violate any of such statutes (such previous violations or conspiracies having been committed or entered into after the enactment of the deportation act of 1925), amounts to one year or more.
>
> An alien who was convicted, or who admits the commission prior to entry, of an offense involving moral turpitude.
>
> An alien who has, after the enactment of the deportation act of 1925, violated or conspired to violate, whether or not convicted of such violation or conspiracy (A) the white slave traffic act or any law amendatory of, supplementary to, or in substitution for, such act; or (B) any statute of the United States prohibiting or regulating the manufacture, possession, sale, exchange, dispensing, giving away, transportation, importation, or exportation of opium, coca leaves, or any salt, derivative, or preparation of opium or coca leaves.

At present we have no law for deporting, for instance, an alien who assists another to unlawfully enter the country unless by a stretch of the imagination we conclude that he was a person likely

**DEPORTATION**

to become a public charge, an opinion in which we would most likely be promptly overruled by, for instance, Judge Anderson of the district court of Boston, and other judges holding views somewhat similar to his. For that reason the new legislation provides machinery for the deportation at any time after entry of "an alien who conceals or harbors, attempts to conceal or harbor, or aids, assists, or abets any other person to conceal or harbor any alien liable to deportation; an alien who aids or assists in any way any alien to unlawfully enter the United States."

Another very important feature is the inclusion in the deportable classes of any alien "who is found employed on a vessel engaged in the coastwise trade of the United States without having been admitted to the United States for permanent residence."

The bill also makes some very important changes in section 18 of the immigration act with respect to deportation expenses as well as the power of the Secretary to direct the alien's removal at the expense of the steamship company to certain specified places or countries, as well as other important features.

Now, I can give you some figures. In 1910, we deported 3,520; in 1911, 3,310; in 1912, 2,853; in 1913, 3,626, etc. The following table gives the number for the fiscal years 1910–1913, and 1919–1925, and five months of the current fiscal year.

DEPORTATION OF ALIENS

| Fiscal year: | Number deported | Fiscal year: | Number deported |
|---|---|---|---|
| 1910 | 3,520 | 1925 | 9,495 |
| 1911 | 3,310 | 1926 (5 months)— | |
| 1912 | 2,853 | July | 919 |
| 1913 | 3,626 | August | 940 |
| 1919 | 3,103 | September | 855 |
| 1920 | 2,762 | October | 909 |
| 1921 | 4,517 | November | 869 |
| 1922 | 4,345 | | 4,492 |
| 1923 | 3,661 | | |
| 1924 | 6,409 | | |

Mr. HOLADAY. What was the number in 1912?

Mr. HULL. In 1912 there were 2,853. There was a little drop in there. In 1919 there were 3,103; in 1920, 2,762; in 1921 (which was, of course, just before the enactment of the first quota law), there were 4,517. I presume a part of that was after the enactment of the first quota law. In 1922, there were 4,345; in 1923, 3,661; in 1924, 6,409; and in 1925, 9,495—which is the best gauge that you have of the number that we are deporting at the present time. We are running along, at the present time, at about the same rate as for 1925, the number being about 4,492 for the five months. That is up to the first day of December.

The CHAIRMAN. Let me ask you right there, in order to be very clear: When you say, "deportation," you mean an alien picked up some place in the United States and deported?

Mr. HULL. Yes, sir.

The CHAIRMAN. As differentiated from being debarred?

Mr. HULL. Yes.

The CHAIRMAN. Now, you gave some figures there and indicated the first quota act, which became effective June 3, 1921, might have

**129**

affected the figures that fiscal year, which was within less than a month of expiring.

Mr. HULL. Yes.

The CHAIRMAN. Do you think the first quota law had any effect on deportations in that short space of time?

Mr. HULL. Well, I do not know. I was not, of course, in the Bureau at that time. I do not know. I presume it had a slight effect. At any rate, the figures would indicate it did. The first quota act went into effect, as I recollect, on June 3, 1921.

The CHAIRMAN. Yes. How could the restrictive policy of that act cause an enlargement of deportations?

Mr. HULL. Well, of course, it would make the number greater that could be deported in the following years. When you have a restricted policy, you make a larger class deportable.

Mr. WHITE. I would like to ask Mr. Hull this question: Have you reason to think, Mr. Hull, or do the statistics prove that a large part of these deportations are parties who have surreptitiously entered the United States, or are we to conclude these persons largely have passed muster and gotten in here and it has subsequently been determined they were not eligible to admission?

Mr. HULL. Largely there are smuggled in, some come as visitors and others become public charges after legal entry. Most of these we are deporting.

Mr. WHITE. Illegally?

Mr. HULL. Some of them criminals; perhaps a few of them who legally came in are criminals.

Mr. DICKSTEIN. You do not mean to say you have deported anybody who came in in excess of the quota; you are referring to those who came in here illegally or did not go through the proper medical inspection, who you found subsequently in the States and found illegally in the United States?

Mr. HULL. They might be here in excess of the quota.

Mr. DICKSTEIN. Yes, a man might come in in excess of the quota and be found in the United States in certain circumstances, and yet be legally admitted to the United States.

Mr. WILSON. You do not mean in excess of the quota as provided by law?

Mr. HULL. No; he is here; he came in under the quota.

Mr. WILSON. But came in in violation of some other law?

Mr. HULL. Yes.

Mr. HOLADAY. Can you place, in your statement, the reason for the deportations in the year 1925?

Mr. HULL. The reasons?

Mr. HOLADAY. Yes, the grounds.

The CHAIRMAN. He means a table. I think you have the same thing in your report.

Mr. HOLADAY. Yes; I think that is in the report.

Mr. HULL. Yes, that can be done.

The CHAIRMAN. Let that be inserted at this point, from your annual report.

(The table above referred to is as follows:)

78072–26——2

TABLE 56.—*Aliens deported to countries whence they came after entering the United States, fiscal year ended June 30, 1925, by race or people and causes*

Race columns (left to right): Italian (south), Italian (north), Irish, Hebrew, Greek, German, French, Finnish, English, East Indian, Dutch and Flemish, Dalmatian, Bosnian, and Herzegovinian, Cuban, Croatian and Slovenian, Chinese, Bulgarian, Servian, and Montenegrin, Bohemian and Moravian (Czech), Armenian, African (black), Total.

| Cause (Race or people) | Total |
|---|---|
| Number deported | 9,495 |
| Feeble-minded | 4 |
| Insanity | 527 |
| Epileptics | 6 |
| Constitutional psychopathic inferiority | 24 |
| Other mental conditions | 47 |
| Tuberculosis (contagious) | 82 |
| Other contagious diseases | 70 |
| Pregnancy | 6 |
| Other physical conditions | 105 |
| Prostitutes, or inmates of houses of prostitution, and aliens coming for any immoral purpose | 209 |
| Support by or received the proceeds of prostitution, or connected with house of prostitution or other place habitually frequented by prostitutes | 51 |
| Aliens who procure or attempted to bring in prostitutes or aliens for any immoral purpose, or assists, or protects prostitutes from arrest | 83 |
| Found in the U. S. after having been deported as a prostitute or a procurer or as having been connected with the business of prostitution or importation for prostitution or other immoral purposes | 14 |
| Anarchists, and violations under the act of Oct. 16, 1918, as amended June 5, 1920 | 83 |
| Criminals | 637 |
| Under narcotic act | 63 |
| Polygamists | 9 |
| Without proper visa under immigration act of 1924 | 12,728 |
| Under per centum limit act of 1921 (excess quota) | 304 |
| Without passport under the State Department regulations | 430 |
| Under passport provision of sec. 3, act of 1917 | 293 |
| Under Chinese exclusion act | 93 |
| Geographically excluded classes (natives of that portion of Asia and islands adjacent thereto described in sec. 3, act of 1917) | 57 |
| Under last proviso of sec. 23, act of 1917; and under sec. 17, immigration act of 1924 | 115 |
| Contract laborers | 80 |
| Unable to read (over 16 years of age) | 478 |
| Under 16 years of age, unaccompanied by parent | 23 |
| Assisted aliens | 57 |
| Professional beggars and vagrants | 3 |
| Likely to become a public charge | 1,738 |
| Entered the United States within one year of previous deportation | 104 |
| Entered without inspection, or at a time or place not designated by immigration officials. Deportation required within three years | 1,169 |
| Other causes | 30 |

131

TABLE 56.—*Aliens deported to countries whence they came after entering the United States, fiscal year ended June 30, 1925, by race or people and causes*—Continued

| Race or people | Japanese | Korean | Lithuanian | Magyar | Mexican | Pacific Islander | Polish | Portuguese | Rumanian | Russian | Ruthenian (Russniak) | Scandinavian (Norwegians, Danes, and Swedes) | Scotch | Slovak | Spanish | Spanish American | Syrian | Turkish | Welsh | West Indian (except Cuban) | Other peoples |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number deported | | 83 | 6 | 22 | 1,751 | 3 | 95 | 65 | 82 | 93 | 44 | 512 | 463 | 97 | 324 | 67 | 116 | 18 | 42 | 7 | 150 |
| Feeble-minded | | | | | | | | | | | | | | | | | | | | | |
| Insanity | | 1 | | | 5 | | 12 | 7 | | 2 | | 22 | 14 | 8 | 2 | | 1 | | | | 3 |
| Epileptics | | | | | 3 | | | | | | | | | | | | | | | | |
| Constitutional psychopathic inferiority | | | | | | | | | 1 | | 1 | 2 | | | | | | | | | |
| Other mental conditions | | 1 | | | | 2 | | | 5 | 3 | | | 1 | | | | | | | | |
| Tuberculosis (contagious) | | | 1 | | 4 | | | 1 | | 2 | | 2 | | | | | | | | 2 | |
| Other contagious diseases | | | | | 5 | 3 | | | | | 10 | 3 | | | | | | | | 1 | |
| Pregnancy | | | | | | | | | | | 1 | 3 | | | | | | | | | |
| Other physical conditions | | 1 | | | 8 | | 8 | 8 | 3 | | 12 | 2 | 2 | 3 | 1 | | | | | 1 | 1 |
| Prostitutes, or inmates of houses of prostitution, and aliens coming for any immoral purpose | | 2 | | | 14 | | | 4 | | | | 6 | 6 | | 3 | | | | | | 3 |
| Support by or received the proceeds of prostitution, or connected with house of prostitution or other place habitually frequented by prostitutes | | 1 | | | 9 | | 2 | | | | | 3 | | | | | | | | 1 | |
| Aliens who procure or attempted to bring in prostitutes or aliens for any immoral purpose, or assists, or protects prostitutes from arrest | | | | | 19 | | 2 | 1 | | | | | | | | | | | | | 2 |
| Found in the U. S. after having been deported as a prostitute or a procurer or as having been connected with the business of prostitution or importation for prostitution or other immoral purposes | | | | | 11 | | | | | | | | | | | | | | | | |
| Anarchists, and violations under the act of Oct. 16, 1918, as amended June 5, 1920 | | 1 | | | | | 4 | | | 2 | 2 | 2 | | | | | | | | | |
| Criminals | 5 | 1 | 3 | 9 | 190 | | 10 | | 3 | 3 | 18 | 27 | 13 | 9 | 6 | 4 | | | | | 9 |
| Under narcotic act | 1 | 1 | | | 9 | | | | | | | 1 | | | | | | | | | |
| Polygamists | | | | | | | | | | | | | | | | | | | | | 9 |
| Without proper visa under immigration act of 1924 | 19 | | 23 | 235 | | 39 | 17 | 17 | 26 | 17 | | 142 | 142 | 41 | 141 | 24 | 23 | 7 | 20 | 46 |
| Under per centum limit act of 1921 (excess quota) | | 2 | | | | | 3 | 3 | 3 | 3 | 2 | 10 | 36 | 16 | 18 | | 8 | | | |
| Without passport under the State Department regulations | | 2 | 9 | | | 19 | 8 | 10 | 3 | | 36 | 2 | 1 | 2 | 9 | 1 | 2 | |
| Under passport provision of sec. 3, act of 1917 | 28 | | | | | | | | | | | | | | | | | | | |
| Under Chinese exclusion act | | | | | | | | | | | | | | | | | | | | | |
| Geographically excluded classes (natives of that portion of Asia and islands adjacent thereto described in sec. 3, act of 1917) | 2 | 1 | | | | | | | | | | | | | | | | | | 6 |
| Under last proviso of sec. 23, act of 1917; and under sec. 17, immigration act of 1924 | | 2 | 4 | | | 11 | 3 | | | | 7 | 11 | 33 | | | | | |
| Contract laborers | | | 21 | | | | 3 | 1 | 1 | 9 |
| Unable to read (over 16 years of age) | 2 | 3 | 284 | | 3 | 6 | 3 | 2 | 13 | 8 | | 8 | 31 |
| Under 16 years of age, unaccompanied by parent | 1 | 5 | | 2 | | 2 | 1 | | | |
| Assisted aliens | | 3 | | | | | 1 | | 1 | |
| Professional beggars and vagrants | | 1 | | | | | | | 1 | |
| Likely to become a public charge | 13 | 6 | 16 | 347 | | 21 | 21 | 11 | 109 | 41 | 10 | 31 | 4 | 24 | 23 |
| Entered the United States within one year of previous deportation | | 2 | | 6 | | 2 | 10 | | 15 | 1 | 1 | 1 | 3 | 1 |
| Entered without inspection, or at a time or place not designated by immigration officials. Deportation required within three years | 6 | 1 | 6 | 346 | | 17 | 12 | 8 | 4 | 62 | 32 | 38 | 9 | 9 | 2 | 10 |
| Other causes | 1 | 1 | 3 | 5 | 1 | 1 | 33 | 1 | 1 | 1 |

Mr. HULL. I might say, by months, so far this year, that we have deported in July, 919; August, 940; September, 855; October, 909; and November, 869.

Now, of course, I presume what you want to get is something in regard to the expense of deportation. Of course, on the details, Mr. White or Mr. Wagner, probably Mr. Wagner, will be better than I am. I have only been in the bureau something like 10 months and, of course, I have not accumulated all the knowledge, but I find the deportation costs are something like $87, on an average, per man. That is the way they are running, at least, this year.

The CHAIRMAN. That is the average between sending him back across the land borders and sending him overseas?

Mr. HULL. That is the actual expense of the average amount for all. The overhead is not included in that. The actual dollars and cents that we are out, on the average, for every alien that we deport, rail and water transportation, detention charges, etc., or the actual money that it costs our bureau to deport an alien, on the average, is $87, and that may be at the land border or it may be at the port. Of course, that does not include, you know, the aliens that we allow to depart voluntarily; it is the actual deportation under warrant of the Secretary of Labor.

Mr. DICKSTEIN. How long have most of the people been in this country that you have deported since 1925?

Mr. HULL. It would be hard to say, but then the great bulk of them are here less than five years.

The CHAIRMAN. In most of the cases, the law forbids you to go back of five years?

Mr. HULL. I think it is five years.

The CHAIRMAN. Three years.

Mr. HULL. Some of them you can go back to five, and some of them you can go further; but in many cases it is less than three years.

Mr. DICKSTEIN. A man who has committed two felonies—the statute as against him would not apply, would it, Mr. Hull? A man who had served two prison sentences for a felony, you could deport him at any time, if he were an alien?

Mr. HULL. As I understand it, you mean a man who has had two convictions of felony?

Mr. DICKSTEIN. Yes.

Mr. HULL. Of course, there is the question of moral turpitude there. Of course, just how far you can go is sometimes debatable.

The CHAIRMAN. Now the figures show that deportations are increasing, and you have given us the average cost per deportation?

Mr. HULL. Yes.

The CHAIRMAN. And that includes those who go out under the plan by which they are permitted to ship foreign? Do you get the average by including all methods you adopt to save money?

Mr. HULL. Well, if here is a warrant out, I understand that is included.

The CHAIRMAN. I know, but you arrange that quite a large number may depart?

Mr. HULL. Yes.

The CHAIRMAN. Are they then called deportees?

Mr. HULL. Well, it depends on how far you have gone, as I understand that. If you have arrested a man and taken him down and gotten him to the seaport and he says, "If you let me go, I will ship foreign," and that can be arranged, he would count as a deportation.

The CHAIRMAN. Then when you actually deport a man and it is arranged he can ship foreign, does that man count in your average cost of deportations?

Mr. HULL. Why, as I understand it, he does. He certainly would, because there is some expense connected with his detention and arrest and carrying him down to the port, but we save a great deal of money along that line.

The CHAIRMAN. In making your estimates of the amount of money to be secured for any one year, how can you arrive at any such figure?

Mr. HULL. Well, so far as it relates to the time since I have been in the bureau, we have not arrived at any positive figures. It is estimated at $1,000,000.

The CHAIRMAN. Do you feel obliged at any time to delay the matter of deportations for lack of funds?

Mr. HULL. Why, we certainly do. When I went into the bureau I found the bureau facing a potential deficit. I went in in May and there was a deficit of about $100,000, and if we had gone ahead, why we would then have had a deficit of close to $100,000.

Mr. Box. Gone ahead with what, Mr. Commissioner?

Mr. HULL. Deportations.

Mr. Box. Under the law?

Mr. HULL. Under the law.

The CHAIRMAN. That is the point we are trying to arrive at, in the preparation of a bill which would greatly enlarge the number of deportations.

Mr. WILSON. Do you understand, Mr. Hull, they had to check up on deportations because they did not have the money?

Mr. DICKSTEIN. No; they had to stop deportations because they did not have the money.

Mr. HULL. We had to stop.

Mr. WILSON. I say, you would have deported more if you had had sufficient funds?

Mr. HULL. Certainly.

Mr. BACON. Have you brought that to the attention of the Appropriations Committee?

Mr. HULL. We have brought the facts to the attention of the Bureau of the Budget and I think it has been brought to the attention of the Appropriations Committee.

Mr. BACON. J understand.

Mr. HULL. But I was asked to sign an order stopping deportations so that, when the 1st of July came, we would not show a deficit for the year.

The CHAIRMAN. When did you sign such an order?

Mr. HULL. I think it was the 25th of May, if I remember rightly.

The CHAIRMAN. Of last year?

Mr. HULL. Ten days after I went in the bureau.

**134**

Mr. WILSON. When you made an estimate for the Budget, did you make that known, that you needed more money for deportations?

Mr. HULL. Absolutely.

Mr. WILSON. You sent that in?

Mr. HULL. Oh, certainly. We have asked for more money and told them why.

Mr. WILSON. Did they recommend it, or do you know?

Mr. HULL. Well, they have not recommended it so far; that is, for the fiscal year 1927.

The CHAIRMAN. Now, let us get that. That was May, 1924, then, you signed the order?

Mr. HULL. No; May, 1925.

The CHAIRMAN. 1925?

Mr. HULL. I went into the bureau on May 15, 1925.

The CHAIRMAN. And the new fiscal year came on the following July 1?

Mr. HULL. The following July 1.

The CHAIRMAN. So that you would go into the new fiscal year, then, short of money?

Mr. HULL. No; we did not. We had the money, but we stopped deportations the 25th of May; absolutely stopped them.

The CHAIRMAN. What happened with individuals who were waiting deportation?

Mr. HULL. They were detained.

The CHAIRMAN. For how long?

Mr. HULL. Well, until the first of the next fiscal year.

The CHAIRMAN. And then did you have sufficient funds to start in and catch up with the work?

Mr. HULL. We have not yet; we hope to get them.

The CHAIRMAN. Have you many now awaiting deportation?

Mr. HULL. No; we are going right ahead, so far.

The CHAIRMAN. Well, when they are detained, where are they detained?

Mr. HULL. Well, at the points of deportation, or they may be detained back in the country, or they may be left in jail. We do not start after a party, that is all; we just let them stay.

Mr. Box. They are all in custody, are they not, Mr. Commissioner?

Mr. HULL. Most of them. I won't say "all," because it might be some of them are paroled.

Mr. Box. That is the exception?

Mr. HULL. Yes; that is an exception.

The CHAIRMAN. Could you put a table in this record showing the number on hand awaiting deportation at any given date that is convenient to you?

Mr. HULL. Yes; what date do you want?

The CHAIRMAN. You select the date that would fit the records of the various stations, just so we can see how we are running in deportations.

Mr. HULL. Well, it would be higher the 25th of June or the 1st of July, than it would be at other times.

The CHAIRMAN. Why?

Mr. HULL. Well, because we stopped.

Mr. Box. And they continued to accumulate?

Mr. HULL. They accumulated to some extent.

Mr. Box. I think that statement ought to show the greatest number that accumulated, the persons then in custody that had accumulated on your hands, because of lack of funds to deport them.

The CHAIRMAN. That is one point. Another table that is desirable would be the number on hand now.

Mr. HOLADAY. Why would it not be a good idea for that first statement to be as of date June 30, 1925. That would show the number on hand at the close of the fiscal year. Then a statement of the number on hand at a recent date, say, January 1, or whatever date would be possible.

The CHAIRMAN. Yes.

(The table above referred to is as follows:)

Number of aliens under orders of deportation—

| | |
|---|---|
| June 30, 1925 | 1,150 |
| Jan. 1, 1926 | 2,788 |
| Jan. 15, 1926 | 2,835 |

The CHAIRMAN. Now, then, where are you now on deportations this month? Are you proceeding with cases as they come along, or are you deferring?

Mr. HULL. Well, we are proceeding, but not proceeding quite as fast as we would like to.

The CHAIRMAN. How is your deportation money prorated per month, or is it dosed out by the month?

Mr. HULL. Well, we have only sufficient funds for about seven months deportation work.

The CHAIRMAN. Is it allotted to you by the month?

Mr. HULL. No, it is allotted in a lump sum. But, then, we have been exceeding out apportionment; that is, we have been exceeding the amount that was appropriated up to the present time, and we have asked for a deficiency from the Budget and it has been granted by them; that is, the Budget have recommended a deficiency for this year, as I understand.

The CHAIRMAN. A supplemental appropriation?

Mr. HULL. A supplemental appropriation.

The CHAIRMAN. How large will that be?

Mr. HULL. I do not know, of course. That depends on Congress. The Budget has recommended, I understand, $600,000.

The CHAIRMAN. To take care of pending deportation matters?

Mr. HULL. Oh, yes, and other expenses. The border patrol comes in here.

The CHAIRMAN. The border patrol—operating expense?

Mr. HULL. Yes. I think about $450,000 for border patrol. You see, there are, you might say, two things in regard to the enforcement of this act; first, your border patrol, which stops the alien at the border and it is much cheaper, in my opinion, to stop the alien at the border than it is to let him get in; but you must have a very effective force, and you have to have a larger force than we have at the present time. Of course, the border patrol, you see, is a creation of the last year and, while it is doing wonderful work, marvelous work you might say, it is not large enough by quite a bit.

Mr. BACON. It ought to be twice as large, ought it not, Mr. Hull?

Mr. HULL. I do not think there is anybody wise enough to say what that border patrol will have to be. It will have to be twice;

**136**

and, more than that, I will say that if you desire 95 per cent efficiency.

It will never be 100 per cent efficient, but it can be made very close to what you might say is 100 per cent efficient, but it will take work and it will take time. You can not create it in a minute.

Mr. WILSON. Can you give an estimate of the number of aliens now held who are subject to deportation and who you are unable to deport because of the lack of funds?

Mr. HULL. No. We have not stopped deporting this year.

Mr. WILSON. What I mean is you had to cut down?

Mr. HULL. We have not stopped. No, I do not think, officially, that we cut down.

The CHAIRMAN. Let me get at it on another tack——

Mr. HULL. We have told them to go ahead.

Mr. WHITE. I got that mixed a little, Mr. Chairman. He was speaking a little while ago of the last fiscal year. This fiscal year you have not discontinued deportations, as yet?

Mr. ROBE CARL WHITE. They have been curtailed.

Mr. HULL. We have curtailed to some extent; that is the point.

Mr. WHITE. Are you going to be short of funds?

Mr. HULL. We will have to do more than that, if we do not get some funds.

The CHAIRMAN. When you warn your officials out through the country with regard to expenditures for deportations, what do you do? Do you send them a telegram saying, " Slow down," or how do you word it?

Mr. HULL. I think they are simply warned that they can not have any more money for their allotments.

The CHAIRMAN. For deportation purposes?

Mr. HULL. No——

Mr. ROBE CARL WHITE. When we went before the Budget, we made our representations and then we were advised that our appropriation would be the same for this coming year as for last year and at that time we had not curtailed any of our activities, and our financial man reported to me and Mr. Hull that if we continued on the same basis we were then going, we would wind up the year with a deficit of $350,000 to $400,000. When that fact became known, I immediately approved an order of Mr. Hull notifying the field officers that they must cut down in their deportation work, as that is about the only phase of the work where we can save money. This is the only flexible part of our appropriation, unless we reduce the personnel. If you do not mind, I will quote a letter received yesterday from one of the district directors, which will give you an idea of the whole situation, or the situation in most of the districts. He wrote:

The financial problem, as regards meeting expenses chargeable against the immigration appropriation, with which we are confronted here, simply can not be solved without funds. The immigration allotment given this district on July 1, to cover expenses for the fiscal year, is now completely exhausted and the deficit which has already been created is rapidly increasing. On the 1st of January, the balance in our immigration allotment was only $697.87.

That is for an entire district.

* * * Our fixed obligations alone, for the remainder of the year, such as telephone, rentals, etc., will total about $1,200, and, in addition, our detention bills at the present time are running over $14 per day.

## 14
### DEPORTATION

That is for the detention of aliens.

* * * There is only one way to meet this situation, if additional funds can not be supplied, and that is to immediately release all the aliens we are now holding in jails, make no more arrests, and refuse to take into custody those aliens for whom we hold warrants and are due for early release from penal institutions within the district.

This program does not appeal to me and, if put into actual operation, nothing short of absolute chaos would be the result. However, with our allotment completely exhausted and a debt of $700 already contracted, and with positive instructions outstanding that we must keep within the amount given the district at the beginning of the year, there seems to be no other course to follow.

I would greatly appreciate some advice or instructions as to how this situation is to be handled.

Mr. DICKSTEIN. Where did that come from?

Mr. ROBE CARL WHITE. This came from Buffalo, from the man in the Buffalo district. In the Buffalo district, the last knowledge I had of it, they had about 700 unserved warrants. They had several hundred (I have forgotten the exact number) warrants that were served, but the hearings have not yet been held. Now, at the time that order was issued, we had been informed that our appropriation for 1927 was the same as for 1926. Since then we have asked for a deficiency, covering this year, and we understand, or have been informed by the Budget, that the President has approved the submission of our estimate of $600,000 to Congress. Therefore, we can ease up on these districts by giving them a new allotment, providing the Appropriations Committee of Congress approves the recommendation of the President and the Budget, which we have reason to believe, or I presume we are safe in believing, they will do. The order curtailing the activities of all districts has not yet been withdrawn, so that is the occasion for this letter from the district director. The men were driven desperate to try to handle the situation. If we had been compelled to operate under our appropriation, without a deficiency appropriation this year, it would simply mean marking time.

Mr. BACON. What is the situation for the coming fiscal year in the Budget?

Mr. ROBE CARL WHITE. Well, the coming fiscal year, for 1927, the appropriation is the same as for 1926.

Mr. BACON. In spite of the fact it has been proved that you needed a $600,000 additional appropriation to carry on?

Mr. ROBE CARL WHITE. Well, I do not know as I can say "proved." Our representations to the Budget were made along the lines of needing additional moneys. We failed to convince them of that fact.

Mr. BOX. You did convince them, however, you needed some $600,000 additional for the present year?

Mr. ROBE CARL WHITE. Yes; we convinced them of that fact.

Mr. BACON. Is the Budget for 1927 $600,000 short of what you asked for?

Mr. ROBE CARL WHITE. $1,350,000 short.

Mr. BACON. In other words, you asked $1,350,000 that you did not get from the Budget?

Mr. BOX. Yes; and even this deficiency appropriation, I understand, is not what they said they needed for this immediate work. Is that correct, Mr. Secretary?

Mr. BACON. I understood that too, Mr. Box.

Mr. JENKINS. Suppose a man is arrested and held for deportation, because of lack of funds; has he any right to get a release from jail?

The CHAIRMAN. Oh, yes.

Mr. ROBE CARL WHITE. Yes; he has rights. The courts repeatedly have held we have no right to hold an alien an unreasonable length of time. Three months has been held by the courts to be an unreasonable length of time. It is true that we have held aliens as high as two years, but it was generally because the aliens themselves refused to disclose their country of nativity, or to give any information whatever on which we could get a passport, or we carried them on because they were generally bad ones and we figured they should be confined. However, that eats up our appropriation very rapidly.

Mr. JENKINS. That is what I thought; that it would be useless to hold these fellows there if the law gave them a right to release themselves. But I see your point. Now let me ask you another question: Has your enforcing or parole department any system whereby they can take into custody the worst ones and pass up the less offensive?

Mr. ROBE CARL WHITE. Oh, yes. That is exactly what the last order said. You understand, gentlemen, we have never gone out and made surveys of districts to ascertain whether or not aliens are in that district unlawfully—illegally in this country. We have had numerous demands for this character of work to be done, but we have instructed our men to confine themselves to what we call the emergency work—the work that is right in front of them, the deporting of aliens who are reported to the Immigration Service through various sources, civil authorities, and individuals; and the ones they run across in their everyday work. At the present time, I have requests from four places for surveys claiming many are in these localities illegally and that serious trouble might arise unless we clean out the aliens who are illegally there, and we are arranging to-day for one party of three inspectors to go and make a survey of one district. That is only one of many districts and places where we really ought to go and make a survey and get the aliens who are illegally here and deport them. That kind of work we have been unable to do.

The CHAIRMAN. Now, is it not just that situation that is probably responsible for the very insistent demand that Congress enact an enlarged deportation act?

Mr. ROBE CARL WHITE. I presume it is; yes, sir.

Mr. VINCENT. Mr. White, you said that the Budget had recommended the same appropriation, as originally made in 1924, for 1925?

Mr. ROBE CARL WHITE. Yes.

Mr. VINCENT. Now, let me see if I understand it exactly. As I remember it, after we passed the immigration law in 1924, this committee was instrumental in getting an amendment put on the appropriation bill, for an item concerning immigration, of $1,200,000, in addition to that recommended by the Bureau of the Budget.

Now, do I understand that their recommendation now includes that amount, or that it goes back to the amount with that off?

Mr. ROBE CARL WHITE. It includes that amount.

Mr. VINCENT. It includes that amount?

Mr. ROBE CARL WHITE. In other words, our appropriation for 1925 is $5,084,000.

Mr. WAGNER. $5,084,865.

Mr. ROBE CARL WHITE. And the appropriation recommended to Congress for 1927 is the same amount. Now, you understand the Budget Committee appreciates the fact that when they give us $600,000 additional this year, something will be required for next year. Of course, they hope that we will be able to curtail our activities in such way as to absorb this extra amount, and we will make every honest effort to do so.

Mr. BACON. Mr. White, is it not true that the item Mr. Vincent speaks of, namely, the $1,200,000, was entirely designed for the use of the border patrol?

The CHAIRMAN. Except $200,000; $1,000,000 for the border patrol.

Mr. BACON. $1,000,000 for the border patrol, and the other $200,000 for what?

Mr. WAGNER. Just the general immigration expenses.

Mr. BACON. In other words, it did not largely affect your question of deportations?

Mr. ROBE CARL WHITE. No.

Mr. HOLADAY. Mr. White, your sole reason for the department pursuing the restricted deportation policy and confining its activities to what you term " emergency cases " is because of the lack of funds to finance the border and more active policy, is it not?

Mr. ROBE CARL WHITE. Oh, yes. Yes; we must live within our appropriations. You understand, gentlemen, that we have certain fixed charges. The salary roll is fixed, and it is about $4,097,571 at the present time. Now, that is a fixed charge, unless you reduce your personnel. That leaves us $987,294 with which to pay all other expenses, including deportation. Now, out of that, the cost of deporting aliens for the first five months of this year was $395,129, and the overhead estimated expense outside of salaries is about $500,000 for the year. Now, then, we have already spent in five months almost all that was available for deportation work for the whole year. Now, the added $600,000 will enable us to get by for the rest of this year, continuing the same policy we have been following; that is, deporting about 900 aliens a month.

