ROBERT S. BREWER, JR.
United States Attorney
PAUL E. BENJAMIN, CA Bar Number 306066
Assistant United States Attorney
United States Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
(619) 546-7579
Paul.Benjamin@usdoj.gov
Attorneys for the United States of America

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>  v.<br><br>FERNANDO GIRARTE-ALCALA,<br><br>       Defendant. | Case No.: 20-mj-20121-KSC<br><br>UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS AT ECF NO. 32 |

Defendant's motions at ECF No. 32 should be denied entirely. Defendant requests that the Court prevent immigration officers from arresting him at the courthouse after the criminal case is over. Among other flaws, the Court has no jurisdiction to enter an order enjoining speculative post-judgment actions of a non-party to this action. As his motion makes clear, the proper forum for Defendant's requested relief, if any, is an affirmative civil lawsuit against the prospective arresting agency. And in any event, there is no common-law privilege against an immigration arrest at a courthouse. The claimed privilege—long-ceased—applied only as to private parties making private arrests to initiate private lawsuits. The privilege did not apply to arrests by the sovereign. And the privilege did not apply to civil arrests of criminal defendants.

With respect to his equal protection claim, Defendant is not charged with any law enacted in the 1920's; he is charged with attempted entry, a crime first enacted by Congress in 1990. This alone disposes of Defendant's motion and renders his claim non-justiciable. But even on the merits, the equal protection claim fails. Congress has plenary power over immigration affairs and its decisions are subject to a highly deferential standard of review.

The illegal entry law easily passes that low standard. Defendant's motions should be denied.

I

DEFENDANT'S MOTION TO PROHIBIT CIVIL ARREST SHOULD BE DENIED

A.    *Defendant's Request for Injunctive Relief Fails on Jurisdictional Grounds*

While Defendant shies away from explicitly saying so, his motion clearly seeks injunctive relief from the Court. Indeed, Defendant seeks an order of the Court preventing DHS from arresting him following conclusion of this criminal case. *See, e.g., Injunction*, Black's Law Dictionary (11th ed. 2019) (injunction means a "court order commanding or preventing an action"). For multiple reasons, the requested injunction is not appropriate.

First, even if Defendant's requested relief was possible in this action, and it is not, this Court is not authorized to grant injunctive relief. As Chief Judge Burns stated recently in relation to this same issue, "Magistrate Judges are not authorized by law to issue injunctive relief." *Teczon-Marin v. Dembin*, 20-cv-1493-LAB, ECF No. 8 (S.D. Cal. August 10, 2020) (citing 28 U.S.C. § 636(b)(1)(A)).

Second, the Court has no jurisdiction to enjoin the actions of a non-party. "A federal court may issue an injunction if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim; it may not attempt to determine the rights of persons not before the court." *Zepeda v. United States Immigration Service*, 753 F.2d 719, 727 (9th Cir. 1985); *see Jones v. Donovan*, No. 19-55206, 2020 WL 4037567, at *1 (9th Cir. July 17, 2020) ("The district court did not abuse its discretion by denying Jones's motion for a permanent injunction because the district court lacked the authority to grant Jones's requested relief as it was related to non-parties."). DHS is not a party to this action; the Court therefore has no jurisdiction in this case to enjoin their potential post-judgment actions. The four district court cases Defendant cites illustrate the jurisdictional flaw in Defendant's motion. In each, DHS, or a component agency, was the named defendant in a civil lawsuit seeking injunctive relief.

2

Third, the ripeness doctrine, outlined previously, bars adjudication of Defendant's claim. This doctrine "prevents the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967). "A proper ripeness inquiry contains a constitutional and a prudential component." *Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d 1144, 1153 (9th Cir. 2017). With respect to the constitutional component, a movant must "show that he has sustained or is immediately in danger of sustaining some direct injury as a resulted of the challenged official conduct and the jury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotations omitted). Whether Defendant will be arrested in court by immigration authorities after his criminal case ends is contingent on a number of factors.

- One, Defendant must actually appear for trial. A high percentage of § 1325 defendants released on bond do not.
- Two, Defendant's case must terminate while he is in court, and, if convicted, the court must give him a time-served sentence. For example, if Defendant receives a custodial sentence, then he would go into the custody of the United States Marshal.
- Three, even if Defendant appears, and even if his case terminates while he is in court, and even if he does not receive a custodial sentence, immigration officials would have to be present in order to take Defendant into custody, and attempt to do so.

Under these circumstances, the issue is not fit for adjudication. *Texas v. United States*, 523 U.S. at 300; *see Clinton v. Acequia, Inc.*, 94 F.3d 568, 572 (9th Cir. 1996) ("In the absence of an immediate and certain injury to a party, a dispute has not 'matured sufficiently to warrant judicial intervention.'"). Defendant's "allegations of future injury are too speculative to be 'of sufficient immediacy and reality' to satisfy the constitutional requirement of ripeness." *Davis*, 785 F.3d at 1318 (citation omitted).

Further, even if there was a ripe case or controversy, the "prudential component" of the ripeness doctrine prohibits adjudicating Defendant's motion. "In evaluating the prudential aspects of ripeness, [the] analysis is guided by two overarching considerations:

'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Thomas*, 220 F.3d at 1141. The issues here are not fit for judicial decision—the prospective arresting agency is not a party to the action; and no arrest has occurred. Given these dynamics, the issue is not appropriate for adjudication at this time. *See id.* ("The record before us is remarkably thin and sketchy, consisting only of a few conclusory affidavits."); *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1132 (9th Cir. 1996) (stating that case "devoid of any factual context whatsoever" is not fit for review); *Am.-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 510–11 (9th Cir. 1991) ("This case has come to us upon a sketchy record and with many unknown facts. Given the procedural posture of the case, the facts understandably have not been well-developed. . . . In such situations, the Supreme Court has indicated that we ought not to exercise jurisdiction.").

Finally, even if all the contingencies Defendant imagines aligned, the Court would not have jurisdiction to enjoin any attempted immigration arrest. Indeed, Article III justiciability requires "ongoing controversies *between litigants*." *Deakins v. Monaghan*, 484 U.S. 193, 199 (1988) (emphasis added). Post-conviction and sentencing, this requirement would not be met. The controversy between the litigants—determining guilt and punishment in this criminal case—would be concluded. DHS is not a litigant in this action; nor are its immigration enforcement efforts in controversy. Accordingly, there would be no proper case or controversy for the court to address. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) ("If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so.").