Mr. VINCENT. If you had more money, without passing any new deportation law at all, taking the one you have now and making the surveys such as you have very properly suggested, I think, there would be a tremendous increase in deportations, would there not?

Mr. ROBE CARL WHITE. Oh, yes. We could make the deportations almost anything you wanted, until we rid the country of the aliens who are illegally here. And our best estimate, secured from the director recently (and it can only be an estimate, you understand), and which I believe is conservative, is there are now between 250,000 and 275,000 aliens in this country who are illegally here, and who are supposed to have entered since 1921. Some of those, probably, are entitled to relief. But the greater proportion of

them should not be here; they should be out of the country and, if they want to remain in the United States, they should come back properly and with proper documents and a clean bill of health as to their character and morals.

Mr. FREE. Will you describe the process of deportation; that is, is a man picked up and then there is a ticket bought for him, or does some inspector go with him?

Mr. ROBE CARL WHITE. Do you want me to describe the method?

Mr. FREE. Will you please do that and give us an estimate of the expense per person?

Mr. ROBE CARL WHITE. Our inspectors first locate the man, make some inquiries and, if they think the alien is here illegally, they then ask the Secretary of Labor for a warrant of arrest. They serve the warrant of arrest, take the alien in charge, and then the alien, under the law, is entitled to a hearing, with his own attorney present, if he wishes. This hearing is recorded and transcribed and the inspector recommends to the Secretary, after the hearing is completed, whether or not in his judgment the alien is here illegally; and, if so, the grounds upon which he should be deported. That is forwarded to the department, passed upon there, and if they approve the recommendation of the inspector a warrant of deportation is issued, under which the alien is taken in charge and deported.

Then it becomes necessary for us to secure a passport and to take the alien, at Government expense, from wherever he is found in the country (if he is to go across the water) to the port of embarkation. If he is found in Nevada, and he should go to France or England, he is taken to New York. The expense of that part of the deportation is defrayed by the Government. Then, in many cases, the steamship companies pay the expense from the port of embarkation to his destination. Of course, we have quite a number that we deport entirely at Government expense.

That, in short, is about the process.

Mr. VINCENT. That would be true in all cases where the deportation arises solely upon some act of the individual after he has been legally brought into the country?

Mr. ROBE CARL WHITE. Yes. There are a great many grounds upon which deportation occurs.

Mr. VINCENT. The steamship companies would not be responsible for some crime he committed here?

Mr. ROBE CARL WHITE. That is correct.

The CHAIRMAN. Let me ask you, right on that point; I was informed, last summer, in the effort to break up tong wars, or Chinese factional wars, in New York City, the Department of Labor, through its immigration service, stepped in and arrested and arranged for the deportation of about 250 Chinese?

Mr. ROBE CARL WHITE. No. Mr. Chairman, this is what happened——

The CHAIRMAN. I would like to know.

Mr. ROBE CARL WHITE. The tong war broke out in New York City and the Department of Justice, through Mr. Buckner, made raids. After they had taken into custody a great many Chinese, they asked the Immigration Service to come there and see whether they were deportable, or not. In the first place, we did not initi-

ate a single arrest; it was initiated by the Department of Justice or the city authorities, and we only took the ones that we knew were deportable, and that amounted to——

Mr. WAGNER. Two hundred and fifty-three was my recollection.

Mr. ROBE CARL WHITE. Mr. Wagner says it amounted to 253 from New York. Now that, without any initiative of our own, without any way of preventing it, loaded our appropriation with almost $40,000. Then the same process was undertaken at Cleveland. I have forgotten the details, but it never reached any great proportion.

The CHAIRMAN. Right along that line—that is exactly why I brought it up—your service could have inaugurated an inquiry among the Chinese of New York as to their right to be in the United States?

Mr. ROBE CARL WHITE. Yes, sir. We have often made surveys—we used to in years gone by.

The CHAIRMAN. But you did not do it in this case?

Mr. ROBE CARL WHITE. We did not do it in this instance, we have for years had reason to believe that there are probably from two to three thousand Chinese in the city of New York alone, who would be subject to deportation if their cases were gone into carefully.

Mr. BACON. You did not have the money to make a survey?

Mr. ROBE CARL WHITE. We did not have the money. It would probably mean half a million dollars to clean up the New York Chinese situation alone, to say nothing of every other community in the United States.

The CHAIRMAN. That is what I am trying to get at; that is where this discussion comes in, to aid the Committee in its consideration of an enlarged deportation bill.

Mr. DICKSTEIN. Mr. White, did you glance through page 5, section 19, and all the way down, to page 15, the section, we will say, referring to aliens who entered the United States at any time, at a place other than designated by the Immigration officials, etc.?

Mr. ROBE CARL WHITE. Where is that?

Mr. DICKSTEIN. That is on page 5, section 19, subdivision 2.

Mr. ROBE CARL WHITE. Yes.

Mr. DICKSTEIN. Now, let us assume that in the past 10 or 15 years men have come to this country and did not go through the proper legal steps; they have married American wives and have American children. Now, if they were found, the way the section reads, you would have a right to deport them?

Mr. HOLADAY. Mr. Dickstein, I think you failed to read the last line there.

Mr. DICKSTEIN. Who entered the United States before June 3, 1921. But I am going back 10 years before that.

Mr. HOLADAY. It would not apply to them.

Mr. DICKSTEIN. It would apply only to those who came after?

Mr. ROBE CARL WHITE. After June 3, 1921.

Mr. HOLADAY. Yes.

Mr. DICKSTEIN. What would you do in that case where the man had married and had American children, and was otherwise admissible, of good moral character, and everything else?

**142**

Mr. Bacon. Do you call it good moral character if they break the laws of the country by coming in, by smuggling?

Mr. Dickstein. I can see the argument that they came here illegally, say, on June 4, 1921.

Mr. Bacon. Since the first quota law.

Mr. Dickstein. Yes; but they are otherwise fit; they are not bolsheviks; are not anarchists, and do not believe in the destruction of this Government, and they have married and have American children. What are you going to do with them?

The Chairman. Why, give them a clean bill of health and let them tell all the rest of their relatives back home how to get in the same way.

Mr. Dickstein. I am only trying to get the information.

The Chairman. Well, you have got it.

Mr. Dickstein. You have given it to me.

Mr. Robe Carl White. I think the circumstances of each case should govern. There are some cases in which I think an injustice would be done to aliens who are illegally in this country if we deported them. I know all along the border, in the sparsely settled districts, we have run across cases where men residing near the border have sold their belongings and come across, there was no immigration officer within many miles of them, and they drove across, and later they were picked up in the United States. There was no intention on the part of the alien to evade our laws. There are some few instances of that kind where it seems to me an injustice would be done if they were deported. I am, however, personally opposed to Congress passing a blanket law legalizing the entry of all aliens who came into this country prior to any given date.

Mr. Dickstein. Prior to June 3, 1921?

Mr. Robe Carl White. I would be opposed to that, for this reason, that I think every case should be investigated, and I would much prefer that you give authority to some one to legalize their entry, after investigation.

Mr. Dickstein. How about the Commissioner of Immigration, or the Department of Labor?

Mr. Robe Carl White. I think the Commissioner General of Immigration would be the proper man, of course, in whom to lodge that discretionary authority.

Mr. Golder. When you deport an alien, is it necessary to make some arrangement with the country from which he came?

Mr. Robe Carl White. Only to secure passports.

Mr. Golder. Do you ever have any difficulty in securing the approval of the country to which you intend to send him?

Mr. Robe Carl White. Oh, yes; we have questions arising all the time. We have two or three aliens in custody now who have been in custody for some time, waiting passports, because the country to which they are going refuses to issue the passport on the ground they have no record of his having been born there. We have a little child now—I have forgotten its affliction—but it is a mandatory deportation case, so far as the deportation law is concerned. The father is a naturalized citizen of the United States. The child was admitted temporarily several years ago; has been here ever since,

and now the laws of the country of its nativity—I think it is Po-
land—is such that when the father became a naturalized American
citizen the child expatriated itself, and so it refuses to take her back.
Under Polish laws the child is now an American citizen, and, under
our laws, it is still a Polish citizen.

Mr. GOLDER. What do you do in those cases?

Mr. ROBE CARL WHITE. Well, we do not know what to do.

Mr. VINCENT. Well, is it not a fact, to be perfectly truthful about
it, that the United States can not do anything about a case of that
kind?

Mr. ROBE CARL WHITE. I do not know, but I am inclined to
believe there is nothing we can do. I do not know.

Mr. BOX. With reference to those cases of aliens that are held
in custody, the Government pays the expenses of those aliens, does
it not?

Mr. ROBE CARL WHITE. Yes, where we pick them up under a de-
portation order.

Mr. BOX. And the ones who are to be deported, if you had to
hold them six months or a year, the cost of deporting is then very
much greater than if they were deported promptly?

Mr. ROBE CARL WHITE. Oh, yes indeed.

Mr. BOX. And if you had had the funds to deport those aliens
immediately upon arrest, the expense would have been very much
less than now?

Mr. ROBE CARL WHITE. Yes. The natural flow of deportation
should continue, and it is continuing on those we are actually taking
in custody. You understand, we use every method we can to avoid
detention expenses.

Mr. BOX. Have you any idea now how many remained in custody
on the 1st of July, this fiscal year?

Mr. ROBE CARL WHITE. I have not any figures. Mr. Wagner re-
minds me it was something like one thousand. You understand,
Congressman, that our officers, immediately on receiving the order
to cease all deportations, permitted every alien possible, to leave
the jails under bond or recognizance, in order to avoid detention
expense.

Mr. BOX. By that method you reduced it to what is now esti-
mated as 1,000?

Mr. ROBE CARL WHITE. That is my recollection. I can give you
the figures later if you want.

Mr. BOX. Can you give us any information about what the aver-
age cost is—I know you can not do it accurately, but the average
cost—of maintaining those deportees, per man?

Mr. ROBE CARL WHITE. About 90 cents per day.

Mr. BOX. And if you had 1,000 on hand, then you would have
about $900 a day expense on that account?

Mr. ROBE CARL WHITE. Yes. There is another point. In our
published records, as to the number deported, no account is taken
of the number picked up along our borders, who are given the
opportunity of returning voluntarily. In one district last year
three thousand one hundred and some odd were permitted to return
in this way.

The CHAIRMAN. In what district?

Mr. ROBE CARL WHITE. In the San Antonio district.

The CHAIRMAN. Did they go back to Mexico?

Mr. ROBE CARL WHITE. They went back to Mexico.

Mr. Box. To what country did they go?

Mr. ROBE CARL WHITE. Mexico. They were all Mexicans. We do not permit European aliens from Mexico to return to Mexico voluntarily.

Mr. Box. I want to get that because the committee has some matters pertaining to that very phase of the question.

Mr. ROBE CARL WHITE. Yes.

Mr. Box. How many did you say went back voluntarily from San Antonio to Mexico last year?

Mr. ROBE CARL WHITE. It was over 3,000.

Mr. Box. Over 3,000 that you had ordered deported, and voluntarily returned?

Mr. ROBE CARL WHITE. No.

Mr. Box. Subject to deportation?

Mr. ROBE CARL WHITE. They were Mexicans, apprehended and subject to deportation and, rather than be detained, expressed a preference to return of their own will. They signed releases and waivers and we carted them back.

Mr. Box. Do you actually see that they go back over the border?

Mr. ROBE CARL WHITE. Oh, yes; every one is put across and delivered to the Mexican authorities.

The CHAIRMAN. That is at Federal expense?

Mr. ROBE CARL WHITE. Yes.

Mr. Box. Can you give any idea of the expense, roughly, of sending back that 3,000?

Mr. ROBE CARL WHITE. No. The service maintains large trucks, and when these men are apprehended, they are taken back by the truckload.

Mr. Box. You carry them back across the Rio Grande in truckloads, then?

Mr. ROBE CARL WHITE. Yes; and they are delivered to Mexican authorities.

The CHAIRMAN. A sort of holiday trip. [Laughter.]

Mr. BACON. In addition to the 32,000 Mexicans that came in legally for permanent residence last year, how many came in illegally; have you any idea—a rough estimate?

Mr. ROBE CARL WHITE. No. That would be the wildest kind of a guess, but I think I am safe in saying since the establishment of the border patrol 75 per cent of alien smuggling across the Mexican and Canadian borders has been stopped.

Mr. BACON. Can you tell me how many Mexicans you deported last year?

Mr. ROBE CARL WHITE. I have not the figures, but they are given in the Commissioner General's annual report.

Mr. BACON. That figure would not show, however, the number of Mexicans who were politely turned back?

Mr. ROBE CARL WHITE. No; it would not.

Mr. BACON. The figures of those turned back are not in your annual report, are they?

Mr. ROBE CARL WHITE. No.

Mr. BACON. You say there were 3,000 from the San Antonio district. How many are there for the El Paso border?

**145**

Mr. Robe Carl White. I haven't the figures in my mind now, as to the entire Texas border, but the number is quite large in both the El Paso district and the California district. We have had some trouble in the California district. They are tightening upon the Mexican side as well as on the American side and there has been some objection to our returning Mexicans under a voluntary procedure.

Mr. Wilson. Now, what does he do? When you drive a truck load up to the consulate, does he refuse to receive them?

Mr. Robe Carl White. No.

Mr. Wilson. But he simply objects to it in words?

Mr. Robe Carl White. No. I remember only one objection being made, and that was in the California district. We are having quite a little difficulty in the Southern California district from our own people, who claim the law is being enforced too stringently. It seems to come principally from chambers of commerce along the border.

Mr. Bacon. In other words, the people down there are looking for cheap labor?

Mr. Robe Carl White. Well, they are like the most of us, I guess; they want the law enforced when it does not affect them personally.

Mr. Vincent. That is a uniform proposition.

Mr. Bacon. Can you give the committee any information to show the number of Mexicans handled by the border patrol—not only those deported, but those turned back?

Mr. Robe Carl White. Yes, I think we have those figures. I am not sure we have them with us.

Mr. Bacon. I understand.

Mr. Robe Carl White. For the last year, Mr. Wagner tells me, the persons questioned, or investigated, for the entire border, that is, for both borders, was 1,252,379; the persons detained temporarily, 9,321; persons referred to local immigrant inspector for further investigation, 14,078; persons apprehended, or assistance rendered in their apprehension, for violation of customs regulations, 1,185; aliens arrested involving seizures of vehicles or contraband goods, 536; aliens arrested on warrants, 2,847; aliens attempting to enter the United States turned back without resorting to warrant procedure, 14,711; alien smugglers captured, 331; smuggled aliens captured, 4,641; miles patroled (on foot, by vehicle, and by boat), 2,288,000.

Then in the inspection of trains, motor vehicles, etc., freight and passenger trains examined were 104,094; passengers on same, estimated, 1,553,500; automobiles and motor busses stopped and examined 418,128; boats and other means of transportation stopped and examined, 33,485. The estimated number of passengers on these automobiles, motor busses, boats, and other means of transportation were 1,543,400.

The seizures, including assistance given other officials, for violation of customs, prohibition, and immigration laws, were, automobile, 253; boats and other conveyances, 195. The value of these vehicles, including the seized contraband goods, estimated, was $475,672.

The special investigation made, such as requests by immigration officers to establish responsibility and willingness to support rela-

146

tives applying at various ports of entry for admission into the United Statets, were 2,177.

Mr. BACON. Now, what is the total force of your border patrol?

Mr. ROBE CARL WHITE. Four hundred and ninety-seven.

Mr. BACON. Four hundred and ninety-seven on the Mexican and on the Canadian borders?

Mr. ROBE CARL WHITE. Yes, sir.

Mr. BACON. On both borders?

Mr. ROBE CARL WHITE. Yes. That is the entire force. That does not mean that many men are actually patrolling it. The actual number of officers on the border patrol roll at present is 497, with a total annual salary obligation of $865,000. This leaves only $135,000 to pay for all other expenses incident to the operation and maintenance of the border patrol, which is insufficient. In order to maintain the present forces during the remainder of the year and to take care of the incidental expenses, an additional appropriation of at least $250,000 is necessary. That is a memorandum I wrote to the Secretary.

Mr. BACON. Could we have that memorandum made a part of our record, as far as it affects the border patrol?

The CHAIRMAN. We would be very glad to have that.

(The following memorandum was submitted for the record by the Assistant Secretary:)

### IMMIGRATION BORDER PATROL

The actual number of officers on the border patrol at present is 497, with a total annual salary obligation of $865,000. This leaves only $135,000 to pay for all other expenses incident to the operation and maintenance of the border patrol, which is insufficient. In order to maintain the present force during the remainder of the year and take care of the incidental expenses, an additional appropriation of at least $250,000 is necessary.

In addition, the bureau believes that at least 200 patrol officers should be added to the force. In order to do this, it would require a further appropriation of $200,000 over and above the stated amount of $250,000, making a total of $450,000, and if the border patrol is to function at all in a reasonable manner, a supplemental appropriation in the latter amount should be granted to this branch of the service.

### CHARACTER OF WORK

|  | Number |
|---|---|
| Persons questioned or investigated | 1,252,379 |
| Persons detained temporarily | 9,321 |
| Persons referred to local immigrant inspector for further investigation | 14,078 |
| Persons apprehended (or assistance rendered in their apprehension) for violation of customs regulations | 1,185 |
| Aliens arrested involving seizure of vehicles or contraband goods | 536 |
| Aliens arrested on warrants | 2,847 |
| Aliens attempting to enter the United States turned back without resorting to warrant procedure | 14,711 |
| Alien smugglers captured | 331 |
| Smuggled aliens captured | 4,641 |
| Miles patrolled (on foot, by vehicle, and by boat) | 2,288,000 |

### INSPECTION OF TRAINS, MOTOR VEHICLES, ETC.

|  | Number |
|---|---|
| Freight and passenger trains examined | 104,094 |
| Passengers on same, estimated | 1,553,500 |
| Automobiles and motor busses stopped and examined | 418,128 |
| Boats and other means of transportation stopped and examined | 33,485 |
| Passengers on above | 1,543,400 |

SEIZURES (INCLUDING ASSISTANCE GIVEN OTHER OFFICIALS) FOR VIOLATION OF CUSTOMS, PROHIBITION, AND IMMIGRATION LAWS

| | Number |
|---|---|
| Automobiles | 253 |
| Boats and other conveyances | 195 |
| Value of above, including seized contraband goods, estimated | $475,672 |
| Special investigations made, such as requests by immigration officers to establish responsibility and willingness to support relatives applying at various ports of entry for admission to the United States | 2,177 |

Mr. GOLDER. Did I understand you to say, in your judgment, there are about 250,000 aliens now in the United States deportable under the existing laws?

Mr. ROBE CARL WHITE. That is the judgment of the district directors, in all of the districts, which meets with my approval. I believe they are conservative in that.

Mr. GOLDER. I understand Mr. Hull to say that the average cost of deportations is about $89; is that correct?

Mr. ROBE CARL WHITE. Yes; $87.

Mr. GOLDER. That was the average, I understood. Now, does that include the cost of office work connected therewith?

Mr. ROBE CARL WHITE. Oh, no.

Mr. GOLDER. Or is it merely the cost of transportation?

Mr. ROBE CARL WHITE. No.

Mr. BACON. It does not include the cost of investigating and making the surveys?

Mr. ROBE CARL WHITE. It does not include what I call the overhead—the salaries, office expenses, etc.

Mr. GOLDER. Adding, then, the cost of investigation and other incidental expenses, it would cost close to $25,000,000 to deport those now subject to deportation under existing law?

Mr. ROBE CARL WHITE. Something like that. It would extend, of course, over a period of years; you will not get them all at one time.

Mr. BOX. Now, then, this 14,000 that you say returned voluntarily and you carried back, you carried them to the border and there unloaded the truck?

Mr. ROBE CARL WHITE. We turned them over to the Mexican officials.

Mr. BOX. But you have no method, then, of telling what became of them, after they got across the border?

Mr. ROBE CARL WHITE. No.

Mr. BOX. And if they were smuggled back into the country, they would have to be detected?

Mr. ROBE CARL WHITE. Oh, we have picked up some who have been in before, but the number is not large.

Mr. VINCENT. Are you correct in saying you turned them over to the Mexican consul?

Mr. ROBE CARL WHITE. The Mexican immigration officials at the port. They all go to some port of entry. Most of those were turned over at Laredo, Eagle Pass, and Brownsville, in the Texas territory.

The CHAIRMAN. Now, I want to ask you in regard to the overseas deportations under a limited policy. I assume you first look after those who have served sentences for crime?

Mr. ROBE CARL WHITE. Yes; we try to empty the institutions.

The CHAIRMAN. And you have a pretty good system of keeping in touch with the State officials?

Mr. ROBE CARL WHITE. We have direct contact with some of them and rely upon the State officials to advise us. Some of the States have laws requiring State officials to notify the Immigration Service of all aliens confined in their institutions; others do not.

The CHAIRMAN. Now, then, your next line: Is that likely to be the alien insane?

Mr. ROBE CARL WHITE. Well, they are generally in the institutions, you know.

The CHAIRMAN. And you clean out the institutions first?

Mr. ROBE CARL WHITE. Yes.

The CHAIRMAN. Then you take care of the most pressing cases that come under the observation of your inspectors?

Mr. ROBE CARL WHITE. Yes.

Mr. FREE. Is the literacy test being applied strictly along the Mexican border now?

Mr. ROBE CARL WHITE. Much more so than ever before in the history of immigration. That is one of the reasons for the great decrease in the number of Mexicans coming in legally through our ports. That is one of the things they object to all along the border having the literacy test enforced.

Mr. BOX. They object to the head tax too, do they not?

Mr. ROBE CARL WHITE. Well, I have never heard of an objection coming from our people with reference to the head tax, but it may come from some of the Mexicans themselves.

Mr. BACON. Who is it that objects—the large employers of labor?

Mr. ROBE CARL WHITE. No, I have never had any objection from the large employers of labor. It is mostly from the chambers of commerce, whoever they represent.

Mr. FREE. I can answer that question, Mr. Bacon. Take the beet-sugar people, for instance: They are very anxious to get Mexicans to work in the beet fields.

Mr. BACON. I suppose that is true of the silver and lead mines?

Mr. FREE. Not so much so. I am speaking now of California. But there is a concerted effort on behalf of most of the beet-sugar factories to get in Mexicans to do that work. I understand in the old days they used to bring them in and then pass them back, and there was sort of a string coming and a string going.

Mr. ROBE CARL WHITE. Mr. Chairman, I would like to ask if it is possible or is it advisable for a section to be added to your deportation law giving the Immigration Service authority to forfeit and use vehicles captured from smugglers of aliens.

The CHAIRMAN. Yes, and I think, if we are not able to prepare a deportation law quickly, that should be sent in as a separate resolution.

Mr. ROBE CARL WHITE. I would be glad to have this done. The Customs Service, the Prohibition Service, can use automobiles seized by their service. We are unable to use a one; we can not even pay for gasoline to run one of them, and the result is that we are confined to the sum of $80,000 for care and maintenance and purchase of vehicles, which is entirely inadequate to properly equip the border patrol.

Mr. BACON. I should think even General Lord could understand that 475 men could not patrol 6,000 miles of border on foot.

Mr. ROBE CARL WHITE. Here is the problem—I want to be fair: The Customs Service are probably asking General Lord, or the Budget Committee, for money to equip and keep a patrol in the same district in which you are keeping an immigration patrol. I happen to know that is true, and I think the time is coming when it will be necessary for Congress to place control of the border patrol in some one place and not have a dual patrol. In my opinion the entire border outside of ports of entry at least should be placed under the Commisioner General of Immigration. Almost any man can detect a case of liquor or narcotics, or goods of any kind, and turn them over to the proper authorities, but it is only the trained immigration officer who can decide whether a person has the right to enter the United States. And without a trained man to deal with the human traffic across our borders you will soon run into many difficulties.

Mr. BACON. It is much cheaper to stop the smuggling of aliens at the border than it is to send them back after they once get in?

Mr. ROBE CARL WHITE. Oh, yes.

Mr. BACON. In other words, to increase your border patrol is in the interest of real economy?

Mr. ROBE CARL WHITE. Yes.

Mr. DICKSTEIN. How many Mexicans came in legally to the United States in 1925?

Mr. BACON. Thirty-two thousand plus immigrants for permanent residence.

Mr. DICKSTEIN. Legally came in?

Mr. BACON. Legally; absolutely.

Mr. WHITE. As I understood you, you say there have been 14,000 apprehended on the Mexican border, who had elected to go back without proceedings?

Mr. ROBE CARL WHITE. On both borders. Very few on the Northern border.

Mr. WHITE. Have you any information which you could submit to the committee, even approximately, of how many of these Mexicans entered surreptitiously to perform seasonal work, or for other purposes, and voluntarily returned, or stayed until they were apprehended or investigated?

Mr. ROBE CARL WHITE. I do not believe, Mr. White, I have any information on that. We, of course, have not endeavored or attempted to interfere with legitimate business along the border any more than we have to.

Mr. WHITE. Are they mainly laborers who elect to go back without proceedings, as a rule?

Mr. ROBE CARL WHITE. I judge so. But, of course, I can not say without referring to our records.

The CHAIRMAN. Now, I want to ask Mr. Hull a question, and that is this: Have you had occasion to deal to any extent with persons admitted under a bond—visitors whose time has expired and who who have to go out?

Mr. HULL. Oh, we have that, of course, very often.

The CHAIRMAN. Is that going to require inquiry and investigation by the Immigration Service?

Mr. HULL. I think the time will come, probably, that we will have to have a little more efficiency, but we have a fairly efficient system. That, of course, is taken care of by the different districts. You know the country is divided into 35 districts.

The CHAIRMAN. It means ultimately an enlargement of the activities of the Immigration Service with a view to enforcing embarkation, in some cases?

Mr. HULL. I presume there will have to be some more efficient systems adopted, perhaps, but I think it is fairly efficient now, as far as the giving of bonds at the port for coming in as tourists or visitors is concerned.

The CHAIRMAN. Have we proceeded far enough so that you have had to proceed to enforce the collection of bonds?

Mr. HULL. Oh, yes. We have to proceed to enforce the collection of bonds very often.

The CHAIRMAN. In the case of visitors?

Mr. HULL. In the case of visitors or tourists, or something. I do not know exactly which they were. I say, "very often;" I do not mean a whole lot of cases, but they do come up, where we have to breach the bond.

The CHAIRMAN. Now, let us see what the procedure is: After you forfeit the bond, do you then proceed to look for the person who was admitted as a visitor and who has forfeited his bond?

Mr. HULL. We certainly do. We try to apprehend them. They are sometimes out of the country. We have all angles to that. We have cases very often where they claim the man went out, and he has gone, and the bond has been fulfilled; but we usually breach the bond, just the same, because we have no evidence.

The CHAIRMAN. What I am trying to get is whether or not the forfeiture of bonds for visitors will enlarge the necessity for deportation, as time grows on.

Mr. HULL. Of course, that depends; I think, perhaps, when they find out that the bond will be enforced thoroughly, they will probably protect themselves by complying with the bond.

The CHAIRMAN. It has not become an acute matter as yet in deportation?

Mr. HULL. Oh, no. We can handle the bond question. I, myself, think it is a very good way to protect the Government against aliens staying here. I wish we had authority in some cases where we do not have authority, especially in the case of students.

The CHAIRMAN. To exact bonds?

Mr. HULL. To exact bonds. I think you will have to come to that.

Mr. BOX. In what cases and under what circumstances can you do it now, in the cases of visitors and students?

Mr. HULL. As I understand it, you can not exact a bond for a student. You can exact a bond for people who are liable to become a public charge at the ports.

Mr. BOX. You do not do that, though, as to ordinary visitors and commercial people, and people of that class?

Mr. HULL. Oh, certainly not; not ordinarily. It is only when suspicious parties are coming here and liable to become a public

charge, or liable to try to stay in the country, or something like that. Then the ports usually protect themselves by exacting a bond.

The CHAIRMAN. Now, I want to ask you a question on an entirely different matter. Do you know how it comes that the immigration inspectors are started on a base pay of $140 per month? While the customs inspectors are started on a base pay of $150 a month?

Mr. HULL. No, sir; I do not know. I would like to know.

The CHAIRMAN. Has the department made any recommendations that would result in correcting that inequality?

Mr. HULL. As I understand it, they have, but they have not been able to do it.

The CHAIRMAN. Do you know with what result?

Mr. HULL. They have not been able to do it.

Mr. BACON. Who has the power to correct that?

Mr. ROBE CARL WHITE. The Secretary. Our entrance pay for immigrant inspectors is $1,860, now.

The CHAIRMAN. Has it been raised?

Mr. ROBE CARL WHITE. Yes.

Mr. WAGNER. I do not know about the customs, but I think some misunderstanding exists from the fact that our officers received the $240 bonus in addition to their base pay prior to July 1, 1924, and a great many inspectors said they got $1,500 when they were getting $1,740, or something like that. But since July 1, 1924, $1,860 has been the entrance salary for immigration inspectors, and $1,680 for patrol inspectors.

Mr. BACON. The Secretary of Labor could increase the base pay?

Mr. WAGNER. He can.

Mr. BACON. But he would have to get the approval of the Budget?

Mr. WAGNER. No, sir.

Mr. ROBE CARL WHITE. No, sir; but he would have to get the money to pay them.

Mr. VINCENT. And it is the failure to get the money to pay them that has prevented you from increasing the base pay?

Mr. ROBE CARL WHITE. We have not been able to make promotions, except in individual cases, for two years, and we have many men in the service who ought to be promoted, in justice to them and to work they are doing.

The CHAIRMAN. Will you place in the record, at this place, if you can ascertain, the base pay of the various inspectors in the various services of the United States; that is, in the customs, immigration, meat inspection, and any others?

Mr. ROBE CARL WHITE. I think I can do that.

(The information above called for is as follows:)

|  | Per annum |
|---|---|
| Immigration patrol inspector | $1,680 |
| Immigrant inspectors | 1,860 |
| Customs patrol inspectors | 1,700 |
| Deputy collector inspectors | 1,700 |
| Quarantine inspectors, Department of Agriculture | 1,860 |

Mr. WHITE. If I understood you right, Mr. Hull, you said part of the $600,000 supplemental appropriation would be applied to patrol expenses, and I would like to ask you if sufficient of that $600,000 supplemental appropriation could be applied to deportations; that is, to the strictly deportation work, to keep your work current for the balance of the year?

152

Mr. Hull. Why, no, not current; you can not do it.

Mr. White. Well, how much would it lack?

Mr. Hull. Well, we have asked for $250,000 more than they gave us, and that would not keep us up to what we might be doing; but it would probably be as near as we can figure what we can use efficiently. You can try to spend too much money.

Mr. White. Yes.

Mr. Hull. If you want to.

Mr. White. Without anticipating any raise in the pay of your inspectors and agents, would you then be able to apply enough of the $600,000 supplemental appropriation to the distinct work of deportation, as you have outlined it here, to keep the work reasonably current?

Mr. Hull. No, sir.

Mr. White. You could not?

Mr. Hull. No, sir.

The Chairman. I want to ask you this: In your opinion, would a sufficient sum, to take care of double the number of deportations we now have, effect a saving in the long run to the Government, through reducing activities in the Federal courts for the prosecution of aliens for liquor violations and narcotic violations and criminal proceedings of every kind?

Mr. Hull. I think that the deportation of these people in an economic proposition and that it should be done as fast as it can be done efficiently.

The Chairman. It is the place to start, for real economy, is it not?

Mr. Hull Yes; it is the place to start for real economy. As to whether if you would spend a million dollars in deporting, you would save that in court cases, I would not want to go on record.

The Chairman. Now we have one letter right to the point. Here is a man who writes from El Paso, on the 6th of January, and says:

With great bunches of men standing in front of the entrance to the Southern Pacific yards here this a. m. wanting work, and this is one day out of the year, with 86 per cent of the defendants in Federal court here aliens, of the bootleg variety, and the thief kind, with 76 per cent of the defendants in the several District courts here aliens, of the bootleg class and criminal kind—

And then he goes on to make an appeal for effective deportations that will reduce the activities in the courts, and I believe he is giving the key as to where we should begin to spend money to save the expansion and congestion in other activities in the Government.

Mr. Hull. I think he is right.

Mr. Box. I have some letters, Mr. Chairman, just like that.

The Chairman. I am going to put this letter in the record.