Based on prior cases, the Government expects Defendant will petition to the Court's "supervisory powers." This similarly fails. No case stands for the principle that these supervisory powers permit the Court to issue an injunction over the actions of a non-party to the action. Nor is the Government aware of any case supporting the prospect that a court's "supervisory powers" permits the Court to act outside of an Article III case or controversy.

4

## B.    Defendant's Request for an Injunction Fails on the Merits

In any event, even if the Court reaches the merits of Defendant's claimed privilege against an immigration arrest, Defendant's claims fail. Congress gave the Executive Branch expansive authority to make immigration arrests. No common-law privilege against civil courthouses arrests limits this authority. Indeed, Defendant cites no historical case applying the privilege in the context here.[1]

### 1.    Immigration Arrest Authority

As outlined previously, "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). "This authority rests, in part, on . . . its inherent power as sovereign to control and conduct relations with foreign nations." *Id.* (citations omitted). Accordingly, "it has been universally recognized that Congress possesses authority over immigration policy as an incident of sovereignty." *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1076 (9th Cir. 1998). Exercising its plenary authority, Congress in the INA gave broad arrest authority to the Executive Branch in immigration affairs. *See*, e.g.*, 8 U.S.C. §§ 1182, 1225, 1226, 1231, 1357. Specifically, Congress provided that "[o]n a warrant issued by the Attorney General,[2] an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Congress also provided that "without [a] warrant," a federal officer may "arrest any alien in the United States, if he has reason to believe that

---

[1]    Notably, in response to the same claimed common-law privilege, a First Circuit Judge recently stated at oral argument that,

> It just beggars credulity to say that a principle can be long established and familiar when you can't even cite a single analogous case in which the privilege was applied in the manner in which you seek to have the district court apply it.

Audio Recording of Oral Argument at 22:10–22:30, *Ryan v. ICE*, Case No. 19-1838 (1st Cir. July 29, 2020) (remarks of First Circuit Judge Bruce M. Selya), *available at* http://media.ca1.uscourts.gov/files/audio/19-1838.mp3 (decision pending). This oral argument is from the appeal of one of the primary district court cases Petitioner relies on in his petition. *See Ryan v. ICE,* 382 F. Supp. 3d 142 (D. Mass. 2019).

[2]    Congress has since transferred immigration enforcement functions from the Attorney General to the Secretary of Homeland Security. *See* 6 U.S.C. § 251.

1    the alien so arrested is in the United States in violation of any [] law or regulation and is
2    likely to escape before a warrant can be obtained for his arrest." *Id.* § 1357(a)(2).

3         These statutes confer arrest authority that is generally plenary and unqualified. There
4    is no jurisdictional limitation on where these arrests can occur—aliens subject to
5    immigration enforcement may be arrested anywhere in the country. *See* 8 U.S.C. § 1226(a)
6    (providing for arrests "[o]n a warrant" without jurisdictional limitation), § 1357 (providing
7    for warrantless arrests without jurisdictional limitation); 8 C.F.R. § 287.5(c) (similar).
8    Aliens can even be arrested by immigration authorities after being ordered released on
9    bond by a criminal court. *See United States v. Vasquez-Benitez*, 919 F.3d 546, 552 (D.C.
10   Cir. 2019) ("Detention of a criminal defendant pending trial pursuant to the BRA and
11   detention of a removable alien pursuant to the INA are separate functions that serve
12   separate purposes and are performed by different authorities. The Supreme Court has
13   affirmed that civil detention is a constitutionally permissible part of the Congress's broad
14   power over immigration and the Executive's authority to execute that power.").

15        When Congress wanted to restrict immigration officers' powers, it did so
16   explicitly—e.g., by authorizing "access to private lands" within "twenty-five miles" of the
17   border, but limiting access to "dwellings" and restricting warrantless entry to "the premises
18   of a farm or other outdoor agricultural operation." *See* 8 U.S.C. § 1357(a)(3), (e). Likewise,
19   with respect to arrest authority, for aliens serving a term of imprisonment, DHS must wait
20   to effectuate an immigration arrest until after the period of imprisonment is complete. *Id.*
21   § 1226(c); *see id.* § 1231. These provisions show that Congress knew how to limit DHS's
22   arrest authority and made conscious choices about when, where, and how to do so.[3] And
23   Congress included no prohibition on courthouse arrests.

24

25

---

26   [3]    *See generally Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes
particular language in one section of a statute but omits it in another section of the same Act, it is generally
presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion. . . . Had
27   Congress intended to restrict § 1963(a)(1) to an interest in an enterprise, it presumably would have done
so expressly as it did in the immediately following subsection (a)(2)"; citations omitted).
28

On the contrary, Congress has explicitly contemplated that immigration arrests may—and will—occur at courthouses. For instance, in 2006, Congress provided that when "an enforcement action leading to a removal proceeding" takes places "at a courthouse (or in connection with that appearance of the alien at a courthouse)," then, for certain categories of aliens arrested, the Notice to Appear initiating removal proceedings must include a statement confirming compliance with the confidentiality requirements of 8 U.S.C. § 1367. *See* 8 U.S.C. § 1229(e)(1), (2).

### 2.   *Defendant's Claimed Privilege*

Despite this backdrop outlining DHS's expansive arrest authority, Defendant claims that a common-law privilege against civil courthouse arrests limits this authority and immunizes him from being arrested by immigration officials at the courthouse. Defendant is wrong. The claimed privilege prevented private parties from effectuating civil courthouse arrests on other private parties in an era where civil arrest was necessary to initiate a civil lawsuit. The privilege did not prevent acts of the sovereign or apply to criminal defendants. Moreover, it has been replaced by a privilege against service of process, one the Supreme Court has cautioned "should not be enlarged beyond the reason upon which it is founded[.]" *Lamb v. Schmitt*, 285 U.S. 222, 225 (1932). Defendant's requested application of this privilege does just that.

### 3.   *The Original Common-Law Privilege and its Limitations*

Many centuries ago, a civil plaintiff commenced a civil lawsuit by having the defendant arrested pursuant to a writ of *capias ad respondendum*. *See Duncan v. Darst*, 42 U.S. 301, 304-07 (1843) (discussing common law writ). The civil arrest gave the court personal jurisdiction over the defendant, who was held to answer the plaintiff's charges in court. *See* 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 281-83 (1768)[4] (describing use of writ). In this era, a privilege against civil arrest existed for certain persons going to, attending, and leaving courthouses. *See* 3 Blackstone, at 288-90. The

---

[4] Available at https://www.google.com/books/edition/Commentaries_on_the_Laws_of_England/laZFAAAAcAAJ?hl=en&gbpv=1&dq=Blackstone+commentaries+volume+3+1768&printsec=frontcover.

privilege did not belong to the person attending, but to the Court itself. *See Cameron v. Lightfoot*, 96 E.R. 701, 702 (K.B. 1778) ("But this privilege is not considered as the privilege of the person attending the Court, but of the Court which he attends."). Accordingly, it was "discretionary with the court to allow it or nor as [would] best advance the interests of justice." *Mountague v. Harrison*, 140 E.R. 753, 753 (K.B. 1857).