(The letter above referred to is as follows:)

El Paso, Tex., *January 6, 1926.*

Hon. Albert Johnson,
            *Washington, D. C.*

Dear Sir: I am writing this in defense of restricted immigration. Why leave the back door of Mexico open? To leave the back door of Mexico open, of itself will paralyze the European quota law, by virtue of the fact that they come to Mexico when they feel like it and bootleg themselves in the United States when they get hungry.

With great bunches of men standing in front of the entrance to the Southern Pacific yards here this a. m. wanting work, and this is one day out

**153**

of the year; with 86 per cent of the defendants in Federal court here aliens, of the bootlegged variety and the thief kind; with 76 per cent of the defendants in the several district courts here aliens of the bootlegged class and criminal kind, 86 bales of cotton was ginned off of my farm last year. I have a valley farm 20 miles from El Paso.

With 67 American families coming into the Mesilla Valley during 1925, all farmers, all bought land and were living on it January 1, 1926, the foreigners are being shipped out bodily; I beg to suggest that more Americans be allowed to come here, instead of the scoff and scum, the mongrel, the bootlegger element, from Mexico, which is composed of the riff raff of southern Europe.

As for a labor shortage, I did not have any trouble last year; I have never had any trouble with the labor question. I could get 10 times the labor that I want, and get it in 10 minutes at that, with great bunches of men standing around all over this town, any day and every day the year around.

With hundreds of Americans here staggering under the enormous burden of taxation—the limit, it can not be raised any more—trying to Americanize these aliens against their will. I have just made a call. It was a two months old baby. It had inherited syphilis and will die. It belongs to an alien woman. Another evidence of the cross section of the aliens that come here.

Put Mexico under the rule, certainly so, and deport all undesirable citizens; forfeit all naturalization papers obtained through fraud, and then two of the three district judges here can go on leave of absence for an indefinite time; the Federal judge can go fishing for six months, if he likes. The courts here are waterlogged with alien business. Take them out of here; send them home; we can cut taxes in 30 days and a 90 per cent perfect enforcement of the eighteenth amendment will be possible in 24 hours.

The citizens in the lower valley are fighting the Hindoo now.

Very truly yours,

— ——— ———.

---

The CHAIRMAN. Now, when you talk of deporting 250,000 persons (and I assume that number does not contemplate those who have come here in the long years past without certificates of arrival), I assume a deportation, we will say, of 25,000 a year, of the flagrant cases, would act as a deterrent and reduce Federal activities along all other lines?

Mr. HULL. Will you allow me to suggest I think Mr. White, in his answer, might have been misunderstood. I think he was correct; I think the surveys made by the district directors brought forth this fact. When I asked for it, I divided it into two classes; those that came in before June 3, 1921, and those that came in since June 3, 1921.

The CHAIRMAN. Yes.

Mr. HULL. And the 250,000 Mr. White mentioned applied to those that apparently had come in since June 3, 1921.

Mr. ROBE CARL WHITE. I did not know that.

Mr. BOX. That did not apply to the great number back of that date?

Mr. ROBE CARL WHITE. No.

Mr. HULL. Now, I have been quoted, and I think every member of the Department of Labor has been quoted, as to the number of aliens here who came in before June 3, 1921. That is a very important question, and I have noticed by some of the questions you are interested in that, and what we are doing with it. Now, nobody knows how many there are.

Mr. BOX. You mean those that came illegally?

Mr. HULL. Yes.

Mr. Box. All of them?

Mr. Hull. No; they did not come legally, they are illegally in this country.

Mr. Box. That is what I mean—illegally.

Mr. Hull. Illegally in this country, but it is a technical question.

Mr. Box. About what is that number, as a rough outline?

Mr. Hull. Nobody knows. The only basis that we have, so far as we know, for the computation is, in the applications for reentry permits, about 20 per cent, so far, have been rejected, if I remember rightly, for lack of verification at the ports or wherever they filed. Now you apply that on through the number of aliens that we know are in the country, and you can make a rough guess and it will run you over 1,300,000. That, probably, is too many, but it may be right. It may be less; we do not know.

The Chairman. That would apply to all the people who are here and unable to prove legal entry into the United States?

Mr. Hull. And the payment of the head tax and inspection.

Mr. Box. That is all prior to June 3, 1921.

Mr. Hull. They came in before June 3, 1921. Now those people are all kinds. Some of them are the nicest people in the world. We have those cases every day, and I have on my desk now a letter from a man who has been voting right along, illegally in the country.

Mr. Bacon. How did he become a citizen?

Mr. Hull. I do not know.

Mr. Bacon. Or didn't he become a citizen? Perhaps he was voting without becoming a citizen.

Mr. White. I would like to answer that question. We had a case in my neighborhood of a German who had come to this country possibly 45 or 50 years ago, possibly longer; his children were born here, but it transpired, during the war, that he had neglected to take all the steps necessary to become a citizen. He had been voting for years and years, was counted as a citizen in the general estimate of the people; his children were born here, but during the war he was apprehended and he was compelled to go to Kansas City, 250 miles, to establish the fact and circumstances. That answers the question.

The Chairman. And, further, until very recently, quite a number of States permitted them to vote, on taking out their first papers. Now there is only one State that does that.

Mr. Robe Carl White. Of the total number of permits, since we had a law permitting us to grant them, 178,195 have been refused because of failure to verify their landings.

Mr. Bacon. That is a permit for what?

The Chairman. A permit to go out of the country and return.

Mr. Robe Carl White. Now, then, I want to put one more item in the record. The revenue derived by our Department for the issuance of permits, to date, is $360,920.11.

The Chairman. To the end of the fiscal year, or to date?

Mr. Wagner. That is up to date, December 31, 1925.

The Chairman. With about 20 per cent of the applicants unable to secure those permits to travel abroad and return, because they could not prove legal entry into the country?

78672—26——3

Mr. Robe Carl White. Yes; unable to get permits, and yet we have received·three hundred and sixty odd thousand dollars from that source.

The Chairman. Has you department got together and discussed the advisability of increasing the head tax? Has that ever been discussed down there?

Mr. Robe Carl White. Only incidentally.

· The Chairman. I believe that is all. I am sorry we were unable to give Mr. Hull more time.

· Mr. White. There is one question I would like to ask. Some allusion has been made to the making of a survey or appraisal of the number of deportable aliens in certain districts—the total number. That would include those who had not been taken into custody, and you used the word "survey" in speaking of the reports, as I understood you, I think, of your superintendents or directors, in certain districts, and I want to ask you, Mr. Hull, if you think it would be possible to make the duty of making that survey supplemental to the duties of your present agents in those districts, so as not to require a large number, or any number, for that matter, of additional employees?

Mr. Hull. If you did so with any efficiency, you would have to provide the money. You can not do it without providing the money. Now, we say "survey"; it is more an estimate by the districts.

Mr. White. Yes.

Mr. Hull. And it varies. You can say it was not accurate, it was nothing more than a mere approximate guess. Now, if you make a survey, you have to provide the money for making that survey. We have no men at the present time to do the work. Our personnel is cut to the very bone and I want to reiterate what Mr. White said, that they are very much underpaid and very much overworked.

Mr. White. It would occur to most any mind that those agents are engaged in that very work now, the apprehension of those men on complaint or evidence furnished, and would not these deportable aliens come under their notice constantly from day to day?

Mr. Hull. No; not in a great district like we have; they do not come under their notice.

Mr. Box. You did not employ any extra men to make this survey; it was all done about the time you had in mind, I understand?

Mr. White. Yes; I understand.

Mr. Hull. Simply a request from the office, to send us the information they have. I sent out the request myself, for my own information. I do not place a great deal of reliance on it, I want to say, for fear anybody starts up any scare stories about our going out and trying to deport a lot of people who have come here. We have not been trying to deport anybody who came in before June 3, 1921, unless there is good cause, but there are a lot of people in this country who ought to have their records straightened out.

Mr. Dickstein. How about those who came here prior to June 3, 1921? They can not become citizens?

Mr. Hull. They can not until their records are straightened out. That is one reason we are asking for a registration law, so that those aliens can be taken care of and be registered.

Mr. Dickstein. Why not legalize those who came here prior to June 3, 1921, if they are otherwise admissible, if they are of good moral character, and fit in with the standards of the United States and would make good American citizens?

Mr. Hull. As we come to them, we are trying to take care of them ourselves; but, as Mr. White has said, it would be the mistake of mistakes for Congress to try to pass a blanket act, because you do not want to legalize a lot of people who ought not to be here.

Mr. Dickstein. That blanket act, or any act, no matter what the act should be, should have some qualification giving power to the Secretary of Labor, that if that person who came here illegally was otherwise fit and admissible, he could be permitted to stay.

The Chairman. That is section 1 of the proposed registration bill that will be before the committee in the course of time, to find and provide a place where those domiciled in the country would have a place to permit them to naturalize and allay the fear there would be a gigantic deportation.

Mr. Hull. I think you can do no better work, in my opinion, than to straighten that matter out.

Mr. Dickstein. I think so.

The Chairman. We are very much in sympathy with the suggestion you made, and I think the committee will approve an effort to bring up, immediately before the appropriation act, a resolution that would authorize the use of seized vehicles.

Mr. Box. I understand that is done in other services now. I think Congress took some action in reference to that at the last session.

Mr. Hull. It has been done.

The Chairman. It went out of one of the bills passed this year on a point of order, for the reason it had been put in irregularly, and I think this committee should endeavor to pass a resolution immediately to take care of that.

Mr. Robe Carl White. We asked the Budget committee to put it in the appropriation act, but they said it should be separate legislation.

The Chairman. We will now adjourn until 10.30 o'clock to-morrow morning.

(Thereupon, at 12 o'clock noon, the committee adjourned until to-morrow, Wednesday, January 13, 1926, at 10.30 o'clock a. m.)

# EXHIBIT G

# Calendar No. 1484

| 70TH CONGRESS | SENATE | REPORT |
|---|---|---|
| 2d Session | | No. 1456 |

## MAKING IT A FELONY WITH PENALTY FOR CERTAIN ALIENS TO ENTER THE UNITED STATES OF AMERICA UNDER CERTAIN CONDITIONS IN VIOLATION OF LAW

JANUARY 17 (calendar day, JANUARY 18), 1929.—Ordered to be printed

Mr. BLEASE, from the Committee on Immigration, submitted the following

## REPORT

[To accompany S. 5094]

The Committee on Immigration, to which was referred the bill (S. 5094) making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law, having considered the same, report favorably thereon with the recommendation that it do pass with the following amendment:

Page 2, line 10, after the word "hereunder", insert the words ", the clerk shall notify the marshal who has the prisoner in custody and he".

A memorandum from the Labor Department is made a part of this report and reads as follows:

Except as provided in the act relating to the exclusion and expulsion from the United States of those who are members of the anarchistic and similar classes approved October 16, 1919, as amended, there is no provision of law under which a penalty, other than repeated deportation, can be imposed on aliens who have been expelled from the United States and who reenter the country unlawfully. It frequently happens that aliens of the criminal and other classes who are deported under the general immigration law reenter the country unlawfully. As a matter of fact, in some instances such aliens have been deported four or five times, only to return as soon as possible to the United States in an unlawful manner.

The proposed legislation attached hereto simply provides that any alien who has been arrested and deported under the provisions of the general immigration law of 1917, or the so-called quota limit act of 1924, and who shall thereafter gain admission to the United States except through lawful channels shall be deemed guilty of a felony and upon conviction thereof shall be punished by a fine not to exceed $1,000, or by imprisonment for a term of not more than two years, to be followed by deportation and under the usual procedure. The act relative to anarchists and other radicals above referred to limits punishment to imprisonment for a term of not more than five years, but as the cases arising under the two laws mentioned vary greatly as to their seriousness, it is thought there ought to be discretion as to whether a fine or imprisonment should be imposed, and for the same reason a maximum penalty only is suggested

It is believed that such a statute would be of material aid in enforcing our immigration laws.

2   PENALTY FOR ALIENS TO ENTER IN VIOLATION OF LAW

A letter from the Secretary of Labor is also made a part of this report and reads as follows:

<div align="right">

DEPARTMENT OF LABOR,
OFFICE OF THE SECRETARY,
*Washington, January 2, 1929.*
</div>

Hon. HIRAM W. JOHNSON,
*United States Senate, Washington, D. C.*

MY DEAR SENATOR: In response to your letter of December 26, 1928, requesting the views of this department respecting S. 5094, a bill by Senator Blease, "making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law," I have to state that in our opinion the enactment of the law proposed would be of material assistance in the administration of existing immigration laws.

It is academic that no prohibitive law can successfully be enforced without a deterrent penalty. The fact that possible deportation is not a sufficient deterrent to discourage those who seek to gain entry through other than regular channels is demonstrated by the frequency with which this department is compelled to resort to deportation proceedings for the same alien on several succeeding occasions. Unfortunately, however, no statistics as to the number of instances in which deportations have been repeated have been kept. Many of the aliens who are required to be deported enter as seamen, and it goes without saying that deportation as passengers aboard regular passenger steamers is no penalty in this class of cases. In any event, an alien deported at Government expense under the present procedure is not subject to any more difficulties or embarrassment than before the first successful attempt to enter the country unlawfully.

Aside from the sexually immoral and members of the anarchistic and similar cases there is nothing in the immigration laws which penalizes aliens for reentering the United States unlawfully after they have been deported at considerable expense to the Government. The enactment of a law imposing a penalty is recommended.

Sincerely yours,

<div align="right">

JAMES J. DAVIS.
</div>

160

# EXHIBIT H

Mr. REED of Pennsylvania. Mr. President, may I ask the calendar numbers of the bills?

Mr. BLEASE. They are Calendar Nos. 1483 and 1484. There is a unanimous report from the Committee on Immigration, and the bills are indorsed by the Secretary of Labor and the Immigration Commissioner. There are going to be some matters along this line taken up in the House on Friday. I had a talk with Chairman JOHNSON last night and he asked me to get the measures over to the House before then if I possibly could.

Mr. REED of Pennsylvania. Will the Senator be willing to withhold his request for half an hour to enable us to read the bills?

Mr. BLEASE. That will be agreeable to me. The Senator will find the reports with the bills.

Mr. BLEASE subsequently said: Mr. President, the Senator from Pennsylvania [Mr. REED] does not now object to the consideration and passage of the two bills which I asked to have considered a few moments ago. I now ask unanimous consent for the consideration of Senate bill 5093.

The PRESIDING OFFICER (Mr. JOHNSON in the chair). Is there objection to the present consideration of the bill referred to by the Senator from South Carolina?

There being no objection, the Senate, as in Committee of the Whole, proceeded to consider the bill (S. 5093) to authorize the issuance of certificates of admission to aliens, and for other purposes, which was read as follows:

*Be it enacted, etc., That an alien who has been lawfully admitted to the United States for permanent residence and who has continued to reside therein since such admission, shall upon his application to the Commissioner General of Immigration, in a manner to be by regulation prescribed, with the approval of the Secretary of Labor, be furnished with a certificate made from the official record of such admission. Such certificate shall be signed by the Commissioner General of Immigration and shall contain the following information concerning such alien: Full name under which admitted; country of birth; date of birth; nationality; color of eyes; port at which admitted; name of steamship, if any, and date of admission. Such certificate shall also contain the full name by which the alien is then known, his signature, and his address. A photograph of the alien shall be securely attached to the certificate, which shall bear an impression of the seal of the Department of Labor.*

*SEC. 2. Such certificate shall be prima facie evidence of the lawful admission of such alien. A fee of $3 shall be paid by such alien to the Commissioner General of Immigration for each such certificate. The moneys so received by the Commissioner General of Immigration shall be paid over to the disbursing clerk of the Department of Labor, who shall thereupon deposit them in the Treasury of the United States, rendering an account therefor quarterly to the General Accounting Office, and the said disbursing clerk shall be held responsible under his bond for such fees.*

*SEC. 3. This act shall take effect July 1, 1929.*

The bill was reported to the Senate without amendment, ordered to be engrossed for a third reading, read the third time, and passed.

Mr. BLEASE. I ask unanimous consent for the present consideration of Senate bill No. 5094.

There being no objection, the Senate, as in Committee of the Whole, proceeded to consider the bill (S. 5094) making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law, which had been reported by the Committee on Immigration with an amendment, in section 2, page 2, line 9, after the word "hereunder," to insert the words "the clerk shall notify the marshal who has the prisoner in custody and he," so as to make the bill read:

*Be it enacted, etc., That any alien who has been arrested and deported in pursuance of the provisions of the immigration act of February 5, 1917, or the immigration act of 1924, and who thereafter shall enter the United States in violation of law shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine not to exceed $1,000 or by imprisonment for a term of not more than two years; and upon payment of the said fine or at the expiration of the term of said sentence shall be taken into custody upon the warrant of the Secretary of Labor and deported in the manner provided in the immigration act of February 5, 1917.*

*SEC. 2. That upon the conviction of any person or persons under the provisions of the above section, the clerk of the said court shall promptly notify the Secretary of Labor thereof, and of the terms, place, and date of the expiration of the said sentence; and upon the payment of any fine imposed in lieu of imprisonment hereunder, the clerk shall notify the marshal who has the prisoner in custody and he shall detain the prisoner for a period not to exceed five days if so much*

shall be necessary for his or her apprehension and being taken into custody under warrant of the Secretary of Labor as heretofore provided.

The amendment was agreed to.

The bill was reported to the Senate as amended, and the amendment was concurred in.

The bill was ordered to be engrossed for a third reading, read the third time, and passed.

### TIMBERLANDS IN YOSEMITE NATIONAL PARK

Mr. WALSH of Montana. Mr. President, there is pending before the Congress, now in the hands of the conference committee of the two Houses, a bill which empowers the Secretary of the Interior to condemn any and all lands held in private ownership in national parks. It has been represented that there are certain timberlands in the Yosemite National Park which are likely to be logged out during the ensuing year. That is offered as the reason why urgency in that matter is necessary.

I am this morning in receipt of the following telegram:

LOS ANGELES, CALIF., *January 22, 1929.*

Hon. THOMAS J. WALSH,

*United States Senate, Washington, D. C.:*

Referring to a dispatch from Washington in the Los Angeles Times of to-day, stating that the lumber company owning lands in Yosemite Park plans to begin operations within the park on April 1, next, I beg to advise you on behalf of Arthur H. Fleming and myself, who control the company referred to, Yosemite Lumber Co., that that company does not plan or intend to operate within the park at any time this year, and will not do so. We have so advised Senator SHORTRIDGE.

ROBERT C. GILLIS.

I ask that the telegram be referred to the committee of conference on the bill to which I have referred, the Interior Department appropriation bill.

The VICE PRESIDENT. Without objection, it will be so referred.

### FIRST DEFICIENCY APPROPRIATIONS

The Senate, as in Committee of the Whole, resumed the consideration of the bill (H. R. 15848) making appropriations to supply urgent deficiencies in certain appropriations for the fiscal year ending June 30, 1929, and prior fiscal years, to provide urgent supplemental appropriations for the fiscal year ending June 30, 1929, and for other purposes.

The PRESIDING OFFICER (Mr. JOHNSON in the chair). The question is on the motion of the Senator from Tennessee [Mr. McKELLAR] to suspend paragraph 3 of Rule XVI for the purpose of proposing the amendment relating to tax refunds, which has heretofore been read.

Mr. McKELLAR. Mr. President, on yesterday, when the Senate took a recess, we were discussing the question of tax refunds. I want to call the attention of Senators this morning to this situation: During the last eight years the Treasury Department, under its back-tax system, has collected $3,900,000,000, in round figures. The department has engaged in that work an army of back-tax attorneys and agents. How much that army of tax attorneys and agents cost the Government I do not know, but I think that during the time I have stated it may be safely estimated that the cost to the Government for that service has been not less than half a billion dollars. Frequently heretofore, when this subject has been brought up, the Internal Revenue Bureau has replied that it is true the service has cost a great deal of money, but that the refunds amounted to only about one-fourth, or 25 per cent, of the money actually collected.

Now, I wish to call the attention of the Senate to the fact that in connection with the collection of Federal back taxes no citizen knows when he is going to finish paying such back taxes. If he sells a piece of property he has to figure in making the contract the probable amount of back Federal taxes that may be assessed against the transaction. If he transfers stock he has got to make similar careful calculations. This puts the average taxpayer in an embarrassing and oftentimes in a hazardous situation. He is constantly under the menace of a re or back assessment. It is unfair and unjust to the plain, every-day, average taxpayer and business man. Frequently that situation interferes with the free sale of stocks or other personal property, and also of real estate, because the taxes are at times quite excessive. In other words, under our present system of back taxes no man knows when his is going to get through paying the Federal reassessments.

A Federal agent goes to Richmond, for instance, and decides who, in his judgment, should pay additional back taxes. No one ever knows when he has finished paying. So the question of back Federal taxes has come to be one of the serious questions in business in this country. If it were necessary, if good

# EXHIBIT I

Case 3:20-mj-20121-KSC   Document 32-1   Filed 08/07/20   PageID.386   Page 165 of 218

## DEPORTATION OF ALIENS

FEBRUARY 6, 1929.—Committed to the Committee of the Whole House on the
state of the Union and ordered to be printed

Mr. JOHNSON of Washington, from the Committee on Immigration
and Naturalization, submitted the following

# REPORT

[To accompany H. R. 16850]

The Committee on Immigration and Naturalization, to whom was
referred the bill (H. R. 16850) to provide for the deportation of cer-
tain aliens, and for the punishment of the unlawful entry of certain
aliens, having had the same under consideration, reports it back to
the House without amendment and recommends that the bill do pass.

The immigration acts of 1917 and 1924, which now appear to rep-
resent the settled policy of this Government, have made it possible,
to a great extent at least, to limit the entry into this country of unde-
sirable and dangerous aliens. This bill will materially assist the
immigration authorities in further preventing the entry of such
aliens, and provides methods whereby those already unlawfully in
the United States and those who may hereafter unlawfully enter or
seek to enter the country may be deported.

There should be no objection to the deportation of aliens who con-
stitute a menace to or an unjust burden upon our Government.

The principal reason for deporting undesirable aliens is to pro-
mote the maintenance of law and order in our country and to afford
protection and opportunities for development to all the people resid-
ing in our country, aliens and citizens alike. No class of people
suffers more from the actions of undesirable and law-breaking aliens
than does that great body of worthy and deserving aliens residing in
our midst who, in good faith are contributing to the welfare of the
country, and are in large numbers attempting to become citizens of
the United States. Unworthy conduct and flagrant disregard of the
laws of our country on the part of a very small percentage of the
aliens residing in the United States unfortunately, but certainly tend
to create a prejudice in the public mind against all aliens. There-
fore the deportation of that small percentage of undesirable aliens

2                         DEPORTATION OF ALIENS

will redound to the benefit of the worthy and deserving aliens in the country to an equal, if not greater, degree than to that of our own citizens.

The hearings in the Sixty-ninth Congress on the subject matter contained in the bill were exhaustive. Much important testimony was developed. The necessity for revision and strengthening of the deportation clause of the immigration act of 1917 was fully shown.

Printed copies of these hearings are available for the use of the members.

### IN ADDITION TO OTHER LAWS

The provisions of the bill are in addition to other acts and provisions of law relating to deportation. The following laws have not been repealed:

(1) Sections 18, 19, and 20 of the immigration act of 1917.

(2) The act entitled "An act to exclude and expel from the United States aliens who are members of the anarchistic and similar classes," approved October 16, 1918, as amended by an act to amend such act, approved June 5, 1920.

(3) The immigration act of 1924, section 14 of which provides for the deportation, without time limit, of aliens excluded by that act, or remaining in the United States longer than permitted by law or regulations.

(4) The act entitled "An act to deport certain undesirable aliens and to deny readmission to those deported," approved May 10, 1920 (relating to war-time offenses, etc.).

(5) Section 2 of the act entitled "An act to prohibit the importation and the use of opium for other than medicinal purposes," approved February 9, 1909, as amended.

(6) The act of December 26, 1920, entitled "An act to provide for the treatment in hospitals of diseased alien seamen."

(7) Laws relating to the immigration, exclusion, and deportation of Chinese persons or persons of Chinese descent.

## SCOPE OF BILL

Section 1 of the bill adds seven classes of aliens who may be deported, but only if in each case the Secretary of Labor after hearing finds that such aliens are undesirable residents of the United States. This section of the bill is explained in detail as follows:

### VIOLATION OF NARCOTIC LAWS AND WHITE SLAVE TRAFFIC ACT

(1) An alien who hereafter violates or conspires to violate the white slave traffic act (U. S. C. Title 18, Secs. 397-404), or any law amendatory of, supplementary to, or in substitution for, such act.

(2) An alien who hereafter violates or conspires to violate any statute of the United States taxing, prohibiting, or regulating the manufacture, production, compounding, possession, use, sale, exchange, dispensing, giving away, transportation, importation, or exportation of opium, coca leaves, or any salt, derivative, or preparation of opium or coca leaves.

These two classes of aliens are placed in the same category as alien prostitutes, so far as deportation is concerned, are placed by the existing law.

**165**

DEPORTATION OF ALIENS                    3

Where it can be established in any manner, by immigration officials or otherwise, that an alien has violated or conspired to violate these particular laws he may be immediately taken into custody and deported without awaiting his conviction for such offense, just as under existing law the immigration authorities may summarily arrest and deport aliens found practicing prostitution or connected with the business of prostitution. An alien may still be deported under the provisions of section 2 of the act of February 9, 1909, as amended, relating to the importation of narcotics, although this paragraph furnishes a supplementary basis for deportation and permits deportation for a violation of that act, irrespective of a conviction of a violation. The primary purpose of the paragraph, however, is to catch the large number of alien violators of the so-called Harrison Antinarcotic Act of December 17, 1914, as amended. While the Harrison Act is a taxing act, it nevertheless prohibits and regulates the narcotic drug traffic as an incidental and necessary means of enforcing the taxes imposed.

At the present time no alien violators of the antinarcotic laws are being deported except those who have been convicted under section 2 of the act of February 9, 1909, as amended by the act of May 26, 1922, which requires knowledge or fraudulent intent. In many cases violators of the Harrison Act are given nominal or short sentences, and in the case of such violators who are given sentences of one year or more, the Solicitor of the Labor Department has held that such offenses do not involve moral turpitude. The question has not been settled by the courts for the reason that, in view of the solicitor's holding, the department has not attempted to deport in such cases.

### CONCEALING OR HARBORING ALIEN LIABLE TO DEPORTATION

(3) An alien who hereafter willfully conceals or harbors, attempts to conceal or harbor, or aids, assists, or abets any other person to conceal or harbor, any alien liable to deportation.

The desirability of providing for the deportation of this class of aliens needs no comment.

(4) An alien who hereafter willfully aids or assists in any way any alien unlawfully to enter the United States.

This provision is in addition to the penalties provided by section 8 of the immigration act of 1917. Aliens in this country who seek to aid others to enter in violation of our laws should not be permitted to remain in the United States.

### SURREPTITIOUS OR UNLAWFUL ENTRY

(5) An alien who hereafter enters the United States at any time or place other than as designated by immigration officials, or eludes examination or inspection by immigration officials, or obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact.

This class of aliens is partly taken care of under the existing law which provides for the deportation of the following class:

At any time within three years after entry any alien who shall have entered the United States by water at any time or place other than as designated by immigration officials, or by land at any place other than one designated as a port

**166**

**4**                    DEPORTATION OF ALIENS

of entry for aliens by the Commissioner General of Immigration, or at any time not designated by immigration officials, or who enters without inspection.

No good reason is seen for perpetuating the distinction made in existing law between entering by water or by land. The suggested amendment is broad enough to cover entry in any manner. Immigration officials, of course, will designate times and places only as authorized by their superior officers. It is deemed desirable to state affirmatively the additional grounds set forth in this paragraph which can now be covered only by resorting to the phrase "who enters without inspection."

### CONVICTION OF CRIME

(6) An alien who is convicted of any offense (committed after the enactment of this act and at any time after entry) for which he is sentenced to imprisonment for a term of one year or more, and who is thereafter convicted of the same or any other offense (committed after the enactment of this act and at any time after entry) for which he is sentenced to imprisonment for a term of one year or more.

The existing law provides:

Any alien who is hereafter sentenced to imprisonment for a term of one year or more because of conviction in this country of a crime involving moral turpitude committed within five years after the entry of the alien to the United States, or who is hereafter sentenced more than once to such a term of imprisonment because of conviction in this country of any crime involving moral turpitude, committed at any time after entry—

Except that deportation shall not be made or directed in such case—

if the court, or judge thereof, sentencing such alien for such crime shall, at the time of imposing judgment or passing sentence or within 30 days thereafter, due notice having first been given to representatives of the State, makes a recommendation to the Secretary of Labor that such alien shall not be deported.

These provisions of law are not repealed by the bill. Therefore, in the future as heretofore an alien sentenced for a year or more because convicted of a crime involving moral turpitude committed within five years after entry will be deportable, subject to the qualification that deportation will not be made if the judge sentencing the alien makes the recommendation to the Secretary of Labor that he shall not be deported. The second clause of the portion of the existing law first quoted above provides for deportation of an alien sentenced more than once to a term of one year or more for conviction of a crime involving moral turpitude regardless of the length of time after entry. This clause, although not repealed by the bill, will in the course of time be superseded by the provisions of subsection (6) of section 1 of the bill which provides for deportation upon conviction twice with sentence for a term of one year or more, but it will be noticed that this portion of the bill requires that both offenses must be committed after the enactment of the act. The existing law will, however, remain in force not only to cover cases of the liability to deportation existing at the time of the enactment of the new act, but also to take care of the case where after the enactment of this act an alien is sentenced to one year or more for a crime involving moral turpitude, where the first conviction took place before the enactment of this act.

**167**

## HABITUAL CRIMINALS

(7) An alien who is convicted of any offense (committed after the enactment of this act and within 10 years after entry) for which he is sentenced to imprisonment for a term which, when added to the terms to which sentenced under two or more previous convictions of the same or any other offense (committed after the enactment of this act), amounts to two years or more.

This paragraph is to take care of habitual criminals and makes an alien deportable who has already been twice sentenced to imprisonment and is again sentenced so that the three sentences combined amount to two years or more, but all the offenses must be committed after the enactment of this act and within 10 years after the entry of the alien.

## APPEALS AND PARDONS

Section 2 of the bill gives the alien convicted of crime two safeguards not affirmatively specified in existing law, although, as a matter of practice, it is quite likely that both are being afforded without specific provision. They are that no conviction can be used as a ground of deportation unless, first, it is a conviction in a court of record, and, second, that the judgment on such conviction has become final. This provision is applicable to every conviction alluded to in subsections (6) and (7) above quoted and explained. Where an alien has appealed, or while he has the right to appeal, from the judgment on a conviction rendering him liable to deportation, he may not be deported. These safeguards are deemed desirable, especially since the court or judge is not given the right to recommend that the alien be not deported, in the cases covered by such paragraphs.

This section also provides that in the case of a sentence for an indeterminate term in which the minimum term under the sentence is less than one year, the term actually served shall be considered the term for which sentenced where deportation is based upon the length of the term of imprisonment.

An alien who has been unconditionally pardoned after conviction of an offense specified in subsections (6) and (7) of section 1 shall not be deported on account of that offense. Thus a pardon would not relieve from deportation an alien who has violated or conspired to violate the white slave traffic act or the Federal antinarcotic laws, nor would it save persons engaged in or connected with prostitution, nor others who are deported under some provision of law other than the subsections enumerated. This provision of the bill continues the principle embodied in a provision of the existing law which exempts from deportation an alien who has been pardoned after conviction of a crime involving moral turpitude. It should be noted that there is no relief from deportation if the pardon is conditioned upon continued good behavior. Such a pardon amounts only to a commutation of sentence or a parole, and section 5 provides that in such cases the deportation may be effected upon the release from confinement.