In addition to the privilege being discretionary, it was limited in other significant ways. For instance, the privilege did not apply to legal action undertaken by the sovereign. As English courts made clear, "certainly no privilege [was] good against the King." *Wheely v. Richam*, 92 E.R. 882, 882 (K.B. 1694); *see also Alder v. Puisy*, 89 E.R. 10, 10 n.1 ("[T]here is no privilege against the King's process."). Indeed, "the King may sue where he pleases." *Wheely*, 92 E.R. at 882. As an example, in the English system, attorneys had a privilege against courthouse arrest. *See Central Trust Co. v. Milwaukee Street Ry. Co.*, 74 F. 442, 443 (E.D. Wis. 1896) ("The ancient rule in England extended to practicing attorneys generally the privilege from arrest by the ordinary process of court, on the theory that they were 'always supposed to be there attending'") (quoting 3 Blackstone at 289). An attorney's common law privilege against civil arrest, however, did not extend to matters concerning the sovereign: "In [cases] in which the King alone is concerned, the Officer [of the Court] shall not have Privilege; for it would be unreasonable that the Courts should allow Protection to those who offend against the publick [sic] Peace of the Community and the King's Interest." 4 MATTHEW BACON, A NEW ABRIDGEMENT OF THE LAW 222 (4th ed. 1759) (citations omitted)[5]; *see also* EDWARD P. WEEKS, A TREATISE ON ATTORNEYS AND COUNSELLORS AT LAW § 107, at 200 (1878)[6] (stating general rule that attorneys are immune from arrest coming or going from court, but not against the sovereign: "In England, an attorney is not privileged when the action is wholly at the suit of the king, or if he be sued in exchequer as accountant to the king").

---

[5] Available at https://books.google.com/books/about/A_New_Abridgment_of_the_Law.html?id=Uxo2AQAAMAAJ.
[6] Available at https://catalog.hathitrust.org/Record/010490487.

Finally, criminal defendants were not privileged from civil courthouse arrests. As a mid-19th century Pennsylvania Court of Quarter Sessions stated:

> In England, there can be no longer any doubt on this subject. Repeated adjudications have settled, that the privilege from arrest, *eundo morando et redeundo* [going, remaining and returning], is confined to civil proceedings, and a defendant who has been in custody on a criminal charge of felony, and has been acquitted and discharged, is not privileged from arrest on his return home; and the court will not relieve him from such arrest, unless it appears that his apprehension on the criminal charge, was a contrivance by the plaintiff to get him into custody in the civil suit.

*Commonwealth v. Daniel*, 6 Penn. L.J. 330 (Qtr. Sess. Phila. Co. 1847) (collecting cases);[7] *see Anonymous*, 1 Dowl. 157-58 (1832)[8] (a defendant, when discharged from legal custody, has no privilege from arrest in returning home); *Goodwin v. Lordon*, 110 Eng. Rep. 1251, 1251-52 (1834) (same); *Jacob v. Jacobs*, 3 Dowl. 675, 676-77 (1835) (same).

### 4. *The Common-Law Privilege Replaced*

Private civil lawsuits are no longer initiated by civil arrests; personal service is all that is required. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) ("But now the *capias ad respondendum* has given way to personal service of summons or other form of notice . . . ."). Accordingly, by the 20th century, the privilege against civil arrest had transitioned into a narrow privilege against service of process. In *Stewart v. Ramsay*, 242 U.S. 128 (1916), the Supreme Court stated "that suitors, as well as witnesses, coming from another state or jurisdiction, are exempt from the service of civil process while in attendance upon court, and during a reasonable time in coming and going." *Stewart*, 242 U.S. at 129; *see, e.g., United States v. Hefti*, 879 F.2d 311, 316 (8th Cir. 1989) ("*Stewart* . . . makes plain that exemption from process is accorded only to non-residents not normally subject to suit in the jurisdiction."). This privilege gave immunity from service of process

---

[7] Available at https://www.google.com/books/edition/Pennsylvania_Law_Journal_Reports/vUiTAAAAIAAJ?hl=en&gbpv=1&dq=The+Pennsylvania+Law+Journal+volume+6+1847+Abner&pg=PA49&printsec=frontcover#spf=1593450172856.

[8] Alfred S. Dowling's Reports of Cases are available at https://catalog.hathitrust.org/Record/008595448 (full text of 9 volumes available at this link).

in a private civil suit, where a party entered a jurisdiction to attend a court proceeding.[9] This privilege is "founded not upon the convenience of the individuals, but of the court itself." *Schmitt*, 285 U.S. at 225. Specifically,

> the due administration of justice requires that a court shall not permit interference with the progress of a cause pending before it, by the service of process in other suits, which would prevent, or the fear of which might tend to discourage, the voluntary attendance of those whose presence is necessary or convenient to the judicial administration in the pending litigation.

*Id.* The *Schmitt* court cautioned that "the privilege should not be enlarged beyond the reason upon which it is founded[.]" *Id.* For instance, the privilege would not extend to circumstances where "service was made on one whose attendance was not voluntary, and hence had no tendency to interfere with judicial administration." *Id.* (*citing Netograph Mfg. Co. v. Scrugham*, 197 N.Y. 377, 90 N.E. 962, 962 (1910). In *Netograph*, New York's highest court held that a criminal defendant on bail—like Defendant—was not immune from civil service of process when appearing in criminal court. 197 N.Y. at 378. In such cases, the defendant is "constructively in the custody of the law," "cannot be said to be free to come at will," and therefore could not claim the privilege against service of process. *Id.* Likewise, in *Employers Mut. Liability Ins. Co. v. Hitchcock*, 158 F. Supp. 783 (E.D. Mo. 1958), a court found that a "person attending court upon a criminal indictment . . . is not immune from service of process in another suit either related or unrelated to it." *Id.* at 786. The Court stated:

> The reason for the immunity being the administration of justice by the court in the case in which immunity is sought, when applied to the facts herein, presents this question: What effect could the civil suit have upon the criminal proceedings in which the defendant was compelled to appear? The answer is, absolutely nothing.
>
> There is no voluntary appearance to be effected; there is no delay that could be caused; there is no added preparation incurred, for the issues in each case are based on substantially the same facts; there is no hardship, for apparently

---

[9]   *See Schmitt*, 285 U.S. at 225 (service on an Illinois resident when he was in the Northern District of Mississippi "in attendance on the court"); *Page Co. v. MacDonald*, 261 U.S. 446, 446-47 (1923) (service on a Canadian resident who was in Massachusetts "in attendance before a special master appointed by the superior court"); *Moylan v. AMF Overseas Corp.*, 354 F.2d 825, 829 (9th Cir. 1965) (service on nonresident witness who "came to Guam for the sole purpose of testifying").

the records to be relied upon in each case are within the district; there just
isn't rhyme nor reason why the immunity should be invoked.