## READMISSION OF DEPORTED ALIENS

Under section 3 of the immigration act of 1917 one of the classes excluded from admission consists of persons who have been deported under any of the provisions of that act and who may again seek admission within one year unless they have obtained permission

6                     DEPORTATION OF ALIENS

from the Secretary of Labor to reapply for admission.  A serious
situation has arisen, particularly on our land borders, whereby
people deported to contiguous countries turn around and come back
again without further penalty than exclusion or another deporta-
tion.  No matter how serious the offense for which deported, an
alien can under existing law, except in a few limited cases (as pros-
titutes, anarchists, and war-time offenders), if otherwise admis-
sible, reenter the United States after one year from the date of his
deportation and can apply to the Secretary for readmission at any
time within that period.  Subsection (d) of section 3 of the bill
retains so much of the provision of the present law referred to as
applied to aliens who have been excluded on arrival and sent back.
They, as heretofore, are prohibited from coming back within one
year unless they have obtained the consent of the Secretary of Labor.
Subsection (a) of section 3, however, provides that if any alien has
been arrested and deported he shall be excluded from admission to the
United States, and imposes fine or imprisonment or both upon him
if he enters or attempts to enter the United States.   At the termina-
tion of the imprisonment he will be deported under section 19 of the
1917 act as belonging to an excluded class at the time of entry.   It
will be noted that liability to deportation also exists even though no
indictment for the criminal offense is brought, or even if the alien is
acquitted of the criminal offense after trial.
     In compliance with paragraph 2a of Rule XIII of the Rules of the
House the following shows the amendment made by subsection (d)
of section 3 of the bill to section 3 of the immigration act of 1917.
The matter printed in black brackets represents the old matter to be
eliminated from such section, and the matter printed in italics
represents the new matter to be inserted in such section.

   SEC. 3.  That the following classes of aliens shall be excluded from admission in
the United States:  *  *  *  persons who have been [deported under any of
the provisions of this act, and] *excluded from admission and deported in pursuance
of law, and* who may again seek admission within one year from the date of such
deportation, unless prior to their reembarkation at a [foreign port] *place outside
the United States* or their attempt to be admitted from foreign contiguous territory
the Secretary of Labor [shall have] *has* consented to their reapplying for
admission.

     Owing to the inadequacy of the appropriations now made for en-
forcement of deportation provisions under existing law, the Depart-
ment of Labor has, in many cases, after a warrant of deportation has
been issued, refrained from executing the warrant and deporting the
alien, at the expense of the appropriation, to the country to which he
might be deported, upon the condition that the alien voluntarily, at
his own expense, leave the United States.  Some doubt exists whether
an alien so departing has been "deported."  Subsection (b) of sec-
tion 3 of the bill therefore removes any possible doubt on this ques-
tion by providing that in such cases the alien shall be considered to
have been deported in pursuance of law.
     Under the present law an alien seaman upon arrival in the United
States, even though he belongs to one of the excluded classes (except in
cases of certain dangerous mental and physical diseases and disorders
and except in the case of aliens who are not bona fide seamen), is
nevertheless not excludable as in the case of any other class of aliens,
but is permitted to land temporarily for the purpose of reshipping
foreign.  If such a seaman is arrested and deported in pursuance of

law, he may turn around and immediately return to the United States and upon arrival must again be permitted to land temporarily for the purpose of reshipping foreign. Thus he is afforded an opportunity of quitting his calling and again remaining in the United States beyond the time fixed by the law and regulations. To prevent this result it is provided in subsection (c) of section 3 of the bill that an alien subject to exclusion from admission on the ground that he has once been deported shall not, although employed as a seaman, l e entitled to any of the landing privileges allowed by law to seamen.

The existing law (sec. 18 of the immigration act of 1917) provides a penalty for any person in charge, etc., of a vessel "knowingly to bring to the United States at any time within one year from the date of deportation any alien rejected or arrested and deported under any provision of this act [of 1917] unless prior to reembarkation the Secretary of Labor has consented that such alien shall reapply for admission." Subsection (e) of section 3 of the bill provides a penalty for the person in charge, etc., of a vessel "knowingly to bring to the United States any alien excluded or arrested and deported under any provision of law until such time as such alien may be lawfully entitled to reapply for admission to the United States." There appears to be no reason why the person in charge, etc., of a vessel should not be penalized for knowingly bringing an alien who has been deported so long as it is unlawful for him to reenter the United States. This means that in the case of an alien arrested and deported it is unlawful for him to return at all, and in the case of an alien excluded and deported it is unlawful for him to return within one year from the date of such deportation unless the Secretary of Labor has, prior to the expiration of the year, consented to his reapplying for admission.

In compliance with paragraph 2a of Rule XIII of the Rules of the House the following shows the amendment above described made by subsection (e) of section 3 of the bill in section 18 of the immigration act of 1917. The matter in the left-hand column is the present law and the matter in the right-hand column shows the proposed amendment:

| PRESENT LAW | PROPOSED AMENDMENT |
|---|---|
| or knowingly to bring to the United States at any time within one year from the date of deportation any alien rejected or arrested and deported under any provision of this act, unless prior to reembarkation the Secretary of Labor has consented that such alien shall reapply for admission, as required by section 3 hereof | or knowingly to bring to the United States any alien excluded or arrested and deported under any provision of law until such time as such alien may be lawfully entitled to reapply for admission to the United States |

## PENALTY FOR UNLAWFUL ENTRY

Section 4 of the bill attempts to cure one of the defects of the present law by imposing a criminal penalty upon any alien who enters the United States at any time or place other than as designated by immigration officials, or eludes examination or inspection or obtains entry by a willfully false or misleading representation, or a willful concealment of a material fact. Under the present law all that can be done to such an alien is to deport him. It is believed that

DEPORTATION OF ALIENS

if the class of aliens who are endeavoring to enter the United States surreptitiously become aware that when detected they will be fined and imprisoned, as well as deported, the number who attempt to smuggle themselves or have themselves smuggled into the United States will be materially lessened. It should be noted that the punishment of fine or imprisonment is not in substitution for deportation. After the sentence has been served the alien will be deported, under subsection (5) of section 1 of the bill. It will be noted that liability to deportation also exists even though no indictment for the criminal offense is brought, or even if the alien is acquitted of the criminal offense after trial.

### DEPORTATION AFTER IMPRISONMENT

Section 5 provides that an alien sentenced to imprisonment shall not be deported under any provision of law until after the termination of the imprisonment, which is similar in principle to the provision in section 19 of the existing law. Particular attention is directed to the fact that an alien violating the provisions of section 3 or 4 of the bill is not to be deported until after the termination of the imprisonment to which he may be sentenced under such section.

In the case of prisoners released on parole under convictions by State courts, it was the practice of the department until recently to take the prisoner into custody immediately on his parole if deportable for any reason. Objections were made by one of the States to this practice, on the ground that it was an infringement on the right of the State to retain custody of the prisoner during the period he is out on parole. The Solicitor of the Department of Labor recently advised the Secretary of Labor that the statute did not authorize the practice of the department, and accordingly it has been discontinued so that under the present law the alien is not deported until the end of the term for which sentenced or until he is unconditionally released from confinement. Your committee is convinced that the law should be made clear that the alien is deportable immediately upon his release from confinement. If he belongs to a deportable class he should be deported even though it may not be against the public policy of the State, under whose laws he has been convicted, that he should be allowed to go at large on parole. The authority of Congress in relation to the deportation of aliens is supreme and the law or practice of a State can not and should not allow an alien to remain in this country for a moment longer than permitted by act of the National Legislature, which alone is charged with the duty and responsibility of ridding the country of undesirable aliens. Accordingly, section 5 of the bill provides that the alien may be deported immediately upon his release on parole.

### TIME LIMIT ON DEPORTATION

It will be noted that section 6 of the bill provides that there shall be no time limit within which deportation proceedings on the grounds provided in this bill shall be begun, with the exception that deportation based on conviction of crime as specified in subsection (6) or (7) of section 1 shall not be begun after the expiration of three years

after the termination of imprisonment. In all other cases proceedings may be begun at any time after the entry of the alien even though he may also be deportable under some provision of existing law which places a time limit on the beginning of proceedings. For example, an alien deportable under subsection (5) of section 1 of the bill for surreptitious entry may be deported at any time thereafter although he may also be deportable under provisions of existing law which have a time limit of three years after entry.

### ALIEN BELONGING TO MORE THAN ONE DEPORTABLE CLASS

Section 7 of the bill is put in out of an abundance of caution to make it clear that it is the intention of Congress that an alien who is liable to deportation under any paragraph of the bill shall be deported whether or not he is liable to deportation under any other paragraph of the bill or in any other law, and, conversely, that the grounds for deportation set forth in the bill are in addition to and not in substitution for the grounds already existing under other laws. For instance, if an alien violates the narcotic drugs import and export act, he is to be deported (under paragraph (2) of section 1), even though he has not been convicted of the violation and consequently is not deportable under section 2 of such act, or even though he is convicted and sentenced to less than a year's imprisonment or merely fined. Again, if an alien is deportable under paragraph (5) of section 1 of the bill (surreptitious entry) he can not escape deportation merely because he does not come within the somewhat similar language of the present law. It is also intended by the bill, for example, that an alien liable to deportation as a procurer under the provisions of existing law shall not escape deportation even though he has not violated the white slave traffic act and hence would not be deportable under subsection (1) of section 1 of the bill.

### DEFINITION OF TERMS

Section 9 of the bill provides that terms defined in the immigration act of 1924 shall have the same meaning when used in this bill. These definitions are:

(1) The term "United States," found in section 28 (a) of the 1924 act, as follows: "The term 'United States,' when used in a geographical sense, means the States, the Territories of Alaska and Hawaii, the District of Columbia, Porto Rico, and the Virgin Islands."

(2) The term "alien," found in section 28 (b) of the 1924 act, as follows: "The term 'alien' includes any individual not a native-born or naturalized citizen of the United States, but this definition shall not be held to include Indians of the United States not taxed, nor citizens of the islands under the jurisdiction of the United States."

(3) The term "immigration act of 1917," found in section 23 (f) of the 1924 act, as follows: "The term 'immigration act of 1917' means the act of February 5, 1917, entitled 'An act to regulate the immigration of aliens to, and the residence of aliens in, the United States.'"

H R—70–2—vol 2——3

10                     DEPORTATION OF ALIENS

### FINALITY OF SECRETARY'S DECISION

The bill does not disturb the provision of the existing law (section 19 of 1917 act), that the decision of the Secretary of Labor in every case of deportation shall be final. This provision has been considered by the Supreme Court as meaning that the decision of the Secretary is final only if the alien has in fact had due process of law, but the court has refused to overturn the decision of the Secretary unless it appears, (1) that his action has been arbitrary, or (2) that there is no evidence on which to support the finding, or (3) that the alien has not had proper notice and opportunity to be heard, or (4) that the Secretary has misconstrued the law. In no case does the court have the right to review the evidence for the purpose of determining whether or not the weight of evidence supports the findings of the Secretary. If there is evidence in support of his finding, the court will sustain it even though, were the matter before the court originally, the court would have reached a conclusion opposite to that which the Secretary has reached. The arrested person has the right to a judicial determination of his claim of citizenship, unless such claim is plainly frivolous.

### APPENDIX A

[H. R. 16850, Seventieth Congress, second session]

**A BILL To provide for the deportation of certain aliens, and for the punishment of the unlawful entry of certain aliens**

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the following aliens shall, upon warrant of the Secretary of Labor, be taken into custody and deported in the manner provided in sections 19 and 20 of the immigration act of 1917 [U. S. C. Title 8, §§ 155, 156], if the Secretary of Labor, after hearing, finds that such aliens are undesirable residents of the United States:

(1) An alien who hereafter violates or conspires to violate the white-slave traffic act [U. S. C. Title 18, §§ 397–404], or any law amendatory of, supplementary to, or in substitution for, such act.

(2) An alien who hereafter violates or conspires to violate any statute of the United States taxing, prohibiting, or regulating the manufacture, production, compounding, possession, use, sale, exchange, dispensing, giving away, transportation, importation, or exportation of opium, coca leaves, or any salt, derivative, or preparation of opium or coca leaves.

(3) An alien who hereafter willfully conceals or harbors, attempts to conceal or harbor, or aids, assists, or abets any other person to conceal or harbor, any alien liable to deportation.

(4) An alien who hereafter willfully aids or assists in any way any alien unlawfully to enter the United States.

(5) An alien who hereafter enters the United States at any time or place other than as designated by immigration officials, or eludes examination or inspection by immigration officials, or obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact.'

(6) An alien who is convicted of any offense (committed after the enactment of this act and at any time after entry) for which he is sentenced to imprisonment for a term of one year or more, and who is thereafter convicted of the same or any other offense (committed after the enactment of this act and at any time after ent y) for which he is sentenced to imprisonment for a term of one year or more.

(7) An alien who is convicted of any offense (committed after the enactment of this act and within ten years after entry) for which he is sentenced to imprisonment for a term which, when added to the terms to which sentenced under two or more previous convictions of the same or any other offense (committed after the enactment of this act), amounts to two years or more.

173

DEPORTATION OF ALIENS.                                    11

SEC. 2. For the purposes of subsections (6) and (7) of section 1—

(a) No conviction shall serve as a basis for deportation proceedings unless such conviction is in a court of record and the judgment on such conviction has become final;

(b) In the case of a sentence for an indeterminate term in which the minimum term under the sentence is less than one year, the term actually served shall be considered the term for which sentenced; and

(c) An offense of which an alien, after conviction, has been unconditionally pardoned, shall not be considered an offense.

SEC. 3. (a) If any alien has been arrested and deported in pursuance of law, he shall be excluded from admission to the United States whether such deportation took place before or after the enactment of this act, and if he enters or attempts to enter the United States after the expiration of sixty days after the enactment of this act, he shall be guilty of a felony and upon conviction thereof shall, unless a different penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years or by a fine of not more than $1,000, or by both such fine and imprisonment.

(b) For the purposes of this section any alien ordered deported (whether before or after the enactment of this act) who has left the United States shall be considered to have been deported in pursuance of law, irrespective of the source from which the expenses of his transportation were defrayed or of the place to which he departed.

(c) An alien subject to exclusion from admission to the United States under this section who is employed upon a vessel arriving in the United States shall not be entitled to any of the landing privileges allowed by law to seamen.

(d) So much of section 3 of the immigration act of 1917 [U. S. C. Title 8, § 136 (j)] as reads as follows: "persons who have been deported under any of the provisions of this act, and who may again seek admission within one year from the date of such deportation, unless prior to their reembarkation at a foreign port or their attempt to be admitted from foreign contiguous territory the Secretary of Labor shall have consented to their reapplying for admission" is amended to read as follows: "persons who have been excluded from admission and deported in pursuance of law, and who may again seek admission within one year from the date of such deportation, unless prior to their reembarkation at a place outside the United States or their attempt to be admitted from foreign contiguous territory the Secretary of Labor has consented to their reapplying for admission."

(e) So much of section 18 of the immigration act of 1917 [U. S. C. Title 8, § 154] as reads as follows: "or knowingly to bring to the United States at any time within one year from the date of deportation any alien rejected or arrested and deported under any provision of this act, unless prior to reembarkation the Secretary of Labor has consented that such alien shall reapply for admission, as required by section 3 hereof" is amended to read as follows: "or knowingly to bring to the United States any alien excluded or arrested and deported under any provision of law until such time as such alien may be lawfully entitled to reapply for admission to the United States." The amendment made by this subsection shall take effect on the expiration of sixty days after the enactment of this act, but the provision amended shall remain in force for the collecton of any fine incurred before the effective date of such amendment.

SEC. 4. Any alien who hereafter enters the United States at any time or place other than as designated by immigration officials or eludes examination or inspection by immigration officials, or obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall be guilty of a misdemeanor and, upon conviction, shall be punished by imprisonment for not more than one year or by a fine of not more than $1,000, or by both such fine and imprisonment.

SEC. 5. An alien sentenced to imprisonment shall not be deported under any provision of law until after the termination of the imprisonment. For the purposes of this section (but not for the purposes of section 6) the imprisonment shall be considered as terminated upon the release of the alien from confinement, whether or not he is subject to rearrest or further confinement in respect of the same offense.

SEC. 6. Proceedings for the deportation of an alien made deportable by this act may be begun at any time after the entry of such alien, without regard to any of the periods prescribed in the immigration act of 1917; but no proceeding based on subsection (6) or (7) of section 1 of this act shall be begun after the expiration of three years after the termination of the imprisonment.

174

**12**                          DEPORTATION OF ALIENS                          . . .

SEC. 7. If any alien is liable to deportation upon any ground specified in any paragraph of this act, he shall be deported whether or not he is liable to deportation upon a ground specified in any other paragraph of this act or in any other law, and any alien who is liable to deportation upon a ground specified in any law other than this act shall be deported whether or not he is liable to deportation upon a ground specified in this act.

SEC. 8. Upon the final conviction of any alien of any offense in any court of record of the United States or of any State or Territory it shall be the duty of the clerk of the court to notify the Secretary of Labor, giving the name of the alien convicted, the nature of the offense of which convicted, the sentence imposed, and, if imprisoned, the place of imprisonment, and, if known, the place of birth of such alien, his nationality, and the time when and place where he entered the United States.

SEC. 9. Terms defined in the Immigration act of 1924 shall, when used in this act, have the meaning assigned to such terms in that act.

SEC. 10. This act may be cited as the "Undesirable aliens act of 1929."

————

APPENDIX B

DEPORTATION SECTIONS (SECS. 18, 19, AND 20) OF THE IMMIGRATION ACT OF FEBRUARY 5, 1917

SEC. 18. That all aliens brought to this country in violation of law shall be immediately sent back, in accommodations of the same class in which they arrive, to the country whence they respectively came, on the vessels bringing them, unless in the opinion of the Secretary of Labor immediate deportation is not practicable or proper. The cost of their maintenance while on land, as well as the expense of the return of such aliens, shall be borne by the owner or owners of the vessels on which they respectively came. That it shall be unlawful for any master, purser, person in charge, agent, owner, or consignee of any such vessel to refuse to receive back on board thereof, or on board of any other vessel owned or operated by the same interests, such aliens; or to fail to detain them thereon; or to refuse or fail to return them in the manner aforesaid to the foreign port from which they came; or to fail to pay the cost of their maintenance while on land; or to make any charge for the return of any such alien, or to take any security for the payment of such charge; or to take any consideration to be returned in case the alien is landed; or knowingly to bring to the United States at any time within one year from the date of deportation any alien rejected or arrested and deported under any provisions of this act, unless prior to reembarkation the Secretary of Labor has consented that such alien shall reapply for admission, as required by section 3 hereof; and if it shall appear to the satisfaction of the Secretary of Labor that such master, purser, person in charge, agent, owner, or consignee has violated any of the foregoing provisions, or any of the provisions of section 15 hereof, such master, purser, person in charge, agent, owner, or consignee shall pay to the collector of customs of the district in which the port of arrival is located, or in which any vessel of the line may be found, the sum of $300 for each and every violation of any provision of said sections; and no vessel shall have clearance from any port of the United States while any such fine is unpaid, nor shall such fine be remitted or refunded: *Provided*, That clearance may be granted prior to the determination of such question upon the deposit with the collector of customs of a sum sufficient to cover such fine. If the vessel by which any alien ordered deported came has left the United States, and it is impracticable for any reason to deport the alien within a reasonable time by another vessel owned by the same interests, the cost of deportation may be paid by the Government and recovered by civil suit from any agent, owner, or consignee of the vessel: *Provided further*, That the Commissioner General of Immigration, with the approval of the Secretary of Labor, may suspend, upon conditions to be prescribed by the Commissioner General of Immigration, the deportation of any aliens found to have come in violation of any provision of this act if, in his judgment, the testimony of such alien is necessary on behalf of the United States Government in the prosecution of offenders against any provision of this act or other laws of the United States; and the cost of maintenance of any person so detained resulting from such suspension of deportation, and a witness fee in the sum of $1 per day for each day such person is so detained, may be paid from the appropriation for the enforcement of this

**175**

act, or such alien may be released under bond, in the penalty of not less than $500, with security approved by the Secretary of Labor, conditioned that such alien shall be produced when required as a witness and for deportation.

No alien certified, as provided in section 16 of this act, to be suffering from tuberculosis in any form, or from a loathsome or dangerous contagious disease other than one of quarantinable nature, shall be permitted to land for medical treatment thereof in any hospital in the United States, unless the Secretary of Labor is satisfied that to refuse treatment would be inhumane or cause unusual hardship or suffering, in which case the alien shall be treated in the hospital under the supervision of the immigration officials at the expense of the vessel transporting him: *Provided further*, That upon the certificate of an examining medical officer to the effect that the health or safety of an insane alien would be unduly imperiled by immediate deportation, such alien may, at the expense of the appropriation for the enforcement of this act, be held for treatment until such time as such alien may, in the opinion of such medical officer, be safely deported: *Provided further*, That upon the certificate of an examining medical officer to the effect that a rejected alien is helpless from sickness, mental or physical disability, or infancy, if such alien is accompanied by another alien whose protection or guardianship is required by such rejected alien, such accompanying alien may also be excluded, and the master, agent, owner, or consignee of the vessel in which such alien and accompanying alien are brought shall be required to return said alien and accompanying alien in the same manner as vessels are required to return other rejected aliens.

SEC. 19. That at any time within five years after entry any alien who at the time of entry was a member of one or more of the classes excluded by law; any alien who shall have entered or who shall be found in the United States in violation of this act or in violation of any other law of the United States; any alien who at any time after entry shall be found advocating or teaching the unlawful destruction of property, or advocating or teaching anarchy or the overthrow by force or violence of the Government of the United States or of all forms of law or the assassination of public officials; any alien who within five years after entry becomes a public charge from causes not affirmatively shown to have arisen subsequent to landing; except as hereinafter provided, any alien who is hereafter sentenced to imprisonment for a term of one year or more because of conviction in this country of a crime involving moral turpitude committed within five years after the entry of the alien to the United States, or who is hereafter sentenced more than once to such a term of imprisonment because of conviction in this country of any crime involving moral turpitude committed at any time after entry; any alien who shall be found an inmate of or connected with the management of a house of prostitution or practicing prostitution after such alien shall have entered the United States, or who shall receive, share in, or derive benefit from any part of the earnings of any prostitute; any alien who manages or is employed by, in, or in connection with any house of prostitution or music or dance hall or other place of amusement or resort habitually frequented by prostitutes or where prostitutes gather, or who in any way assists any prostitute or protects or promises to protect from arrest any prostitute; any alien who shall import or attempt to import any person for the purpose of prostitution or for any other immoral purpose; any alien who, after being excluded and deported or arrested and deported as a prostitute or as a procurer, or as having been connected with the business of prostitution or importation for prostitution or other immoral purposes in any of the ways hereinbefore specified shall return to and enter the United States; any alien convicted and imprisoned for a violation of any of the provisions of section four hereof; any alien who was convicted or who admits the commission prior to entry of a felony or other crime or misdemeanor involving moral turpitude; at any time within three years after entry, any alien who shall have entered the United States by water at any time or place other than as designated by immigration officials, or by land at any place other than one designated as a port of entry for aliens by the Commissioner General of Immigration, or at any time not designated by immigration officials, or who enters without inspection, shall, upon the warrant of the Secretary of Labor, be taken into custody and deported: *Provided*, That the marriage to an American citizen of a female of the sexually immoral classes the exclusion or deportation of which is prescribed by this act shall not invest such female with United States citizenship if the marriage of such alien female shall be solemnized after her arrest or after the commission of acts which make her liable to deportation under this act: *Provided further*, That the provision of this section

14                         DEPORTATION OF ALIENS

respecting the deportation of aliens convicted of a crime involving moral turpitude shall not apply to one who has been pardoned, nor shall such deportation be made or directed if the court, or judge thereof, sentencing such alien for such crime, shall, at the time of imposing judgment or passing sentence or within 30 days thereafter, due notice having first been given to representatives of the State, make a recommendation to the Secretary of Labor that such alien shall not be deported in pursuance of this act; nor shall any alien convicted as aforesaid be deported until after the termination of his imprisonment: *Provided further,* That the provisions of this section, with the exceptions hereinbefore noted, shall be applicable to the classes of aliens therein mentioned irrespective of the time of their entry into the United States: *Provided further,* That the provisions of this section shall also apply to the cases of aliens who come to the mainland of the United States from the insular possessions thereof: *Provided further,* That any person who shall be arrested under the provisions of this section on the ground that he has entered or been found in the United States in violation of any other law thereof which imposed on such person the burden of proving his right to enter or remain, and who shall fail to establish the existence of the right claimed, shall be deported to the place specified in such other law.   In every case where any person is ordered deported from the United States under the provisions of this act or of any law or treaty the decision of the Secretary of Labor shall be final.

SEC. 20. That the deportation of aliens provided for in this act shall, at the option of the Secretary of Labor, be to the country whence they came or to the foreign port at which such aliens embarked for the United States; or, if such embarkation was for foreign contiguous territory, to the foreign port at which they embarked for such territory; or, if such aliens entered foreign contiguous territory from the United States and later entered the United States, or if such aliens are held by the country from which they entered the United States not to be subjects or citizens of such country, and such country refuses to permit their reentry, or imposes any condition upon permitting reentry, then to the country of which such aliens are subjects or citizens, or to the country in which they resided prior to entering the United States. If deportation proceedings are instituted at any time within five years after the entry of the alien, such deportation, including one-half of the entire cost of removal to the port of deportation, shall be at the expense of the contractor, procurer, or other person by whom the alien was unlawfully induced to enter the United States, or if that can not be done, then the cost of removal to the port of deportation shall be at the expense of the appropriation for the enforcement of this act, and the deportation from such port shall be at the expense of the owner or owners of such vessels or transportation line by which such aliens respectively came, or, if that is not practicable, at the expense of the appropriation for the enforcement of this act. If deportation proceedings are instituted later than five years after the entry of the alien, or if the deportation is made by reason of causes arising subsequent to entry, the cost thereof shall be payable from the appropriation for the enforcement of this act. A failure or refusal on the part of the masters, agents, owners, or consignees of vessels to comply with the order of the Secretary of Labor to take on board, guard safely, and transport to the destination specified any alien ordered to be deported under the provisions of this act shall be punished by the imposition of the penalties prescribed in section 18 of this act: *Provided,* That when in the opinion of the Secretary of Labor the mental or physical condition of such alien is such as to require personal care and attendance, the said Secretary shall when necessary employ a suitable person for that purpose, who shall accompany such alien to his or her final destination, and the expense incident to such service shall be defrayed in the same manner as the expense of deporting the accompanied alien is defrayed. Pending the final disposal of the case of any alien so taken into custody, he may be released under a bond in the penalty of not less than $500 with security approved by the Secretary of Labor, conditioned that such alien shall be produced when required for a hearing or hearings in regard to the charge upon which he has been taken into custody, and for deportation if he shall be found to be unlawfully within the United States.

O

# EXHIBIT J

soldiers have never been given a pensionable status, and the pending resolution does not give them a pensionable status.

Of all the States that suffered from border warfare during the Civil War period, Missouri was probably most devastated by the rip tides and cross currents of the opposing armies of the North and South. The Union and Confederate forces alternately swept across the State, leaving woe and desolation in their wake. It was to meet this situation that the Federal Government created the Department of the West and the Department of the Missouri, and by the act of March 25, 1862, Congress provided—

That the Secretary of War be, and he is hereby, authorized and required to allow and pay to the officers, noncommissioned officers, musicians, and privates who have been heretofore actually employed in the military service of the United States, whether mustered into actual service or not, where their services were accepted and actually employed by the generals who have been in command of the Department of the West or the Department of the Missouri, the pay and bounty as in cases of regular enlistment.

This act further gave these officers and privates a pensionable status when wounded or incapacitated for service.

The act of March 25, 1862, placed those who served in Missouri Militia organizations (whose services were accepted, and who were actually used by the generals in command of the Department of the West or the Department of the Missouri, although not actually mustered into the Army of the United States) on a different basis than those who served in militia organizations in other States. They were given this preferred and pensionable status if their services were accepted and actually employed by the generals in command of the Department of the West or the Department of the Missouri.

Mr. TILSON. Is the gentleman ready to assure the House that this joint resolution does not enlarge the class that now draws pensions?

Mr. LOZIER. Yes; this resolution adds no new class to the pension rolls. It will in some instances increase the allowance and remedy present discriminatory conditions. It does not give a pensionable status to any group or class of soldiers or their dependents who have not heretofore had and who do not now have a pensionable status.

Mr. TILSON. But it enables the members of the said class to take advantage of more recent laws. Is that the case?

Mr. LOZIER. Yes; the statement of the gentleman from Connecticut is correct. This resolution extends to the survivors of the Missouri State Militia and the Provisional Missouri Militia who rendered service during the Civil War and their dependents, who now have title to pension under existing law, the advantage of the act of Congress approved May 1, 1920, the act of Congress approved July 3, 1926, and the act of Congress approved May 23, 1928. Under the present law these survivors are receiving $50 per month, and by extending the benefits of these acts to them they will be automatically increased to $65 per month, with further increase to $72 and $90 per month in case of partial or total disabilities. The widows of the Missouri State Militiamen and the Provisional Missouri Militiamen who have title under existing law now receive $30 per month. This will increase them to $50 per month under the provisions of the act of July 3, 1926, if married to the soldier prior to or during the period of his service during the Civil War.

It also allows them the benefits of the provisions of the act of May 23, 1928, increasing their pensions from $30 per month to $40 per month if they have or may hereafter attain the age of 75 years. All widows must show their husbands rendered 90 days or more military service and were honorably discharged from all contracts of service, or, regardless of the length of service, were discharged for or died in service of a disability incurred in the service and in the line of duty, and that they were married to the late soldier prior to June 27, 1905.

As I have stated, there are two precedents extending the benefits of existing pension laws to the survivors of the Missouri State Militia and the Provisional Missouri Militia and their dependents. The first was a House joint resolution approved February 15, 1895, and the second was a House joint resolution approved March 4, 1907. I have already explained these resolutions in detail. The pending resolution extends the benefits of the acts of May 1, 1920, July 3, 1926, and May 23, 1928, so as to include the officers and privates of the Missouri State Militia and the Provisional Militia and their widows and minor children, just as House joint resolution, approved February 15, 1895, extended the provisions of the act of June 27, 1890, to these classes, and just as House joint resolution, approved March 4, 1907, extended the benefits of the act of February 6, 1907, to these same classes.

Mr. CANNON. Mr. Speaker, the only criticism that can be made of this bill is that it does not go far enough. It should also provide a pensionable status for all who served during the Civil War in the Missouri Militia and the Provisional Enrolled Missouri Militia and their survivors. Thousands of loyal citizens of the State enlisted in these organizations, were armed and equipped by the Federal Government, commanded by Federal officers, fought side by side with Federal troops, and the State of Missouri has since been reimbursed for their services by the Federal Government. But because in the turmoil of war they did not happen to be sworn into the Federal service, that technicality has excluded them and their widows from the benefits of the pension laws enjoyed by their comrades, who rendered no greater service, endured no greater hardships, and contributed no more loyally to the preservation of the Union. It is to be hoped that in the near future their patriotic services will be recognized by legislation giving them equal pensionable status. But in the meantime this bill is a step in the right direction. It allows veterans who are now limited to a pension of $50 per month the advantage of recent enactments providing for increases to $65 per month, with a further increase to $72 and $90, respectively, in case of partial or total disabilities. It also permits widows now receiving $30 per month to take advantage of recent legislation authorizing increases to $40 and $50 per month, depending on date of marriage. For this reason the bill should be passed. It is to be hoped that it will also serve to call attention to the need for additional legislation providing for other members of Missouri organizations whose services in the war entitle them to the same consideration but who have for more than half a century been deprived of this deserved recognition.

The SPEAKER. Is there objection to the request of the gentleman from Ohio [Mr. W. T. FITZGERALD]?

There was no objection.

The joint resolution was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider was laid on the table.

## PERMISSION TO ADDRESS THE HOUSE

Mr. CONNERY. Mr. Speaker, I ask unanimous consent that on Monday next, after the reading of the Journal and disposition of matters on the Speaker's table, I may be permitted to address the House for 30 minutes.

Mr. TILSON. Mr. Speaker, the Consent Calendar is a very heavy one, and I am loath to allow the gentleman to take 30 minutes on Consent Calendar day.

Mr. CONNERY. I will modify my request and ask for 20 minutes.

Mr. SNELL. What is the matter with to-morrow?

Mr. TILSON. Will the gentleman be ready to-morrow?

Mr. CONNERY. No; I am not ready for to-morrow, but I will be ready for Monday or Tuesday.