*Id.* at 785. The Pennsylvania Supreme Court has also noted that "the great preponderance of authority is that the defendant in a criminal case is not privileged from arrest on civil process while attending court to answer a criminal charge"; while there were "a few contrary decisions in the lower courts," there were none in any "court of last resort, . . . to which [the Court] [had] been referred." *Wood v. Boyle*, 177 Pa. 620, 632, 35 A. 853 (1896).

> 5.    *Analysis*

As the above legal background makes clear, Defendant's attempt to claim the common-law privilege for himself is flawed in various ways. <u>First</u>, Defendant is a criminal defendant, required to attend his trial. Even if the privilege against civil arrest still existed, he could not claim it. *See Boyle*, 177 Pa. at 632; *Hitchcock*, 158 F. Supp. at 785. <u>Second</u>, the privilege does not apply as against the sovereign, which in immigration affairs is represented by the Department of Homeland Security. *See Fiallo*, 430 U.S. at 792, ("Our cases 'have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'") (citation omitted). <u>Third</u>, even if the privilege was still active when Congress enacted the INA in 1952, the INA displaced it. Indeed, the INA's comprehensive statutory scheme provided no limitations on courthouses arrests; on the contrary, DHS may arrest all aliens except aliens who are in state criminal custody serving a criminal sentence. *See* 8 U.S.C. § 1231(a)(4). Nor can it be said that the expansive privilege claimed by Defendant—prohibiting the sovereign from making arrests—was "so well established" at the time the INA was codified that it can be assumed Congress considered it and silently incorporated it. *See, e.g.*, *United States v. Craft*, 535 U.S. 274, 288 (2002) (to conclude that Congress meant to incorporate a common-law rule, that rule must have been "so well established" that it can be "assume[d]" Congress considered it). <u>Fourth</u>, as a matter of discretion, the facts here would not warrant extension of the privilege. As Defendant concedes, if any arrest were to occur in this case, it would be at the conclusion of his

1   criminal proceeding.[10] Therefore, his arrest would have no effect on the criminal

2   proceeding. *See Hitchcock*, 158 F. Supp. at 785. Moreover, as a prudential matter,

3   conducting arrests inside the courthouse pose less risks than arrests outside. The Court

4   should reject Defendant's request for an injunction enjoining his arrest.

5              C.   *Defendant's Related Sixth Amendment and Due Process Claims Fail*

6              Defendant's attempt to make this a Sixth Amendment/Due Process issue similarly

7   fails. First, as required for standing,[11] in addition to DHS not being a party to this action,

8   Defendant cannot show any injury in fact, i.e., that he suffered "an invasion of a legally

9   protected interest" that is "concrete and particularized and actual or imminent, not

10  conjectural or hypothetical." *Spokeo, Inc.*, 136 S. Ct. at 1547. Defendant's motion contains

11  no facts supporting his Sixth Amendment assertions. *See* Crim. L.R. 47.1(g) (stating that a

12  "motion requiring a predicate factual finding must be supported by declarations"). For

13  instance, he claims witnesses are chilled from appearing in court, but he does not identify

14  who they are, what material evidence they have in this illegal entry case, or whether the

15  witnesses are even illegally present in the United States. Likewise, Defendant fails to

16  provide any evidence—because he cannot—showing that any witnesses in § 1325 cases

17  have been arrested in court. Defendant has not suffered an actual or imminent injury.[12]

18

---

19  [10]      Defendant cites several recent district court cases finding the common-law privilege applicable to

20  state courthouse arrests. Those are non-precedential decisions subject to further litigation. *See, e.g.,* Panel
    Poised to Overturn Injunction on ICE Arrests at Courthouses, https://www.courthousenews.com/panel-

21  poised-to-overturn-injunction-on-courthouse-ice-arrests/ (July 29, 2020). Additionally, those cases were
    civil class actions filed against the arresting agency; involve state courthouses, invoking federalism

22  principles not present here; and involve far more reaching fact patterns than is present here. *See, e.g., New
    York v. ICE*, 2020 WL 3067715 (S.D.N.Y. June 10, 2020) (the plaintiffs had offered "substantial evidence"

23  that various non-citizen litigants "feared any kind of participation in the legal system, including reporting
    domestic violence, litigating family court actions, and pursuing meritorious defenses in criminal cases")

24  (citations omitted).

    [11]      Standing requires a party to show: (1) that he suffered an injury in fact; (2) the injury was fairly

25  traceable to the challenged conduct of the opposing party; and (3) the injury was likely to be redressed by
    a favorable judicial decision. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

26  [12]      Defendant also claims that officers "may stalk him down corridors, watch him from the back of
    the courtroom, and arrest him for a civil deportation proceeding at their whimsy." ECF No. 32 at 7. But

27  he provides no evidence that he has been "stalked" in the courthouse or that anyone in this court is arrested
    at the "whimsy" of an immigration officer. Moreover, Defendant fails to articulate how any subjective

28  apprehension on his part of coming to court implicates his right to present a defense. For example, like

12

II

## DEFENDANT'S MOTION TO DISMISS SHOULD BE DENIED

A.   *Statutory Background*

In the Immigration Act of 1917, Congress passed legislation requiring deportation of aliens who entered the United States "at any time or place other than as designated by immigration officials, . . . or who enter[ed] without inspection." Immigration Act of 1917, Pub. L. No. 64-301, § 19, 39 Stat. 874, 889. To enhance the deterrent value of this statute, the 70th Congress made unlawful entry a misdemeanor offense in 1929. *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 2.[13] As the House Committee Report stated, "it is believed that if the class of aliens who are endeavoring to enter the United States surreptitiously become aware that when detected they will be fined and imprisoned, as well as deported, the number who attempt to smuggle themselves or have themselves smuggled into the United States will be materially lessened." H.R. Rep. No. 2418 at 7. This Act did not include an attempted entry crime – the crime Defendant is charged with.