Mr. SNELL. Tuesday is to be a full day for the Committee on the Merchant Marine and Fisheries. They have two bills that will take the entire day, Mr. Speaker. It would be all right for to-morrow.

Mr. CONNERY. All right, Mr. Speaker. I will try to be ready to-morrow, and will change my request and ask for 30 minutes to-morrow.

Mr. TILSON. So far as I am concerned the gentleman can have as much time as he needs to-morrow.

The SPEAKER. The gentleman from Massachusetts asks unanimous consent that to-morrow, after the reading of the Journal and the disposition of matters on the Speaker's table, he may address the House for 30 minutes. Is there objection?

There was no objection.

## IMMIGRATION

Mr. MICHENER. Mr. Speaker, by direction of the Committee on Rules I call up House Resolution 318, a privileged resolution, which I send to the Clerk's desk to have read.

The Clerk read the resolution, as follows:

Resolved, That upon the adoption of this resolution the Committee on Immigration and Naturalization shall have one legislative day for the consideration of the following bills:

H. R. 16927, to clarify the law relating to the temporary admission of aliens to the United States.

H. R. 16926, granting preference within the quota to certain aliens trained and skilled in a particular art, craft, technique, business, or science.

S. 5094, making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law.

That after general debate on each bill, which shall be confined to the bill and shall continue not to exceed one hour, to be equally divided and controlled by those favoring and opposing the bill, each bill shall be read for amendment under the 5-minute rule. In the case of the bill S. 5094, it shall be in order to consider without the intervention

of the point of order, as provided in clause 7 of rule 16, the committee amendment recommended by the Committee on Immigration and Naturalization now in the bill, and such committee amendment for the purpose of amendment shall be considered under the 5-minute rule as an original bill. At the conclusion of the reading of each bill for amendment the committee shall rise and report the bill to the House with such amendments as may have been adopted, and the previous question shall be considered as ordered on each bill and the amendments thereto to final passage without intervening motion except one motion to recommit.

Mr. MICHENER. Mr. Speaker, this rule makes in order three bills reported favorably by the Committee on Immigration and Naturalization. The bills are a bill to clarify the law relating to the temporary admission of aliens to the United States, a bill granting preference within the quota to certain aliens trained and skilled in a particular art, craft, technique, business, or science, and a bill making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law.

I might state that the so-called Schneider bill or naturalization bill is not in issue, neither is the Box quota bill.

This rule simply permits the consideration of these bills under the general rules of the House, permitting one hour general debate on each bill, with the exception that in the consideration of the Senate bill (S. 5094) the amendment which has been suggested by the committee may be considered without being subject to a point of order.

These are immigration bills and will be fully explained by the Immigration Committee when being considered.

Is any time desired in opposition to the rule?

Mr. O'CONNOR of New York. Yes; I would like to have some time.

Mr. MICHENER. How much?

Mr. O'CONNOR of New York. Fifteen minutes.

Mr. MICHENER. I yield to the gentleman from New York 15 minutes.

Mr. O'CONNOR of New York. Mr. Speaker and gentlemen of the House, it has been said around this Chamber that these three bills are perfectly innocent and do not involve much controversy. The Rules Committee has reported this rule for consideration of these three bills at this short session of Congress. Some of us who shall listen to the debate on the bills will be anxious to find out just what emergency prompted their being brought in under a rule when so much important legislation is still pending in this short session.

During the six years that I have been in the House, and during all that time I have been on the Rules Committee, I have always had grave doubt about any immigration bill which was presented to this House. It is not so much the particular provisions of any immigration bill as it is the spirit behind the bill with which I am deeply concerned. Here to-day I want to discuss that spirit which I believe pervades our country to an alarming extent, and I want to discuss it without any thought of the past or recent events. I approach it looking to my country's future.

I believe that there are many people in this country to-day who fear that these United States of ours is the most intolerant, narrow-minded nation on the globe. I am not going to use any bromides about loving my country. That is the gratuitous mouthing of a demagogue. If I think my country is wrong, I propose to criticize it in its own citadel. I will defend it against attack from without, but I reserve the right to criticize it from within. I fear there is a spirit pervading our country to-day reflected in these immigration bills that is a menace to the country—a spirit of intolerance and bigotry not only to religions but to races.

Take the first bill, relating to the deportation of alien criminals. Has anybody ever said anything here about establishing a penal colony for the deportation of citizen criminals and putting out of the country the criminal citizen?

Take another bill before us to-day, the Box bill, relating to immigrants coming over our borders. It represents a spirit of superior intolerance to our neighbors on the north and south.

Oh, I do not like the spirit behind all these measures. There seems to be a spirit of bigotry and intolerance in America directed at the races of the rest of the world that surely is un-American. There are certain people in our country who believe that no other race on the face of the globe can be compared in education, in culture, in respectability to the inhabitants of the United States.

Let me state here, gentlemen, not in order to say anything sensational but to bring the truth forcibly before this body: Take a railroad train and go through the South, through the West, through the North, and in the outlying sections of the country look at what we call our own people, who have not had the opportunities of the people in the big cities. You will see American people of the Nordic races, you will see people whose forefathers were here 300 years ago, but you will see them in the lowest state of civilization. Is that the type to which you refer when you speak of the "American blood" in America? Yes; you will see them in rags and tatters; you will see them unkempt, uncultured, uneducated, and uncouth.

Then I suggest you take an automobile and ride through the so-called foreign sections of the big cities and see these foreign people whom you hate so vehemently. Look at their children going to school in droves, seeking every opportunity for education, eager to acquire and to assimilate all the customs and habits of our country. See them going through the grammar schools, the high schools, to the colleges, from Harvard to Stanford, eager to become a part of America and of its institutions.

Let me make this assertion here, after due consideration, that I believe that the foreigners in this country to-day on the whole furnish better material for citizenship than many of the so-called American types living in outlying sections of the country.

Oh, I do not consider that an attack on my country. Every one of these bills is directed at one or a few particular races. Why is that spirit rampant in America? It is daily commented upon in colleges in nearly every issue of the current magazines.

How long can demagogues in all political parties continue to preach this doctrine of saying "America for Americans only" and further foment this vindictive intolerance evidenced by these bills? It surely must result in damage to our country. It is a spirit of vindictiveness against anybody whose ancestors were not born here 300 years ago. I do not care what its effect is in elections, but I do care what effect it is going to have on our country in the future.

Where is this doctrine being preached? On the political stumps by demagogues. But, more than that, this doctrine of intolerance of "American" narrow-mindedness is being preached in the pulpits of our churches, from the rostrums of small communities where people go to learn the thought of their communities. This doctrine is being propagated through the country by what I believe to be an ignorant, uneducated, cleric party, and I have no hesitation in saying it.

I further have no hesitation in saying that the preachers of intolerance, and I am talking principally about intolerance to races, are the most uneducated of any profession in America; that the clergy of America are the least educated of any profession in America, but they have the most powerful influence of any profession in America. They get a smattering of general knowledge, a little ecclesiastical training, but no broad vision, and then they go into a community and try to shape the thought of that community and preach that the Italian, the Jew, the Irish, the German are not fit to live in America. That is the danger to America. The country is flooded I might say with "Elmer Gantrys" preaching an un-American doctrine. Many Members are as afraid of an immigration bill as they are of a prohibition bill. They fear what will be said about them at home if they take a position in opposition to them. The preachers will attack them.

It is not a bad rule in approaching legislation to "beware of the Greeks bearing gifts," to see what spirit is behind the legislation.

These three bills are not needed now, but they will go to credit some men here in their districts with having furthered the cause of intolerance. I am as much interested in this question of restrictive immigration as anybody else, but I do not want America to become so narrow that it feels that these people of the Old World can not furnish something to this country. They have, in fact, furnished a great deal it has to-day. This smug nationalism is the greatest snobbishness that any nation could wear on its countenance in facing the rest of the world. Much we have in this country to-day we owe to the immigrants who came here from the Old World. Everyone knows the spirit behind the 1924 immigration law, directed principally at two peoples, the Italians and the Jews. That spirit of the Ku-Klux Klan has continued to persist. The same spirit I believe pervades these three bills here to-day—the sanctimonious, self-opinionated conceit that nobody else except the natural-born American, whatever he may be, is fitted to enjoy our present-day America.

I am not so much interested for the moment in what happens in immigration legislation. Perhaps immigration should be regulated. Perhaps we should close the doors. But I do detest the giving of false economic reasons to disguise intolerance. I regret to see labor deceived and deluded by false eco-

Case 3:20-mj-20121-KSC   Document 32-1   Filed 07/20/20   PageID.403   Page 182 of 218

nomic reasons advanced, when I feel confident that the spirit behind the whole question is mean and contemptible and, worst of all, un-American. [Applause.]

## REGULATING THE HEALING ART IN THE DISTRICT OF COLUMBIA

Mr. ZIHLMAN. Mr. Speaker, I ask unanimous consent to take from the Speaker's table the bill (S. 3936) to regulate the practice of the healing art, to protect the public health in the District of Columbia, insist on the House amendments, and agree to the conference asked by the Senate.

The SPEAKER. The gentleman from Maryland asks unanimous consent to take from the Speaker's table the bill (S. 3936) to regulate the practice of the healing art in the District of Columbia, insist on the House amendments, and agree to the conference asked by the Senate. Is there objection?

Mr. ALMON. Mr. Speaker, reserving the right to object, I want to ask the gentleman from Maryland in reference to the House amendment known as the Johnson amendment, whether he will bring that back to the House, if necessary, in order to have it incorporated in the bill as a part of the bill, and give the House an opportunity to vote upon it? The amendment was adopted by a considerable majority. I do not think it would be fair to the House for the House conferees to recede without giving the House an opportunity to vote upon it.

Mr. ZIHLMAN. Mr. Speaker, there are only two amendments. It is true there are three, but one of them is a corrective amendment of the text. Necessarily, the conference report would come back to the House for action.

Mr. ALMON. But if the conferees receded on this amendment and brought back the conference report, we would have to vote the conference report up or down.

Mr. ZIHLMAN. Mr. Speaker, I do not understand what the gentleman desires.

Mr. ALMON. I mean this: Rather than recede from the House amendment known as the Johnson amendment, that the gentleman give the House an opportunity to vote on it before receding. It is a very easy question to answer yes or no.

Mr. ZIHLMAN. I do not see how the conferees could agree to bring it back for further instructions. We will bring back the conference report.

Mr. ALMON. I think the gentleman should agree to give the House an opportunity to vote upon it again rather than to let it go out.

Mr. ZIHLMAN. The gentleman presumes that the conferees are going to let that go out. The conferees are bound by the action of the House and they represent the will of the House. We will insist upon the House amendments and my unanimous-consent request carried with it the provision that we insist on the House amendments.

Mr. ALMON. I hope that the House conferees will insist on the Johnson amendment.

Mr. ZIHLMAN. We hope to bring the bill back with the House amendments agreed to by the Senate.

The SPEAKER. Is there objection to the request of the gentleman from Maryland?

There was no objection.

The Chair appointed the following conferees: Mr. ZIHLMAN, Mr. BOWMAN, and Mr. BLANTON.

## IMMIGRATION

Mr. SABATH. Mr. Speaker, I desire to propound an inquiry to the gentleman from Michigan. Does this rule provide that one hour of general debate shall be on each of these bills or one hour on all the bills combined.

Mr. MICHENER. On each bill.

Mr. SABATH. That is the information I desired.

Mr. MICHENER. Mr. Speaker, there being no further debate on the rule, I move the previous question.

The previous question was ordered.

The question was taken, and the resolution was agreed to.

## TEMPORARY ADMISSION OF ALIENS TO THE UNITED STATES

Mr. VINCENT of Michigan. Mr. Speaker, under the rule just adopted by direction of the Committee on Immigration and Naturalization, I call up the bill H. R. 16927 for consideration.

The SPEAKER. The gentleman from Michigan calls up the bill which the Clerk will report.

The Clerk read as follows:

A bill (H. R. 16927) to clarify the law relating to the temporary admission of aliens to the United States

*Be it enacted, etc.,* That section 3 of the immigration act of 1924 (U. S. C. title 8, sec. 203) is amended by inserting "(a)" after the section number and by adding at the end of the section a new subdivision to read as follows:

"(b) For the purposes of clause (2) of subdivision (a) of this section no alien shall be considered as visiting the United States temporarily as a tourist or temporarily for business or pleasure (1) if he is coming under an agreement already made, express or implied, to engage in or resume employment by a person in the United States, or employment in any business or industry of the United States whether or not the employer is a citizen or resident of the United States, unless in either case he would, if an immigrant subject to the contract-labor provisions of the immigration act of 1917, come within the specific exemptions of such provisions, or (2) if he is coming to seek employment in the United States."

Mr. VINCENT of Michigan. Mr. Speaker, will the Speaker call my attention when I have used 10 minutes?

Gentlemen of the House, this bill is not for the purpose of making any drastic change in the immigration law. It is for the purpose of making certain and clear the intent of the Congress with respect to one point of the immigration law of 1924, in view of certain court decisions which the committee believes have departed from the real intent of the Congress. When the immigration law of 1924 was adopted it was found necessary to permit certain persons to enter the United States as nonimmigrants. Those classes of persons were clearly set forth in the immigration law.

The classes of nonimmigrants, that is, persons who were not to be treated as immigrants at all, but who could come into the United States temporarily because they were not immigrants, were set forth in section 3 of the immigration law, and they are made up of six different classes of persons. The first class is the government official, his family, attendants, servants, and employees. That is, those who come here to represent another country as officials of that country are not immigrants to this country. Second, an alien visiting the United States temporarily as a tourist or temporarily for business or pleasure. Those people were not to be considered as immigrants. They could come in for a brief limited period and then depart without undergoing the rules and regulations of quota, and so forth, that govern immigrants. The third class was the alien in continuous transit through the United States. That is, if a man came from a foreign country and landed at New York, but his destination was Montreal, Canada, he could pass through the United States without becoming an immigrant to the United States. Fourth, an alien lawfully admitted to the United States and who later goes in transit from one part of the United States to another through a foreign contiguous territory. That is, an immigrant admitted lawfully to this country, living in Buffalo, but passing to Chicago across the lower part of Canada, did not become an immigrant again when reaching the United States at Detroit, and so forth. Now trouble has arisen with respect to the second class that I named, that is, the alien visiting the United States temporarily as a tourist or temporarily for business or pleasure. Certain persons have come to the borders of the United States and claimed the protection of this clause 2 as nonimmigrants on the ground that they were intending temporarily to enter the United States for business. That business in each of these instances has consisted of this, either going into the United States to engage in a job of labor or some employment for which they have a contract, or, second, going into the United States to hunt for a job as a laboring man, or in some such employment. It was never the thought of the Committee on Immigration and Naturalization that a person coming into the United States to take a job, or to go about the country hunting for a job, was engaged in business. The intention the committee had is clearly expressed in its debates, and that was that we should not raise around the United States a Chinese wall through which business men, engaged in trade and having one part of such trade in a foreign country and the other part in this country—international commerce—ought not to be deprived of entering the United States temporarily for the purpose of carrying on a legitimate, substantial business which had, as I have said, a part of its situs in this country and part in another country.

Mr. MORTON D. HULL. Mr. Speaker, will the gentleman yield there for a question?

Mr. VINCENT of Michigan. Certainly.

Mr. MORTON D. HULL. Does this affect those coming into this country as teachers in schools and colleges and preachers?

Mr. VINCENT of Michigan. This provision has no reference to them. That is covered by another provision of the immigration act.

Now then, a short time ago certain persons entered the country first at Detroit and then at Buffalo, and when they were excluded from entering they brought suit in the Federal court on the ground that they were entering under this clause 2 of this provision. They contended that they were entering temporarily for business. That "business" consisted in many of these cases of coming into the United States to take a job as a laboring man, a job that had already been contracted for, and the court, in the second circuit court of the United States, Judge Manton, ruled that such person entering the United

The Clerk read as follows:

Mr. Hawley with Mr. Garner of Texas.
Mr. Treadway with Mr. Rainey.
Mr. Timberlake with Mr. Hull of Tennessee.
Mr. Bacharach with Mr. Watson.
Mr. Crowther with Mr. Ramseyer.
Mr. Estep with Mr. McLaughlin.

The result of the vote was announced as above recorded.

The SPEAKER. The question is, Shall the bill pass?

The question was taken, and the bill was passed.

On motion of Mr. Johnson of Washington, a motion to reconsider the vote by which the bill was passed was laid on the table.

## THE RETIREMENT AND RECLASSIFICATION BILLS

Mr. HUDSPETH. Mr. Speaker, I ask unanimous consent to proceed out of order for three minutes.

The SPEAKER. The gentleman from Texas asks unanimous consent to proceed out of order for three minutes. Is there objection?

There was no objection.

Mr. HUDSPETH. Mr. Speaker and gentlemen of the House, I feel it of the utmost importance to call to the attention of the House at this time the necessity for passing the Dale Lehlbach retirement bill. I have aided in securing a rule for consideration of this measure, which rule has been in the possession of the chairman of the Rules Committee for quite a while.

This act increases the maximum retirement pay to $1,200 a year and the average allowance to $800. The present maximum is $1,000, and the average pay around $700. And in many cases employees receive less than $100 yearly.

This fund comes largely out of the salaries of the employees—in fact, practically all of it. So, why should Congress object to passing a meritorious measure, which means the caring for aged employees of the Federal Government, when it comes out of their own pockets?

The session is approaching its close. There is no question that if this bill should be placed before the House at the present time it would pass by a vote of three-fourths of the membership.

I also wish to draw attention of the Members of the House to the reclassification act, passed by the Senate, known as the Brookhart bill and introduced in the House by Mr. Celler, of New York.

And I will further bring to the attention of the Members of the House the fact that under the Welch bill, as administered by the Personnel Classification Board, from my personal knowledge and through information gained in discussing the matter with employees here, in my home city of El Paso, and elsewhere, that the ones receiving the lower pay have not been benefited.

I do not object, Mr. Speaker and gentlemen, to the fact that increases were granted under the Welch Act. I think this was very necessary and timely. But I do wish to impress upon you the fact that those in the lower grades, who I thought at the time of the passage of the act, would receive substantial increases, have not received them under the classification made by this board.

Furthermore, the Comptroller General construes this act in a different way from what Congress intended. And those whom we intended should get the real benefit, or a majority of the Federal employes, I might say, have not received it, as the act has been construed and administered.

Everyone recognizes at the present time the great increase in the cost of living. And since I have been a Member of Congress there has been at least 100 per cent increase in the cost of living. But the increase in salaries has not been commensurate with, by any means, or in proportion to the increase in the necessaries of life.

"The laborer is worthy of his hire." The Federal Government is a big corporation, and it has as faithful employees as we have in this great country. Therefore I especially urge that these bills be taken up at the earliest possible moment and placed before the House, where there is no question they will pass by a large majority.

I especially urge the Republican steering committee and the chairman of the Rules Committee, who have the power to bring these measures up and permit the Members who earnestly desire to have these increases made, to give them opportunity to vote upon them, so that they may be enacted at the other end of the Capitol and reach the President in time for his signature before the final adjournment on the 4th of March.

I recently signed a request for the bringing up of these measures and am informed by the gentlemen who circulated this petition that over 300 names of Members of the House had been secured requesting immediate consideration. This shows the temper of the House and should convince the "powers that be" of the great importance of considering this legislation at the earliest possible time. [Applause.]

## DEPORTATION OF ALIENS

Mr. JOHNSON of Washington. Mr. Speaker, I move that the House resolve itself into the Committee of the Whole House on the state of the Union for the consideration of the bill (S. 5004) making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law.

The motion was agreed to.

Accordingly the House resolved itself into the Committee of the Whole House on the state of the Union for the consideration of the bill S. 5094, with Mr. Bacon in the chair.

The Clerk read the title of the bill.

Mr. JOHNSON of Washington. Mr. Chairman, I ask unanimous consent that the reading of the bill be dispensed with.

The CHAIRMAN. Is there objection to the request of the gentleman from Washington?

There was no objection.

Mr. JOHNSON of Washington. Mr. Chairman, this bill is an abridgment of a bill relating to deportation which passed the House almost unanimously in the last Congress and in the Congress before that. The bill in much larger form was reported from the committee to this House a year ago in January, but the time now is so short between now and adjournment it has been decided by the committee to report out a deportation bill in shorter form.

The committee has given the bill, in case it becomes a law, a title so that the act may be known as the undesirable aliens act of 1929.

The bill has been written with the greatest care, without malice or feeling of any kind, and is designed for the protection of the United States, and is intended to reach only the most dangerous classes of criminals and those aliens who smuggle or who assist in smuggling other aliens into the United States. This is the bill you have all been asking for. [Applause.]

Mr. SCHAFER. Will the gentleman yield?

Mr. JOHNSON of Washington. In just a minute. Wait until I have finished my statement.

The committee spent some time in endeavoring to draft a paragraph that would reach the alien gunman, and at a meeting of the committee this morning the reporting of an amendment including one more classification was authorized, reading as follows:

(8) An alien who is convicted of carrying on or about the person, transporting, or possessing any weapon or explosive bomb, for which he is sentenced to imprisonment for a term of six months or more; or who, having been convicted of carrying on or about the person, transporting, or possessing any weapon or explosive bomb, is thereafter convicted of carrying on or about the person, transporting, or possessing any weapon or explosive bomb, regardless of the sentence in either case. This subsection shall apply only in the case of offenses committed after the enactment of this act.

In other words, in respect of this line of cases the committee, if we can enact this into law, reaches down to less than one year's conviction and recognizes a conviction of six months in a court of record, or two convictions of the same person regardless of the length of time.

Quite a number of the States have very stringent laws against the carrying of guns. Most of them require permits, and several States have laws with regard to the carrying of guns by aliens, and in some States aliens are required also to have permits.

I am hopeful we can get right along with the bill. It has been abridged to the last degree and will be effective, and now includes this additional provision.

Mr. HUDSON. Will the gentleman yield?

Mr. JOHNSON of Washington. Wait until I have rounded out my statement.

Mr. HUDSON. Will the gentleman yield with respect to the language describing the bomb?

Mr. JOHNSON of Washington. I just read it. We can not describe bombs and hatchets and the size of bombs, and all that sort of thing, in respect of the enactment of a bill to apply to persons who have been convicted. We use the words "explosive bombs." The courts will take care of the description according to State laws.

This language is the key to the bill:

That the following aliens shall, upon warrant of the Secretary of Labor, be taken into custody and deported in the manner provided in sections 19 and 20 of the immigration act of 1917 (U. S. C. title 8, secs.

155, 156), if the Secretary of Labor, after hearing, finds that such aliens are undesirable residents of the United States.

Now, gentlemen must understand that sections 19 and 20 of the basic immigration act of 1917 still stand, providing for deportation, and that every alien may have a lawyer and have a defense. That applies to two or three classes now—the procurer type and one or two others. This bill extends it to the narcotic type, the narcotic peddler, and also to those who would smuggle and harbor aliens. I think that makes it clear. They have the process and opportunity of defense, and in addition I want to say that all cases of deportation not mentioned in this particular act remain in the law of 1917.

Mr. TAYLOR of Tennessee. Will the gentleman yield?

Mr. JOHNSON of Washington. I yield.

Mr. TAYLOR of Tennessee. I regard this as a very meritorious bill. It has already passed the Senate, I believe?

Mr. JOHNSON of Washington. Part of the text of the bill has passed the Senate, but we have substituted a deportation bill.

Mr. TAYLOR of Tennessee. I wondered if this amendment was adopted it would not jeopardize the bill?

Mr. JOHNSON of Washington. I think not; this Senate proposal really related to aliens deported and returning to the United States. I think that we can get something out of this that the people want.

Mr. UNDERHILL. Will the gentleman yield?

Mr. JOHNSON of Washington. I yield.

Mr. UNDERHILL. Will the gentleman state why we can not make this retroactive?

Mr. JOHNSON of Washington. I have a doubt as to the policy of making laws retroactive.

Mr. UNDERHILL. If we could go back to January 1 and catch that bunch that did the shooting the other day in Chicago——

Mr. JOHNSON of Washington. I am not sure they are all aliens.

In regard to a retroactive clause, it is interesting to note that many of the provisions in the large deportation bill were brought out a year ago in the past. Yet some of the cases provided for deportation exist now only in a small degree. You must remember that there was a time limit—five years in most cases and three years in some. There was no limit to some of the worst criminals. When your committee undertook five years ago to work out a deportation law there were a great many dependent aliens in insane institutions—decrepit and paupers. The law was not passed and so time limit ran in nearly all of the cases. The restrictive immigration act went into effect on July 1, 1924, so it will be five years next July, and on July 1 next time limit will run out in nearly all classes.

Mr. COCHRAN of Missouri. Will the gentleman yield?

Mr. JOHNSON of Washington. I yield.

Mr. COCHRAN of Missouri. My attention was called to the cases of four aliens ordered deported confined in an institution in St. Louis where the State Department was unable to secure from the foreign government their passports. How are you going to get such people deported if the foreign government will not issue the passports?

Mr. JOHNSON of Washington. We have the same trouble in the United States, for we as a government decline to take back our insane aliens from Canada.

Mr. COCHRAN of Missouri. Then what is the use of passing this bill if the foreign governments will not grant the passports?

Mr. JOHNSON of Washington. This reaches another type entirely.

Mr. SABATH. Mr. Chairman and gentlemen of the House, I am pleased to be in a position to say that it begins to look as if I have been of some service to the House and to the country. I say this because I recall that when some four years ago the House was about to pass a deportation bill I called attention to the fact that it contained many glaring defects. I pointed out here at that time that some of its provisions were most unfortunate, unfair, and utterly indefensible. That I was justified in my criticism was demonstrated later by the refusal of the Senate to enact it into law.

Again, a year ago, the House passed a deportation bill, not as fierce, not quite as bad, as the one we passed in 1926, but still a very vicious bill which again failed, and properly so, to pass the Senate.

Therefore, I am indeed pleased that to-day the committee submits for your consideration a deportation bill which is not as vicious, which is not as bad, and which I am hopeful that I may be able to vote for, and will vote for, if a few amendments are agreed to, and which amendments I feel that you gentlemen will vote for when they are submitted to the House.

Now, with a view of enlightening some of you gentlemen who have been made to believe that in years gone by we have had

no deportation legislation, I want to read to you, while I have a chance, what the present law provides.

I desire to do this so that in the future you will not be carried away on legislation that is brought up on the floor of the House merely because some unreasonable people insist upon its enactment. I know that most of you, due to the large amount of work you have, and the many duties which you must perform, are unable to familiarize yourselves with all of the laws. Therefore, at this time I shall read what the present deportation law actually is. Section 19 provides:

SEC. 19. That at any time within five years after entry, any alien who at the time of entry was a member of one or more of the classes excluded by law; any alien who shall have entered or who shall be found in the United States in violation of this act, or in violation of any other law of the United States; any alien at any time after entry shall be found advocating or teaching the unlawful destruction of property, or advocating or teaching anarchy, or the overthrow by force or violence of the Government of the United States or of all forms of law or the assassination of public officials; any alien who within five years after entry becomes a public charge from causes not affirmatively shown to have arisen subsequent to landing; except as hereinafter provided, any alien who is hereafter sentenced to imprisonment for a term of one year or more because of conviction in this country of a crime involving moral turpitude, committed within five years after the entry of the alien to the United States, or who is hereafter sentenced more than once to such a term of imprisonment because of conviction in this country of any crime involving moral turpitude, committed at any time after entry; any alien who shall be found an inmate of or connected with the management of a house of prostitution or practicing prostitution after such alien shall have entered the United States, or who shall receive, share in, or derive benefit from any part of the earnings of any prostitute; any alien who manages or is employed by, in, or in connection with any house of prostitution or music or dance hall or other place of amusement or resort habitually frequented by prostitutes, or where prostitutes gather, or who in any way assists any prostitute or protects or promises to protect from arrest any prostitute; any alien who shall import or attempt to import any person for the purpose of prostitution or for any other immoral purpose; any alien who, after being excluded and deported or arrested and deported as a prostitute, or as a procurer, or as having been connected with the business of prostitution or importation for prostitution or other immoral purposes in any of the ways hereinbefore specified, shall return to and enter the United States; any alien convicted and imprisoned for a violation of any of the provisions of section four hereof; any alien who was convicted, or who admits the commission, prior to entry, of a felony or other crime or misdemeanor involving moral turpitude; at any time within three years after entry, any alien who shall have entered the United States by water at any time or place other than as designated by immigration officials, or by land at any place other than one designated as a port of entry for aliens by the Commissioner General of Immigration, or at any time not designated by immigration officials, or who enters without inspection, shall, upon the warrant of the Secretary of Labor, be taken into custody and deported.

I have read to you the deportation provision of our law which has been on the statute books for over 10 years, under which to my mind you can deport almost anybody, at least anybody and everybody who is guilty of any crime. But in that law there were limitations as to when deportations must take place in instances of certain offenses. It will be noted that the law now requires that deportation must take place within three or five years in certain instances. That, however, does not apply to the provision that I had written into the law, namely, the deportation of violators of the white-slave traffic, under which they can be deported at any and all times without any limitation of time. The bills that the committee reported, and the House voted for, at the last session and the session before last, merely recited the present laws and eliminated the limitations that are placed in it, in respect to some of the offenses mentioned in the 1917 act. Therefore, as I say, I am mighty pleased to-day to know that the committee has finally, after sobering up and giving the matter due consideration, submitted a report and recommended a bill which is not as harsh, not as unreasonable, as those bills which you gentlemen have twice voted for almost unanimously in this House, due to the fact that you did not have the information that you should have had before voting on such important legislation.

Mr. EVANS of California. Mr. Chairman, will the gentleman yield?

Mr. SABATH. Yes.

Mr. EVANS of California. Will the gentleman point out to us the difference between the old deportation law and this bill under consideration?

Mr. SABATH. I do not think that I have the time, but I will say that this bill eliminates the time limit in certain offenses, so that under this law—and that is one of the objections I still have—a man may be deported for a minor offense—yes, even for misdemeanors committed 20 or 30 years ago. The gentleman, I take it, is a lawyer; and he knows that in every State in the Union we have a statute of limitation which runs, in most of States, three years, and in some of them five years, which is the time limit within which a man guilty of an offense, even a crime, can be prosecuted. But in this bill we completely eliminate that time limit, and a man might be deported, as I stated, 10, yes, 20, years after the offense has been committed. That provision in relation to some minor offenses is, I think, cruel, un-American, unwise, and unjustifiable, and I feel it should be amended. I favor the deportation of a real criminal at any and all times, but not one guilty of only a minor infraction of law.

Mr. RUTHERFORD. Mr. Chairman, will the gentleman yield?

Mr. SABATH. Yes.

Mr. RUTHERFORD. The gentleman stated a moment ago that the committee had sobered. Does the gentleman wish to leave the impression that it was drunk on power?

Mr. SABATH. I know that the gentleman of my committee do not get drunk on anything else than power. Of course, I am not at all times with them, and I do not know whether they imbibe anything other than the power that has been granted to them as members of that committee. I certainly do not wish to leave any inference that the committee, or any member of it, has been drunk on anything other than power. Proviso 3 and proviso 4 in this bill, I think, should be amended. I hope you gentlemen who are here will realize that I am not seeking anything beyond fairness and justice, that I favor deportation, and that I always did, of any criminal and, again, I am obliged to congratulate myself and pat myself on the back because the committee has finally agreed with me and has brought in a provision under which we will be able to deport the criminal gunman. In the acts of 1925 and 1926, and in the last year's act, that provision was not in the deportation bill. I then introduced a bill which provided directly for the summary deportation of gunmen. I have no sympathy, and never did have any, with any real criminal, but I do have sympathy for an unfortunate alien who, through no fault of his, finds himself an inmate in an institution, such as a hospital or public sanitarium, where he has been sent because of injury that he has received through no fault of his own, and who, because of that fact, when found to be receiving treatment in such an institution is designated a public charge, though he did nothing to bring it upon himself, and under our laws is ordered deported because he has not enough funds to be taken care of or treated in a private hospital or sanitarium. I have always favored the deportation of every real criminal.