Over twenty years later, in 1952, the 82nd Congress passed the Immigration and Nationality Act ("INA"), an act designed to "revise the laws relating to immigration, naturalization, and nationality" in the United States. *See* Pub. L. No. 82-414, 66 Stat. 163 (introduction). In this renewed and comprehensive legislation (codified at 8 U.S.C. § 1 et seq.), Congress included a misdemeanor and (for the first time) felony provision for illegal entry. *Id.* at § 275, 66 Stat. 229 (8 U.S.C. § 1325).[14] Again, there was no provision for attempted entry – the crime Defendant is charged with.

---

many defendants, at the conclusion of his trial Defendant may go into the custody of the U.S. Marshal. That prospect cannot mean Defendant's Sixth Amendment rights are infringed.

[13]      The text stated, "Any alien who hereafter enters the United States at any time or place other than as designated by immigration officials or eludes examination or inspection by immigration officials, or obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall be guilty of a misdemeanor."

[14]      The text stated, "Any alien who (1) enters the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers, or (3) obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall, for the first commission of any such offenses, be guilty of a misdemeanor . . . and for a subsequent commission of any such offenses shall be guilty of a felony . . . ."

13

Nearly 40 years later, in the Immigration Act of 1990, the 101st Congress amended 8 U.S.C. § 1325 to add attempted entry for the first time to the list of crimes codified in Section 1325. *See* Pub. L. No. 101-649, § 543(b)(2), 104 Stat. 5059. The Immigration Act of 1990 was sponsored by Senator Edward Kennedy and easily passed by Congress.[15]

B.    *Defendant Contests the Constitutionality of an Uncharged Crime*

Defendant contends the illegal entry law is unconstitutional because of alleged racial animus when illegal entry was first criminalized in the 1920's. For various reasons set forth below, this claim fails. But there is a preliminary point which is fatal to Defendant's motion. Defendant is not charged with any law enacted in the 1920's; Defendant is charged with *attempted* entry under 8 U.S.C. § 1325(a)(1). *See* ECF No. 1. As indicated above, attempted entry first became a crime just 30 years ago, in the Immigration Act of 1990. Defendant offers no reason to believe that the attempted entry crime violates the constitution.[16] He does not even address the issue. This is dispositive of Defendant's motion.

C.    *Defendant's Claim is Not Justiciable*

The same fact also raises an insurmountable justiciability issue. Pursuant to Article III of the U.S. Constitution, federal courts can only adjudicate live cases or controversies. The court's "role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution." *Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134 (9th Cir. 2000) (en banc). "Ripeness is an Article III doctrine designed to ensure that courts adjudicate live cases or controversies and do not issue advisory opinions [or] declare rights in hypothetical cases." *Bishop Paiute Tribe v. Inyo*

---

[15]    *See, e.g.,*
https://www.senate.gov/legislative/LIS/roll_call_lists/roll_call_vote_cfm.cfm?congress=101&session=2&vote=00323 (89 senators voted in favor); https://www.congress.gov/bill/101st-congress/senate-bill/358.

[16]    At best, Defendant may seek to weld the congressional decisions made in the Immigration Act of 1990 to the Act of 1929. That sort of attenuated constitutional inquiry—particularly where the actual charged crime was not present in the original bill—is not countenanced by any authority.

1    *Cty.*, 863 F.3d 1144, 1153 (9th Cir. 2017). Here, Defendant invites the Court to adjudicate
2    the constitutionality of a crime which is not even charged. That would be a quintessential
3    advisory opinion. The Court should decline to render one.

4           D.    *Defendant Fails to Establish an Equal Protection Violation*

5         In the event the Court reaches Defendant's equal protection claim, the claim should
6    be rejected. Immigration laws are subject to a highly deferential standard of review. With
7    the proper standard in view—requiring Defendant, for instance, to negate "every
8    conceivable basis which might support" the illegal-entry law—Defendant's claims fail.

9           1.    *Congress's Immigration Laws Are Subject to Deferential, Rational-*
10                  *Basis Review*

11        For more than a century, "it has been universally recognized that Congress possesses
12   authority over immigration policy as an incident of sovereignty." *United States v.*
13   *Hernandez-Guerrero*, 147 F.3d 1075, 1076 (9th Cir. 1998). The Supreme Court has called
14   Congress's inherent immigration power "plenary"; the Ninth Circuit has deemed it
15   "sweeping." *Id.* (citing *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972) and *Catholic*
16   *Social Servs. v. Reno*, 134 F.3d 921, 927 (9th Cir. 1998)). "Whatever the label, all agree
17   that 'over no conceivable subject is the legislative power of Congress more complete than
18   it is over' the admission of aliens." *Id.* (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)).
19   Given Congress's expansive authority over immigration affairs, its actions in this area are
20   "largely immune from judicial control," *Fiallo*, 430 U.S. at 792, subject only to "narrow
21   judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 n.21 (1976). Indeed, "the
22   reasons that preclude judicial review of political questions also dictate a narrow standard
23   of review of decisions made by the Congress or the President in the area of immigration
24   and naturalization." *Fiallo*, 430 U.S. at 796 (citing *Mathews v. Diaz*, 426 U.S. 67, 82
25   (1976); *see also id.* at 792 ("[I]t is important to underscore the limited scope of judicial
26   inquiry into immigration legislation."); *Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018)
27   ("deferential standard of review" applies in immigration context).

28

According to Supreme Court jurisprudence, this "deferential standard of review" is limited to considering whether the law is "facially legitimate and bona fide." *Mandel*, 408 U.S. at 769. In *Mandel*, the Attorney General denied admission to a Belgian journalist who had been invited to speak at a conference at Stanford. 408 U.S., at 756-57. The professors who wished to hear Mandel challenged that decision under the First Amendment, and the Supreme Court acknowledged that their constitutional "right to receive information" was implicated. *Id.* at 764-65. But the Court limited its review to whether the Executive gave a "facially legitimate and bona fide" reason for its action. *Id.* at 769. Given the authority of the political branches over admission, the Court held that "when the Executive exercises this [delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification" against the asserted constitutional interests of U.S. citizens. *Id.* at 770.