I have no sympathy with those who deliberately come here in violation of the law, trusting to outwit our officials, and I repeat that they should be deported. Therefore, I hope to-day to be able to support a deportation bill even though it may go a little further than I think it should, providing it may contain provisions which I feel of interest to our Nation. I say, I am hopeful that I may be able to vote for it, providing, however, you will help me to justify my vote for it by eliminating some few unjustifiable provisions which are both unreasonable and unconstitutional.

In addition to the amendment which I offer, I have another amendment which I desire to offer and will offer when the proper time comes, and that provides for the deportation of anyone, not only the gunman convicted in court of record, but I will go with the committee a step farther. I believe we should deport every gunman after he has been found guilty the second time of having in his possession any gun, pistol, revolver, or explosive bomb. It should not be necessary that he should be convicted in a court of record, but it should suffice that he has been convicted in any court. I repeat that I am not, never was, and never will be in favor of anything helpful to any alien criminal. I am against them; I want them out. I want the alien here to behave himself and demonstrate that he is deserving of our hospitality. On the other hand, gentlemen, I want to ask of you that in the future when this question comes up do not look upon this question as involving principally the alien, but as having reference chiefly to the criminal.

The number of the criminal aliens is small, indeed, in comparison; the percentage is much lower in fact than that among American-born or American citizens.

These gunmen that you read about are not aliens. They are not men who came here in the last 5, 8, 10, or 15 years and of the so-called new immigration. A majority are men who are born in this country; some are of foreign parentage.

A large number of men who are studying the present crime wave believe that the late war is responsible for the prevalent crime.

The war undoubtedly taught men to hold human life cheap; it imbued men with the killing instinct. Civilization is going to have to pay the price for a certain period, until this killing instinct subsides.

However, anyone who has studied the conditions can not deny that prohibition, to a far greater extent than the war, is responsible for the present wave of crime.

In this I am borne out by every man and woman, and every organization that has investigated and studied conditions. Therefore, gentlemen, the sooner we modify or change the present prohibition law the sooner we will be able to reduce, and I hope, eliminate a great measure of the existing deplorable conditions. Such action, and such action alone, in my judgment, will tend to arrest the ever-increasing disregard of every other law. Prohibition has been responsible for more crime than anything else that has occurred in America in a century.

Therefore I am indeed grateful that the committee has agreed to embody in this bill an amendment which will bring about summary deportation of any alien guilty of carrying concealed weapons. I concede it is a very stringent provision, but I feel it is absolutely necessary, not because it will bring about any great number of aliens for this offense, but it will prove beyond doubt that only a very few, if any, of these gunmen are aliens, which will be demonstrated within a short space of time after this provision goes into effect and will stop the continuous attacks of those who are trying to unload all the blame for all crime on the shoulders of the immigrant classes.

The amendment referred to which I shall offer at the proper time and which I hope will be adopted, reads as follows:

(8) An alien who is convicted of carrying on or about the person, transporting, or possessing any weapon or explosive bomb, for which he is sentenced to imprisonment for a term of six months or more; or who, having been convicted of carrying on or about the person, transporting, or possessing any weapon or explosive bomb, is thereafter convicted of carrying on or about the person, transporting, or possessing any weapon or explosive bomb, regardless of the sentence in either case. This subsection shall apply only in the case of offenses committed after the enactment of this act.

In this connection, gentlemen of the House, I desire to state that in the following additional amendment I believe I provide a manner of getting at a real solution of this problem of the alien gunman in a more far-reaching and practical way than by any method that has heretofore been suggested here:

an alien who has no lawful and visible means of livelihood, who has been convicted for the second time as a vagrant, if it appears that in each case at the time of his arrest he was carrying on his person or in a vehicle, a concealed pistol, revolver, gun, or bomb.

Mr. GREEN rose.

Mr. SABATH. I had forgotten the gentleman. I am glad——

Mr. GREEN. Will the gentleman yield?

Mr. SABATH. I will.

Mr. GREEN. I wonder if the gentleman has the figures showing exactly what percentage of the criminals of the country are aliens and what percentage are Americans?

Mr. SABATH. Well, I will give that information in a minute.

Mr. GREEN. And also give to the House what percentage of our population is foreign born.

Mr. SABATH. I will try to give the gentleman and the House all the information I possibly can within the time allotted to me. I am glad to see the gentleman rise and ask for information for I know he can use a lot of information and the information probably will be beneficial to him I hope in the future. [Laughter.] I do not know of anybody who can absorb more information than the gentleman.

Mr. GREEN. And I do not know of any gentleman who can come as near not giving information as the gentleman. Will the gentleman answer the question?

Mr. SABATH. I shall again prove to you and to the House that you are again wrong in your statement, as I will give you facts and figures that will make you dizzy, and I hope that it will do you some good.

Mr. GREEN. Answer the question.

Mr. SABATH. And be absorbed by you and subsequently utilized in the right direction.

The gentleman from Florida requested information, and I must not disappoint him. I wish to submit some information relative to his own State of Florida. Florida had an estimated population in 1925 of 1,253,957, of which 28,571 are listed by the United States Census Bureau as aliens, and I imagine a very, very small proportion of that number are Europeans and a very large proportion Cubans and from the West Indies.

Florida, being part of the States, is under prohibition along with the rest of us, and the records show the people down there are inclined to violate the prohibition laws very much as they do elsewhere. If the aliens are the only ones violating the Volstead Act, they must be kept pretty busy. The records show that during the year ending June 30, 1928, the number of "distilleries" seized in the State of Florida numbered 820, while of lesser apparatus for violating the prohibition laws, there were confiscated in that State, in addition, 581 individual stills, 850 still worms (whatever they are), and 20,981 "fermenters." So that it is evident that someone down in the gentleman's State does enjoy a drink. I read recently in the newspapers a statement by some public official to the effect that 100 stills are operating in the Nation as a whole for every 1 destroyed, and if this estimate holds good as to Florida it becomes evident that more good "likker" is being produced in the good and great State of Florida that can probably be consumed by the aliens without a little assistance now and then from the balance of the Florida citizenship.

I do not wish to be understood as assailing Florida or Floridans. Not at all. I sympathize with Florida. Not only did she lose in a single year all that valuable paraphernalia for the manufacture of the celebrated Florida "hootch" or "white mule." but her citizens were forced to withstand the agonizing ordeal of standing helplessly by and watching the authorities seize, lay violate hands upon, and destroy 36,596 gallons of the finished product of the still, to say nothing of 1,097,287 gallons of the still unfinished product, otherwise known as "mash." Visualize it, contemplate it, weep over it, you who have hearts, the "makings" of a million grand and glorious feelings heartlessly and ruthlessly wasted!

One more reference as to the prohibition and Florida, and then I intend to let Florida alone. In addition to the output of Florida's distilleries, stills, still worms, and that Florida handy household convenience, the "fermenter," it is said that enough red liquor is smuggled into Florida ports from Cuba and the Bahamas every year to float one of those cruisers of the type recently authorized by Congress.

Adjoining Florida is the "bone-dry" State of Georgia. Georgia in 1925 had an estimated population nearly three times that of Florida, but only one-sixth as many aliens, 4,734 against Florida's 28,571. But—shades of William D. Upshaw—the year ending June 30, 1928, witnessed the destruction of more than twice as many stills, and the seizure of more than twice as much mash, in which so much hope and anticipation is centered, than occurred even in Florida.

To recapitulate, the year's casualties for "bone-dry" Georgia were: 1,919 distilleries, 1,484 stills, 934 still worms, 19,379 fermenters, 33,351 gallons of spirits, 2,456,067 gallons of mash—all gone to smash! And the number of aliens affirmed to be in Georgia was only 4,734 out of its total population of 3,058,260! Only one-sixth as many aliens and more than twice as much law violation! Is further comment necessary?

If the estimate previously cited, of 100 stills operating for each one discovered and seized holds good for Georgia, the "aliens" down there have no need of any worry on our part. They are no doubt still able to get a drink and this notwithstanding the statement on the part of its Representatives.

I have no personal animus whatever in this matter, and am not pretending that Florida or Georgia is any worse or any better or any drier or any wetter than any other State in the Union. As a matter of fact, they are not. I could cite similar figures about most any other State in prohibition America. For the farce is nation-wide.

But since I have been discussing those two States I wish to add, as a matter of postscript, a little further data to show which way the wind is blowing in a couple of the leading cities of Florida and Georgia.

Arrests for drunkenness in Jacksonville, Fla., for the year 1921 numbered 995, but for 1927 the number was 3,109 more than three times as many as during 1921.

Arrests for the same cause in Atlanta, Ga., in 1921 numbered 4,491, as against 9,896 in 1927.

Similar statistics could be cited for most cities in the United States, and it is a curious fact that the increase of arrests for drunkenness appears markedly greater in the former so-called dry States than in the former so-called wet States.

Another peculiar fact revealed by the official report of the Commissioner of Prohibition is that some of the States which send the leading dry crusaders to Congress are greater violators of the prohibition law, in proportion to population, than some of the former so-called wet States. Much is said, for instance, about the "wetness" of my own State, Illinois. Now, I frankly admit the prohibition law is violated there, but you seldom hear the Representatives of the "dry" States doing likewise. Yet the official report of the United States Commissioner of Prohibition shows that the number of arrests for violations of the prohibition amendment is greater per capita in the "dry" South, which produces our leading "dry" advocates, than in "wet" Illinois. The following figures are all taken from the report indicated, covering the year ending June 30, 1928:

| State | Population estimated, 1925 | Distilleries seized | Stills seized | Still worms seized | Fermenters seized | Spirits seized | Mash seized |
|---|---|---|---|---|---|---|---|
| | | | | | | Gallons | Gallons |
| Alabama | 2,467,190 | 411 | 308 | 3 | 4,298 | 8,207 | 377,654 |
| Florida | 1,253,957 | 820 | 581 | 850 | 20,981 | 36,596 | 1,097,287 |
| Georgia | 3,058,260 | 1,919 | 1,484 | 934 | 19,379 | 33,351 | 2,456,067 |
| Total | 6,779,407 | 3,153 | 2,373 | 1,787 | 44,658 | 78,154 | 3,930,988 |
| Illinois | 6,964,960 | 330 | 935 | 191 | 9,431 | 75,193 | 1,618,234 |

This table and figures show that there are ten times as many distilleries, three times as many stills, nine times as many still worms, five times as many fermenters, and over twice the number of gallons of mash seized in the three States with a population of 200,000 less than that of the State of Illinois. And this notwithstanding that the laws are not enforced in these dry States to the extent that they are in my State.

Now, I hope that in the future the gentleman from Florida, who believes in law and order and decency and morality, will help me and others to bring about an amendment or modification of the prohibition law, so that we can eliminate the present wave of crime that is prevalent from one section of the country to the other solely as a result of prohibition.

Mr. GREEN. I will be glad to help the gentleman if his committee will bring out a bill that will deport every alien who violates the prohibition law.

Mr. SABATH. Here I have a report from the Commissioner of Immigration for the year 1928. On page 154 of this highly informative document he will find, in Table No. 56, the facts relative to "Aliens deported (under warrant proceedings) after entering the United States, fiscal year ended June 30, 1928, by race or people and causes."

In that entire year, the latest for which we have available statistics, the total number deported for the entire United States was 11,625. Of that number, only 681 are shown to have been deported as "criminals after entry." In other words, this amounts to less than 6 per cent.

Now, the gentleman wants to know from what countries these deported persons came. This table furnishes that information, too. Of the 681 deported under the aforementioned head, 191 were returned to Mexico. It may surprise some Members of this House to know that neither the second largest number of those deported, nor the third largest number of those deported, came from any of the much-maligned southeastern European countries, but from the so-called Nordic races, so much championed here. Now, gentlemen, I dislike very much to point out the shortcomings of any people. But I feel that it is nothing short of my duty to give the country the facts on the situation. The second largest number of aliens deported as "criminals after entry" were English, of which there were 79.

Among the various races we note that 46 French were deported; also 58 Italians—a considerable number, perhaps, yet 21 fewer than of British. Deportations of some of the nationalities were: Czechoslovakian, 5; Bohemian and Moravian, none; Lithuanian, none; Rumanian, 2; Russian, 3; Bulgarian, Serbian, and Montenegrin, none; but Scotch, 29.

The fact is, gentlemen, and you may as well face the facts, the English propagandists have been fooling the American people right along. It is well known in this connection that propaganda always did constitute a big part of British diplomacy. Through British secret organizations, lobbyists, and through the press the English have succeeded in convincing the American people that the southeastern European immigration to the United States is composed mainly of the lawbreaking class.

Were we to take this propaganda at its face value, we could only conclude, and God only knows how many Americans have erroneously so concluded, that lawbreakers have been coming in from southeastern Europe by the hundreds of thousands. I have just cited figures showing how different are the real facts in the premises.

The document from which I have read to the House to-day is available to anyone. If the gentleman has not been able to secure a copy, I will be glad to furnish him one, together with additional information that will be helpful and beneficial to him in the future.

Mr. GREEN. Does not the gentleman know that it is estimated there are a million criminal aliens in the United States?

Case 3:20-mj-20121-KSC Document 21-1 Filed 01/20/21 PageID.408 Page 187 of 218

Mr. SABATH. I thank the gentleman. He always comes to my relief when I am nearly exhausted.

This statement of the gentleman from Florida, about the million of alien criminals in the United States is on par, and just as wild and untrue, as many of his other statements on the question of immigration and prohibition. It is amazing how reckless he and the other prohibitionists and restrictionists can be with facts and figures.

Now, I have with me information here that I have been furnished with only to-day by the secretary of the committee, namely, a report from the State Department. If we have no confidence in the Labor Department or the Commissioner of Immigration, although I know he is a sincere and well-meaning man, and so is the Secretary of Labor, we certainly have confidence in the Secretary of State. I am sorry that the incoming newly elected President will not see fit to reappoint the present incumbent as Secretary of Labor, because I know that he has done splendid service in the position that he occupies, and especially during the last campaign.

Mr. GREEN. Mr. Chairman, will the gentleman yield right there?

Mr. SABATH. No; I can not yield.

Mr. GREEN. I think the Secretary of the Treasury is the one they were most interested in.

Mr. SABATH. Oh, I know you people are interested in the Treasury and in money.

Mr. GREEN. We are interested in the Secretary of the Treasury when he opposes a $24,000,000 additional appropriation for prohibition enforcement.

Mr. SABATH. Yes; I know you and all your prohibitionists are just anxious to get hold of the $24,000,000, and if possible, more, so that you can provide for more lucrative jobs for the professional prohibitionist fellows.

The gentleman wanted to know the number of aliens that are on the list that might be deported, and what proportion of them had been deported. I have to repeat that the number who have been deported was a little over 11,000, and I believe that under the present law the number will not be increased, although I am ready to vote for any additional appropriation that may be necessary.

Right in connection with this, Mr. Chairman and members of the committee, let me call your attention to one thing: I observe that yesterday the Secretary of the Treasury agreed to an additional appropriation for the Coast Guard and for our border patrol. I have advocated for years that the service should be unified. Why should we have a thousand or twelve hundred immigration inspectors at $2,000 each and other inspectors as well doing work in the same section of our country, and doing nearly the same work? We could easily save millions of dollars and secure a better enforcement of the law on our borders and at the same time secure much better and more efficient service if the inspection force were unified, and for that reason I hope you gentlemen on the Committee on Appropriations and you other men of influence will be able to bring home to the Secretary of the Treasury that information that should have been his that this department should be unified. We would be able to secure thereby an inspection and examination and control of our border lines without the additional expenditure of $2,000,000 or $5,000,000.

Now, as I am nearly exhausted—not in convincing material but in strength—I shall be glad to yield the floor. How much time have I consumed, Mr. Chairman?

The CHAIRMAN. Twenty minutes.

Mr. SABATH. I am thankful for the courtesy of my friend, the chairman, and the membership of the House, in giving me this opportunity at this time.

Mr. JENKINS. Mr. Chairman, in the momentary absence of the gentleman from Washington [Mr. JOHNSON], I yield to the gentleman from Texas [Mr. BOX] 10 minutes.

The CHAIRMAN. The gentleman from Texas is recognized for 10 minutes.

Mr. BOX. Mr. Chairman and members of the committee, Members of the House who were Members of the preceding Congress will recall that this House then passed a deportation bill. It was much more inclusive and, I think, a better bill than this one. But it did not become a law. The fault, if it was a fault, is not chargeable to this House.

During the first session of this Congress your committee reported another deportation bill, somewhat subdued, a little milder in its provisions, and that bill remained here on the calendar indefinitely and had very little prospect of passage. Now we have brought forth a third and still more subdued edition of the original deportation bill.

One reason why this bill is presented in this form is because your committee believes that it has a better chance of passage than a bill such as was reported before; and if Members are not satisfied with this measure because it does not do all the things they think should be done, I suggest to them that, although we can not accomplish all that we believe we should do, that is no reason whatever why the good that this measure will accomplish should not be done.

There are several leading features in this measure which are worthy of attention and fully justify its passage by the House. I want to call attention, first, to a group of offenses named in the first part of the bill. When aliens commit these offenses there is a summary proceeding for their deportation upon its being found that they are guilty of these offenses and are undesirable aliens. You will find them grouped in the first portion of the bill—those who engage in the sale of narcotics and others who are guilty of the commission of certain other offenses therein named. Then there is another group of offenses. When aliens commit any of those latter offenses it is necessary, before they can be deported, that they shall have been convicted in a court of record and given the sentences prescribed. In viewing this legislation and wondering why former measures have been so modified, you should give attention to the fact that we have a very large number—and I could quote official figures if it were necessary to do so—of people now in the United States who are subject to deportation and who are not being deported. It seems not wise to add a vastly increased number when the number is so great and the Government is not now dealing with them adequately. Take, for instance, aliens who are guilty of the violation of the liquor laws. A number of gentlemen have asked questions about that. I would not undertake to estimate the number, but I would say it is very great. With Congress willing to appropriate only enough money to deport about 12,000 aliens per year, it would seem to be utter folly to authorize the deportation of 50,000 or 100,000 more. We do not want the law to appear utterly helpless and ineffective, and therefore your committee has concluded for that reason to leave out a lot of these offenses. When these offenses are committed many of those who commit them are tried in a police court. The sentences are short. It is not certain that it is wise to deport a man who has been convicted in a magistrate's court or in any court other than a court of record.

Mr. LaGUARDIA. Will the gentleman yield?

Mr. BOX. Yes.

Mr. LaGUARDIA. When these blanket injunctions are issued during a labor dispute, it is quite possible for a man to be committed for contempt or for the disobedience of an injunction and thus come under the provisions of this bill.

Mr. BOX. If that is true—and I would not want to be diverted into a discussion of it—I will say to the gentleman that that line of offenses was not considered by the committee in reporting this legislation, and I think the gentleman will find that the Department of Labor must find, in addition to other things, that they are undesirable aliens.

Mr. LaGUARDIA. In all these cases?

Mr. BOX. I think so.

Mr. LaGUARDIA. That would be helpful, but I fail to find it in the bill.

Mr. BOX. I think the gentleman will find that in the bill. Then there is another class of aliens with which we have been dealing heretofore. I refer to immigrants who approach the border, are detected, and then ordered deported. If such immigrants have been rejected at the border, they can attempt to enter and reenter repeatedly, subjecting themselves to no inconvenience except being pushed back across the border. We have inserted in this bill a provision providing for their punishment in case they attempt to reenter the country or to enter it in any manner illegally. If an adequate force is provided to intercept these who enter the country illicitly, and they are carried into the courts and punished for their efforts to disregard the immigration laws, that will have a very beneficial and helpful effect in procuring a better enforcement of the law.

There are many features of the measure which I would like to discuss with the House at length. However, an adequate discussion of them would require much more time than any of us can take under the circumstances here. I therefore merely say to my colleagues that while this measure does not accomplish all that the country would like to accomplish in this direction, it is a moderate but substantial improvement of the present law. The committee amendment, which I understand the chairman expects to present, ought to be adopted and the bill as thus amended ought to pass the House. [Applause.]

Mr. Chairman, I yield back the remainder of my time.

Mr. JOHNSON of Washington. Mr. Chairman, I yield four minutes to the gentleman from Florida [Mr. GREEN].

Case 3:20-mj-20121-KSC   Document 1-1   Filed 04/07/20   PageID.409   Page 188 of 218

Mr. GREEN. Mr. Chairman, this is a bill that is good as far as it goes. I would like to see the committee offer a much more stringent deportation bill in view of the fact that the department, as I understand, has estimated there are now 1,000,000 aliens in the United States who entered unlawfully.

I would also like to see the bill go far enough to deport for one offense, though it happened to carry only a 30-day conviction, be it for prohibition violation or what not. I do not entertain the sob stuff about separating families, and all the propaganda which is usually heard before the committees and before the House in regard to breaking down the immigration laws.

I believe if our department has not sufficient machinery to enforce the deportation laws, the Congress, in defense and in protection of the laboring forces of America and the homes and institutions of America, should provide sufficient funds for this purpose.

I believe there is no more serious question confronting the organized labor forces of the Nation and the institutions of our Government than the immigration question. If you will examine the criminal records you will find that, in proportion to alien population, the percentage of criminals is largely foreign.

Mr. DICKSTEIN. Will the gentleman yield?

Mr. GREEN. A little later. I think you will find the percentage is 80 per cent, according to population.

Mr. COMBS. Will the gentleman yield?

Mr. GREEN. A little later. You will find that 80 per cent of them are of foreign birth, I believe, that is according to population. You will find that the communistic and bolshevistic influences which are here in our Nation are invariably emanating from persons of foreign birth.

Then, my colleagues, when we know these things and when we are sworn to protect the Constitution, when we pay our taxes to uphold American institutions, why not meet these problems frankly? I favor closing the immigration doors and deporting all undesirable aliens. [Applause.]

If we stand for restricted immigration, vote for all these measures and instruct your immigration committees to bring out more drastic bills, even though the august body which sits at the other end of the Capitol seems to be laboring under a different spell.

Mr. DICKSTEIN. Will the gentleman yield now?

Mr. GREEN. I will.

Mr. DICKSTEIN. Where does the gentleman find that 1,000,000 unlawful aliens are in the United States?

Mr. GREEN. One million aliens unlawfully entered the United States and are now here.

Mr. DICKSTEIN. Where does the gentleman get that information?

Mr. GREEN. I understand that is a statement that has recently been made by the Immigration Bureau.

Mr. DICKSTEIN. Does the gentleman state that upon his own knowledge?

Mr. GREEN. Certainly not. I have not checked it up.

The CHAIRMAN. The time of the gentleman from Florida has expired.

There being no further general debate, the bill will be read for amendment.

The Clerk read as follows:

That the following aliens shall, upon warrant of the Secretary of Labor, be taken into custody and deported in the manner provided in sections 19 and 20 of the immigration act of 1917 (U. S. C. title 8, secs. 155, 156), if the Secretary of Labor, after hearing, finds that such aliens are undesirable residents of the United States:

(1) An alien who hereafter violates or conspires to violate the white slave traffic act (U. S. C. title 18, secs. 397–404), or any law amendatory of, supplementary to, or in substitution for, such act.

(2) An alien who hereafter violates or conspires to violate any statute of the United States taxing, prohibiting, or regulating the manufacture, production, compounding, possession, use, sale, exchange, dispensing, giving away, transportation, importation, or exportation of opium, coca leaves, or any salt, derivative, or preparation of opium or coca leaves.

(3) An alien who hereafter willfully conceals or harbors, attempts to conceal or harbor, or aids, assists, or abets any other person to conceal or harbor, any alien liable to deportation.

(4) An alien who hereafter willfully aids or assists in any way any alien unlawfully to enter the United States.

(5) Any alien who hereafter enters the United States at any time or place other than as designated by immigration officials, or eludes examination or inspection by immigration officials, or obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact.

(6) An alien who is convicted of any offense (committed after the enactment of this act and at any time after entry) for which he is sentenced to imprisonment for a term of one year or more, and who is thereafter convicted of the same or any other offense (committed after the enactment of this act and at any time after entry) for which he is sentenced to imprisonment for a term of one year or more.

(7) An alien who is convicted of any offense (committed after the enactment of this act and within 10 years after entry) for which he is sentenced to imprisonment for a term which, when added to the terms to which sentenced under two or more previous convictions of the same or any other offense (committed after the enactment of this act), amounts to two years or more.

Mr. JOHNSON of Washington. Mr. Chairman, I offer the following committee amendment:

The Clerk read as follows:

Page 4, after line 9, insert a new subsection to read as follows:

"(8) An alien who is convicted of carrying on or about the person, transporting, or possessing any weapon or explosive bomb, for which he is sentenced to imprisonment for a term of six months or more; or who, having been convicted of carrying on or about the person, transporting, or possessing any weapon or explosive bomb, is thereafter convicted of carrying on or about the person, transporting, or possessing any weapon or explosive bomb, regardless of the sentence in either case. This subsection shall apply only in the case of offenses committed after the enactment of this act."

Mr. JOHNSON of Washington. Mr. Chairman, this amendment is self-explanatory.

Mr. LaGUARDIA. Will the gentleman yield?

Mr. JOHNSON of Washington. I yield.

Mr. LaGUARDIA. Even the case under this provision would be subject to review by the Secretary of Labor as provided in the first section here as an undesirable alien?

Mr. JOHNSON of Washington. Yes.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Washington.

The question was taken, and the amendment was agreed to.

Mr. SABATH. Mr. Chairman, I offer the following amendment.

The Clerk read as follows:

Page 4, after line 9, and after the amendment just agreed to, insert a new subdivision to read as follows:

"An alien who has no lawful and visible means of livelihood, who has been convicted for the second time as a vagrant, if it appears that in each case at the time of his arrest, he was carrying on his person or in a vehicle, a concealed pistol, revolver, gun, or bomb."

Mr. SABATH. Mr. Chairman, this is the amendment that I alluded to before, and it ought to pass without any opposition.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Illinois.

The question was taken; and on a division (demanded by Mr. JOHNSON of Washington) there were 26 ayes and 42 noes.

So the amendment was rejected.

Mr. DICKSTEIN. Mr. Chairman, I move to strike out the last word. Mr. Chairman and members of the committee, I doubt whether anything I may say will influence your vote, but I think you are working very fast and certainly working in haste. I venture to say that 9 out of 10 Members of the House can not explain if I asked them certain questions regarding this legislation, and how drastic it is. I am not going to speak about the constitutionality of the bill, I will leave that to my colleagues and the gentleman from Florida.

So far as I am concerned, I will give you the meat of the proposition.

The new deportation bill is a decided improvement over the bill reported by the committee. It does not change the limitation statute of the existing deportation provisions. It does not make the inspectors of immigration judges and jurors or give them any discretionary powers. It consists of seven sections, which briefly provide as follows:

First. It deports all violators of the white slave traffic act. We have no objection to that.

Second. It deports all violators of the narcotic act. We have no objection to that.

Third. It deports any alien who willfully harbors or conceals aliens liable to deportation. We have no objection to that.

Fourth. It deports any alien who assists willfully another alien to enter the United States unlawfully. We have no objection to that.

Fifth. It deports aliens who enter the United States at an improper place or elude examination by an immigration inspector. We have no objection to that.

Sixth. It deports an alien who is convicted of any offense for which he is sentenced for one year or more. I certainly object to this clause. If the offense were a felony, I have no objection,

187

but I can not accept the broad definition of "offense," which appears in the act.

Seventh. The same objection applies to the next provision, which makes an alien deportable if two or more convictions will total 2 years or more within 10 years after entry. The same objection is made as is made to the preceding provision. If the offense be a felony, I am satisfied; but where it is the violation of some police regulation or the prohibition law, I certainly can not accept it.

An attempt was made a number of years ago to insert in the deportation bill the question of violations of the prohibition law. So far as I am concerned, I am not talking about alien violators who willfully attempt to smuggle liquor into the United States or moonshiners or persons who are bringing in poisonous liquors. What I am referring to is persons who innocently and under circumstances may be found in possession of liquor and who may be sentenced for one year or more by some judge who is a fanatic on the question. It is needless for me to mention the States in which judges habitually impose stiff sentences for the most trivial liquor violation.

It may further happen that a poor alien, who may otherwise have a good moral character and who has raised an American family, may be subject to the attack under this proposed amendment if he should by chance be convicted of a violation of the prohibition law.

Proponents of this bill apparently do not want to insert a paragraph in this proposed deportation bill by saying so in the American language that they intend to deport persons who violate the prohibition law, and so they express it under the heading of "any offense."

It is needless to say that this offense, if committed by anybody, does not make him an undesirable person to remain in the United States; and we can not compare them to persons who violate the white slave traffic law and the narcotic act.

Objection must be raised to the provisions of section 2, where in a case of an indeterminate term the term actually served shall be considered on the basis of the length of sentence. It will be observed that under the laws of New York, for instance, a good many misdemeanors, even of a trivial nature, are punishable by an indeterminate term, and therefore a person may be convicted several times of trifling violations of law and have deportation stare him in the face if this bill is not amended.

I respectfully suggest that wherever the term "offense" appears in the act it should be changed to "felony." If that correction is made, I shall be prepared to accept the bill as it stands.

The minority of the committee is not opposed to deportation; as a matter of fact, in seven sections you will find in the proposed deportation law, to five of them we have no objection. I want to call your earnest and serious attention to sections 6 and 7 of this proposed bill. In my opinion, if you read it twice you will hesitate as to whether or not you would agree to the policy and advisability of striking it out.

As to the proposition on page 7, paragraph 6, where it says a person convicted of "any offense." Why do they not provide for a person convicted of a felony instead of a person convicted of "any offense"? The present deportation law is, I maintain, more than sufficient to deport every undesirable alien. Whether it is going to be workable or not, it is a repetition of the same deportation provisions that we had in the previous act.

Mr. CRAIL. Mr. Chairman, will the gentleman yield?

Mr. DICKSTEIN. Yes.

Mr. CRAIL. In the gentleman's State, can they send a man to prison for a year for anything less than a felony?

Mr. DICKSTEIN. Yes; they can for a misdemeanor. We can send them up for a indeterminate sentence, which means three years.

Mr. LAGUARDIA. For spitting on the sidewalk.

Mr. DICKSTEIN. Yes. Under the provisions of this bill a person who has been here for 20 years and who has committed three or four offenses, if they total up to 2 years in the 20 years, can be deported, and what are you going to do with his wife and family; who is going to take care of that wife and family?

Mr. GREEN. Send them with him.

Mr. DICKSTEIN. Oh, the only time that I can answer the gentleman's question is, if he will come back with me to-morrow and tell me the difference between a white horse and a black horse and which horse eats more, then I shall be in a better position to yield to some of his questions.

Mr. GREEN. I will do that if the gentleman will support with me a proposition closing the doors to immigration altogether for five years.

Mr. DICKSTEIN. Then you would have to throw everyone out of Florida.

Mr. GREEN. I am in favor of a restriction for five years.

Mr. DICKSTEIN. You better go back home and tell some of your townsmen not to charge $1 for a glass of beer that is not worth a nickel. [Laughter.] ↑You go back and tell them that.

Mr. GREEN. If the gentleman knows of a place in Florida or elsewhere where they sell beer openly, I will send the prohibition agents there.

Mr. DICKSTEIN. If the gentleman will come with me to-morrow, I will show him where it is.

Mr. GREEN. I will not go with you. You take the prohibition agents with you.

Mr. DOWELL. Mr. Chairman, I make the point of order that both gentlemen are out of order, and I shall insist upon their proceeding in order.

The CHAIRMAN. The gentleman from New York will proceed in order.

Mr. SCHAFER. Mr. Chairman, will the gentleman yield?

Mr. DICKSTEIN. Yes.

Mr. SCHAFER. The gentleman from Florida [Mr. GREEN] desires to entirely close the doors to immigrants and wants to deport everybody. His speech indicates that the only criminals are aliens. I would like to see him so amend his views as to be willing to deport the notorious criminals in the Ku-Klux Klan organization.

Mr. DICKSTEIN. I have no objection.

The CHAIRMAN. The time of the gentleman from New York has expired.

Mr. LAGUARDIA. Mr. Chairman, I offer the following amendment, which I send to the desk and ask to have read.

The Clerk read as follows:

Page 3, line 2, after the word "offense," insert the words "involving moral turpitude"; and on page 4, line 3, after the word "offense," insert the words "involving moral turpitude."