The Supreme Court later confirmed that *Mandel*'s deferential test applies equally to congressional decisionmaking. In *Fiallo*, decided in 1977, the Supreme Court considered a congressional law giving immigration preferences to mothers of illegitimate children. 430 U.S. at 795. In other words, the state created a "categorical" entry classification that discriminated on the basis of sex and legitimacy. In reviewing an equal protection challenge alleging discrimination against fathers, the Supreme Court found "no reason to review the broad congressional policy choice at issue . . . under a more exacting standard than was applied in *Kleindienst v. Mandel*, a First Amendment case." *Id.* at 795. In rejecting the constitutional challenge, the Court remarked that the issue was one "solely for the responsibility of the Congress and wholly outside the power of this Court to control." *Id.* at 799 (quotation omitted). The Court also made clear that it was "not the judicial role in [immigration cases] to probe and test the justifications for the legislative decision." *Id.*; *see also Hawaii*, 138 S. Ct. at 2419 (citing *Fiallo*'s principle that the judiciary is not to probe the justifications underlying Congress's immigration decisions).

In the Ninth Circuit, *Mandel/Fiallo*'s "facially legitimate and bona fide" test is "equivalent to the rational basis test typically applied in equal protection cases." *Ablang v.*

*Reno*, 52 F.3d 801, 804 (9th Cir. 1995) (applying rational-basis review and finding the Government "put forth facially bona fide and legitimate reasons" for requiring proof of paternity within a certain time limitation); *Dent v. Sessions*, 900 F.3d 1075, 1081 (9th Cir. 2018) (stating that in immigration affairs, outside of citizenship claims, "[w]e have applied *Fiallo*'s standard and looked for only a 'facially legitimate and bona fide reason' to support a statutory distinction"); *Hernandez-Mancilla v. Holder*, 633 F.3d 1182, 1185 (9th Cir. 2011) ("We review equal protection challenges to federal immigration laws under the rational basis standard . . . ."); *Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1049 (9th Cir. 2017) (en banc) (for equal protection claims, "ordinary rational basis review is the appropriate standard in the immigration context").[17]

Defendant makes a passing remark in a footnote that "Courts apply strict scrutiny to laws that are 'motivated by a racial purpose of object.'" ECF No. 32 at 5 n.3 (citing *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999)). However, *Hunt* involved claims of racial gerrymandering, not immigration law, and has no bearing on the proper level of scrutiny here. *Contrast Hunt*, 526 U.S. at 1548-49 ("[o]ur decisions have established that all laws that classify citizens on the basis of race, . . . are constitutionally suspect and must be strictly scrutinized"), *with Fiallo*, 430 U.S. at 792 ("[I]n the exercise of its broad power over immigration and naturalization, Congress regularly makes rules that would be unacceptable if applied to citizens.") (quotation omitted).[18]

---

[17] In a concurring opinion in *Ledezma-Cosino*, three judges presented their view, citing *Mandel/Fiallo*, that the government's burden in the immigration context is "even lighter than rational basis: We approve immigration laws that are facially legitimate without probing or testing possible justifications." *Ledezma-Cosino*, 857 F.3d at 1050 (Kozinski, J., concurring). And in *Hawaii*, the Supreme Court stated that "[a] conventional application of *Mandel*, asking only whether the policy is facially legitimate and bona fide, would put an end to our review." 138 S. Ct. at 2420. Nonetheless, at the Government's suggestion, the Court went further to apply rational basis review to the immigration policy at issue. In any event, regardless of the precise standard of review, it is no more than rational basis.

[18] In any event, given Congress' plenary authority over immigration, the illegal entry law would satisfy even strict scrutiny, i.e., legislation "narrowly tailored to achieve a compelling interest." *Miller v. Johnson*, 515 U.S. 900, 920 (1995). "It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *United States v. Cortez-Rocha*, 394 F.3d 1115, 1123 (9th Cir. 2005) (citing *United States v. Ramsey*, 431 U.S. 606, 616 (1977)); *see also United States v. Flores-Montano*, 541 U.S. 149, 152 (2004) ("The Government's interest in preventing the entry of unwanted persons . . . is at its zenith at the international border."). Section 1325 achieves that interest in the most possible tailored way.

1    Based on arguments in other cases, the United States anticipates that the defense will
2  argue that Section 1325 is not subject to rational-basis review because it is a criminal law,
3  not an immigration law. That is a distinction without a difference. Indeed, the Ninth Circuit
4  has explicitly found that Section 1326—a criminal law—is "well within the ambit of
5  Congress's sweeping power over immigration matters." *United States v. Hernandez-*
6  *Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998) ("In fact, it is plain that § 1326 is a
7  necessary piece of the immigration-regulation framework; without the threat of criminal
8  prosecution that it provides, Congress's immigration-regulation authority would be fatally
9  undermined—all bark and no bite."). And in *United States v. Ruiz-Chairez*, 493 F.3d 1089
10 (9th Cir. 2007), the Ninth Circuit applied rational basis review to the illegal reentry
11 sentencing Guideline—a criminal sentencing provision—and found it passed that test. *See*
12 *id.* at 1091 ("Because the illegal reentry statute is a proper exercise of Congress's
13 immigration power, and because § 2L1.2 properly implements this congressional directive,
14 we must conclude that the 16 level enhancement in §2L1.2 serves a legitimate government
15 interest and has a rational basis.") (citations omitted).

16            2.    *The Rational-Basis Test is Satisfied*

17    The rational-basis test is an "exceedingly low level of judicial scrutiny." *Aleman v.*
18 *Glickman*, 217 F.3d 1191, 1201 (9th Cir. 2000). The test is met where "there is a rational
19 relationship between the disparity of treatment and some legitimate governmental
20 purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). "[T]he government 'has no obligation
21 to produce evidence to sustain the rationality of a statutory classification'; '[t]he burden is
22 on the one attacking the legislative arrangement to negative every conceivable basis which
23 might support it.'" *Glickman*, 217 F.3d at 1201 (quoting *Heller*, 509 U.S. at 320).

24    "The rational basis standard . . . does not require that the [governmental entity]
25 choose the best means of advancing its goals." *Vermouth v. Corrothers*, 827 F.2d 599, 603
26 (9th Cir. 1987). Instead, all that is needed is some "rational connection" between the rule
27 and the governmental interest, regardless of whether that rule is an "exact fit" for the
28 interest at issue. *Mauro v. Arpaio*, 188 F.3d 1054, 1059–60 (9th Cir. 1999). Moreover,

rational-basis review allows for decisions "based on rational speculation unsupported by evidence or empirical data." *United States v. Navarro*, 800 F.3d 1104, 1114 (9th Cir. 2015).