Mr. LAGUARDIA. Mr. Chairman, I submit this amendment for the purpose of making clear what I am sure is the intent of the committee.

Mr. JOHNSON of Washington. But it is not the intent of the committee.

Mr. LAGUARDIA. Mr. Chairman, that is a frank and honest admission. Therefore I shall change my statement and say that I offer my amendment in order to make this law somewhat in keeping with the ideas of fair men and men who are versed in the law. To have this law apply to men who are convicted of offenses which the chairman of the committee has declared do not necessarily involve moral turpitude is so extreme as to make its very purpose ridiculous. We have the declaration of the chairman that it is not the intention of the committee to deport only in cases involving moral turpitude, and that destroys the logical, the sensible, the sound and honest intent, as described by the gentleman from Texas [Mr. Box]. You have a proposition here which requires very serious attention. If it is limited to offenses involving moral turpitude, then you embrace in the provisions of the law cases of murder, assault, burglary, robbery, arson, rape, all the crimes in the penal laws known as malum per se. But if you leave it open, with the meaning which the chairman of the committee has declared is the intention of the committee, you are providing for deportation in cases of violation of traffic regulations, or in violation of a town ordinance, a misdemeanor, or any trivial matter, and, mark you, without a statute of limitation. A man may be deported for the most trivial offenses.

Mr. JOHNSON of Washington. Mr. Chairman, will the gentleman yield?

Mr. LAGUARDIA. Yes.

Mr. JOHNSON of Washington. The gentleman understands that the present deportation laws have to do with those who are convicted of crimes involving moral turpitude. This prosecution is dealing with two convictions, each of a year or more, and it is not likely that any court in the land will send anybody up for one year for violating a traffic regulation.

Mr. LAGUARDIA. I will say to the gentleman that right in the great State of Pennsylvania in the coal region a man may be sent to jail for standing on the street. The private coal and iron police of the coal companies—thugs and perjurers, that is what they are—may send a man to jail for holding a meeting on his own property. That is the situation I am trying to overcome.

Mr. TARVER. If the gentleman will yield, the gentleman I am sure is aware that the highest courts in the country have sustained the ruling that the manufacture and sale of intoxicants is not a crime involving moral turpitude. If this amendment is adopted, any bootlegger or manufacturer of intoxicating liquor could not be deported irrespective of conviction.

Mr. LaGUARDIA. If the gentleman will support my amendment, I will support an amendment providing for the deportation of the bootlegger.

Mr. TARVER. I would accede to the gentleman's proposal if I could be assured that such an amendment——

Mr. LAGUARDIA. I will withdraw my amendment if the gentleman will offer such an amendment.

Mr. TARVER. I have such an amendment prepared, and if the gentleman will withdraw his amendment I will offer my amendment.

Mr. LAGUARDIA. I want to say to the gentleman from Georgia that the proposition contained in this bill and as admitted by the chairman of the committee is so extreme, so far-fetched that any amendment should be adopted.

The CHAIRMAN. The time of the gentleman has expired.

Mr. LAGUARDIA. I ask for three additional minutes.

The CHAIRMAN. Is there objection? [After a pause.] The Chair hears none.

Mr. TARVER. If the gentleman will stand by his statement and withdraw his amendment, I will offer my amendment.

Mr. LaGUARDIA. I ask unanimous consent that my amendment may be held in abeyance pending the amendment to be offered by the gentleman from Georgia.

The CHAIRMAN. Is there objection?

Mr. McCORMACK. I object.

The CHAIRMAN. The question is on the amendment offered by the gentleman from New York.

The question was taken, and the Chair announced the noes appeared to have it.

On a division (demanded by Mr. SCHAFER) there were—ayes 10, noes 70.

So the amendment was rejected.

Mr. SABATH. Mr. Chairman, I desire to offer an amendment.

The CHAIRMAN. The Clerk will report the amendment.

The Clerk read as follows:

Page 3, line 13, strike out the words " in any way."

Mr. SABATH. Mr. Chairman and gentlemen, I hope you have before you the bill, and if you will look at page 3——

Mr. LaGUARDIA. What line?

Mr. SABATH. Line 12.

Mr. JOHNSON of Washington. The committee will accept the amendment. I would like to say the words mean nothing anyway, and there is no objection to striking them out.

The CHAIRMAN. The question is on agreeing to the amendment.

The question was taken, and the amendment was agreed to.

Mr. SABATH. Mr. Chairman, I have another amendment.

The CHAIRMAN. The Clerk will report the amendment.

The Clerk read as follows:

Page 4, line 4, strike out " 10 " and insert " 5."

Mr. SABATH. You will find, Mr. Chairman and gentlemen, on page 4, paragraph 7, starting out with line 3, the following:

(7) An alien who is convicted of any offense (committed after the enactment of this act and within 10 years after entry) for which he is sentenced to imprisonment for a term which, when added to the terms to which sentenced under two or more previous convictions of the same or any other offense (committed after the enactment of this act), amounts to two years or more.

My amendment strikes out the word " 10 " and substitutes the word " five," so that the paragraph will provide—

that within five years after his entry—

In lieu of 10 years, and so forth.

Now, we know that after a man has been here for five years he has, more or less, acquired the habits and customs of our country, and if, in due course of time, he commits some violation or offense of which he may be found guilty, which may be only a misdemeanor, or he may be guilty of something else, and due to two or three such convictions, sentence would amount to two years, he could be deported up to 10 years of his residence within the United States. Now, I feel that it would be reasonable if we would shorten that to five instead of ten.

Mr. DICKSTEIN. Does not the gentleman think that instead of using " any conviction " it would be better to use the word " felony " in sections 6 and 7?

Mr. SABATH. I am not speaking of that. This amendment is pending now, and I feel that it should be adopted.

The CHAIRMAN. The question is on agreeing to the amendment offered by the gentleman from Illinois.

The question was taken, and the amendment was rejected.

Mr. JOHNSON of Washington. Mr. Chairman, I move that all debate on this section and all amendments thereto be now closed.

Mr. TARVER. Mr. Chairman, I have been trying for 15 minutes to get the floor.

The CHAIRMAN. The gentleman from Washington moves that all debate on this section and amendments thereto be now closed. The question is on agreeing to the motion of the gentleman from Washington.

The question was taken, and the Chair announced that the ayes appeared to have it.

Mr. TARVER and Mr. SCHAFER demanded a division.

The CHAIRMAN. A division is demanded.

The committee divided; and there were—ayes 65, noes 8.

Mr. SCHAFER. Mr. Chairman, I make the point of order that there is no quorum present.

The CHAIRMAN. The Chair will count.

Mr. SCHAFER. Mr. Chairman, I will withdraw that point of order.

The CHAIRMAN. The gentleman from Wisconsin withdraws the point of order.

Mr. TILSON. Mr. Chairman, may I proceed for two minutes out of order?

The CHAIRMAN. The gentleman from Connecticut asks unanimous consent to proceed for two minutes out of order. Is there objection?

Mr. SCHAFER. Reserving the right to object, Mr. Chairman, did we not just adopt the motion of the gentleman from Washington [Mr. JOHNSON] closing debate on the pending question?

The CHAIRMAN. That is correct.

Mr. TILSON. I am not going to debate the question at all, I assure the gentleman.

The CHAIRMAN. Is there objection to the request of the gentleman from Connecticut?

There was no objection.

Mr. TILSON. Mr. Chairman, as I understand the rule under which we are now operating, it will be necessary to continue to-day if this bill is to be finished under the rule. It happens that we have now reached about the hour of adjournment, and it seems that we have several sections of the bill still to consider that will require some little time. To-morrow we are to be in session and the day is not crowded at all. I am wondering whether if we rose and went into the House we might be able to secure unanimous consent to go on with this bill to-morrow instead of continuing to-day. Is there anyone who will object to this request in the House?

Mr. TARVER. I object.

Mr. SCHAFER. I shall object unless the vote taken to close debate on the section is vacated.

Mr. TARVER. I shall object unless I shall be afforded the same opportunity of presenting my amendment as other Members have had.

Mr. JOHNSON of Washington. There is no desire at all, I will say to the gentleman, to keep off legitimate and proper amendments. Just as the gentleman from Connecticut has said, the rules confine us to one day. The hour is getting late. If we can come to an agreement by unanimous consent, we may be able to finish the bill.

Mr. TARVER. I shall object unless you follow the suggestion of the gentleman from Wisconsin that we vacate the motion to close debate.

Mr. TILSON. The committee can vacate its own action at this stage by unanimous consent.

Mr. JOHNSON of Washington. If we can have the understanding that we are not foreclosed because the rule provides for one day and can continue to-morrow, I will be very pleased to give the gentleman the time he wants.

Mr. LaGUARDIA. I will state that while I shall invoke every honorable and fair parliamentary and strategic measure to defeat the bill I will not avail myself of the privilege of raising the question of consideration to-morrow. I think it is for the best interests of all concerned that we have more time to-morrow to consider the bill.

Mr. TILSON. It seems to me that is true, and if the Members present are willing to agree to this I should like to make the request in the House, where it will be binding.

Mr. JOHNSON of Washington. Mr. Chairman, I ask unanimous consent to vacate the proceedings of the committee by which debate on this section was closed. Is there objection?

Mr. NEWTON. Mr. Chairman, reserving the right to object, and I shall not object, should there be an objection when we go into the House, I presume the procedure will be that we will go back into the Committee of the Whole and complete our labors to-day.

Mr. JOHNSON of Washington. That is so understood.

Mr. GREEN. And the gentleman from Georgia [Mr. TARVER] will be given an opportunity to offer his amendment to-morrow?

189

Case 1:20-mj-20121-KSC Document 1-2 Entered on FLSD Docket 01/31/20 Page 191 of 218

Mr. JOHNSON of Washington. That is understood.

The CHAIRMAN. The gentleman from Washington asks unanimous consent to vacate the proceedings limiting debate on this section. Is there objection?

There was no objection.

Mr. JOHNSON of Washington. In accordance with the understanding just reached, Mr. Chairman, I move that the committee do now rise.

Mr. COOPER of Ohio. Mr. Chairman, a parliamentary inquiry.

The CHAIRMAN. The gentleman will state it.

Mr. COOPER of Ohio. I have an amendment at the Clerk's desk. What will be the status of that amendment?

The CHAIRMAN. The amendment offered by the gentleman from Ohio has not yet been reported. It can be offered to-morrow when the House is in the Committee of the Whole. The question is on the motion of the gentleman from Washington that the committee do now rise.

The motion was agreed to.

Accordingly the committee rose; and the Speaker having resumed the chair, Mr. BACON, Chairman of the Committee of the Whole House on the state of the Union, reported that that committee had had under consideration Senate bill 5094, making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law, and had come to no resolution thereon.

Mr. TILSON. Mr. Speaker, I ask unanimous consent that on to-morrow it may be in order to continue the consideration of Senate bill 5094, which has been under consideration in the Committee of the Whole to-day.

The SPEAKER. The gentleman from Connecticut asks unanimous consent that to-morrow it shall be in order to consider Senate bill 5094. Is there objection?

Mr. GARRETT of Tennessee. Under the rule?

The SPEAKER. Under the rule; yes. Is there objection?

There was no objection.

## LEAVE OF ABSENCE

By unanimous consent, leave of absence was granted to Mrs. NORTON, for an indefinite period, on account of illness.

## BATTLE FIELDS AT BRICES CROSS ROADS AND TUPELO, MISS.—CONFERENCE REPORT

Mr. MORIN. Mr. Speaker, I present a conference report on the bill (H. R. 8736) to provide for the inspection of the battle field of Brices Cross Roads, Miss., and the battle field of Tupelo, or Harrisburg, Miss., for printing under the rule.

## CONSTRUCTION AT THE MILITARY ACADEMY—CONFERENCE REPORT

Mr. MORIN. Mr. Speaker, I present a conference report on the bill (H. R. 11469) to authorize appropriations for construction at the United States Military Academy, West Point, N. Y., for printing under the rule.

## MORRIS FOX CHERRY—CONFERENCE REPORT

Mr. MORIN. Mr. Speaker, I present a conference report on the bill (H. R. 12538) for the benefit of Morris Fox Cherry, for printing under the rule.

## DEFINITION OF THE TERMS "CHILD" AND "CHILDREN"—CONFERENCE REPORT

Mr. MORIN. Mr. Speaker, I present a conference report on the bill (H. R. 12449) to define the terms "child" and "children" as used in the acts of May 18, 1920, and June 10, 1922, for printing under the rule.

## THE CONGRESSIONAL CEMETERY

Mr. ABERNETHY. Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD upon a bill which I have introduced in the House and which has been favorably reported by the Committee on Military Affairs, a bill relating to the Congressional Cemetery, and I desire to include in that extension certain data included in the report of the hearings about this cemetery.

The SPEAKER. The gentleman from North Carolina asks unanimous consent to extend his remarks on a bill introduced by himself. Is there objection?

There was no objection.

Mr. ABERNETHY. Mr. Speaker, the Military Affairs Committee has reported unanimously H. R. 11916, a bill introduced by me for the care and preservation of certain lands and monuments in the Congressional Cemetery.

This historic cemetery, in which many of the Nation's heroes and great men are buried, has been allowed to lapse into decay and the monuments and gravestones to deteriorate for the want of proper care and protection. A large part of this cemetery is Government-owned ground. The Government cared for the same for quite a while, but for many years no care has been given it.

The bill introduced by me and recommended by the Military Affairs Committee puts the care of that part of the cemetery owned by the Government under the supervision of the War Department.

In the hearings before the committee certain historical data concerning the Congressional Cemetery were produced, and under the permission granted me I am having the same inserted in my remarks. I also am including certain letters and other data showing the patriotic organizations which favor this bill, which were also placed in the hearings.

The Sons of the American Revolution submitted to me for the committee the following data:

1. The remains of Jacob Gideon, a Revolutionary soldier, lie in Congressional Cemetery. He is of special interest also because two of his descendants, Philip F. and John B. Larner, are members of the Columbia Historical Society and the Sons of the American Revolution. Jacob Gideon was a trumpeter and private in the Pennsylvania Militia. His name also appears in the index of Eckenrode's Virginia Archives. The inscription on his monument, a marble slab, reads:

"In memory of Jacob Gideon, a soldier of the Revolution; died March 3, 1841, aged 87 years."

In the National Intelligencer of March 5, 1841, appeared the following notice:

"Died in this city on Wednesday evening, the 3d instant, Mr. Jacob Gideon, sr., a soldier of the Revolution, aged 87 years. His friends and acquaintances and those of his son. Jacob Gideon, jr., are requested to attend his funeral this morning, Friday, at 11 o'clock, from the residence of his son, on Seventh Street between E and F Streets."

2. Capt. Hugh George Campbell: The actual Revolutionary services of this Hugh George Campbell are somewhat shrouded. His name does not appear in any of the indexes of the South Carolina archives. It is, however, an indubitable fact, obtained from the current literature of his later life, that the inscription on his monument states the historical truth. The inscription reads as follows:

"Beneath this marble rest the mortal remains of Hugh George Campbell, late a captain in the Navy of the United States. He was a native of the State of South Carolina. In the year 1775 he entered as a volunteer on board the first vessel of the war commissioned by the council of his native State. He served his country upward of 22 years as a comrade and died in this city on the 11th day of November, 1820, aged about 62 years."

"Callahan, in Officers of the Navy, 1775 to 1800, has this entry:

"'Hugh George Campbell appointed commander 27 July, 1799, captain 16 October, 1800.'"

3. In the Congressional Cemetery lie the remains of Hon. Elbridge Gerry, who was gathered unto his fathers in Washington during his second year as Vice President, on November 23, 1814. The military services of Gerry are noted by Heitman. It is proper also to record that he was born at Marblehead, Mass., July 17, 1744, graduated at Harvard, and became a member of the Continental Congress of 1776. He was also a member of the First National Congress of 1789 and was one of the envoys sent to establish relations with France in 1797. He was elected Governor of Massachusetts in 1810 and Vice President of the United States in 1812. His grave is covered with a handsome monument which was erected by an act of Congress in 1823.

4. At this point it will be well to record that Gen. George Clinton was originally interred in Congressional Cemetery, where he remained until a few years ago, when his body was transferred to New York with considerable ceremony.

5. Gen. James Jackson, one of the most distinguished Georgians, reposes in Congressional Cemetery. His enviable military record is to be found in Heitman, and more extensively, together with his civil life, in The National Portrait Gallery. He was Governor of Georgia, and United States Senator from 1801 to March, 1806. He passed away on the 19th day of March, of that year, and was interred, the Portrait Gallery states, "Four miles from Washington," which was, in fact, Rock Creek Churchyard. He was reinterred in Congressional Cemetery under one of those quaint cenotaphs. A Revolutionary War, D. A. R. marker stands on his grave and the last phrase of the inscription on his tomb is "a soldier of the Revolution."

6. Senator Uriah Tracey, of Connecticut: Connecticut Men in the Revolution lists the name of Uriah Tracey in a company that marched from sundry places for the relief of Boston, etc., in the Lexington alarm, 1775, and were formed into an independent and ranging company at Roxbury. The military services of Senator Tracey were of a clerical nature for a short period. There is nothing on his grave to permanently record his army connection. He was the first Congressman to be interred in Congressional Cemetery. This occurred July 19, 1807, by exhumation from Rock Creek.

7. Gen. Thomas Blount, a Representative from North Carolina, was born in Edgecomb County, May 10, 1759, and at the age of 16 entered the Revolutionary Army. In 1780 he became a deputy paymaster

# EXHIBIT K

**Professor Kelly Lytle Hernández**
Department of History
Department of African-American Studies
Department of Urban Planning
University of California, Los Angeles
6265 Bunche Hall, Box #951473
Los Angeles, California 90095-1473
hernandez@history.ucla.edu

**EDUCATION**

Ph.D., Department of History, University of California at Los Angeles, 1998 - 2002

B.A., Department of Ethnic Studies, University of California at San Diego, 1992 - 1996

**ACADEMIC POSITIONS**

Director, Ralph J. Bunche Center for African American Studies at UCLA, July 1, 2019 to present

Tom Lifka Endowed Chair in History (UCLA), July 1, 2019 to present

Interim Director, Ralph J. Bunche Center for African American Studies at UCLA, July 1, 2017 to June 30, 2019

Professor, departments of History, African American Studies, and Urban Planning, July 1, 2017 to present

Associate Professor, Department of History, University of California at Los Angeles, 2010 - 2017

Director, UCLA Public History Initiative, 2012 - 2014

Associate Director, National Center for History in the Schools, 2010 - 2012

Associate Director, Chicano Studies Research Center, University of California at Los Angeles, 2008 - 2010

Assistant Professor, Department of History, University of California at Los Angeles, 2004 - 2010

University of California President's Postdoctoral Fellow, Department of Ethnic Studies, University of California, San Diego, 2002 - 2004

Research Fellow, Center for U.S.-Mexican Studies at the University of California, San Diego, 2001 - 2002

Research Fellow, Center for Comparative Immigration Studies at the University of California, San Diego, 2001 - 2002

Visiting Scholar, Immigration and Naturalization Service Historical Library, Washington, D.C., 2000

**MAJOR RESEARCH PROJECTS**
*Bad Mexicans* (forthcoming from Norton Books)

Million Dollar Hoods ([milliondollarhoods.org](milliondollarhoods.org))

*City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771 –
1965* (University of North Carolina Press, April 2017).

*MIGRA! A History of the U.S. Border Patrol* (Berkeley: University of California Press, 2010).

**AWARDS and PRIZES**
Commendation from the Los Angeles County Board of Supervisors for work on incarceration and
immigration (November 19, 2020)

2019 John D. and Catherine T. MacArthur Fellow

2019 Catalyst Award. Awarded CADRE for Million Dollar Hoods

2018 Local Hero Award (KCET). Awarded for Million Dollar Hoods as well as historical
scholarship on the rise of mass incarceration in Los Angeles.

2018 John Hope Franklin Prize for most outstanding book in American Studies. Awarded by the
American Studies Association for *City of Inmates: Conquest, Rebellion and the Rise of Human
Caging in Los Angeles, 1781-1965* (University of North Carolina Press, 2017).

2018 Athearn Book Award for the best book on the history of the twentieth-century American
West. Awarded by the Western History Association for *City of Inmates: Conquest, Rebellion and
the Rise of Human Caging in Los Angeles, 1781-1965* (University of North Carolina Press, 2017).

2018 American Book Award for excellence in American literature. Awarded by the Before
Columbus Foundation for *City of Inmates: Conquest, Rebellion and the Rise of Human Caging in
Los Angeles, 1781-1965* (University of North Carolina Press, 2017).

2018 FREEDOM NOW! AWARD. Awarded for Million Dollar Hoods by the Los Angeles
Community Action Network.

2018 John A. Rawley Prize for best book in U.S. race relations. Awarded by the Organization of
American Historians for *City of Inmates: Conquest, Rebellion and the Rise of Human Caging in
Los Angeles, 1781-1965* (University of North Carolina Press, 2017)

2015 Louis Knott Koontz Award for best article published in *Pacific Historical Review*,
American Historical Association – Pacific Coast Branch. Awarded by the Board of Editors of the
*Pacific Historical Review* to "Hobos in Heaven: Race, Incarceration, and the Rise of Los
Angeles, 1880 -1910."

2010 Clements Book Award, Clements Center for Southwest Studies, Southern Methodist
University. Awarded for *MIGRA! A History of the U.S. Border Patrol.*

Honorable Mention, 2010 Lora Romero First Book Prize, American Studies Association

Honorable Mention, 2010 John Hope Franklin Book Prize, American Studies Association

2007 Oscar O. Winther Prize for the best article published in the *Western Historical Quarterly* (2006).  Awarded by the Board of Editors of the *Western Historical Quarterly* to "The Crimes and Consequences of Illegal Immigration:  A Cross-Border Examination of Operation Wetback, 1943-1954," *Western Historical Quarterly* (Winter 2006), 421-444.

2007 Bolton-Kinnaird Prize in Borderlands History. Awarded by the Western History Association to "The Crimes and Consequences of Illegal Immigration:  A Cross-Border Examination of Operation Wetback, 1943-1954," *Western Historical Quarterly* (Winter 2006), 421-444.

Norris F. Hundley Dissertation Prize (UCLA), 2002.

**<u>SELECTED ESSAYS and ARTICLES</u>**
Kelly Lytle Hernández, "The Rise of Mass Incarceration in Los Angeles," in Care First, Jails Last: Health and Racial Justice Strategies for Safer Communities (Los Angeles County Alternatives to Incarceration Work Group Final Report, February 2020)

Kelly Lytle Hernández, guest editor for "Carceral West," a Special Volume of *Pacific Historical Review* (January 2019)

Kelly Lytle Hernández, "Reforming Deportees: Imprisonment and Immigration Control during the 1930s," *Beyond the Borders of the Law: Critical Legal Histories of the North American West*, eds., Katrina Jagodinsky and Pablo Mitchell (University of Kansas Press, 2018), 263-280.

Kelly Lytle Hernández, Khalil Gibran Muhammad, and Heather Ann Thompson, co-editors and co-authors of "Constructing the Carceral State," in "Constructing the Carceral State," a Special Volume of the *Journal of American History* (June 2015).

"Hobos in Heaven: Race, Incarceration, and the Rise of Los Angeles, 1880 -1910," *Pacific Historical Review* v. 83, n. 3 (August 2014), 410-447.

"The Deportees: Mexican Immigration and the Rise of U.S. Immigration Control during the 1920s," in Rafael G. Alarcón Acosta and Fernando Saúl Alanís Enciso, ed. *Historia de la Migración Mexicana a Estados Unidos. Visiones Comparadas* (Siglo XIX, 2013).

"Amnesty or Abolition? Felons, Illegal Immigrants and America's Unfinished Abolition Movement," *Boom: A Journal of California* (Winter 2012), 54-68.

"Borderlands and the Future History of the American West," *Western Historical Quarterly* v 42, n 3 (Autumn 2011), 325-330.

Interchange participant, "Latino History: An Interchange on Present Realities and Future Prospects," v 97, n 2 *Journal of American History* (September 2010), 424-463.

"Mexican/Central American Migration to the United States," *OAH Magazine of History* v 23 (October 2009), 25-30.

**194**

Kelly Lytle Hernández and Pablo Yankelevich, eds. "Dossier 1: The Archive," *Aztlán: A Journal of Chicano Studies* (Spring 2009).

Kelly Lytle Hernández and Pablo Yankelevich, "An Introduction to el Archivo Histórico del Instituto Nacional de Migración," *Aztlán: A Journal of Chicano Studies* (Spring 2009).

"Persecuted Like Criminals: The Politics of Labor Emigration and Mexican Migration Controls during the 1920s and 1930s," *Aztlán: A Journal of Chicano Studies* (Spring 2009).

"The Crimes and Consequences of Illegal Immigration:  A Cross-Border Examination of Operation Wetback, 1943-1954," *Western Historical Quarterly* v 37, n 4 (Winter 2006), 421-444.

"Ni blancos ni negros: mexicanos y el papel de la patrulla fronteriza estadounidense en la definición de una nueva categoría racial, 1924-1940," *Cuicuilco* v 11, n 31 (Mayo-Agosto 2004), 85-104.

*Mexican Immigration to the United States, 1900 – 1999: A Sourcebook for Teachers*, published by the National Center for History in the Schools (Fall 2002).


## POLICY REPORTS  and ARTICLES

Co-author, "Immigration Enforcement at the Orange County Jail," (Million Dollar Hoods), June 11, 2019

Co-author, "Bookings into the Los Angeles County Jail (2010-2016): A Million Dollar Hoods White Paper prepared for the Los Angeles County Alternatives to Incarceration Work Group," (Million Dollar Hoods), June 11, 2019

Co-Author, "The Los Angeles Police Department's Metropolitan Division," (Million Dollar Hoods, April 2, 2019.

Co-author, "Women in the Los Angeles County Jail: An Analysis of LASD Booking Data (2010-2016)," (Million Dollar Hoods), January 8, 2019

Co-author, "Policing Our Students," (Million Dollar Hoods), October 30, 2018.

Co-author, "The Price of Freedom: Bail in the City of L.A.," (Million Dollar Hoods), May 14, 2018.

Co-author, "Policing the Unemployed in Los Angeles," (Million Dollar Hoods), May 2, 2018.

Co-author, "Race, Cannabis, and Recent Disparities in Cannabis Enforcement by the LAPD," (Million Dollar Hoods), February 28, 2018.

Co-author, "Access to Freedom: Caged L.A.," *Items: Insights from the Social Sciences* (Social Science Research Council), February 20, 2018

Co-author, "Policing the Houseless 2.0," (Million Dollar Hoods), December 5, 2017

Co-author, "The Price for Freedom: Bail in the City of Los Angeles," (Million Dollar Hoods), December 5, 2017

Co-author, "Policing the Houseless," (Million Dollar Hoods), October 10, 2017

"How Crossing the U.S.-Mexico Border Became a Crime," *The Conversation*, April 30, 2017.

"Largest Deportation Campaign in U.S. History is No Match for Trump's Plan," *The Conversation*, March 8, 2017.

"America's Mass Deportation System is Rooted in Racism," *The Conversation*, February 26, 2017

**SELECTED BOARDS and PROFESSIONAL SERVICE**
National Book Award, 2019 Literature for Justice Committee, April 2019 to present

Society of American Historians, elected member, 2019 - present

Los Angeles Civic Memory Working Group, 2019 - present

Appointed by Supervisor Hilda Solis to the Los Angeles County Alternatives to Incarceration Workgroup, co-chair of the Data and Research Committee, March 2019 to March 2020.

Chair, American Talent Initiative Faculty Committee (UCLA)

Committee Member, Time to Degree Taskforce (UCLA)

Foundation Board Member, ACLU of Southern California, March 2018 – present

UC Systemwide Faculty Advisory Committee, UCLA representative, UC President's Postdoctoral Fellowship Program, 2017 to present

Editorial Board Member, *The Journal of American History*, March 2017 – present

Program co-chair with Andrew Graybill (Southern Methodist University) and Katherine Benton-Cohen (Georgetown University), Western History Association 2017 Annual Meeting, current

Editorial Board, David J. Weber Series in New Borderlands History, University of North Carolina Press, 2012 – present

*American Quarterly,* Managing Board, 2010 – 2014

*Western Historical Quarterly,* Editorial Board, 2011 – 2014

*LABOR: Studies in Working-Class History of the Americas*, Contributing Editor, current

Distinguished Speaker, Western History Association, 2012-2016

Distinguished Lecturer, Organization of American Historians, 2011 - present

Organization of American Historians, member and 2013 Program Committee member

**SELECTED MEDIA INTERVIEWS**

Interview for *Factually! With Adam Conover,* episode title, "The Racist Roots of America's Immigration Laws." Originally aired on February 18, 2020.

Interview for United States of Anxiety (WNYC), episode title, "Fragility in Liberty." Originally aired February 20, 2020.

"LAUSD Plans to Expand List of Offenses Eligible for Diversion to Reduce Racially Disparate School Arrests," WitnessLA, October 7, 2019

"San Diego Native Wins MacArthur "Genius" Grant," Midday Edition, KPBS San Diego, October 3, 2019

"Los Angeles Working to Expand Diversion Programs to Further Reduce Student Arrests and Increase Services," LAUSD Press Release, October 1, 2019.

Live television interview about MacArthur grant, Univision, September 30, 2019.

Live radio interview about MacArthur grant on Press Play with Madeleine Brand, KCRW, September 26, 2019

"Rebel Historian Who Reframes History Receives MacArthur Genius Grant," All Things Considered," National Public Radio, September 25, 2019.

"MacArthur Genius Grant Winners of 2019: The Full List," New York Times, September 25, 2019

"Who's behind the law making undocumented immigrants criminals? An 'unrepentant white supremacist," *Washington Post*, June 27, 2019.

Live radio interview on Worldview with Steve Bynum on WBEZ (Chicago), June 27, 2019.

"Million Dollar Hoods: Why L.A. Cages More People than Any Other City," *Justice Not Jails*, July 4, 2018.

"Councilmember Harris-Dawson Joins Community Groups to Urge State and Local Officials to End Cash Bail: *New study from UCLA's Million Dollar Hoods Project highlights the disproportionate Price for Freedom,*" *Los Angeles Sentinel*, May 17, 2018.

Mother's Day Bailout press conference (Skid Row, Los Angeles), May 10, 2018

"We Live as Second-Class Citizens: What It's Like to Face Border Patrol Agents Every Day," *The Guardian,* May 3, 2018.

"Many Latinos Answer Call of the Border Patrol in Age of Trump," *Los Angeles Times*, April 23, 2018.

Mexican Americans and the History of U.S. Anti-Cannabis Laws, *Mitu* (first posted February 2018)

"The American Detention Machine," *The Atlantic*, February 23, 2018

"The Double Punishment for Black Undocumented Immigrants," *The Atlantic*, December 30, 2017 (interviewee)

On-camera interview, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, C-SPAN Book TV (2017)

"Life on a Million Dollar Block," six-week "Off the Block" series for KCRW (NPR affiliate) based on Million Dollar Hoods mapping project. September/October 2016.

Interviews with the following outlets in response to Donald Trump's deportation and border enforcement strategy: *Los Angeles Times, New York Times, Washington Post, The Intercept,* and *FactCheck.org.*

"A Two-Minute History of Operation Wetback" . CNN. First aired January 2016.

Podcast, "The Carceral State," *Journal of American History*.  Conducted June 2015.

On-air interview, "States, Feds Battle over Border Control," *The World* hosted by Marco Werman for Public Radio International. Interview conducted in July 2010.

On-camera interview for History Channel production entitled, "El Camino Real" on the history of the Spanish mission system in California.  Interview conducted on August 11, 2005

Consultant and on-camera interview for History Channel production entitled, "The Border Patrol." Interview conducted spring 2001.