The United States has a legitimate interest in deterring illegal entry. And there is a clear rational relationship between that interest and Section 1325, which criminalizes illegal entry. *See, e.g., Hernandez-Guerrero*, 147 F.3d at 1078 ("In fact, it is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite."). Defendant's own exhibits outline the goal of deterrence Congress had in mind with the illegal entry law:

> Under the present law all that can be done to [an alien who enters illegally] is to deport him. It is believed that if the class of aliens who are endeavoring to enter the United States surreptitiously become aware that when detected they will be fined and imprisoned, as well as deported, the number who attempt to smuggle themselves or have themselves smuggled into the United States will be materially lessened.

Defense Exhibit I, p. 170-71; *see also* H.R. Rep. No. 2418 at 7.

As the Supreme Court recently stated, "it should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Hawaii*, 138 S. Ct. at 2420. "On the few occasions where we have done so, a common thread has been that the laws at issue lack any purpose other than a 'bare . . . desire to harm a politically unpopular group.'" *Id.* (*citing Dep't of Ag. v. Moreno*, 413 U.S. 528, 534 (1973)). That is clearly not the case here with Section 1325 – a law seeking to deter all aliens from illegally entering the country.

Defendant cites the higher percentage of illegal-entry prosecutions of Mexican and Latin American defendants as proof of disparate impact and discrimination. It is not. Those numbers are a product of geography, not discrimination. For instance, in FY19, Border Patrol had 859,501 total encounters. *See* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics. Ninety-nine percent of these encounters (851,508) occurred on the southwest border. *See* https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019.

These numbers are neither surprising nor illuminating of Congress's motives in the

1920's. Indeed, if it were enough to state an equal protection claim that a broad-scale immigration law disparately impacted individuals of any particular ethnicity—to include those from a country sharing 1,954 miles of border with the United States—virtually any such law could be challenged on that ground. *See DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915-16 (2020) (plurality opinion) (finding disparate impact of DACA rescission on Latinos from Mexico—totaling 78% of DACA recipients—did not establish a plausible equal protection claim; "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds") (citation omitted);[19] *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) ("When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern.").

### 3.   *Arlington Heights*

Defendant relies almost exclusively on *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). But *Arlington Heights* is inapplicable here.[20] Indeed, Defendant fails to cite any case finding the rubric of *Arlington Heights* applicable to immigration laws passed by Congress. For good reason: the expansive *Arlington Heights* inquiry is antithetical to the longstanding principle that, with regard to congressional immigration policy, it is "not the judicial role . . . to probe and test the justifications for the legislative decision." *Fiallo*, 430 U.S. at 799. There is no probe more exacting than *Arlington Heights*, which invites inquiry into "circumstantial and direct evidence of intent," the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," and the "legislative or administrative

---

[19]     For this same reason, Defendant's attempt to show disparate impact under *Arlington Heights* fails. *See* ECF No. 32 at 20-21.

[20]     *Arlington Heights* involved a rezoning request to accommodate the placement of low-income housing, "which would probably be racially integrated." *Id.* at 258. In other words, it is far from the circumstance here involving the plenary power of Congress over immigration affairs.

history." 429 U.S. at 267-68. This does not comport with the plenary power given to Congress over immigration policy and the narrow judicial review over such policymaking.

Separately, Defendant cannot escape the reality that the "governing statutory framework" of United States' immigration law comes from 1952, when Congress replaced prior disparate statutes with the comprehensive INA. *See* Pub. L. No. 82-414, 66 Stat. 163 (codified as amended at 8 U.S.C. § 1 et seq.); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 756 (9th Cir. 2018). Nor can he escape the fact that the crime he is charged with—attempted entry—was not even a crime until 1990. Or that 8 U.S.C. § 1325 has been updated or modified several additional times by Congress—including in 1986, 1991, and 1996. Defendant's motion waves away this lengthy congressional record, claiming "later reenactments do not cleanse the law of its original taint." ECF No. 32 at 19.

Under Defendant's view, the taint of prior discriminatory intent forever prevents the criminalization of illegal entry. This makes little sense. Whether intentional discrimination existed in 1929 legislation—a point contested below—is a question about the motives of the 1929 legislature. Legislative intent is not an artifact that "carr[ies] over" from one law to the next; it must be decided anew with each successive enactment. *See Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality) (inquiring "whether a discriminatory intent has been proved" as to the particular enactment at issue, because "past discrimination cannot . . . condemn governmental action that is not itself unlawful"); *cf. Palmer v. Thompson*, 403 U.S. 217, 225 (1971) (contemplating that a law invalidated because of improper motive might "be valid" if the legislature "repassed it for different reasons").

The cases Defendant relies on for his "forever tainted" argument do not support it. In *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), the Supreme Court held that the Sixth Amendment requires that a jury find a criminal defendant guilty by a unanimous verdict. That result flowed simply from a historical and textual analysis of the Sixth Amendment, e.g., that a "trial by an impartial jury" "unmistakabl[y]" required a jury to "reach a unanimous verdict in order to convict." *Id.* at 1395. The Court did not hold that the origins of the state laws at issue were the basis for invalidating those state laws. On the contrary,

the majority, even while commenting on the racist origins, explicitly stated that "the dissent is right about one thing—a jurisdiction adopting a nonunanimous jury rule even for benign reasons would still violate the Sixth Amendment." *Id.* at 1401 n.44; *see id.* at 1426 (Alito, J., dissenting) ("If Louisiana and Oregon originally adopted their laws allowing non-unanimous verdicts for these reasons, that is deplorable, but what does that have to do with the broad constitutional question before us? The answer is: nothing."). Defendant's characterization of *Ramos* is that the Court's discussion of the racial underpinnings of the state law drove the outcome. Instead, as the majority acknowledged, it was entirely superfluous. In any event, *Ramos* does not apply here because it does not involve immigration law and the concomitant deferential standard of review.

*Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020), is similarly irrelevant. There, the Supreme Court considered whether application of a "no-aid" provision in Montana's constitution to bar religious schools from participating in a state scholarship program violated the Free Exercise Clause of the First Amendment. *Id.* at 2254. The answer was yes, because the provision "plainly exclude[d] schools from government aid solely because of religious status." *Id.* at 2255. The provision was not found unconstitutional because of any "checkered tradition," as Defendant suggests. ECF No. 42 at 13. That phrase appears briefly in the opinion in response to the argument that a tradition arose in the late-19th century against state support for religious schools. *Espinoza*, 140 S. Ct. at 2258. The Court rejected that movement as illuminating the historical understanding of the Free Exercise Clause. *Id.* at 2259 ("The no-aid provisions of the 19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause."). In other words, neither *Ramos* nor *Espinoza* stands for the proposition Defendant claims— that "not only do courts examine the racial motivations of a law at the time of its passage, later reenactments do not cleanse the law of its original taint." ECF No. 32 at 19.