**<u>SELECTED TALKS, PRESENTATIONS, AND LECTURES</u>**
Guest Speaker, American Civil Liberties Union of Southern California, October 4, 2019

City of Inmates book talk, The Bail Project (Los Angeles), June 25, 2019

Nation of Settlers, Build Power! Launch Party (Hollywood), May 16, 2019

Million Dollar Hoods, Institute for Research on Labor and Employment (UC Berkeley), May 14, 2019

Keynote, Nation of Settlers, Teaching History Conference (UCLA), May 3, 2019

Keynote, City of Inmates book talk, Los Angeles County Alternatives to Incarceration Workgroup Retreat, April 26, 2019

Keynote, Million Dollar Hoods, Oberlin College, April 24, 2019

Keynote, Immigrant Detention Conference, University of Maryland, March 28, 2019

Keynote, Immigration Conference, California State University, Sacramento, March 7, 2019

**198**

Panelist, The Future of Incarceration, The State of Black California Conference (Sacramento, CA), February 27, 2019

City of Inmates book talk, Marquette University, February 21, 2019

City of Inmates book talk, University of Wisconsin - Madison, February 22, 2019

Keynote, Mass Deportation/Incarceration, LatinoJustice, November 16, 2018

Panelist, "Sorry to Bother You" Screening at UCLA, November 6, 2018

Panelist, Men's Empowerment Conference hosted by KJLH and Senator Bradford at California State University, Dominguez Hills, September 8, 2018.

Keynote, New Left Coast Forum hosted by *L.A. Progressive* at Los Angeles Trade Tech, August 24, 2018.

Panelist, People Power Conference sponsored by the Community Coalition (South Central Los Angeles), June 9, 2018.

Presentation, "The Facts and Fictions of Latinos and the U.S. Criminal Justice System," LatinoJustice convening at UCLA, May 29, 2018

*City of Inmates* book talk, California Historical Society (San Francisco, CA), May 23, 2018.

*City of Inmates* book talk for Los Angeles Department of Public Health, May 31, 2018.

Guest Presentation, Women and Incarceration in LA, for A New Way of Life Fundraiser (Los Angeles), May 19, 2018.

Press conference on money bail. Sponsored by Community Coalition (South Central Los Angeles), May 15, 2018.

Comments, Dream Mentor Program organized by the Miller Center at the University of Virginia (Charlottesville, CA), May 10, 2018.

Keynote, Caughey Foundation Lecture at the Autry Museum (Los Angeles, CA), April 29, 2018

Keynote, Public Records and the Movement to End Mass Incarceration, California Public Records and Open Meetings Conference (Los Angeles, CA), April 27, 2018

Book talk, *City of Inmates*, University of North Texas (Denton, TX), April 26, 2018.

Book talk, *City of Inmates*, Pan-African Studies Department at California State University, Los Angeles (Los Angeles, CA), April 23, 2018.

Book talk, *City of Inmates*, Main Museum (Los Angeles, CA), April 19, 2018.

Book talk, *City of Inmates*, Cerritos Community College (Los Angeles, CA), April 19, 2018.

**199**

Panelist, Crimmigration, Organization of American Historians Annual Meeting (Sacramento, CA) April 12, 2018

Keynote, Death by Police conference at University of Illinois at Urbana-Champagne, April 11, 2018

Public Talk, Labor and the Crisis of Mass Incarceration, United Food and Commercial Workers Local 770 (Los Angeles, CA), March 15, 2018

Book talk, *City of Inmates*, University of California, Berkeley, March 14, 2018.

Book talk, *City of Inmates*, California State University, Channel Islands, February 28, 2018.

Moderator for a public conversation with Patrisse Khan-Cullors and Asha Bandele, *When They Call You a Terrorist: A Black Lives Matter Memoir* (2018) at The California Endowment (Los Angeles, CA), February 14, 2018

Book talk, *City of Inmates*, Immigration History Research Center, University of Minnesota, January 25, 2018.

Moderator for a public Conversation with Heather Anne Thompson, *Blood in the Water: The 1971 Attica Uprising and its Legacy* at the Los Angeles Public Library, January 18, 2018.

Panelist, District 2 Town Hall, hosted by JusticeLA and White People for Black Lives, (Hollywood, CA), January 11, 2018.

Book Talk, *City of Inmates*, University of Southern California (Los Angeles, CA), January 10, 2018.

Panelist, #SocialJustice with Common and Kareem Abdul-Jabbar (Los Angeles, CA), January 6, 2018

Project Talk, Million Dollar Hoods, UCLA Medical School, December 15, 2017

Book Talk, Watts Labor Community Action Center, December 14, 2017.

Expert Witness, Civil Society Meeting on Criminalization of Poverty and Homelessness with United Nations Special Rapporteur on Extreme Poverty and Human Rights
Professor Philip Alston, (Los Angeles, CA), December 4-5, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, California State University, San Bernardino, (San Bernardino, CA), November 28, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles* ACLU-Southern California (Los Angeles, CA), November 19, 2017.

Presenter, UCLA Luskin Center for History and Policy, November 15, 2017.

Keynote Speaker, Eqbal Ahmed Symposium, Hampshire College (Amherst, MA), November 9, 2017.

Panelist, Historians and Activism, Western History Association (San Diego, CA), November 3, 2017.

Closing Speaker, Race and Capitalism Conference, UCLA, October 20, 2017.

Presenter, UCLA Criminal Justice Faculty Workgroup, October 18, 2017.

Panelist, Beyond the Bars Conference, University of California, Los Angeles, October 14, 2017.

Presenter, The Racial and Sexual Politics of Migrancy and Border Control, University of Michigan Centennial Event, October 13, 2017

Keynote Address/Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Latino Studies University of Michigan (Ann Arbor, MI), October 12, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Warren Center at Harvard University (Cambridge, MA), September 19, 2017.

LAPD Recruit Training Session. Los Angeles, CA, August 14, 2017.

Million Dollar Hoods, Building Healthy Communities – Long Beach, California, August 9, 2017

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Book Soup (Hollywood, CA), August 6, 2017.

Plenary Panel, Labor and Working Class History Association 2017 Meeting (Seattle, WA), June 22, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Skylight Books (Los Angeles, CA), May 18, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, University of California, San Diego, May 18, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Claremont College of Theology (Claremont, CA), May 2, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Eso Won Book Store (Los Angeles, CA), April 26, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Occidental College (Pasadena, CA), April 25, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, California State Univeristy, Dominguez Hills, April, 20, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Tarleton College (Texas), April 18, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Southern Methodist University (Dallas, Texas), April 17, 2017.

Keynote, Western History Association Lecture at University of Oklahoma. April 13, 2017.

Keynote, National Humanities Center, March 30, 2017.

Presenter, Laying Down the Law Symposium at University of Nebraska at Lincoln, November 16-17, 2017.

Million Dollar Hoods, South Central (Los Angeles) Re-Entry Coalition, September 11, 2016.

Million Dollar Hoods, California Endowment, September 18, 2016.

Plenary Session/Podcast, "Behind the Scholar's Studio: Inside the World of Latino Studies," American Historical Association – Pacific Coast Branch. August 6, 2016.

Public Lecture, "Caged Birds: Immigration Control and the Rise of Mexican Imprisonment in the United States," Franklin and Marshall College. Lancaster, Pennsylvania. March 21, 2016.

Presenter, Immigration since 1965 Conference hosted at University of Texas, Austin. March 4-5, 2016.

Public talk, "Caged Birds: Conquest and the Rise of Mexican Imprisonment in the United States," Puget Sound University. February 29, 2016.

Discussant, UCLA Emerging Immigration Scholars Conference. February 26, 2016.

Keynote Address, "Caged Birds: Conquest and the Rise of Mexican Imprisonment in the United States," Caged/Uncaged Graduate Student Conference. University of California, Los Angeles. January 29, 2016.

Keynote Address, "Caged Birds: Conquest and the Rise of Mexican Imprisonment in the United States," Borderlands Conference, University of Texas at El Paso. November 6, 2015.

Lecture, "The Colonial Origins of the Carceral State," From the Color Line to the Carceral State: Policing, Prisons, and Surveillance in the 20th and 21st Centuries conference, Stony Brook University and Fairfield University. October 27-28, 2015.

Panelist, "Legal Borderlands," Annual Meeting of the Western History Association. October 24, 2015.

Panelist, "Reforming Deportees: Race, Incarceration, and the Settler State during the New Deal Era," Annual Meeting of the Western History Association. October 22, 2015.

Public Talk, "The History of Race and Policing in Los Angeles," LAPD Trust Talks organized by the Downtown Clergy Council, Skid Row. October 3, 2015.

"Caged Birds: Conquest and the Rise of Mexican Imprisonment," plenary panel, Annual Meeting of the Organization of American Historians. St. Louis, Missouri. April 18, 2015.

"Caged Birds: Conquest and the Rise of Mexican Imprisonment," Immigration Conference, Columbia University. April 4, 2015.

"Caged Birds: Conquest and the Rise of Mexican Imprisonment," Department of History, Yale University. March 31, 2015.

Panelist, "Is there an LA School of Western History?" Western History Association Annual Meeting. Newport Beach, California. October 17, 2014.

Presenter, "Borderlands," NEH-Newberry Workshop. Chicago, Illinois. June 23, 2014

Lecture, "Caged Birds: Conquest and the Rise of Mexican Incarceration," University of California, Davis Law School. September 11, 2014.
Public Lecture, "Caged Birds: Conquest and the Rise of Mexican Imprisonment," University of California, Santa Barbara. May 20, 2014.

Public Talk, "Caged Birds," Linfield College. McMinnesville, Oregon. May 6-7, 2014.

OAH Distinguished Lecture at University of Missouri. April 24, 2014.

Panelist, Mass Incarceration/Mass Deportation," UCLA Labor Center. April 19, 2014.

Discussant, UCLA-COLEF Migration Conference. November 22, 2013.

Keynote Discussant for Douglas Blackmon's Talk, "Slavery by Another Name," Historians Against Slavery Conference. Cincinnati, Ohio. September 19, 2013.

Workshop for K-12 History teachers on California History. UCLA History-Geography Project. June 13, 2013.

TAH-OAH Public Talk, "A History of U.S. Immigration Control." Rockford, Illinois. January 26, 2013

TAH workshop, "California Under Three Flags," UCLA History-Geography Project. January 22, 2013.

OAH Distinguished Lecturer Public Talk, "Hoboes in Heaven: Race, Manifest Destiny, and the Rise of Los Angeles," Purdue University. March 7, 2013.

Public Talk, "The Invention of Immigrant Detention," University of California, Berkeley, Boalt Law School. March 20, 2014.

Book Talk, *MIGRA! A History of the U.S. Border Patrol,* at the Center for the Study of the Pacific Northwest, University of Washington, Seattle. May 17, 2012.

Keynote Address, "Amnesty or Abolition? Felons, Illegals, and America's Unfinished Abolition Movement," Immigration Policy and Reality Symposium, San Jose State University, April 13, 2012.

12

**203**

Working Paper, "Rebellion from the Jail: A History of Community, Incarceration, and Revolution in Los Angeles, 1900 – 1910," Sunbelt Prisons Conference, Southern Methodist University, March 24, 2012.

Book Talk, *MIGRA! A History of the U.S. Border Patrol* at the Center for Comparative Immigration Studies at the University of California, San Diego. February 21, 2012.
Public Lecture, "Hobos in Heaven: Tramps, Chain Gangs, and the Rise of Los Angeles," University of Indiana. February 26, 2012.

Public Talk, "Amnesty or Abolition: Felons, Illegals, and America's Unfinished Abolition Movement," Boxcar Books, Bloomington, Indiana. February 26, 2012.

Conference Paper, "Rebellion from the Jails: A History of Incarceration and Community in Los Angeles, 1907-1910," Sunbelt Prisons workshop, University of Colorado, Boulder. September 15-16, 2011

Keynote Address, Latino/a Scholars Luncheon, 2011 American Historical Association-Pacific Coast Branch Meeting. Seattle, Washington. August 11, 2011.

K-12 Teacher Training, "History of Immigration Control," Denver, Colorado School District. July 11, 2012. Los Angeles, California.

Panel Participant, "Prison State: Incarceration in California," UCLA Department of History, Why History Matters series. Autry Museum. May 11, 2011.

Panel moderator, conference for the UC Center for New Racial Studies. UCLA. April 22, 2011.

Presenter, "*MIGRA! A History of the U.S. Border Patrol*," Critical Race Studies Symposium – Race and Sovereignty. UCLA Law School. April 2, 2011.

Book Talk, "*MIGRA! A History of the U.S. Border Patrol*," Arizona State University. March 25, 2011.

Keynote Address, "Beyond Borders: Migration and the Next California," Symposium to celebrate the launching of *Boom: A Journal of California* (University of California Press). Davis, California. March 10, 2011.

Presenter, "Hoboes in Heaven: Tramps, Convict Labor and the Rise of Los Angeles, 1880-1910," Autry Western History Workshop. November 30, 2010

Panelist, "Hoboes in Heaven: Tramps, Convict Labor and the Rise of Los Angeles, 1880-1910," Latin American Studies Association. Toronto. October 8, 2010.

Book talk, "*MIGRA! A History of the U.S. Border Patrol*," UCLA Law School. October 4, 2010.

Panel moderator, Forty Years of Ethnic Studies at UCLA. May 13, 2010

Panelist, "Crossing Borders, Creating Borders: Nations, Migrants, and Constructions of Law," 2009 Annual Meeting of the Association of American Law Schools. San Diego, California. January 9, 2009.

Keynote lecture series, *Los caminos de la exclusión: migración y racismo en la historia de los Estados Unidos de América.* Sponsored by Sociedad y Estado en el México Moderno del Posgrado de Historia y Etnohistoria de la Escuela Nacional de Antropología e Historia y el Proyecto de Investigación "Nación y Extranjería en México." Mexico City. December 7-11, 2009.

K-12 Teacher Training, "U.S.-Mexico Relations: Immigration Policy," UCLA History-Geography Project's Teaching American History Summer Institute.  Glendale, California. July 17, 2008.

Panel Participant, "Immigration Control in the Carceral Era," invited presentation at University of Texas at Austin.  22nd Annual Hemann Sweatt Civil Rights Symposium. March 26, 2008.

K-12 Teacher Training, "Gold Rush to Gold Rush:  African American Migration to California, 1848 to 1944," presentation for the National Center for History in the Schools.  University of California, Los Angeles.  August 17, 2007.

K-12 Teacher Training, "The Long Civil Rights Movement: New Strategies in Teaching the Civil Rights Movement," presentation for the UCLA History-Geography Project's Teaching American History Summer Institute.  Glendale, California. July 28, 2007.

Training Workshop, "Where Do We Go From Here?:  New Strategies in Teaching Late Twentieth Century American History,"  2007 OAH Community College Workshop at El Camino Community College. Torrance, California.  June 23, 2007.

K-12 Teacher Training, "A History of the Problem of Illegal Immigration at the U.S.-Mexico Border," presentation for the Latin American Immigrants and Mobile Communities in the United States Conference for Teachers, sponsored by the UCLA Latin American Center. April 20, 2007.

K-12 Teacher Training, "The Making of MexAmerica: Race, Migration, and Incorporation in the 19th and 20th Centuries," presentation for the National Center for History in the Schools at the University of California, Los Angeles.  January 19, 2007.

Chair, "Smuggling in the Southwest Borderlands:  State Regulation and Resistance," panel at the 2007 Annual Conference of the Western History Association. Oklahoma City, Oklahoma. October 3-6, 2007

"The Crimes and Consequences of Illegal Immigration: A Cross-Border Examination of Operation Wetback, 1943-1954," presented at the Annual Conference of the Organization of American Historians held from April 19-22, 2006 in Washington, DC.

"Negotiating the Barrier: Migration Control and Social Order between the U.S. and Mexico during the Bracero Era, 1942 – 1964," presented at the Latin American Studies Association 2004 Conference held from October 7-9, 2004 in Las Vegas, Nevada.

"Constructing the Criminal Alien:  A Historical Framework for Analyzing Border Vigilantes at the Turn of the 21st Century" presented at the Center for Comparative Immigration Studies at the University of California, San Diego. La Jolla, California. October 7, 2003.

"Distant Origins: The U.S. Border Patrol and the Mexican Roots of Race in the United States, 1924-1965" presented at the XI Reunion de Historiadores Mexicanos, Estadounidenses y Canadienses. Monterrey, Mexico. October 1-4, 2003.

15

**206**

# EXHIBIT L

# Benjamin Gonzalez O'Brien

**Associate Professor of Political Science**
**San Diego State University**
5500 Campanile Dr.
San Diego, CA 92182
Phone: (619)594-3072
Email: bgonzalezobrien@sdsu.edu

## Education

| | |
|---|---|
| Ph.D., Political Science | 2014, University of Washington |
| M.A., Political Science | 2009, University of Washington |
| M.A., Political Science | 2007, University of Victoria |
| B.S., Political Science & Psychology | 2001, University of Oregon |

1

**208**

**Benjamin Gonzalez O'Brien** **Curriculum Vitae**

## Teaching Positions

| | |
|---|---|
| August 2018-present | Associate Professor |
| San Diego State University | Political Science |

| | |
|---|---|
| 2014-2018 | Professor (Tenured) [1] |
| Highline College | Political Science |

| | |
|---|---|
| 2013-2014 | Lecturer |
| University of Washington-Tacoma | Political Science |

| | |
|---|---|
| 2007-2013 | Teaching Assistant |
| University of Washington | Political Science |

## Publications

### Refereed Books

1) Collingwood, Loren and **Benjamin Gonzalez O'Brien**. 2019. *Sanctuary Cities: The Politics of Refuge* Oxford, England: Oxford University Press, in press.

2) **Gonzalez O'Brien, Benjamin**. 2018. *Handcuffs and Chain Link: Undocumented Immigration and the Politics of Criminality*. Charlottesville, VA: University of Virginia Press.

---

[1]Highline does not have academic ranks for tenured faculty.

Benjamin Gonzalez O'Brien                                                        Curriculum Vitae

## Refereed Journal Articles

1) McGuire, William, **Benjamin Gonzalez O'Brien**, Katherine Baird, Benjamin Corbett, and Loren Collingwood. "Does Distance Matter? Evaluating the Impact of Drop Boxes on Voter Turnout." *Social Science Quarterly*, forthcoming.

2) **Gonzalez O'Brien, Benjamin**. "Reacting to Refuge: Presidential Responses to Sanctuary Policies under the Reagan, Bush, and Trump Administration." in *Trump: Anti-immigrant Rhetoric, Actions, and Policies 2017-2019*, *CISAN, UNAM*, forthcoming.

3) **Gonzalez O'Brien, Benjamin**, Elizabeth Hurst, Justin Reedy, and Loren Collingwood. "Framing Refuge: Media, Framing, and Sanctuary Cities." *Mass Communication and Society*, Vol 22(6): 756-778.
https://doi.org/10.1080/15205436.2019.1685106

4) **Gonzalez O'Brien, Benjamin**. "Sanctuary Cities". In Oxford Bibliographies in Latino Studies. Ed. Ilan Stavans. New York: Oxford University Press, 26 Feb. 2020.
https://www.oxfordbibliographies.com/view/document/obo-9780199913701/obo-9780199913701-0141.xml

5) Collingwood, Loren and **Benjamin Gonzalez O'Brien**. "Covert Cross-Racial Mobilization, Black Activism, and Political Participation Pre-Voting Rights Act." *Florida Historical Quarterly*, vol. 97(4): 435-463.

6) **Gonzalez O'Brien, Benjamin**, Matthew Barreto, and Gabriel Sanchez. 2019. "They're All Out to Get Me! Assessing Inter-Group Competition Among Multiple Populations." *Politics, Groups, and Identities*, published online 01 Jul. 2019, awaiting assignment to print edition.
https://doi.org/10.1080/21565503.2019.1629305

7) Collingwood, Loren, **Benjamin Gonzalez O'Brien**, and Joe Tafoya. 2019. "Partisan Learning or Racial Learning: Opinion Change on Sanctuary City Policy Preferences in California and Texas." *Journal of Race, Ethnicity, and Politics*, vol. 5(1): 92-129.
https://doi.org/10.1017/rep.2019.25

8) Collingwood, Loren and **Benjamin Gonzalez O'Brien**. 2019. "Public Opposition to Sanctuary Cities in Texas: Criminal Threat or Latino Threat?" *Social Science Quarterly*, vol. 100(4): 1182-1196.
https://doi.org/10.1111/ssqu.12632

9) Collingwood, Loren, Stephen El-Khatib and **Benjamin Gonzalez O'Brien**. 2018. "Sustained Organizational Influence: The American Legislative Exchange Council and the Diffusion of Anti-Sanctuary Policy." *Policy Studies Journal*, 44(3): 735-773.

https://doi.org/10.1111/psj.12284

10) Collingwood, Loren, **Benjamin Gonzalez O'Brien**, and Sarah Dreier. 2018. "Evaluating Ballot Initiative Support for Legalized Marijuana: The Case of Washington." *International Journal of Drug Policy*, Vol. 56 (June): 6-20.

https://doi.org/10.1016/j.drugpo.2018.02.010

11) Collingwood, Loren, William McGuire, **Benjamin Gonzalez O'Brien**, Katie Baird and Sarah Hampson. 2018. "Do Drop Boxes Improve Voter Turnout? Evidence from King County, Washington." *Election Law Journal*, Vol. 17(1): 58-72.

https://doi.org/10.1089/elj.2017.0450

12) **Gonzalez O'Brien, Benjamin**, Loren Collingwood, and Stephen Omar El-Khatib. 2017. "The Politics of Refuge: Sanctuary Cities, Crime, and Undocumented Immigration" *Urban Affairs Review*, Vol. 55(1): 3-40.

https://doi.org/10.1177/1078087417704974

13) Barreto, Matt, Betsy Cooper, **Benjamin Gonzalez O'Brien**, Chris Towler, and Christopher Parker. 2012. "The Tea Party in the Age of Obama: Mainstream Conservatism or Out-Group Anxiety?" *Political Power and Social Theory*. 22:1(Jan): 105-137.

https://doi.org/10.1108/S0198-8719(2011)0000022011

## Non-Refereed Book Chapters

1) Barreto, Matt, Gabriel Sanchez and **Benjamin Gonzalez O'Brien**. 2013. "Rainbow Coalition in the Golden State? Exposing Myths, Uncovering New Realities in Latino Attitudes Towards Blacks." In Laura Pulido and Josh Kun (eds.) *Black and Brown Los Angeles: A Contemporary Reader*: 1-36. Berkeley, CA: University of California Press.

2) Barreto, Matt, Loren Collingwood, **Benjamin Gonzalez O'Brien**, and Chris Parker. 2011. "Tea Party Politics in a Blue State: Dino Rossi and the 2010 Washington Senate Election." In William Miller and Jeremy Walling

**Benjamin Gonzalez O'Brien**                                          *Curriculum Vitae*

(eds.) *Tea Party Effects on 2010 U.S. Senate Elections: Stuck in the Middle to Lose: Tea Party Effects on 2010 U.S. Senate Elections*: 255-272. Rowan and Littlefield Publishing Group.

## Non-Refereed Publications

**Gonzalez O'Brien, Benjamin**. 2020. "Washington is safer because of its sanctuary status." *The Seattle Times*, January 1st, 2020.

**Gonzalez O'Brien, Benjamin**. 2019. "No, Ken Blackwell, sanctuary city policies aren't a threat to anyone". *The Hill*, October 24, 2019.
https://thehill.com/opinion/immigration/467294-no-ken-blackwell-sanctuary-city-policies-arent-threat-to-anyone

**Gonzalez O'Brien, Benjamin**. 2018. "The 1929 Law That Turned Undocumented Entry Into a Crime". *Zocalo Public Square*, November 27, 2018.
https://www.zocalopublicsquare.org/2018/11/27/1929-law-turned-undocumented-entry-crime/ideas/essay/

**Gonzalez O'Brien, Benjamin**. 2017. "The Trump team's mythology on sanctuary city crime rates". *The Seattle Times*, July 23rd, 2017.
https://www.seattletimes.com/opinion/the-trump-teams-mythology-on-sanctuary-city-crime-rates/

**Gonzalez O'Brien, Benjamin** and Loren Collingwood. 2017. "How conservative media and Jeff Sessions got it wrong on sanctuary cities". *The Hill*, July 14th, 2017.
https://thehill.com/blogs/pundits-blog/immigration/342043-how-conservative-media-and-jeff-sessions-got-it-wrong-on

Collingwood, Loren, **Benjamin Gonzalez O'Brien** and Stephen El-Khatib. 2017. "Jeff Sessions used our research to claim sanctuary cities have more crime. He's wrong." *Washington Post Monkey Cage*, July 14, 2017.
https://www.washingtonpost.com/news/monkey-cage/wp/2017/07/14/jeff-sessions-used-our-research-to-claim-that-sanctuary-cities-have-more-crime-hes-wrong/?utm$_t erm = .de1f041b8cb3$

Collingwood, Loren, **Benjamin Gonzalez O'Brien**, and Stephen El-Khatib. 2017. "Sanctuary Cities Do Not Experience an Increase in Crime". *Washington Post Monkey Cage*, October 3, 2016.
https://www.washingtonpost.com/news/monkey-cage/wp/2016/10/03/sanctuary-cities-do-not-experience-an-increase-in-crime/?utm$_t erm = .aecb2d3f1bf1$

**Benjamin Gonzalez O'Brien**                                              **Curriculum Vitae**

## Participation in Professional Organizations

2019 *Local Democracy Academy* (June) Umea, Sweden. "Criminalizing Refuge: Sanctuary Cities and the Politics of Immigration in the United States"

2019 CISAN/UNAM *Trump: Anti-immigrant rhetoric, actions and policies 2017-2019 conference* (February) Mexico City, Mexico. "Reactions to Refuge: Presidential Responses to Sanctuary Policies under the Reagan, Bush, and Trump Administrations"

2018 *American Political Science Association Annual Meeting* (September) Boston, MA. "Framing Refuge: Media Coverage of Sanctuary Cities 1980-2017"

2018 *Election Sciences, Reform, and Administration conference* (July) Madison, WI. "Evaluating the Impact of Drop Boxes on Voter Turnout"

2018 *Western Political Science Association Annual Meeting* (March) San Francisco, CA. "Framing Refuge: Partisanship, Crime, and Media Coverage of Sanctuary Cities"

2017 *Law and Society Association Annual Meeting* (June) Mexico City, Mexico. "The Politics of Refuge: Sanctuary Cities, Crime, and Undocumented Immigration"

2017 *Western Political Science Association Annual Meeting* (April) Vancouver, BC. "Voter Turnout in King County Washington: Do Dropboxes Matter?"

2017 *Western Political Science Association Annual Meeting* (April) Vancouver, BC. "The Politics of Refuge: Sanctuary Cities, Crime, and Undocumented Immigration"

2016 *American Political Science Association Annual Meeting* (September) San Francisco, CA. "Inter-Group Attitudes Among Multiple Populations: Competition and Context"

2016 *Western Political Science Association Annual Meeting* (March) San Diego, CA. "Laughing Away Prejudice? Evaluating the Role of Comedy in Reducing Anti-Muslim Attitudes"

2016 *Western Political Science Association Annual Meeting* (March) San Diego, CA. "Gimme Shelter: The Myth and Reality of the American Sanctuary City"

2015 *Western Political Science Association Annual Meeting* (April) Las Vegas, NV. "IRCA, IIRIRA and the Cost of Critical Policy Failures"

6

**213**

**Benjamin Gonzalez O'Brien**                                              **Curriculum Vitae**

2014 *Politics of Race, Immigration, and Ethnicity Consortium Meeting* (November) Eugene, OR. "Path Dependence and Immigration Policy in the 1920s"

2014 *Western Political Science Association Annual Meeting* (April) Seattle, WA. "Path Dependence and Immigration Policy in the 1920s"

2013 *American Political Science Association Annual Meeting* (September) Chicago, IL. "Towards Crimmigration: Path Dependence and the Evolution of Immigration Policy."

2013 *Midwestern Political Science Association Annual Meeting* (April) Chicago, IL. "Towards Crimmigration: Path Dependence and the Evolution of Immigration Policy."

2012 *Law and Societies Association Annual Meeting* (June) Oahu, Hawaii. "Towards Crimmigration: Path Dependence and the Evolution of Immigration Policy."

2012 *Western Political Science Association Annual Meeting* (March) Portland, OR. "The Undocumented Threat: Beliefs, Policy Preferences, and the Politics of Immigration."

2011 *Pacific Northwest Political Science Association Annual Meeting* (October) Seattle, WA. "An Examination of Inter-Group Attitudes Among Multiple Populations: The Role of Neighborhood Context and Group-Based Threat."

2011 *American Political Science Association Annual Meeting* (September) Seattle, WA. "An Examination of Inter-Group Attitudes Among Multiple Populations: The Role of Neighborhood Context and Group-Based Threat."

2011 *Politics of Race, Immigration and Ethnicity Consortium Meeting* (May) Davis, CA. "The Undocumented Threat: Beliefs, Policy Preferences and the Politics of Immigration."

2010 *International Society of Political Psychology Annual Meeting* (July) San Francisco, CA. "An Examination of Inter-Group Attitudes Among Multiple Populations: The Role of Neighborhood Context and Group-Based Threat."

2010 *Western Political Science Association Annual Meeting* (April) San Francisco, CA. "Declaring Sanctuary: Politics, History and the Enforcement of Immigration Policy."

2009 *Pacific Northwest Political Science Association Annual Meeting* (October) Victoria, BC. "Immigration Enforcement's Discontents: The Creation and Endurance of the American Sanctuary City."

2009 *Political Psychology and Immigration Conference* (April) Austin, TX. "Correcting Misperceptions: Undocumented Immigrants, Group Size and Political Attitudes."

2009 *Western Political Science Association Annual Conference* (March) Vancouver, BC. "Correcting Misperceptions: Undocumented Immigrants, Group Size and Political Attitudes."

# Teaching

## Thesis or Comprehensive Exam Supervision

Spring 2019-Spring 2020: Cynthia Neira, Masters
Committee Member:        American Foreign Policy and Latin American Politics comprehensive examination


Fall 2020-Spring 2020: Jereme Umali, Masters
Committee Member:    Racial & Ethnic Politics comprehensive examination


## Courses Taught, San Diego State University

Introduction to American and California Government, Political Science 102
Politics of Race and Ethnicity, Political Science 333
The Legislative Process, Political Science 338
Immigration and Border Politics, Political Science 430


## Courses Taught, Highline College

Introduction to Political Science, Political Science 101
American Government, Political Science 202
Introduction to International Relations, Political Science 203
Comparative Government, Political Science 204
Racial and Ethnic Politics, Political Science 217


## Courses Taught, University of Washington-Tacoma

Introduction to American Politics, Political Science 202
Mass Media and Politics, Political Science 300
Politics of Race and Ethnicity in the United States, Political Science 317
United States Congress, Political Science 353
Advanced Campaigns and Elections, Political Science 405

**Benjamin Gonzalez O'Brien**                                          **Curriculum Vitae**

# Service

**Service for the Department, San Diego State University**

| | |
|---|---|
| 1) Fall 2019-present | Adviser, Washington Center Internship Program |
| 2) Fall 2019-present | Adviser, Sacramento Internship Program |
| 3) Fall 2019-present | Member, Diversity Planning Committee |
| 4) Fall 2019-present | Member, Graduate Committee |
| 5) Fall 2018-present | Department Secretary |
| 6) Fall 2018-Spring 2019 | Member, Scholarship Review Committee |

**Service for the College of Arts & Letters**

| | |
|---|---|
| 1) Spring 2019 | Member, Critical Thinking Grant Committee |

**Service, Highline College**

| | |
|---|---|
| 1) Fall 2017-Spring 2018 | Division Senator, Faculty Senate |
| 2) Fall 2015-Spring 2017 | Member, Graduation Review Committee |
| 3) Fall 2015-Spring 2016 | Member, Faculty Advising Committee |

**216**

**Benjamin Gonzalez O'Brien**                                              **Curriculum Vitae**

**Service to the Profession**

| | |
|---|---|
| 2019 | Session Leader, Local Democracy Academy |
| 2019 | Co-organizer, "Immigration Politics and Policy in the Age of Trump" conference at UCSD |
| 2019 | Reviewer, *State and Local Government Review* |
| 2019 | Reviewer, *Social Inclusion* |
| 2018 | Reviewer, *Urban Affairs Review* |
| 2018 | Panelist, 2018 Pearson-Chambers Symposium on the 2018 election, Univ. of San Diego |
| 2018 | Reviewer, *Urban Affairs Review* |
| 2018 | Reviewer, *Sociological Quarterly* |
| 2016 | Reviewer, *Politics, Groups, and Identities* |

10

**217**