As a final example of Defendant's erroneous taint argument, several courts have recognized that, when a State reenacts a voting provision that was intentionally discriminatory at its origin, the ultimate focus in subsequent litigation is the intent of the

reenacting legislature, not the original one. *See Hayden v. Patterson*, 594 F.3d 150, 166-167 (2d Cir. 2010) (addressing felon-disenfranchisement law); *Johnson v. Governor*, 405 F.3d 1214, 1223-1224 (11th Cir.) (en banc) (same); *Cotton v. Fordice*, 157 F.3d 388, 391-392 & n.7 (5th Cir. 1998) (same); *Chen v. City of Houston*, 206 F.3d 502, 520-521 (5th Cir. 2000) (addressing racial-gerrymandering claim). Those courts also have rejected the proposition that prior intent "remains legally operative" unless and until some affirmative contrary showing is made. *Johnson*, 405 F.3d at 1223; *see Hayden*, 594 F.3d at 166-167; *accord Cotton*, 157 F.3d at 392 (affirming that plaintiff was required to show that the "current version" of the law was "adopted out of a desire to discriminate").

In any event, even assuming Defendant's "forever tainted" position is permissible, and even assuming the Court may examine the constitutionality of legislation that does not contain the crime defendant is charged with, and even assuming *Arlington Heights* applies to probe the justifications of Congress's immigration actions, Defendant's claim still fails. To begin, Defendant fails to show a cognizable disparate impact. As outlined above, the statistics Defendant cites for disparate impact are a feature of Mexico's proximity to the United States – not discrimination. This, alone, is sufficient to reject Defendant's *Arlington Heights* analysis. *See, e.g.,* ECF No. 32 at 10 (Defendant admitting *Arlington* requires establishing a law "disparately impacts a particular group"); *Regents*, 140 S. Ct. at 1915-16 ("because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds").

Moreover, Defendant's perspective that the 1920's immigration laws, leading to the 1929 illegal entry law, were premised on racial animus towards Mexicans is considerably undercut by the fact that people born "in the republic of Mexico" were not subject to the quotas established by the Immigration Act of 1924. On the contrary, an immigrant born in "the Republic of Mexico" was defined as a non-quota immigrant on par with those born in Canada and several other places. *See* Pub. L. No. 68-139, § 4, 43 Stat. 155. For some—

23

1   Asia, for instance—the quota system completely excluded immigration. *See*
2   https://history.state.gov/milestones/1921-1936/immigration-act. These facts do not
3   comport with Defendant's view that Congress was developing legislation with the intent
4   and purpose of discriminating against persons from Mexico. Relatedly, "no [Supreme
5   Court] case . . . has held that a legislative act may violate equal protection solely because
6   of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224
7   (1971). Indeed, the Supreme Court, in *United States v. O'Brien*, 391 U.S. 367, 383 (1968),
8   cautioned of "the hazards of declaring a law unconstitutional because of the motivations of
9   its sponsors. First, it is extremely difficult for a court to ascertain the motivation, or
10  collection of different motivations, that lie behind a legislative enactment," *Palmer*, 403
11  U.S. at 224 (citing *O'Brien*, 391 U.S. at 383, 384), "that is [otherwise], under well-settled
12  criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen
13  said about it," *O'Brien*, 391 U.S. at 384. "What motivates one legislator to make a speech
14  about a statute is not necessarily what motivates scores of others to enact it, and the stakes
15  are sufficiently high for [courts] to eschew guesswork." *Id.*

16       At the conclusion of the *Arlington Heights* analysis Defendant claims the United
17  States would have to show that the contested law would have passed "even had the
18  impermissible purpose not been considered." ECF No. 32 at 11 (citing *Arlington Heights*).
19  There is no need to reach this point. And in any event, Congress *did* pass a new illegal
20  entry law in 1952 (and a new attempted entry law in 1990), and Defendant does not suggest
21  any discriminatory purpose with those pieces of legislation.

22  Finally, there is no need for an evidentiary hearing. Defendant's entire claim rests on
23  *Arlington Heights*. But his claim fails for many reasons besides *Arlington Heights*. There
24  is therefore no reason to hold an evidentiary hearing. *See, e.g., United States v. Irwin*, 612
25  F.2d 1182, 1187 (1980) (evidentiary hearing not required where the material provided to
26       the court "show as a matter of law that [the defendant] was not entitled to relief").

27  //
28  //

III

DEFENDANT'S REQUEST FOR A STAY SHOULD BE DENIED

The Court should not issue a stay. Defendant bears the burden of justifying one. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Four factors govern this analysis: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably harmed absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). None of these factors favor a stay. As outlined above, and beginning with the jurisdictional flaws, Defendant has not established likelihood of success on the merits. Moreover, Defendant will not be irreparably harmed absent a stay. As Chief Judge Burns found while denying a writ of mandamus involving this same issue, "if [Defendant] is taken into [immigration] custody, he will be accorded due process." 20-CV-1493-LAB, ECF No. 8 at 3. For his part, Defendant claims irreparable harm because "he will [be] forced to prepare with [sic] trial believing that his civil immigration arrest is likely to take place at the courthouse." ECF No. 32 at 23. It is not clear what that means. Or how it amounts to irreparable injury. With respect to the public interest, Defendant states that proceeding to trial "may impact which members of the public wish to be present for court." *Id*. It is not clear what this means either. What is clear is that this case has been pending since January 2020, and, irrespective of whether the Speedy Trial Act applies, the public has a "strong interest in the timely administration of justice." *United States v. Tanh Huu Lam*, 251 F.3d 852, 861 n.11 (9th Cir. 2001).[21]

//

//

---

[21]   Defendant says he may file an interlocutory appeal. But there is no basis for that. *See United States v. Samueli*, 582 F.3d 988, 992 (9th Cir. 2009) (an interlocutory appeal is available only where it affects "a right not to be tried"). Nor is mandamus relief available. *See, e.g.*, *In re Ozenne*, 841 F.3d 810, 815 (9th Cir. 2016) (among other things, "the party seeking issues of the writ must have no other adequate means to attain the relief he desires").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

Defendant's motions should be denied.

DATED:  August 19, 2020                    Respectfully submitted,

Robert S. Brewer, Jr.
United States Attorney

*/s/ Paul E. Benjamin*
PAUL E. BENJAMIN
Assistant United States Attorney

26